FILED-USBC, FLS-WPB
'26 NOV 12 AM11:18
AM

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

IN RE:

LARRY EDWARD FISHER,

Debtor.
______________________________________/

Case No. 26-18759-MAM
Chapter 7
Judge Mindy A. Mora

Adv. Proc. No. __________________

LARRY EDWARD FISHER,
Plaintiff,

v.

HOMETAP INVESTMENT PARTNERS II, L.P.;
HOMETAP HEI FUND II SPV I;
HOMETAP EQUITY PARTNERS, LLC; and
HOMETAP HOMEOWNERSHIP SOLUTIONS, LLC,
Defendants.
______________________________________/

# COMPLAINT FOR DECLARATORY RELIEF REGARDING BANKRUPTCY-DEFAULT CLAUSE, SECURED OBLIGATIONS, AND ENFORCEMENT RIGHTS

Plaintiff Larry Edward Fisher ("Fisher"), appearing pro se, alleges as follows:

## I. NATURE OF THE ACTION

1. This adversary proceeding concerns Hometap transaction FL999199 and present rights asserted against Fisher's principal residence under an Option Purchase Agreement ("OPA"), a recorded Mortgage and Security Agreement ("Mortgage"), a recorded Memorandum of Option Purchase Agreement ("Memorandum"), and a recorded UCC-1 financing statement.

2. The dispute is not based on a single isolated email or phrase. Fisher attaches the communication records relevant to the disputes pleaded here in Exhibits B, C, D, E, H, N, and Q. The source email exhibits and printouts are reproduced as supplied, with original message text, signature blocks, quoted-message history, attachments, and source-page identifiers retained as they appear. Fisher asks the Court to read the communications as a whole and determine the parties' rights from the documents, chronology, and applicable law, rather than either side's characterization alone.

3. Fisher seeks declarations concerning: (a) the legal effect of OPA section 7.1(e), which treats bankruptcy-related events as an Event of Default; (b) what obligations the Mortgage actually secures and when any monetary obligation becomes payable; (c) which Hometap entity presently owns or may enforce the relevant rights and may issue a release; and (d) whether the PACE and Velocity matters satisfy the contractual default provisions and notice-and-cure requirements Hometap invoked.

4. Fisher does not seek money damages, punitive relief, a fraud judgment, a Florida licensing determination, or adjudication of Velocity Investments, LLC's independent rights in this complaint. Those matters are not necessary to the narrow declarations requested here.

## II. PARTIES, PROPERTY, AND ASSERTED ROLES

5. Fisher is the Chapter 7 debtor in In re Larry Edward Fisher, Case No. 26-18759-MAM, pending in this Court. He owns and resides at the Florida property identified in the recorded Mortgage (the "Property").

6. Hometap Investment Partners II, L.P. ("Investment Partners II") is the counterparty identified in Fisher's 2021 OPA and the mortgagee/secured party identified in the 2021 transaction documents.

7. Hometap HEI Fund II SPV I ("Fund II SPV I") is a Delaware statutory trust identified as the assignee in a recorded 2024 Assignment of Mortgage. The assignment identifies Fund II SPV I care of Wilmington Savings Fund Society, FSB, as trustee. Fund II SPV I later appeared in Fisher's bankruptcy through counsel as a creditor "by and through its servicer, Hometap Equity Partners, LLC." (Exs. F, O.)

8. Hometap Equity Partners, LLC ("Equity Partners") appears in the closing and later servicing records and is the servicer identified in the July 15, 2026 bankruptcy appearance.

Hometap Homeownership Solutions, LLC ("Homeownership Solutions") was identified by Hometap as the new servicer of Fisher's account effective August 3, 2026. (Exs. F, H.)

9. The different entity descriptions do not, by themselves, establish a defect in ownership or servicing authority. They create a concrete need to determine which defendant owns, services, calculates, enforces, and has authority to release the rights asserted under FL999199.

## III. JURISDICTION, PROCEDURAL BASIS, STANDING, AND CONSENT

10. This proceeding relates to Fisher's Chapter 7 case, In re Larry Edward Fisher, Case No. 26-18759-MAM, pending in the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division. Jurisdiction is invoked under 28 U.S.C. §§ 1334 and 157.

11. Count I arises under title 11 because it asks the Court to determine the effect of Fisher's bankruptcy filing, rejection rules if the OPA is executory, discharge-related consequences, and bankruptcy-triggered contractual treatment. Counts II and III are part of the same actual controversy and seek determination of the extent of Hometap's asserted lien or other property interest and related declaratory relief. Fed. R. Bankr. P. 7001(b), (i).

12. On October 19, 2026, this Court entered Docket Entry 33 granting Fisher's motion to require abandonment of the estate's interest in scheduled prepetition affirmative monetary causes of action against Hometap arising from or relating to FL999199. Fisher does not rely on that order as avoidance of any consensual lien or as an adjudication of the merits of this complaint. (Ex. I.)

13. Fisher claimed the Property exempt as his Florida homestead on Schedule C. The Rule 4003(b) objection period expired without objection, the Chapter 7 Trustee has stated that the residence is not being sold by the estate, and the Trustee filed a Report of No Distribution at Docket Entry 32.

14. On October 19, 2026, this Court also entered Docket Entry 34 directing the Clerk to defer entry of Fisher's Chapter 7 discharge until on or after November 19, 2026. (Ex. I.)

15. Fisher has separately sought relief concerning the Velocity judgment lien under 11 U.S.C. § 522(f). This complaint does not ask the Court to decide Velocity's rights through the Hometap counts.

16. Under Fed. R. Bankr. P. 7008, Fisher consents to entry of final orders and judgment by the Bankruptcy Court to the full extent authorized by statute and the Constitution, and otherwise consents to final adjudication under 28 U.S.C. § 157(c)(2) if consent is required.

## IV. TRANSACTION DOCUMENTS AND COMMUNICATION HISTORY

### A. Transaction, custody, and document versions

17. The OPA and Mortgage identify April 21, 2021 as the Signing Date. The transaction documents identify an effective date of April 26, 2021, an investment amount of $74,287, and net proceeds to Fisher of $70,165.27. (Exs. A, K-1, K-2, J.)

18. Hometap's Investment Signing Instructions directed the settlement agent to give the homeowner unsigned copies of the Investment Documents at the signing appointment and, after disbursement, return fully executed Investment Documents and original recorded documents to Hometap. (Exs. A, K-2.) That instruction is relevant to custody and authentication because Fisher's retained 2021 paper package contains unsigned copies while Hometap later produced signed versions.

19. Fisher states that he retained the 2021 paper package he received. In that retained OPA set, page 19 ends during section 7.2 and the next OPA page is page 22; pages 20 and 21 are not present. The photographed retained set and Compliance Agreement are preserved in Exhibits K-3 and L. Fisher does not ask the Court to infer a reason for the missing pages; he asks that the operative agreement be established from admissible evidence.

20. On June 18, 2026, after Fisher reported that his online contract was no longer available and requested it, Hometap sent "FL999199 OPA and Schedule A.pdf." On June 25, after Fisher asked for the complete executed closing package, Hometap sent "FL999199.pdf" and "Closing Docs.pdf" and represented that the supplied material included the documents signed at closing. The complete correspondence is preserved in Exhibits B and C, and the supplied files are preserved in Exhibits A, K-1, and K-2.

21. The later productions contain differences in placement and sequence of Hometap signature pages. In the retained set, the OPA Hometap signature page uses Agreement wording. In Hometap's 80-page production, a Hometap page using Memorandum wording appears within the OPA portion and the Agreement-wording page appears within the Memorandum portion. The recorded Memorandum contains the Memorandum-wording signature page. Fisher seeks identification of the operative executed documents; he does not allege that a page-placement difference alone voids the transaction.

**<u>B. Transaction characterization and secured obligations</u>**

22. The OPA states that the transaction is "Not a Loan," and Hometap later wrote that it is not a lender, that the transaction is not a loan, and that it does not create debt in the manner of a traditional loan. The same communication history also includes Hometap explanations that it records a mortgage, that the mortgage serves as "collateral for the debt," that it functions like a traditional mortgage in protecting funds, and that Hometap is a lien holder. Fisher asks the Court to determine the legal and contractual consequences from substance and the integrated documents, not from one label in isolation. (Exs. B-E.)

23. The recorded Mortgage expressly secures performance of specified OPA obligations and listed monetary obligations, including the Hometap Share and other amounts described in the Mortgage. Fisher therefore does not allege that the Mortgage secures nothing. He asks the Court

to identify the enforceable secured obligations, the conditions that make them payable, the amount presently due if any, and the remedies available on the established facts. (Ex. J.)

24. The Mortgage was recorded July 1, 2021. The recorded Memorandum and UCC-1 were recorded the same day. The UCC-1 identifies Fisher as debtor and Investment Partners II as secured party. (Ex. J.)

25. The recorded 2024 Assignment of Mortgage states that Investment Partners II assigns the identified Mortgage and Security Agreement to Fund II SPV I, a Delaware statutory trust, and identifies Wilmington Savings Fund Society, FSB as trustee. The recorded assignment does not, on its face, separately identify an assignment of the OPA, Memorandum, or UCC-1. Fisher asks the Court to determine the scope and present enforcement chain rather than infer either completeness or defect from that distinction alone. (Ex. O.)

**C. Contractual default provisions and cure procedure**

26. OPA section 7.1(e) identifies specified bankruptcy and insolvency events as Events of Default and, as relevant here, includes the voluntary or involuntary commencement of a bankruptcy case and states that the specified case, proceeding, assignment, or admission must be "dismissed or otherwise reversed within thirty (30) days." (Exs. A, K-1.)

27. OPA section 7.1(f) addresses failure to pay in a timely manner taxes, assessments, liens, amounts due under loans secured by liens on the Property, or other obligations relating to the Property, where the failure is not cured within thirty days. Section 7.1(h) separately addresses a lien attaching to the Property without Hometap's prior written approval or obtaining an unapproved loan secured or to be secured by the Property. (Exs. A, K-1.)

28. OPA section 7.2 states that, following an Event of Default, Hometap will provide a Notice of Right to Cure Default stating the specific Event(s) of Default and the time in which the default must be cured; if the owner fails to cure within the stated period, Hometap may declare a

default and exercise specified remedies. Those remedies include option-exercise procedures, specified cure payments, and foreclosure subject to the contract and applicable law. (Exs. A, K-1.)

**D. PACE, Velocity, and bankruptcy communications**

29. On March 10, 2026, Hometap sent a PACE Notice of Right to Cure that cited section 6.1(i)(ii) and sections 7.1(a), (b), and (h), and demanded proof that the PACE financing had been paid in full and discharged or that Fisher arrange an Owner Repurchase. The PACE financing documents estimated that the first assessment payment would be due in November 2026. Fisher does not contend that timely payment would by itself establish Hometap's prior written approval; he alleges that the March notice was not based on a delinquent March 2026 installment. (Exs. N, P.)

30. After Hometap requested PACE payment documents, Fisher supplied them. Hometap acknowledged receipt, confirmed that the PACE payments were annual through property taxes, and stated that it would request mortgage statements and updates quarterly. That response is not pleaded as an express waiver, approval, or satisfaction. In September 2026, Hometap still required PACE payoff and release as a condition of returning the account to good standing. (Exs. C, D, N.)

31. On March 26, 2026, Hometap sent a Notice of Right to Cure concerning a Velocity Investments judgment. The notice described an unapproved lien attaching to the Property but cited OPA section 7.1(f). Section 7.1(h), not section 7.1(f), contains the separate unapproved-lien language. Fisher does not allege that the citation discrepancy alone invalidates the notice; he asks the Court to determine the actual asserted default and contractual predicate. (Ex. C.)

32. The November 3, 2025 Velocity judgment contained a provision staying execution pending resolution of Fisher's counterclaim. Recording of a judgment, attachment of a lien,

effect on Florida homestead, title consequences, and a stay of execution are distinct issues. This complaint asks only what established Velocity facts mean under the Hometap contract; it does not adjudicate Velocity's independent rights. (Ex. C.)

33. Fisher filed this Chapter 7 case on July 2, 2026. Hometap thereafter repeatedly treated the filing as a contractual default. An August 28 communication referred Fisher to sections 7.1(d) and 7.1(e) and stated that starting a voluntary bankruptcy process is considered a default event. (Ex. D.)

34. In an August 31, 2026 email, Hometap stated that filing bankruptcy is an Event of Default and further stated: "Once the case is dismissed or discharged, the bankruptcy is no longer considered an open default." In a September 3 email, Hometap stated that Fisher's investment would remain in default until Hometap received a Velocity judgment lien release, confirmation that bankruptcy was discharged or dismissed, and proof that the PACE lien had been paid in full and released. (Ex. D.)

35. Hometap's correspondence states that discharge will end the bankruptcy default, but Hometap has not identified an executed amendment to OPA section 7.1(e). Section 8.17 provides that no supplement, modification, or amendment is binding unless in writing and executed by the party against whom enforcement is sought. The record attached to this complaint contains no executed amendment changing section 7.1(e). Fisher therefore seeks a binding judicial determination of the effect of discharge on the asserted bankruptcy default. (Exs. A, D, K-1.)

36. For months, Fisher repeatedly asked Hometap to identify the contractual and factual basis for the asserted defaults and the consequences for his home. In one message he wrote that he did not want "another piece of an answer that creates another question and another email" and

wanted to know exactly where he stood. The complete sequence relevant to the pleaded disputes is attached, rather than selected sentences alone. (Exs. B-E, H, N.)

37. On October 22, 2026, after identifying the remaining questions, Fisher wrote: "If Hometap does not provide clear and complete written answers, I intend to ask the United States Bankruptcy Court to resolve these questions." The message was copied to Hometap's legal department and bankruptcy counsel. Fisher now asks the Court to decide the underlying rights and obligations, not to impose liability merely because an email was not answered to his satisfaction. (Ex. E.)

38. The communications establish a present controversy concerning bankruptcy-default treatment, PACE, Velocity, secured obligations, present ownership and servicing authority, payoff/release conditions, and potential enforcement against the Property. The controversy is not hypothetical merely because Hometap has not yet completed a foreclosure.

**V. COUNT I - DECLARATORY RELIEF CONCERNING BANKRUPTCY-DEFAULT CLAUSE AND BANKRUPTCY EFFECTS**

*(Against all Defendants asserting rights under FL999199)*

39. Fisher incorporates paragraphs 1 through 38.

40. OPA section 7.1(e) expressly makes bankruptcy-related events a contractual Event of Default unless the specified case, proceeding, assignment, or admission is dismissed or otherwise reversed within thirty days. Hometap has treated Fisher's July 2 filing as an open default and has tied account status and potential remedies to that default.

41. Section 541(c)(1)(B) provides that an interest of the debtor becomes property of the estate notwithstanding a contractual provision conditioned on insolvency, commencement of a bankruptcy case, or appointment of a trustee that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property. 11 U.S.C. § 541(c)(1)(B). Fisher

seeks determination of that provision's effect on the rights Hometap claims section 7.1(e) gave it upon filing.

42. If the OPA is an executory contract, section 365(e)(1) generally prohibits termination or modification of the contract or rights under it after commencement of the case solely because of a bankruptcy-conditioned provision. 11 U.S.C. § 365(e)(1). Fisher does not plead that section 365(e)(1) applies without exception.

43. Section 365(e)(2)(B) expressly provides an exception where the executory contract is a contract to make a loan, extend debt financing or financial accommodations, or issue a security of the debtor. Fisher acknowledges that text. He contends, however, that Hometap's $74,287 transaction funding was advanced in 2021 and that no future funding commitment remained for the estate to demand in 2026. The Court should determine whether the exception applies to this transaction rather than resolve that threshold issue by label alone. 11 U.S.C. § 365(e)(2)(B).

44. If the OPA was executory and subject to 11 U.S.C. § 365(d)(1), the sixty-day period following the July 2, 2026 order for relief expired August 31, 2026 absent a timely extension. Fisher seeks a declaration of the effect of any deemed rejection under section 365(d)(1), including whether it changes Hometap's asserted bankruptcy-default consequences.

45. Rejection of an executory contract constitutes a breach; it is not, by itself, rescission or cancellation. 11 U.S.C. § 365(g)(1); Mission Product Holdings, Inc. v. Tempnology, LLC, 587 U.S. 370 (2019). Fisher therefore does not ask the Court to declare that rejection automatically erased valid in rem or property rights. He asks the Court to identify which rights survived and what claim or remedy follows from any rejection or breach.

46. To the extent Hometap asserts a prepetition personal monetary claim against Fisher, sections 727(b) and 524(a) govern the effect of any Chapter 7 discharge, subject to applicable

exceptions. Fisher does not seek a declaration that discharge automatically eliminates a valid surviving lien; he seeks separation of any personal liability from any enforceable in rem rights and from any adverse treatment imposed solely because he filed bankruptcy.

47. An actual controversy therefore exists concerning whether and to what extent Defendants may rely on section 7.1(e), or on the mere filing or pendency of this Chapter 7 case, to impose default status, additional monetary consequences, acceleration, option-exercise consequences, foreclosure consequences, or other adverse treatment against Fisher or the Property.

## VI. COUNT II - DECLARATORY RELIEF CONCERNING SECURED OBLIGATIONS, OPERATIVE DOCUMENTS, AND PRESENT ENFORCEMENT RIGHTS

*(Against Defendants asserting ownership, servicing, or enforcement authority)*

48. Fisher incorporates paragraphs 1 through 38.

49. The recorded Mortgage identifies multiple categories of secured obligations and provides remedies tied to default, notice, and cure. The OPA simultaneously labels the transaction "Not a Loan," while Hometap's later communications use loan-disclaimer language alongside mortgage, lien, collateral, debt, and lender comparisons. The Court must construe the integrated documents and substance of the transaction to determine the obligations and remedies actually created.

50. The June 2026 productions and Fisher's retained 2021 paper set contain differences in page presence and signature-page placement. Those differences create an actual dispute concerning which executed OPA and related documents govern. Fisher seeks identification of the operative agreement from competent evidence rather than a declaration based solely on his retained unsigned copy or solely on a later Hometap production.

51. The 2024 recorded assignment transfers the identified Mortgage to Fund II SPV I but does not separately identify on its face an assignment of the OPA, Memorandum, or UCC-1.

Defendants have also identified Equity Partners and Homeownership Solutions as servicers at different times. Fisher seeks a declaration identifying the party or parties presently entitled to enforce, calculate, receive payment under, exercise remedies under, and release the rights asserted against the Property.

52. Fisher seeks a declaration identifying: (a) each presently enforceable secured obligation; (b) the event or condition making each monetary obligation due; (c) any separate cure payment, fee, reimbursement, or default amount and its contractual basis; (d) the amount, if any, presently due; and (e) the act and party necessary to obtain a valid release or satisfaction of the Mortgage and related recorded interests.

53. Fisher does not seek a declaration that the words "mortgage," "debt," "lien," or "loan" alone decide the transaction's legal character. Nor does he concede that those terms are legally meaningless shorthand. He asks the Court to reconcile Hometap's contractual labels, recorded security instruments, communications, and enforcement positions in determining the rights actually created.

## VII. COUNT III - DECLARATORY RELIEF CONCERNING ASSERTED PACE AND VELOCITY CONTRACTUAL DEFAULTS

*(Against Defendants asserting those defaults; no relief requested against Velocity or Renew Financial)*

54. Fisher incorporates paragraphs 1 through 38.

55. The March 10 PACE notice and March 26 Velocity notice invoked different factual predicates and contract provisions. Fisher seeks a determination, as between Fisher and Defendants, of which OPA provision applies to each established fact, whether the stated notice-and-cure procedure was satisfied, what if anything remains uncured, and what contractual remedies presently follow.

56. As to Velocity, Fisher asks the Court to determine only whether the established judgment, recording, execution-stay, and lien facts satisfied Hometap's contractual Event-of-Default language and cure requirements. He does not ask this Count to determine Velocity's judgment validity, its independent lien rights, or relief under section 522(f).

57. As to PACE, Fisher asks the Court to determine whether Hometap's asserted default and continuing payoff-and-release condition are supported by the OPA provisions Hometap invoked and the established facts, including the distinction between prior-approval requirements and delinquent-payment provisions. Fisher does not ask the Court to adjudicate Renew Financial's independent rights.

## VIII. ARBITRATION AND DELEGATION

58. The OPA contains an arbitration provision and a delegation clause. Fisher specifically challenges enforcement of the delegation clause to the extent Defendants contend that an arbitrator, rather than this Court, must determine whether a bankruptcy-created right or an applicable statutory prohibition prevents arbitration or delegation.

59. Fisher recognizes Attix v. Carrington Mortgage Services, LLC, 35 F.4th 1284 (11th Cir. 2022), which enforced a delegation agreement against a challenge under 15 U.S.C. § 1639c(e)(3) where the challenge was not directed specifically to delegation. In footnote 4, Attix expressly stated that § 1639c(e)(1), which addresses arbitration terms in covered residential mortgage loans and dwelling-secured open-end credit, "is not at issue in this case." Fisher does not present Attix as having decided the application of § 1639c(e)(1) to FL999199.

60. Fisher also recognizes In re Electric Machinery Enterprises, Inc., 479 F.3d 791, 796-99 (11th Cir. 2007), which holds that core status alone does not permit a bankruptcy court to refuse arbitration; the court must determine whether arbitration would inherently conflict with the underlying purposes of the Bankruptcy Code. Fisher contends that Count I directly asks this

Court to determine the legal consequences of this Chapter 7 filing and bankruptcy-triggered contract provisions, and he requests the required claim-specific inherent-conflict analysis rather than a categorical bankruptcy exception.

61. Pilgrim Skating Arena, Inc. v. Laubenstein (In re Laubenstein), No. 2:20-cv-765-SPC, slip op. at 9-11 (M.D. Fla. Mar. 5, 2021), affirmed denial of stay relief to continue arbitration, concluding that Lisa Laubenstein was a nonsignatory and that the claims asserted or proposed in arbitration were core or intertwined with core proceedings such that enforcing arbitration would conflict with Bankruptcy Code purposes. Fisher cites Laubenstein only as persuasive application of the claim-specific inquiry, not as a categorical rule.

62. If the Court compels arbitration of any claim and Fisher requests a stay, Fisher requests that the Court stay rather than dismiss the arbitrable claim in accordance with 9 U.S.C. § 3 and Smith v. Spizzirri, 601 U.S. 472 (2024), while retaining jurisdiction to the extent permitted by law.

## IX. PRAYER FOR RELIEF

WHEREFORE, Fisher respectfully requests that the Court enter judgment, to the extent within its jurisdiction and authority:

**A.** Declaring the effect of OPA section 7.1(e) under 11 U.S.C. §§ 541(c), 365, 727, and 524, including whether and to what extent Defendants may impose default status or enforcement consequences solely because Fisher filed or remained in Chapter 7;

**B.** If the OPA is executory, declaring the effect of 11 U.S.C. § 365(d), (e), and (g), including the applicability, if any, of § 365(e)(2)(B) and the legal effect of any rejection;

**C.** Declaring which version or combination of the OPA and related Investment Documents is operative and identifying the presently enforceable obligations secured by the Mortgage;

**D.** Declaring which Defendant or other identified party presently owns or may enforce the relevant rights, may calculate and receive amounts due, and has authority to issue a valid release or satisfaction;

**E.** Declaring, as between Fisher and Defendants, whether the established PACE and Velocity facts satisfy the contractual Event-of-Default provisions asserted by Hometap, whether the required notice-and-cure procedures were satisfied, what if anything remains uncured, and what remedies presently follow;

**F.** Declaring what amount, if any, is presently due under the secured obligations and the contractual basis and conditions for each component, without adjudicating independent rights of nonparties not properly before the Court;

**G.** Determining the threshold arbitration and delegation issues on a claim-specific basis; if arbitration is compelled and Fisher requests a stay, staying rather than dismissing the affected claim as required by applicable law; and

**H.** Granting such other declaratory or supplementary relief as is necessary to give effect to the Court's declarations and is permitted by law, without awarding money damages on claims not pleaded in this complaint.

*Respectfully submitted,*
Dated: 12 November, 2026

______________________________
LARRY EDWARD FISHER, Pro Se
21597 Juego Circle, Unit 6-D
Boca Raton, Florida 33433
Telephone: 754-243-3337
Email: Larryf2323@gmail.com

## EXHIBIT INDEX AND COMMUNICATION-SPINE ROADMAP

The exhibit letters below preserve the source labels already applied to the October 25, 2026 review packet so that existing pinpoint references remain stable. Omitted source-label letters are not part of this filing. Exhibits O, P, and Q are newly added. No omission should be read as a concession on an issue outside the pleaded counts.

| Ex. | Description |
|---|---|
| A | June 25, 2026 Hometap-supplied 80-page scanned closing production, retained in supplied order. |
| B | Complete preserved June 18-July 1, 2026 correspondence concerning document production, settlement, and transaction explanations. |
| C | March 26 Velocity notice/FedEx/judgment pages, followed by the preserved June 18 document-request printout. |
| D | Complete preserved August-September 2026 correspondence concerning Velocity, bankruptcy default, PACE, and account status. |
| E | October 22, 2026 Fisher reply and complete supplied settlement/preservation thread, including Fisher's express notice that he would ask the Bankruptcy Court to resolve unanswered questions. |
| F | Docket Entry 13 Notice of Appearance filed July 15, 2026. |
| H | Servicing-transfer email dated July 27, 2026, effective August 3, 2026. |
| I | Entered Docket Entries 33 and 34, filed October 19, 2026. |
| J | Recorded-image copies of 2021 Mortgage, Memorandum, and UCC-1. |
| K-1 | FL999199 OPA and Schedule A.pdf supplied by Hometap June 18, 2026. |
| K-2 | Closing Docs.pdf supplied by Hometap June 25, 2026. |
| K-3 | Selected photographs of Fisher's retained physical paperwork, including the signed Compliance Agreement. |
| L | All preserved OPA photographs from Fisher's retained paper set, including duplicates, plus signed Compliance Agreement. |
| N | March 10, 2026 PACE Notice of Right to Cure, FedEx material, and recorded PACE pages. |
| O | Recorded Assignment of Mortgage, CFN 20240314209, OR Book 35262, Pages 236-239, assigning the identified Mortgage to Hometap HEI Fund II SPV I, a Delaware statutory trust, c/o Wilmington Savings Fund Society, FSB, Trustee. |
| P | Excerpts from RenewPACE Financing Documents for Application 460864, limited to the pages stating the annual assessment schedule and the estimated first payment due in November 2026. The source packet is larger; this exhibit contains noncontinuous excerpts only. |
| Q | November 10, 2026 Savannah Day email and Larry Fisher's November 11, 2026 response, followed by the 32-page supplied email-thread printout in its entirety and original supplied order. |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re Larry Edward Fisher, Case No. 26-18759-MAM
Fisher v. Hometap Investment Partners II, L.P., et al.

# EXHIBIT A

June 25, 2026 Hometap-supplied 80-page scanned closing production, retained in supplied order.

*Source pages follow in preserved order. Existing source-page exhibit identifiers and legacy packet-reference markings are retained for stable pinpoint citation; they do not alter the source document text.*

**Communication spine - read together:**

- March 10, 2026 PACE notice and related material: Exhibit N, followed by March-June exchanges in Exhibit C.
- June 18-July 1, 2026 document/settlement exchanges: Exhibit B.
- July 27, 2026 servicing-transfer notice: Exhibit H.
- August-September 2026 bankruptcy/default/Velocity/PACE exchanges: Exhibit D.
- September-October 2026 settlement, preservation, and October 22 court-warning exchange: Exhibit E.
- November 10 Savannah Day email and November 11 Fisher reply, with the supplied quoted thread: Exhibit Q.

The source email exhibits are reproduced from the supplied records and printouts. Existing redactions, supplied email-address formatting, message text, signature blocks, quoted-message repetition, attachments, and source-page identifiers are retained as they appear in the source materials. Exhibit Q is the 32-page email-thread printout supplied by Fisher, reproduced in its entirety and original order. Fisher's current filing contact information appears in the complaint signature block above.

# Hometap Investment Partners II, L.P.
## *Investment Signing Instructions*

The Investment Signing Instructions set forth below are to be used by the applicable settlement agent (the "**Settlement Agent**") to execute a Hometap Investment Partners II, L.P. ("**Hometap**") equity investment (the "**Investment**") in accordance with all of the instructions contained herein.

If any ambiguities, errors, or questions arrive in connection with the Investment, or any matter contained in the Investment Signing Instructions, the Settlement Agent must contact Hometap prior to the signing appointment to clarify or resolve matters. **If the Settlement Agent determines that an Investment cannot be executed in accordance with the Investment Signing Instructions, the Settlement Agent should not proceed to execution without further instructions from Hometap.**

Hometap shall indemnify, defend and hold harmless the settlement agent, ClearEdge, their affiliates, and their respective directors, officers, employees, contractors and agents, against any third party claim, action or proceeding arising out of an allegation that: (i) the Investment violates applicable law, rule or regulation; or (ii) Hometap has breached the terms of any agreements with the homeowner(s), including any documents contained in the Investment Package, as relating to the Investment. Hometap's indemnification obligations do not cover any third-party claim, action or proceeding arising out of acts or omissions of any indemnified party.

## HOMETAP CONTACT

| | | | |
|---|---|---|---|
| **Name** | Devlin Keogh | **Phone** | 617-675-9764 |
| **Title** | Investment Manager | **Email** | homeowners@hometap.com |

## SETTLEMENT AGENT CONTACT

| | | | |
|---|---|---|---|
| **Support Email** | | **Support Phone** | |

## HOMEOWNERS AND PROPERTY

| | | | |
|---|---|---|---|
| **Investment #** | FL999199 | **Property Address** | 21597 Juego Circle, Unit 6D, Boca Raton, FL 33433 |
| **Investment Amount** | $74,287.00 | **Signing Date** | 04/21/2021 |
| **Title File #** | M-FL678502 | **Disbursement Date** | 04/26/2021 |
| **Homeowner 1 Name, Address & Phone Number** | Larry E. Fisher<br>21597 Juego Circle, Unit 6D, Boca Raton, FL 33433<br>386-871-5115 | **Homeowner 2 Name, Address & Phone Number** | |

**REQUIRED DOCUMENTS, SIGNATURES AND RECORDING**

Settlement Agent will be provided an Investment Package, containing the documents listed in the Investment Package section of these instructions, at least 72 hours in advance of the signing appointment. The Investment Package includes Investment

Documents, which require signatures from the Homeowner(s), and Supporting Documents that are needed for verification purposes, but do not require signatures.

The Investment Documents will be delivered to Settlement Agent already signed by Hometap. Settlement Agent must verify the documents do not have missing Hometap signatures. If the documents are incomplete, Settlement Agent must reach out to Hometap for clarification and to obtain correctly signed documents.

Settlement Agent must not allow Investment Package documents to be signed by the Homeowner(s) earlier than the date agreed upon between Hometap and Settlement Agent. To consummate the Investment, Settlement Agent is responsible to verify that all required Homeowner(s) signature blanks are fulfilled on the Investment Package documents. Homeowner(s) must execute all documents as their name(s) appear in the documents.

All documents that require recording, as determined in the Investment Package section of these instructions, must be submitted for recording by Settlement Agent after the file disburses. Settlement Agent is required to notify Hometap that documents have been recorded after the signing appointment.

## INVESTMENT PACKAGE

| ***Investment Documents*** | ***Required Signatures*** | ***Recorded*** |
|---|---|---|
| 1. Investment Term Sheet | Homeowner(s) | No |
| 2. Option Purchase Agreement | Hometap, Homeowner(s) | No |
| 3. Memorandum of Option | Hometap, Homeowner(s) | Yes |
| 4. Mortgage and Security Instrument | Homeowner(s) and spouse | Yes |
| 5. UCC-1 Filing Statement | None | Yes |
| 6. Consent of Spouse | Spouse (ONLY if not on title) | No |
| 7. Notice of Right to Cancel | Homeowner(s) | No |
| 8. Compliance Agreement & Name Affidavit | Homeowner(s) | No |
| 9. Information Sharing Disclosure | None | No |
| 10. Insurance Request & Authorization Form | Homeowner(s) | No |
| ***Supporting Documents*** | ***Required Verifications*** | |
| 11. Property Report | Homeowner ID matches | No |

## SIGNATURES

Homeowner(s) must sign all documents exactly as his or her name appears on the blank line provided for his or her signature(s). Where a witness is required, you must have the document witnessed. If an acknowledgment is provided, a person authorized to take acknowledgments in the state of signing must execute the acknowledgment. The acknowledgment and/or witness date must be no earlier than the date of the document being acknowledged.

## CORRECTIONS

Any correction to Investment Documents must be approved in writing by us in advance.

**RIGHT TO CANCEL**
The Notice of Right to Cancel must be given at the signing appointment. The Notice of Right to Cancel must be accurately completed, including all dates populated. The signed originals acknowledging receipt of the completed Notice of Right to Cancel by each homeowner and/or person given copies of the Notice must be returned with the executed Investment Documents. Should the transaction be rescinded by any of the Homeowner(s), immediately notify our office.

**COMPLIANCE AGREEMENT & NAME AFFIDAVIT**
By signing this document, the Homeowner(s) are (i) agreeing to assist Hometap with correcting any errors to documents in the future, and (ii) are notifying Hometap of any other names associated with them currently or in the past (e.g., maiden name; incorrect middle initials; nicknames used on official documents).

**DISBURSEMENT OF FUNDS AND FEES**
Hometap will wire funds to the Settlement Agent pursuant to wire instructions provided by Settlement Agent. An Investment Term Sheet (the "**Investment Term Sheet**") has been included in the Investment Package for verification of the funds that will be wired to the Settlement Agent for disbursement and the funds will be disbursed as described on the Investment Term Sheet.

The Settlement Agent is authorized to disburse proceeds to the Homeowner(s) on the Disbursement Date contained herein, provided neither Hometap nor the Homeowner(s) have notified Settlement Agent in writing that the Homeowner(s) has elected to cancel the transaction. Settlement Agent will notify Hometap if the Homeowner(s) contacts Settlement Agent to rescind the transaction.

**IN CASE OF INVESTMENT DOCUMENTS NOT SIGNED**
If the Investment Documents are not executed, please contact Hometap at the phone number contained herein to receive further instructions, including any instruction to return funds to Hometap.

**COPIES OF INVESTMENT DOCUMENTS**
The Settlement Agent will provide unsigned copies of all Investment Documents to the Homeowner(s) at the signing appointment. After the file disburses, Settlement Agent will return the fully executed Investment Documents to Hometap and will then submit any recordable documents to the County Recorder's office. Once recorded, the original recorded documents will be returned to Hometap at **800 Boylston Street, 16th Floor, Boston, MA 02199**, or to an alternative location designated by Hometap in advance. Shipping charges incurred are the responsibility of the Settlement Agent. The settlement fees should include this charge.

ClearEdge Title

**ClearEdge Title, Inc.**
2605 Enterprise Road E
Suite 270
Clearwater, FL 33759
(877) 536-3390

File Number: M-FL678502
Loan Amount: $74,287.00
Close Date: 4/21/2021
Disbursement Date: 4/26/2021

## BORROWER(S) CLOSING STATEMENT

Type: Property Report
Property: 21597 JUEGO CIRCLE, UNIT 6D
BOCA RATON, FL 33433 (PALM BEACH)
(00-42-47-20-02-000-0604)

Borrower(s): LARRY E FISHER
21597 Juego Circle
Boca Raton, FL 33433

| Description | Debit | Credit |
|---|---|---|
| **New Loans** | | |
| Loan Amount | | $74,287.00 |
| Appraisal Fee to Hometap Equity Partners, LLC | $599.00 | |
| HomeTap Fee to Hometap Equity Partners, LLC | $2,228.61 | |
| **Title Charges** | | |
| Title - Lender's Title Insurance to ClearEdge Title, Inc. $74,287.00 | | |
| Title - Escrow Fee to ClearEdge Title, Inc. | $700.00 | |
| **Government Recording and Transfer Charges** | | |
| Recording fees: Memo $61.60 | $61.60 | |
| Recording Fees: Mortgage $87.10 | $87.10 | |
| UCC $36.10 | $36.10 | |
| State Deed Tax/Stamps to ClearEdge Title - Filing Fee | $0.70 | |
| State Mortgage Tax/Stamps to ClearEdge Title - Filing Fee | $260.05 | |
| Intangible Tax to ClearEdge Title - Filing Fee $148.57 | $148.57 | |
| **Totals** | $4,121.73 | $74,287.00 |

**Balance Due TO Borrower:** $70,165.27

**APPROVED AND ACCEPTED**

BORROWER(S)

LARRY E FISHER

Meridian National Title, Inc.

25400 US 19 North, Suite 135

Clearwater, FL 33763

Phone (866) 374-0646

******* REFUND CONFIRMATION FORM******

**File Number: M-FL678502**

**Property Address: 21597 Juego Circle, Unit 6D**

**Projected Disbursement Date: April 26, 2021**

**Transaction Type: Home Equity Investment**

**PLEASE SELECT HOW YOU WISH TO RECEIVE THE PROCEEDS FROM YOUR TRANSACTION:**

☐ CHECK

Does the check need to be sent to the property address above? ____ Yes ____ No

If No, please provide the address where you want the check sent:

______________________________________________

☐ WIRE

We, the undersigned, have requested that Meridian National Title, Inc. deliver the following proceeds or disbursement of funds related to the above property [21597 Juego Circle, Unit 6D, Boca Raton, FL 33433] of settlement by wire to the following financial institution:

| | | | |
|---|---|---|---|
| **Receiving Institution Name** | | | |
| **Financial Institution Routing Number** | | | |
| **Financial Institution Checking Account Number** | | | |
| **Name(s) / Payee(s) of Record with Financial Institution** | | **Are you attaching a voided check** | ☐ Yes ☐ No |

We as the Payee(s) hereby authorize Meridian National Title, Inc. to wire the amount listed on the Option Closing Disclosure to the above financial institutions account notwithstanding the differences in the payee names and the names on the receiving account. By acknowledging the below through signature, the payee(s) also hereby hold Meridian National Title, Inc Title, Inc. harmless and indemnify them against any and all claims and disputes arising from said delivery of funds to the extent of, but not limited to, actual damages, attorney's fees, penalties and other fees associated with this request.

[signature] 4-21-2021

Signature Date Signature Date

**Subscribed and sworn to before me this** 21st **day of** April, 2021

[signature]

(seal) MERRY SANON-LITTLE Notary Public - State of Florida Commission # HH 017847 My Comm. Expires Sep 19, 2024 Bonded through National Notary Assn.

**Notary Public**

MERIDIAN

**Attention Signing agent, including this page the total page count for this attachment you are printing is 81 pages.**

**If you have received or are printing less than that amount please contact our office immediately at:**

**Toll Free: 877-536-3390**
**Email: MNTeam@MeridianNatl.com**

M E R I D I A N

Borrower Name(s): Larry E Fisher
Property Address: 21597 Juego Circle, Unit 6D, Boca Raton, FL 33433
Loan #:

Thank you for handling this signing for Meridian National Title and Hometap Equity Partners, LLC

During business hours of 9AM eastern – 8PM eastern Monday through Friday please contact our office at 877-536-3390 with regards to any issues at the closing. Additionally, should an issue arise outside of normal business hours or you are unable to make contact during normal business hours please reach out to the emergency contact number at 727-612-5242. PLEASE LEAVE A VOICEMAIL IF THAT NUMBER IS NOT PICKED UP.

If funds are due at the closing and a check is not available and the customer has not already made arrangements for a wire transfer please also contact us using the above methods.

Thank you.

Meridian National Title

25400 US 19 North, Suite 110

Clearwater, FL 33763

**(877)-536-3390** Team Line

mnteam@meridiannatl.com

# COMPLIANCE AGREEMENT

Re: Order Number: M-FL678502

In consideration of Meridian National Title, Inc. (hereinafter "title company") closing the transaction under the above order number, the undersigned agree, upon request of the company, to fully cooperate with the company to correct any inaccurate term or provision or mistake in, or omission from any document associated with the closing. He/she/they further agree that, subsequent to closing, he/she/they will execute such documents, or take such action as the company may reasonably deem necessary to properly document the transaction.

The undersigned further agree(s) that in the event an error in charges, costs, or payoff amounts is made, he/she/they will, upon request, immediately remit such sums for which he/she/they had initial responsibility for payment as may be necessary to correct such errors. Nothing herein contained shall be construed to impose liability on the parties for charges incurred as a result of the failure of the company to timely remit payment or take actions which the company has agreed in writing to perform.

The undersigned further authorize the company to correct any clerical errors on his/her/their behalf in order to properly complete the title conveyance and/or provide the lender with insurable documentation.

The undersigned further agree to comply with any such requests outlined above and agree that, in the event he/she/they fail to comply with the request, he/she/they will pay, in addition to any amounts owed above, reasonable costs of the company in enforcing this agreement, including but not limited to, reasonable attorney's fees and costs of litigation.

[signature] 4-21-2021

DATE

Sworn to and subscribed before me, this 21st day of APRIL 2021

[signature]

Notary Public

MERRY SANON-LITTLE
Notary Public - State of Florida
Commission # HH 017847
My Comm. Expires Sep 19, 2024
Bonded through National Notary Assn.

**PLEASE TAKE NOTE OF THE FORM IMMEDIATELY FOLLOWING THIS COVER LETTER**

**PLEASE COMPLETE AND EXECUTE THIS FORM IF YOU WISH TO HAVE YOUR PROCEEDS WIRE DIRECTLY INTO A CHECKING OR SAVINGS ACCOUNT**

# PAYOFF AFFIDAVIT

File No: M-FL678502

Property: 21597 Juego Circle, Unit 6D, Boca Raton, FL 33433

WE, the undersigned, do hereby hold Meridian National Title, Inc and Stewart Title Guaranty Company harmless for any addition monies due from any shortages in the payoff amounts of any and all liens on the aforementioned property described above and listed in the title commitment on file number M-FL678502. We also understand that if for any reason the payoff is incorrect, we are fully responsible for making up the difference and will take care of the said shortages within five (5) days from notification by Meridian National Title, Inc Title whether by telephone or by mail. Should there be a remaining escrow balance we hereby authorize any shortages to be covered thru the escrow balance.

That this affidavit is being made to include Hometap Equity Partners, LLC to grant financing to the borrower(s) of the above described property, and the said parties rely on the statement(s) made by the affiant(s) herein are aware that Meridian National Title, Inc Title is insuring the title to the property herein and that affiant(s) warrant the above statements to be accurate. In the event of the necessity to enforce the terms of this affidavit, affiant(s) shall be responsible personally and/or as a corporation for any losses, including but not limited to, attorney's fees and court costs.

**Revolving Line of Credit Instructions**

**If this is a revolving credit/equity line of credit account, I/we, the undersigned borrower (s), hereby authorize you to close this account. We hereby acknowledge that there are no outstanding draws or checks against this line of credit and understand that we will be held responsible for any draws or checks still outstanding as of the date of payoff.**

AFFIANT(S) FURTHER SAYETH NAUGHT.

______________________________

Larry E Fisher

| |
|---|
| A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document |

STATE OF FL

COUNTY OF Palm Beach

Subscribed and sworn to (or affirmed) before me on by, Larry E Fisher who proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

______________________________

(Notary Signature)

MERRY SANON-LITTLE
Notary Public - State of Florida
Commission # HH 017847
My Comm. Expires Sep 19, 2024
Bonded through National Notary Assn.

(SEAL)

# Marital Affidavit

File No: M-FL678502

Date: April 20, 2021

The undersigned being first duly sworn, on oath, deposes and say that (they/he/she) are the owners of the real estate situated in the County of Palm Beach, State of FL, commonly known as 21597 Juego Circle, Unit 6D, Boca Raton, FL 33433 and more particularly described in that certain mortgage dated in favor of Hometap Equity Partners, LLC, the lender, under transaction number .

Affiant makes the following representations in conjunction with the consummation of the pending mortgage of the real estate referenced above (premises).

On April 20, 2021 before me a Notary Public, personally appeared the undersigned

affiant(s), who being duly sworn according to law and intending to be legally bound, depose(s) and say(s):

1. (Y – N ) _______ That I am married to _________ and have been continuously married since ______________________
2. (Y – N ) _______ That I am a single person and have never been married
3. (Y – N ) _______ That I am married however currently pending divorce proceedings
4. (Y – N ) _______ That I took title as married and have since been divorced and not remarried
5. (Y – N ) _______ That I took title as married and have since been divorced and remarried, my new spouses name is ____________

FURTHER AFFIANTS SAYETH NAUGHT.

_______________________________

Larry E Fisher

STATE OF FL

COUNTY OF Palm Beach

The foregoing instrument was acknowledged before me April 20, 2021 by: Larry E Fisher who is/are personally known to me or who has/have produced a drivers license(s) as identification and who did not take an oath.

_______________________________

(Notary Signature)

(SEAL)

MERRY SANON-LITTLE
Notary Public - State of Florida
Commission # HH 017847
My Comm. Expires Sep 19, 2024
Bonded through National Notary Assn.

hometap

Date Prepared: 04/20/2021

Welcome to Hometap! This document has useful information you need to know before signing your Investment Documents.

Please carefully review all five sections of this document. If you have any questions about the information in these Investment Disclosures before the signing appointment, please contact your Investment Manager. If you have questions about your Investment after the signing appointment, please contact homeowners@hometap.com.

## Section I: Investment Signing

The information on this page contains what you need to know for signing day. Notify your Investment Manager immediately if you have questions so that they can be resolved before your appointment.

A. Signing Information

| | |
|---|---|
| Signing Appointment Date: | 04/21/2021 |
| Cancellation Date: | 04/24/2021 |
| Investment Effective Date: | 04/26/2021 |
| Settlement Agent: | ClearEdge |
| Title File No.: | M-FL678502 |
| Signing Appointment Address: | 21597 Juego Circle, 6D Boca Raton, FL 33433 |

B. Transaction Information

| | |
|---|---|
| Homeowner(s): | Larry E. Fisher |
| Property Address: | 21597 Juego Circle, Unit 6D, Boca Raton, FL 33433 |
| Investor: | Hometap Investment Partners II, LP |

C. Investment Information

| | |
|---|---|
| Occupancy Type: | Primary residence |
| Option Period: | 10 years |
| Option ID: | FL999199 |

## Section II: Cash Flow at Signing

This section explains the fees and costs that are deducted from your Investment Amount at the signing appointment and how your Net Investment Amount is calculated. The fees and costs below are estimates of the amounts assessed at signing and are for informational purposes only. Final numbers will be included in your Option Purchase Agreement. More information about the terms is included in the FAQ section below and in your Option Purchase Agreement. Please review this information carefully and contact your Investment Manager immediately if you have questions.

| | | |
|---|---|---|
| **Investment Amount** | *The amount Hometap will pay you to acquire the Option* | $74,287.00 |

| Investment Fees and Costs | | Amount |
|---|---|---|
| **A. Investment Fee** | *3% of Investment Amount, charged by Hometap* | **$2,228.61** |
| $2,228.61 | to Hometap Investment Partners II, LP | |

| | | |
|---|---|---|
| **B. Third-Party Costs** | *Costs for third-party processing services to finalize Investment* | **$1,299.00** |
| $599.00 | Appraisal | |
| $700.00 | Title Charges | |
| | | |

| | | |
|---|---|---|
| **C. Taxes and Other Government Fees** | | **$594.12** |
| $61.60 | Memorandum | |
| $36.10 | UCC | |
| $87.10 | Mortgage/Deed of Trust | |
| $409.32 | State Deed and Mortgage Tax/Stamp and Intangible Tax | |
| | | |
| | | |
| | | |
| | | |

| | | |
|---|---|---|
| **D. Payoffs** | *Amounts paid to third-party lien holders on your behalf* | **$0.00** |
| | | |
| | | |
| | | |
| | | |

| Total Investment Fees and Costs | |
|---|---|
| E. Total Investment Fees and Costs (A + B + C + D) | **$4,121.73** |

| Calculating Signing Cash Flow | |
| --- | --- |
| Investment Amount | $74,287.00 |
| Total Investment Fees and Costs (E) | $4,121.73 |
| | |
| **CASH DUE TO OWNER (NET INVESTMENT AMOUNT)** | $70,165.27 |

## Section III: Important Information about Your Investment

**THE SALE OF THE OPTION TO HOMETAP CAN HAVE SIGNIFICANT FINANCIAL AND TAX CONSEQUENCES. BY ACCEPTING AN INVESTMENT, YOU ACKNOWLEDGE THAT HOMETAP HAS URGED YOU TO SEEK TAX, LEGAL, AND FINANCIAL ADVICE TO ENSURE AN UNDERSTANDING OF THE RISKS AND BENEFITS OF ENTERING INTO THE OPTION PURCHASE AGREEMENT AND THAT YOU HAVE HAD AN OPPORTUNITY TO DO SO.**

You are granting Hometap a security interest in the Property. You may lose this Property if you do not satisfy the obligations of the Option Purchase Agreement.

You are required to maintain homeowner's insurance on the Property in accordance with Section 6.1 of the Option Purchase Agreement, including flood insurance if applicable. Your insurance policy must name Hometap Investment Partners II, L.P. as a loss payee / mortgagee.

You are responsible for paying all applicable secured loan payments, property taxes, homeowners association (HOA) fees, maintenance fees, mortgage insurance, and any other payments required in connection with the ownership and maintenance of your Property.

Please refer to your Option Purchase Agreement and Security Agreement for more information about:

- What happens if you fail to repurchase the Option before the end of the Option Period;
- What is an Event of Default under the Option Purchase Agreement;
- Situations in which Hometap can force a sale of your home; and
- Your other obligations under the Option Purchase Agreement.

## Section IV: Sample Settlement Scenarios

This section contains sample scenarios to help you understand how much it will cost to settle your Investment by repurchasing the Option. The exact amount required to settle your Investment will depend on the value of your Property at the time you settle. Because we can't predict what that will be, these scenarios are only examples to explain how settlement works.

The values in this table will not change during the Option Period; they are specific to your Investment.

| | | | |
|---|---|---|---|
| Beginning Home Value: | $250,000.00 | Hometap Percentage, if Ending Home Value ≥ Beginning Home Value: | 49.525% |
| Investment Amount: | $74,287.00 | Hometap Percentage, if Ending Home Value < Beginning Home Value: | 41.271% |

At any time during or at the end of the Option Period, you can settle the Investment by repurchasing the Option. If you do not settle the Investment when selling the Property or the Option Period ends, whichever comes first, Hometap has the right to exercise the Option and force the sale of the Property. The amount required to settle the Investment is the Hometap Share.

The following scenarios show examples of how much you may owe Hometap to settle your Investment, based on assumed potential conditions at the time the Option is repurchased or exercised. ***These values are examples only and are not intended to be promises or guarantees of actual conditions at the time the Option is repurchased or exercised.***

**Settlement Scenario 1: Appreciation** Hometap Percentage: 49.525%

This scenario shows examples of calculating the amount for settlement at different times when the Property has appreciated and the Ending Home Value is ***higher*** than the Beginning Home Value. This example assumes an annual appreciation rate of 3% for your Property.

The Hometap Share is the amount of money you must pay to Hometap to settle your Investment. It is the ***lesser*** of (1) the amount calculated using the Hometap Percentage or (2) the Hometap Cap.

The Hometap Cap is the 20% annualized rate of return on the Investment Amount. In the example below, if the Hometap Cap is shown, then the Hometap Cap is the amount you would pay to settle your Investment because it is less than the Hometap Share using the Hometap Percentage.

| Years to Settlement | Ending Home Value | Hometap Share, using Hometap Percentage | Hometap Cap, if applicable |
|---|---|---|---|
| 0.5 | $250,000 | $123,813 | **$81,695** |
| 1 | $257,500 | $127,527 | **$89,144** |
| 5 | $289,819 | $143,533 | |
| 10 | $335,979 | $166,394 | |

## Settlement Scenario 2: Depreciation

Hometap Percentage: 41.271%

This scenario shows examples of calculating the amount for settlement at different times when the Property has depreciated and the Ending Home Value is ***lower*** than the Beginning Home Value. This example assumes a total depreciation rate of 10% for your Property over the 10-year Option Period.

The Hometap Share is the amount of money you must pay to Hometap to settle your Investment. It is the ***lesser*** of (1) the amount calculated using the Hometap Percentage or (2) the Hometap Cap.

The Hometap Cap is the 20% annualized rate of return on the Investment Amount. In the example below, if the Hometap Cap is shown, then the Hometap Cap is the amount you would pay to settle your Investment because it is less than the Hometap Share using the Hometap Percentage.

| Years to Settlement | Ending Home Value | Hometap Share, using Hometap Percentage | Hometap Cap, if applicable |
|---|---|---|---|
| 0.5 | $249,975 | $103,167 | **$81,695** |
| 1 | $248,750 | $102,662 | **$89,144** |
| 5 | $237,500 | $98,019 | |
| 10 | $225,000 | $92,860 | |

## Section V: Frequently Asked Questions

This section answers questions you may have during the Option Period. If you have any questions about the information in these Investment Disclosures before the signing appointment, please contact your Investment Manager. If you have questions about your Investment after the signing appointment, please contact homeowners@hometap.com.

**I'm ready to sell my property. What should I do?**
When you're ready to sell your property, let us know at homeowners@hometap.com. We'll work with you to settle your Investment as part of the sale. After you accept a binding offer from a potential buyer, you'll need to let us know within 3 business days and at least 30 days before closing on the sale. All of the information you need to provide is in Section 2.6(b) of the Option Purchase Agreement.

**I got married! Does that affect my Investment?**
Congratulations! Because Hometap has an interest in the property, we want to make sure your new spouse or partner understands how that may affect any interest they may have in the property. Within 30 days, please have your new spouse or partner complete Exhibit F to the Option Purchase Agreement and send it to homeowners@hometap.com. More information can be found in Section 8.21 of the Option Purchase Agreement.

**How do I settle the Investment?**
You can settle the Investment by paying Hometap in the amount of the Hometap Share. The Hometap Share is based on the value of your property at the time of settlement, so we can't give you an exact number today. The sample scenarios in Section IV show potential scenarios as examples of how settlement may work for you. When you're ready to settle or get an updated estimate of the Hometap Share for your property, contact homeowners@hometap.com or login to your Hometap account.

**Are there penalties or extra fees for settling my Investment before the end of the Option Period?**
No, there are no penalties or fees for settling your Investment at any time. While the amount required to settle the Investment (the Hometap Share) will change over time based on the value of your property, any costs associated with settling (like getting your property appraised or getting a title report) apply whether you settle in the first or the last year of the Option Period.

**When I settle, do I need to get a new appraisal? Are there signing costs?**
As with the Investment signing, you'll have to pay for third-party costs and fees in order to settle your Investment. These may include a new appraisal, an updated title report, recording fees, and similar fees. Hometap will not charge you any fees to settle the Investment.

**Why is there a Hometap Cap? What is it?**
The Hometap Cap protects you from extreme increases in the Hometap Share because of unusually high appreciation or early settlement of your Investment. The math is a little complicated, but we limit the Hometap Share to an annualized 20% rate of return that's prorated for periods of less than a full year.

**Where does the Option Purchase Agreement talk about the prorated annual rate if I settle within the first year?**
Section 2.2 of the Option Purchase Agreement talks about the prorated annual rate, which we call the Hometap Cap, as part of calculating the Hometap Share. Schedule A to the Agreement also describes the Hometap Cap.

**How will renovating my property affect my Investment?**
Section 6.1(f) of the Option Purchase Agreement explains the process for adjusting the Ending Home Value of your property to take into account the value of your renovation. Be sure to let us know within 90 days of the renovation if you want to document your project for an adjustment to the Ending Home Value. You can always reach out to homeowners@hometap.com for more information.

Investment No.: FL999199

**THIS IS NOT A LOAN.**

**THIS IS AN AGREEMENT PURSUANT TO WHICH A HOMEOWNER RECEIVES PAYMENT IN EXCHANGE FOR AN OPTION TO PURCHASE A SPECIFIED PERCENTAGE INTEREST IN THE HOMEOWNER'S HOME THAT MAY BE EXERCISED IN THE FUTURE UPON THE OCCURRENCE OF CERTAIN EVENTS SUCH AS A SALE OF THE HOME.**

# OPTION PURCHASE AGREEMENT

This Option Purchase Agreement (this "**Agreement**") is entered into as of the date of last signature (the "**Signing Date**") by and between Hometap Investment Partners II, L.P., a Delaware limited partnership with its principal offices at 800 Boylston Street, 16th Floor, Boston, MA 02199 ("**we**", "**our**", "**us**", and/or "**Hometap**"), and the homeowner(s) set forth on the signature page attached hereto under the heading of "Owner" ("**you**", "**your**", and/or the "**Owner**"). Capitalized terms used in this Agreement but not otherwise defined shall be defined as set forth in the Investment Term Sheet (as defined below).

**WHEREAS,** Hometap wishes to purchase an exclusive and irrevocable option to acquire, in the future, a percentage possessory interest in Owner's home according to the terms and conditions of this Agreement and to provide the Owner with consideration in exchange for granting such an option;

**WHEREAS,** the Owner wishes to grant Hometap the requested option according to the terms and conditions of this Agreement in exchange for the Investment Amount and understands that by doing so, Hometap shall immediately have a contractual and economic interest in the Owner's home that may be exercised in the future, at which time Hometap may have a possessory interest in the Owner's home;

**WHEREAS,** Hometap wishes to protect its economic interest in the Option through the mechanisms identified in this Agreement and the concurrent Mortgage and Security Instrument, and these and other documents shall be recorded in a manner to establish the priority of Hometap's economic interest;

**WHEREAS,** as of the Signing Date, the Owner and Hometap have conducted and completed the execution of this Agreement (the "**Investment Signing**") at which the Owner has reviewed, confirmed, executed, and returned to Hometap a full, complete, and accurate Investment Term Sheet (the "**Investment Term Sheet**"), which together with this Agreement define, among other information, the Beginning Home Value, Investment Amount, Net Investment Amount, Hometap Percentage, Hometap Share, and Investment Fee;

**WHEREAS,** as of the Signing Date, Hometap has deposited the Investment Amount, as set forth in the Investment Term Sheet, in escrow with the Settlement Agent, which shall be disbursed upon the Effective Date in accordance with the terms and conditions of this Agreement;

**WHEREAS,** the Investment Term Sheet sets forth certain fees, costs, and expenses that Hometap shall incur and/or charge to the Owner in connection with its purchase of the Option;

**WHEREAS,** the Investment Term Sheet is attached and made a part of this Agreement as Schedule A; and

**WHEREAS**, in reliance upon the Investment Term Sheet, and the terms and conditions set forth in this Agreement, Hometap wishes to purchase the Option, and the Owner wishes to sell the Option and accept the Investment Amount, as described in this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Owner and Hometap agree as follows:

## SECTION 1
## OPTION PURCHASE

Section 1.1 Option and Hometap Percentage. You agree to sell to Hometap an exclusive and irrevocable option (the "**Option**") to acquire an undivided percentage interest (the "**Hometap Percentage**") of fee simple title ownership in that certain residential real property owned by the Owner as more fully identified and described on Exhibit A (the "**Property**"), which is attached and made a part of this Agreement. The Property will include only the real property described in Exhibit A and fixtures appurtenant thereto, as covered by a UCC-1 Financing Statement, as more fully set forth in Section 1.2(a)(v) below.

Section 1.2 Agreement Execution and Delivery. In connection with the execution and delivery of this Agreement, the Settlement Agent has conducted the Investment Signing, at which you have:

(a) Executed and delivered to the Settlement Agent originals of the following documents (each as well as other documents completed and delivered in connection with the consummation of the transactions contemplated by this Agreement an "**Investment Document**", and together the "**Investment Documents**"):

(i) this Agreement;

(ii) the Investment Term Sheet;

(iii) a notarized Memorandum of Option Purchase Agreement summarizing the provisions of this Agreement, substantially in the form set forth in Exhibit B, which is attached and made a part of this Agreement (the "**Memorandum of Option**");

(iv) a notarized Mortgage and Security Instrument substantially in the form set forth in Exhibit C, which is attached and made a part of this Agreement (the "**Mortgage and Security Instrument**");

(v) a complete and satisfactory UCC-1 Financing Statement substantially in the form set forth in Exhibit D, which is attached and made a part of this Agreement (the "**UCC-1**", and together with the Memorandum of Option and Mortgage and Security Instrument, the "**Security Instruments**");

(vi) a Notice of Right to Cancel, substantially in the form as set forth in Exhibit E, which is attached and made a part of this Agreement; and

(vii) a Consent of Spouse/Domestic Partner, as defined below, if applicable, in form and substance satisfactory to Hometap, and substantially in the form as set forth in Exhibit F, which is attached and made a part of this Agreement.

(b) Provided (i) written evidence that Hometap has been added as a loss payee (or as we otherwise direct) on all of Owner's insurance policies for the Property and the Settlement Agent is satisfied

with the evidence thereof or (ii) written authorization for Hometap to be added as a loss payee (or as we otherwise direct) on all of Owner's insurance policies for the Property;

(c) Received the Signing Instructions prepared and provided by the Settlement Agent based upon the Investment Term Sheet, which shall set forth the use and disbursement of the Investment Amount (the "**Signing Instructions**"); and

(d) Provided the Settlement Agent any other documents and information we reasonably request to have completed the Investment Signing and secure and perfect the Option and related documents as a lien upon the Property.

Section 1.3 Right to Cancel.

(a) You have a right to rescind and cancel this Agreement ("**Right to Cancel**") by delivering written notice to us at any time prior to 11:59 p.m. Eastern Time on the third (3rd) Business Day following the Signing Date (the "**Cancellation Period**") of your exercise of your Right to Cancel.

(b) If you exercise your Right to Cancel during the Cancellation Period, then this Agreement shall become null and void and of no further legal effect or consequence, the Investment Amount shall be returned to Hometap, and you and Hometap shall have no further obligations to one another.

(c) If you do not exercise your Right to Cancel during the Cancellation Period, then upon expiration thereof, this Agreement shall become binding and effective upon the parties at 12:00 a.m. Eastern Time on the first Business Day following the Cancellation Period (the "**Effective Date**").

(d) For purposes of this Agreement, a "**Business Day**" shall be all calendar days except Sundays and any day that is a federal banking holiday in the United States.

Section 1.4 Disbursement of Funds and Recording of Documents. Upon the Effective Date:

(a) Disbursement of Investment Amount and Net Investment Amount. Hometap shall cause the Investment Amount to be disbursed by the Settlement Agent in accordance with the Settlement Instructions, and the Net Investment Amount shall be delivered and paid to the Owner via wire transfer or check, as instructed by the Owner as soon as reasonably practicable on or following the Effective Date.

(b) Recording of Documents. Hometap shall use commercially reasonable efforts, via the Settlement Agent, to record and file the Security Instruments, as well as any other documents evidencing the satisfaction of liens or encumbrances on the Property as a result of the payments made pursuant to the Settlement Instructions with the appropriate county recorder or other applicable governmental, city, county, or municipal office in which the Property is situated. You agree to take any reasonable actions and sign any additional documentation deemed necessary or desirable by Hometap to allow Hometap to record and file the Security Instruments and any related documents.

Section 1.5 Option Period. The term of the Option (the "**Option Period**") shall commence on the Effective Date and shall continue until the earlier of (a) an Owner Repurchase (as defined below), (b) a Hometap Option Exercise (as defined below), or (c) 11:59 p.m. Eastern Time on the tenth (10th) anniversary of the Effective Date (the "**Expiration Date**"); *provided, however*, that Hometap may extend the Option Period one or more times by up to a total of an additional ten (10) years, by providing you with written notice (an "**Extension Notice**") of our intent to extend the Option Period prior to the Expiration Date or the conclusion of any Extension Period (as defined below). Any Extension Notice shall include the period for which Hometap intends to extend the Option Period (such period being the "**Extension Period**", and the

Option Period and any Extension Period collectively being the "**Effective Period**"), and upon any such extension, the Expiration Date shall be accordingly extended to the last day of any Extension Period. The Extension Period shall continue until the earlier of (a) an Owner Repurchase (as defined below), (b) a Hometap Option Exercise (as defined below), or (c) 11:59 p.m. Eastern Time on the last day of the Extension Period.

## SECTION 2
## OPTION CONDITIONS

Section 2.1 Determination of Ending Home Value. The "**Ending Home Value**" shall be (i) determined by the Appraisal Process (as defined below in Section 2.3) or (ii) in the event of a Permitted Sale (as defined below in Section 2.6(a)), the sale price of the Property, provided that such price is at least ninety percent (90%) of the value of the Property determined by the Appraisal Process.

Section 2.2 Calculation of the Hometap Share. The "**Hometap Share**" represents the value of Hometap's interest in the Property by virtue of the Option and shall be determined by multiplying (a) the Hometap Percentage, as set forth in the Investment Term Sheet, by (b) the Ending Home Value; *provided, however*, that the Hometap Share shall not exceed an amount equal to an annualized rate of return of twenty percent (20%) on the Investment Amount ("**Hometap Cap**"), as further described in the Investment Term Sheet.

Section 2.3 Appraisal Process.

(a) Physical Appraisal. For purposes of this Agreement, a "**Physical Appraisal**" shall mean a physical inspection and appraisal of the Property that meets the following criteria:

(i) the appraiser will be selected by us or approved in advance by us;

(ii) the appraiser must be unaffiliated with either you or us or any other individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government, or any agency or political subdivision of any of the foregoing (each a "**Person**") with an interest in the Property, such as a potential third-party buyer;

(iii) the inspection and appraisal of the Property must be done in compliance with the Uniform Standards of Professional Appraisal Practice; and

(iv) the Owner shall be responsible for payment of Appraisal costs.

(b) Second Physical Appraisal. In any circumstance where the Ending Home Value is being determined by an Appraisal under the terms of this Agreement, either the Owner or Hometap shall have the right to order and complete a second Physical Appraisal. If either party desires to have a second Physical Appraisal, then (a) the second Physical Appraisal must be completed (not just requested or ordered) within thirty (30) days after receiving final results of the first Appraisal and at least ten (10) Business Days before any scheduled closing or settlement, and (b) the Ending Home Value will then be the average of the value of the two Appraisals. Notwithstanding anything in this Agreement to the contrary, the party requesting a second Physical Appraisal shall bear the costs associated with such second Physical Appraisal. The process of undertaking and completing one or two Appraisals under this Agreement shall be referred to as the "**Appraisal Process**".

(c) Alternative Appraisal. Notwithstanding the requirements of Section 2.3(a) above, Hometap may elect to utilize an alternative method of appraisal (an "**Alternative Appraisal**") in lieu of a Physical Appraisal and such Alternative Appraisal shall be deemed binding for all purposes under this Agreement as if such Alternative Appraisal was a Physical Appraisal, subject to the rights of the Owner or Hometap to request a second Physical Appraisal pursuant to Section 2.3(b) above.

(d) Appraisal. For purposes of this Agreement, the singular or plural term "**Appraisal**" shall include, in Hometap's sole discretion, either a Physical Appraisal as defined in Section 2.3(a) or an Alternative Appraisal as defined in Section 2.3(c).

(e) Cooperation. Each party agrees to comply with the Appraisal Process and cooperate in good faith with any third-party vendors so that the Physical Appraisal(s) may be completed in a timely and effective manner.

(f) Notice. If applicable, Hometap shall deliver to you written notice of the Ending Home Value and the Hometap Share within ten (10) Business Days after completion of the Appraisal Process.

(g) Cost of Physical Appraisals. You will pay all reasonable costs and expenses associated with any Physical Appraisal ordered, scheduled, or conducted in accordance with the terms of this Agreement.

Section 2.4 Owner Repurchase.

(a) Owner Right to Repurchase. The Owner shall have the right to repurchase the Option (an "**Owner Repurchase**") from Hometap in the amount of the Hometap Share in accordance with the terms and conditions of this Agreement.

(b) Repurchase Notice. You may elect to complete an Owner Repurchase at any time during the Effective Period, regardless of whether a Transfer is contemplated, by delivering to us written notice (a "**Repurchase Notice**"). Within fifteen (15) Business Days of our receipt of a Repurchase Notice, we shall have the right to conduct the Appraisal Process, at your cost, and determine the Ending Home Value for purposes of calculating the Hometap Share. Within ten (10) Business Days after completion of the Appraisal Process, Hometap shall deliver to you written notice of the Ending Home Value and the Hometap Share and schedule a settlement of the Owner Repurchase (the "**Repurchase Settlement**").

(c) Confirmation of Title. Upon receipt of your Repurchase Notice, we may request, as evidenced by a completed title report, at your cost, confirmation of good and marketable title in and to the Property in fee simple and free of any Liens and Encumbrances (as defined below in Section 2.6(a)(iii)), subject only to the Permitted Encumbrances (as defined below in Section 2.6(a)(iii)), to be provided in the form either (i) of a policy of title insurance issued to, or for the benefit of, Hometap and insuring our rights under the Investment Documents; or (ii) of a written title report, abstract of title, or other title search documentation reflecting, to our satisfaction, confirmation of good and marketable title to the Property (either such form of confirmation being "**Confirmation of Title**").

(d) Transfer. In the event of a Transfer (as defined below in Section 2.5(a)), you agree to follow all procedures set forth below in Section 2.6 in addition to those provided herein in Section 2.4. Should any procedures be inconsistent, those procedures in Section 2.6 shall control.

(e) Expiration. In the event of the Expiration Date, you agree to follow all procedures set forth below in Section 2.7 in addition to those provided herein in Section 2.4. Should any procedures be inconsistent, those procedures in Section 2.7 shall control.

(f) Sufficiency of Tender. Hometap retains the right to reject any tender by you of the Hometap Share payment where we believe your tender is not for the full amount of the Hometap Share, is not actually received by us, is not tendered within the time frame agreed to by you and us, or is subject to any legal limitation.

(g) Termination of Option. Upon our receipt of the Hometap Share payment, the Option shall be terminated, and we will have no further right to exercise the Option or have any further interest whatsoever in the Property. After our receipt of the Hometap Share (together with any other amounts owed by Owner to Hometap under the terms of this Agreement), we will terminate and release the Security Instruments and deliver any other documents reasonably required to verify the termination of the Option and release of the Security Instruments. Owner will be responsible for all Closing Costs as defined and set forth in Section 2.6(d)(iv) below.

Section 2.5 Hometap Right to Exercise Option. Unless and until you elect and complete an Owner Repurchase, Hometap shall have the right to exercise the Option (a "**Hometap Option Exercise**"), as provided for below in Section 3.1, upon any of the following events or occurrences during the Effective Period:

(a) any Permitted Sale (as defined below in Section 2.6(a)), or other sale, exchange, transfer, conveyance, or assignment of all or any part of the Property or any legal or beneficial interest in the Property (any such occurrence being a "**Transfer**"), as provided below in Section 2.6; *provided, however*, that any Transfer to a surviving Owner or estate of an Owner in the event of a death of an Owner shall not trigger a Hometap Option Exercise;

(b) on or in anticipation of the Expiration Date, as provided below in Section 2.7;

(c) upon an Event of Default, as provided below in Section 7;

(d) upon destruction of the Property as provided below in Section 6.1(d); or

(e) upon condemnation of the Property, as provided below in Section 6.1(h).

Section 2.6 Event of Transfer.

(a) Permitted Sale. For purposes of this Agreement, a "**Permitted Sale**" shall mean a Transfer of the Property that meets the following conditions as determined in Hometap's sole reasonable discretion:

(i) the Transfer must be a transaction entered into in good faith without fraud or deceit carried out by unrelated or unaffiliated parties, by a willing buyer and a willing seller, each acting in his or her own self-interest, in which the sale price represents fair market value of the Property (an "**Arm's Length Transaction**"); *provided, however*, that an Arm's Length Transaction does not include any of the following: (A) a transaction between family members or business associates at less than fair market value of the Property, (B) a transaction subject to hidden terms or agreements or special understandings between the parties, whether written or oral (for example, the seller to regain ownership of the Property or the buyer to resell the Property and the seller to receive any proceeds from the resell transaction), or (C) a Transfer in which the sale price of the Property is less than ninety percent (90%) of the fair market value as determined by an Appraisal;

(ii) the terms and conditions of an Arm's Length Transaction will be set forth in a commercially reasonable standard form of Agreement for the Purchase and Sale of Real Property (a "**P&S**") prepared and negotiated by legal counsel with experience in such matters; and

(iii) you must convey title free and clear of any and all (A) licenses, easements, equitable servitudes, public bond obligations, and other conditions, covenants, restrictions and rights to which the Property is subject (collectively, "**Liens and Encumbrances**"), except for those: (1) that are stated as exceptions in the Confirmation of Title, or (2) to which we have expressly agreed in writing that the Property will remain subject (such excepted Liens and Encumbrances being "**Permitted Encumbrances**"), and (B) loans or other obligations (such items being "**Senior Liens**"), or any other liens on the Property to secure the payment of any loans or the performance of any obligations owed to any creditor or third-party vendor.

(b) Notices and Documentation upon Proposed Transfer. In connection with any Transfer, the Owner agrees as follows:

(i) Permitted Sale: Owner Notice of Binding Offer. In the event of a Permitted Sale, Owner shall provide Hometap written notice (a "**Binding Offer Notice**") of any binding offers to Transfer the Property to any Person who proposes to purchase the Property (a "**Third-Party Buyer**"). Such Binding Offer Notice must be delivered within three (3) Business Days of receiving such binding offer and, in any event, no less than thirty (30) days prior to the proposed closing date for such Permitted Sale. Any binding offers shall be in form and substance that are typical of real property purchases and sales for the state in which the Property is located and shall be required to include terms and conditions evidencing an Arm's Length Transaction. A Binding Offer Notice shall include a full and complete copy of the binding offer, which must include the name of the Third-Party Buyer, the sale price, the proposed closing date for the Permitted Sale, the proposed inspection date, if any, and any and all other material terms and conditions of the proposed Permitted Sale, including, without limitation, any financing or mortgage contingencies. The Binding Offer Notice must also indicate whether the Owner intends to complete an Owner Repurchase prior to, or simultaneous with, the closing of the Permitted Sale.

(ii) All Other Transfers: Owner Notice of Transfer. In the event of any Transfer other than a Permitted Sale, Owner shall provide Hometap written notice (a "**Transfer Notice**") no less than thirty (30) days prior to the closing date for such Transfer. A Transfer Notice shall include a full and complete copy of the documents governing the Transfer, which must include the name of the transferee, the sale price (if any), the proposed closing date for the Transfer, the proposed inspection date (if any), and any and all other material terms and conditions of the proposed Transfer, including, without limitation, any financing or mortgage contingencies. If the Owner intends for the Transfer to be an Exempted Owner Assignment (as defined below in Section 8.9(b)) or an Exempted Owner Property Transfer (as defined below in Section 8.9(c)), the Owner shall provide any additional necessary documentation in the Transfer Notice. The Transfer Notice must also indicate whether the Owner intends to complete an Owner Repurchase prior to, or simultaneous with, the closing of the Transfer.

(iii) Notice of Hometap Option Exercise upon a Transfer. Following receipt of a Binding Offer Notice or a Transfer Notice in which you do not elect to exercise your right to an Owner Repurchase, and prior to the closing of the proposed Transfer contemplated by such Binding Offer Notice or Transfer Notice, Hometap shall have the right to complete a Hometap Option Exercise, as further described in Section 3.1, by delivering to you a written notice (an "**Exercise Notice**") of our intent to do so. Upon receipt of an Exercise Notice, you (A) shall not consummate any closing of the Transfer unless and until Hometap has completed its Hometap Option Exercise and all actions deemed necessary or advisable by Hometap to document its interest in the Property, and (B) shall promptly, and in no event more than two (2) Business Days from receipt thereof, provide Hometap all documents, binding offers, escrow instructions, preliminary title reports, and any other materials and information relating to the proposed Transfer that become available.

Following receipt of such materials, Hometap shall use commercially reasonable efforts to complete its Hometap Option Exercise and all actions deemed necessary or advisable by Hometap to document its interest in the Property prior to any closing of a Transfer.

(c) Appraisal Process upon Transfer. Within fifteen (15) Business Days of receiving notice of your election to exercise the Owner Repurchase or our delivering you an Exercise Notice, we may undertake the Appraisal Process and conduct an Appraisal.

(d) Transfer Closing. Any Transfer shall be completed through a closing process (the "**Transfer Closing**") that is commercially reasonable and follows standard practices and procedures for the purchase and sale of real property in the state in which the Property is located, including without limitation using the services of a Settlement Agent. The Owner shall provide written notice (the "**Transfer Closing Notice**") to Hometap promptly, and in any event no later than ten (10) Business Days prior to the date of the Transfer Closing. The Transfer Closing Notice shall include the proposed date of the Transfer Closing, and any and all relevant documents related to such Transfer Closing, including written settlement instructions, identification and acknowledgement of an Owner Repurchase or Hometap Option Exercise, and instructions for the payment of the Hometap Share. Hometap shall have the right to (A) review and provide input on any such settlement instructions and (B) have a representative attend the Transfer Closing. The Owner acknowledges and agrees that the completion of an Owner Repurchase or Hometap Option Exercise shall be concurrent with a Transfer Closing.

(i) Transfer Closing Deliverables. On or prior to a Transfer Closing where there will be an Owner Repurchase or a Hometap Option Exercise, you agree to deliver to the Settlement Agent the appropriate deeds, affidavits, certificates, notices, and other documents required by law, the Settlement Agent or us, in form satisfactory to us, to effect the Owner Repurchase or the Hometap Option Exercise.

(ii) Payment Allocations. At any Transfer Closing where there will be an Owner Repurchase, the Owner shall be responsible for paying Hometap the Hometap Share, as well as any Closing Costs (as defined below in Section 2.6(d)(iv)).

(iii) Termination and Release by Hometap at Transfer Closing. Within ten (10) Business Days of any Transfer Closing, and contingent upon our receipt of the Hometap Share funds, we will submit the documents necessary to terminate and release the Security Instruments.

(iv) Closing Costs. Owner shall pay all costs in connection with a Transfer Closing or Repurchase Settlement including, without limitation, recording fees and costs, reconveyance fees, lien release fees, escrow fees, title insurance fees, federal, state, local and documentary transfer taxes ("**Closing Costs**") and all sales commissions ("**Sales Commissions**"). Closing Costs and Sales Commissions shall be paid from the amounts that are owed to Owner and not from any amounts that are owed to Hometap; *provided, however*, that Owner shall pay Hometap directly for any Closing Costs or Sales Commissions incurred by Hometap and as detailed on the settlement instructions provided by Hometap to Owner.

Section 2.7 Event of Expiration Date.

(a) In the event that the Option remains in [illegible] and has not been, nor is the subject of, a Hometap Option Exercise or Owner Repurchase, then (i) [illegible] Owner has the right to complete an Owner Repurchase as of the Expiration Date, and (ii) Hometap shall have the right to complete a Hometap Option Exercise as of the Expiration Date (either an Owner Repurchase as of the Expiration Date or a Hometap Option Exercise as of the Expiration Date being an "**Expiration Settlement**"), each implemented by

delivering written notice to the other party (either a Repurchase Notice or Exercise Notice, as appropriate) prior to the Expiration Date.

(b) Any Owner Repurchase or Hometap Option Exercise shall follow the procedures, terms, and conditions of Section 2.4 and Section 3.1, respectively. Should any provisions be inconsistent, those provisions of this Section 2.7 shall control.

(c) If we are not satisfied with the Ending Home Value following the Appraisal Process, or with the Confirmation of Title, we may withdraw or reject the Expiration Settlement without any penalty to us, and extend the Effective Period as provided in this Agreement.

## SECTION 3
## EXERCISE OF OPTION; OTHER TERMINATION OF OPTION

Section 3.1 Exercise of Option. Exercise of the Option shall allow Hometap to acquire a percentage possessory ownership interest in the Property equivalent to the Hometap Percentage at the time of exercise.

(a) Exercise Notice. Upon our election to exercise our right to a Hometap Option Exercise, we shall provide you with an Exercise Notice at least thirty (30) days prior to the anticipated date for closing the Hometap Option Exercise (**"Exercise Closing"**). The Exercise Notice shall specify the Exercise Closing date, the Exercise Payment (as defined below in Section 3.1(e)), written settlement instructions, and instructions for release of the Security Instruments upon completion of the Hometap Option Exercise.

(b) Hometap Ownership. In Hometap's sole discretion, we may implement the Hometap Exercise Option by (i) taking joint ownership of the Property with you and (ii) soliciting a Transfer of the entire Property, including your interest, to one or more Third-Party Buyers, and receiving the Hometap Share and the Exercise Payment in connection with such Transfer. Hometap's ownership of the Property shall be a percentage possessory interest in the Property equivalent to the Hometap Percentage at the time of the Hometap Option Exercise. If Hometap takes joint ownership of the Property, the legal form of such joint ownership will be decided by us, which may include a trust with you and us as beneficiaries.

(c) Owner Repurchase. After receiving the Exercise Notice, you may exercise your right to elect an Owner Repurchase pursuant to Section 2.4 above; *provided that* (i) you deliver a Repurchase Notice to Hometap at least twenty (20) days before the Exercise Closing date; (ii) the Repurchase Settlement must (A) occur (1) within fifteen (15) days of you providing us with a Repurchase Notice, and (2) prior to any scheduled Exercise Closing, and (B) use an Ending Home Value that is the value of the Property as determined by an Appraisal. If you elect to make an Owner Repurchase but the Repurchase Settlement is not completed within the prescribed periods in this Section 3.1(c), then (1) your right to make an Owner Repurchase may be terminated, and (2) we may elect to immediately exercise a Hometap Option Exercise.

(d) Exercise Closing. You agree to take any reasonable actions and sign any documentation deemed necessary or desirable by Hometap to allow Hometap to complete the Hometap Option Exercise, including without limitation participating in an Exercise Closing, and to effect our Hometap Percentage possessory interest in the Property.

(e) Disbursement of Exercise Closing Payment. In consideration for the Hometap Percentage possessory interest in the Property, Hometap shall issue a payment to you in the amount of one percent (1%) of the Investment Amount (**"Exercise Payment"**). Hometap shall cause the Exercise Payment to be disbursed by the Settlement Agent in accordance with the Exercise Notice, and the Exercise Payment shall be delivered and paid to the Owner via wire transfer or check, as instructed by the Owner, as soon as reasonably practicable at or following the Exercise Closing.

(f) Recording of Documents. Hometap shall use commercially reasonable efforts, via the Settlement Agent, to record and file the any documents evidencing the Hometap Option Exercise and the Hometap Percentage possessory interest in the Property with the appropriate county recorder or other applicable governmental, city, county, or municipal office in which the Property is situated. You agree to take any reasonable actions and sign any additional documentation deemed necessary or desirable by Hometap to allow Hometap to record and file such documents.

(g) Transfer Following Hometap Option Exercise.

(i) Occupancy. Prior to a Transfer, you will retain physical possession and the exclusive right to occupy the Property (except if we determine that the Property is at risk of waste or gross neglect, in which case we will have discretionary rights of entry or possession solely in order to preserve and maintain the Property).

(ii) Initiation of Transfer by Owner. If you intend to initiate a Transfer, such Transfer shall meet the conditions of a Permitted Sale as described above in Section 2.6(a). Furthermore, you agree to comply with the requirements of Section 2.6 in completing the Transfer.

(iii) Initiation of Transfer by Hometap. If we choose to initiate a Transfer, we will provide you with written notice at least ten (10) Business Days prior to soliciting buyers and transferring the Property to one or more third parties in a Transfer. You will cooperate by allowing access to the Property and promptly executing all documents presented to you by us to effect a Transfer of your interest in the Property to the Third-Party Buyer.

(iv) Ending Home Value and Payment of the Hometap Share. In any Transfer following a Hometap Option Exercise, the Ending Home Value will be the sale price of the Property. At the Transfer Closing for such Transfer, the sale proceeds will be allocated and paid in the manner described in this Section 3.1 and above in Section 2.6(d)(ii), and we will be paid (A) any Closing Costs that we paid as further detailed in Section 2.6(d)(iv) and (B) any other amounts paid by us related to the preparation, marketing, or sale of the Property.

Section 3.2 Non-Exercise; Other Terminations of Option. Subject to the continuing duties, rights, and obligations of the parties in this Agreement, the Option will terminate under the following conditions if there has not been a prior Owner Repurchase or Hometap Option Exercise:

(a) upon a Permitted Sale for which we received a Binding Offer Notice, as provided above in Section 2.4(b)(1), and we affirmatively elected not to exercise the Option and complete a Hometap Option Exercise;

(b) we elect not to complete a Hometap Option Exercise as of the Expiration Date and allow the Option to lapse as of the Expiration Date;

(c) the Property is destroyed and the insurance proceeds and proceeds of any sale of the Property are paid to us in the full amount specified below in Section 6.1(d);

(d) the Property is condemned, in whole and not in part, and the condemnation proceeds are paid to us in the full amount specified below in Section 6.1(h); or

(e) we voluntarily terminate the Option in a written notice delivered by us to you.

Section 3.3 Effect of Non-Exercise and Termination. If the Option is terminated as provided above in Section 3.2, then:

(a) the Option and our rights to exercise the Option will immediately terminate;

(b) the Investment Amount will be retained by you in consideration for the Option;

(c) subject to any survival provisions, this Agreement and any and all the other Investment Documents will terminate and be of no further legal force or effect; and

(d) we will execute, acknowledge, deliver to you, and record and file with the appropriate county recorder or other applicable governmental, city, county, or municipal office in which the Property is situated a termination and release of the Memorandum of Option, a reconveyance of the Security Instruments (including the filing of a termination statement to terminate the UCC-1), and any other documents reasonably required to verify the termination of the Option and the Investment Documents; *provided, however*, that certain obligations and provisions of this Agreement will survive such termination as provided below in Section 8.10.

## SECTION 4
## OWNER REPRESENTATIONS AND WARRANTIES

Section 4.1 Owner Representations and Warranties. The truth, accuracy, and completeness of the representations and warranties set forth in this Section 4.1 are a condition precedent to any of Hometap's obligations under each of the Investment Documents. The Owner hereby represents and warrants to Hometap as of the Effective Date, and hereby renews and reiterates such representations and warranties upon any consummation of a Hometap Option Exercise or Owner Repurchase as provided for in this Agreement, as follows:

(a) Title to Property. You, as Owner(s) identified in this Agreement, individually and collectively, appear on record title of the Property as holding fee simple title to 100% of the Property. There are no other Persons who have a claim to any title to the Property, and all Owners are identified in this Agreement. Your fee simple title to the Property is marketable and insurable, free of any Liens and Encumbrances, except for any Permitted Encumbrances, and there are no additional existing or pending Liens and Encumbrances, or any other claims, restrictions, or other interests against the title to the Property.

(b) Capacity and Authority. You have the full capacity and the legal power, right, and authority to grant the Option, to enter into this Agreement and the other Investment Documents, and to consummate the transactions contemplated hereby and thereby.

(c) Trust. If you are the Trustee of a Revocable Trust: (a) the trust has been duly formed; (b) the Trustees of the trust have the capacity and authority to enter into this Agreement and the other Investment Documents; and (c) true, accurate, and complete copies of all trust documents (and all amendments and supplements) have been delivered to us. For purposes of this Agreement, a "**Revocable Trust**" shall mean a revocable trust, revocable living trust, inter vivos trust, revocable family trust or similar trust established in accordance with the laws of any state.

(d) No Lawsuits, Claims, Bankruptcy, or Foreclosures. There is no litigation or arbitration pending, or to your knowledge, threatened against you relating to your ownership of the Property or that might adversely affect your title to the Property, the Property itself, the value of the Property, the Hometap Share, Hometap's rights herein, or your ability to perform your obligations under this Agreement. You have not received nor are you aware of any: (a) special assessment or other proceedings affecting the Property;

(b) default or notice of default with respect to any loan or other obligation secured by the Property; (c) notice of sale with respect to any lien or deed of trust or mortgage (as appropriate) on the Property; or (d) information or notice that the Property is to be sold or foreclosed upon by a Person holding a lien on the Property.

(e) No Violations. There are no violations of, or claims of violation of, any laws, regulations, zoning ordinances or other land-use regulations relating to the Property and all operations or activities upon, or use or occupancy of the Property or any portion of the Property, by you or others comply with law, including local laws and zoning ordinances.

(f) Environmental Matters. To your knowledge, there are no violations of, or claims of violation of, any state, federal, or local environmental law or regulation relating to the Property, including those concerning hazardous materials ("**Environmental Laws**"). To your knowledge, no hazardous materials are present on, in, or about the Property or property in the vicinity of the Property. You will not, and will not allow others to, violate any laws, including, without limitation, Environmental Laws, relating to the Property or perform any activities upon, or use or occupy the Property or any portion of the Property, in any manner that violates any laws, including, without limitation, Environmental Laws.

(g) Documentation and Information Supplied by Owner; Financial Condition of Owner. Your application to us and all financial and other documentation and other information supplied or made available by you or your spouse or co-owner, if applicable, as part of applying for, or in connection with entering into, this Agreement, the Option, and the Investment Documents is truthful, complete, not misleading, and fairly and accurately reflects your (and, if applicable, your spouse's or co-owner's) financial condition as of (a) the date supplied and (b) the Effective Date. There has been no material change in your financial condition as of the Effective Date since your application to us. To your knowledge, there has not been any change in the condition or value of the Property since the date of any Appraisal conducted prior to the Effective Date.

(h) New Debt or Obligations. Since the date on which you initiated discussions with Hometap, you have not incurred (or agreed to incur) any additional obligations with respect to the Property such as additional debt or other investments in the equity or appreciation of the Property, nor have any additional liens been placed (or, to your knowledge, will be placed) on the Property, in each case other than where you have provided written notification to Hometap of such debt, obligations, or liens.

(i) Not a Loan. You acknowledge and understand that the payment of the Investment Amount by Hometap is not a loan or any other form of financing transaction, swap, or futures contract. Under no circumstances will the Investment Amount accrue interest, and if the Option expires, then you will not be obligated to return or repay the Investment Amount.

(j) Conflict; Enforceability. The execution, delivery, and performance of the Investment Documents will not conflict with, or result in a breach of, any of the terms, conditions, or provisions of, or constitute a default under, any note or other evidence of indebtedness or any contract, indenture, mortgage, deed of trust, loan, agreement, lease, or other agreement or instrument to which you are a party or by which the Property may be bound. The Investment Documents and all other documents required to be executed by you in connection with those documents are and will be valid, legally binding obligations of, and enforceable against, you and any successors or permitted assignees in accordance with their terms.

## SECTION 5
## HOMETAP REPRESENTATIONS AND WARRANTIES

Section 5.1 Hometap Representations and Warranties. Hometap hereby represents and warrants to the Owner as of the Effective Date, and hereby renews and reiterates such representations and warranties upon any consummation of a Hometap Option Exercise or Owner Repurchase as provided for in this Agreement, as follows:

(a) Authority. Hometap is a duly established and organized Delaware limited partnership, is in good standing in all jurisdictions in which it is qualified to do business, and is duly authorized to execute and deliver this Agreement, to enter into transactions contemplated hereunder, and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery, and performance.

(b) Enforceability. Hometap's obligations under this Agreement and any related agreement to which it is a party constitute its legal, valid, and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium, or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

## SECTION 6
## COVENANTS

Section 6.1 Owner Covenants. During the Effective Period, the Owner hereby agrees to comply with and satisfy and observe the following covenants:

(a) Maintain Mortgage, Liens and Encumbrances and Other Secured Obligations. You shall (i) maintain, pay, keep current, and comply with any and all obligations, maintenance requirements, and covenants under your primary mortgage and any and all other mortgages, loans, and obligations that are senior to the lien established by the Security Instruments, the covenants running with the land under this Agreement, and the Option, of which (A) we have actual written notice under a title report, title search, or title commitment obtained in connection with this Agreement and the transaction related thereto, and (B) that are acknowledged in writing by us before or upon our execution of this Agreement (each an "**Acknowledged Pre-Existing Lien**"), and you shall notify Hometap promptly in writing of any defaults or potential or pending defaults thereunder; and (ii) at all times keep the Property free of any and all Liens and Encumbrances, except for (A) Acknowledged Pre-Existing Liens, (B) Permitted Encumbrances, and (C) Approved Subsequent Loans (as defined below in Section 6.1(i)(ii)).

(b) Owner Occupied; Right of Occupancy. During the Effective Period, the Owner (or at least one Owner if there are multiple Owners) shall occupy the Property as Owner's principal place of residence ("**Owner Occupied**") other than during periods of vacancy no longer than ninety (90) days due to renovation. In the event you desire for the Property to no longer be Owner Occupied, you must request such change in writing from Hometap, which shall be approved or denied in Hometap's sole discretion. You will enjoy continuous right of occupancy of the Property as an owner, and not as a tenant or lessee, whether or not we have completed a Hometap Option Exercise, subject to the rights of you and Hometap to Transfer the Property pursuant to the terms of this Agreement. Your sole right of occupancy will be effective only so long as you do not Transfer or attempt to Transfer the Property except as permitted under this Agreement. Your sole right of occupancy is not transferable by you except as part of a Permitted Sale or Exempted Owner Property Transfer, or as otherwise permitted by us.

(c) Maintain Adequate Insurance Coverage. You will keep the Property and all buildings or other customarily insured improvements upon the Property insured by a nationally recognized insurer acceptable to us against loss by fire, hazards of extended coverage, other hazards common for similar properties in similar locations, and other hazards we may request, in an amount equal or greater than the full insurable value of the Property, but in no event less than the minimum amount necessary to fully compensate for any damage or loss on a replacement cost basis. All such insurance policies will name us and our successors and assigns as a loss payee (or as we otherwise direct). If the Property is or becomes located in an area identified on a flood hazard map or flood insurance rate map issued by the Federal Emergency Management Agency as having special flood hazards, a flood insurance policy meeting the requirements of the guidelines of the Federal Insurance Administration is and will be in effect, which policy is and will be issued by a nationally recognized insurer acceptable to us and provide coverage in an amount equal to not less than the lesser of the full insurable value of the Property or the maximum amount of insurance available under the National Flood Insurance Act of 1968. All such flood insurance policies will name us and our successors and assigns as a loss payee (or as we otherwise direct). You will timely pay all premiums for all such insurance policies and, if you fail to do so, we are authorized to maintain and/or obtain such policies at your cost and expense, and you will immediately reimburse us for such costs and expenses. Hometap is under no obligation to purchase any particular type or amount of coverage. As such, coverage shall cover Hometap but may not protect Owner, Owner's equity in the Property, or the contents of the Property and might provide greater or lesser coverage than was previously in effect. You shall provide written evidence of your compliance with the above at any and all signings, closings, and settlements conducted under this Agreement, or as Hometap may reasonably request from time to time.

(d) Destruction or Loss of Property.

(i) Repair and Restoration. If the Property is destroyed or experiences material damage, you will restore or repair the Property to at least the same condition and characteristics as of the time immediately preceding the destruction or damage, subject to all applicable local ordinances. Except to the extent you are required to take other action in connection with any Senior Lien on the Property, you will apply any insurance proceeds to the restoration or repair. If the insurance proceeds are insufficient to complete the restoration or repair, you will be responsible for any shortfall and we will have no responsibility or obligation to pay any amount whatsoever in connection with the restoration or repair of the Property.

(ii) Allocation Where Repair Not Feasible. If any loss occurs in connection with the Property, and restoration or repair is not economically feasible, you will obtain a Physical Appraisal, *provided that* the appraiser will be instructed to determine the value of the Property as it existed immediately prior to the destruction or damage. Any insurance proceeds, whether or not the underlying insurance was required by us, will be allocated in the following order: (A) to the payment (or reimbursement) of reasonable costs and expenses (including attorneys' fees that have been approved by us) reasonably incurred by you, any lender of a Senior Lien, and/or Hometap in collecting and contesting with the insurers the payments under the insurance policies; (B) to payment of any Senior Lien, *provided that*, if the insurance proceeds equal or exceed the amount owed under any Senior Lien, such payment will result in the discharge of any related Senior Lien; (C) to us, an amount equal to the Hometap Share; and (D) to you, the balance of the proceeds.

(e) Physical Appraisals. In connection with any Physical Appraisal, you will cooperate with the appraiser by granting full access to the Property at reasonable times and by making available any relevant documents in your possession pertaining to conditions that may affect the value of the Property. You will immediately share with us any written Physical Appraisal you receive related to this Agreement.

(f) Renovation.

(i) Owner shall be entitled, in your sole discretion to renovate, modify, or otherwise make physical alterations to the Property (a "**Renovation**"), *provided that* any such Renovation is completed by licensed contractors in accordance with local zoning laws and regulations, properly permitted, and only upon receipt of any approvals from any local, municipal, or state authorities. If the Owner undertakes a single Renovation project with documented aggregate costs in excess of $25,000, then the Owner may provide written notice (a "**Renovation Notice**") to Hometap within ninety (90) days following the completion of such Renovation. The Renovation Notice will include: (A) a summary describing the Renovation, (B) photographs of the Property prior to and following the Renovation, (C) copies of all contracts, invoices, permits, and other documentation associated with such Renovation, (D) all material terms and information describing the Renovation, and (E) any other information relating thereto that Hometap may reasonably request.

(ii) In connection with an Owner Repurchase, the Owner may request and Hometap may, in its sole discretion, accept an adjustment to the Ending Home Value to account for any appreciation in the value of the Property resulting from the Renovation. In connection with such a potential Renovation adjustment at the time of an Owner Repurchase, Hometap shall complete an Appraisal at Owner's expense, and such Appraisal shall include a determination of the increase in the Ending Home Value attributable exclusively to the Renovation (the "**Renovation Value Increase**"). If accepted by Hometap, in its sole discretion, the amount of the Renovation Value Increase shall be deducted from the Ending Home Value for purposes of calculating the Hometap Share; *provided, however*, that the Renovation Value Increase shall not exceed the actual cost of the Renovation as evidenced and documented in the Renovation Notice; *and further provided* that the Renovation Value Increase shall not exceed the difference between the Ending Home Value and the Beginning Home Value.

(g) Option Fees. You will pay any reasonable fees imposed or incurred by us from time to time related to the Option during the Effective Period (such fees being referred to as "**Option Fees**"), which may include, without limitation: (i) fees for processing any requests for subordination; (ii) fees for processing any requests for Property title or ownership changes; (iii) fees for processing any reconveyance or renewal recordings of any Security Instruments or other documentation pertaining to the Option; (iv) fees for processing Hometap Cure Payments (defined below in Section 7.2(a)); (v) fees relating to any Event of Default (defined below in Section 7.1), including any fees, costs, or expenses for our oversight of the default process; (vi) fees incurred in any dispute relating to the Property; and (vii) charges to cover any third-party or other out-of-pocket costs relating to any of the foregoing (including charges imposed by title companies and escrow companies, charges related to recording of documents, and attorneys' fees).

(h) Condemnation. If the Property is condemned in whole or in part during the Effective Period, then all condemnation proceeds net of reasonable costs and expenses (including attorneys' fees that have been approved by us) reasonably incurred by you and/or us in collecting and contesting the condemnation proceeds ("**Net Condemnation Proceeds**") will be allocated as provided above in Section 6.1(d)(ii). If the Property is condemned in part, then the Hometap Share shall be calculated using the Net Condemnation Proceeds as the Ending Home Value, and such proceeds will be allocated in the order provided above in Section 6.1(d)(ii). In the case of a partial condemnation, the Option will be retained with respect to any portion of the Property that has not been condemned.

(i) Allowed Loans and Transactions.

(i) Minimum Owner Equity. Without Hometap's prior written consent, Owner may not at any time increase, or permit the increase of, the total balance of loans or other property

interests secured by liens on the Property (including for such purposes the unused portion of any committed line of credit) if such additional debt or property interest would reduce Owner's remaining Owner Equity (as defined below) below the Minimum Owner Equity (as defined below). For purposes of the foregoing, "**Owner Equity**" shall be defined as the amount calculated by subtracting (1) all Acknowledged Pre-Existing Liens, (2) all Approved Subsequent Loans, (3) the present value of the Hometap Share (assuming Ending Home Value higher than Beginning Home Value); *provided, however*, that for purposes of this calculation the Hometap Cap shall not apply, and (4) any other debt or obligations secured by the Property from the current appraised value of the Property (the "**Current Property Value**"). For purposes of the foregoing, "**Minimum Owner Equity**" shall mean the dollar amount equal to twenty percent (20%) of the Current Property Value.

(ii) Approved Subsequent Loans.

(1) Prior to considering any request by Owner to incur any additional indebtedness secured by a lien on the Property (an "**Approved Subsequent Loan**"), Owner shall provide Hometap with all documentation relating to such proposed Approved Subsequent Loan that Hometap may reasonably request, including, without limitation, any commitment letter, offer letter, term sheet, proposed note, preliminary title report, appraisal, or inspection report, as well as any similar documentation relating to any Acknowledged Pre-Existing Liens.

(2) If the proposed Approved Subsequent Loan would result in a lien (or modification or increase of an Acknowledged Pre-Existing Lien) that is senior to the Option, and/or Hometap is being asked to subordinate its Option, any such subordination agreement or consent shall be in a form reasonably acceptable to Hometap.

(3) In connection with a request for an Approved Subsequent Loan, Hometap, in its sole discretion, will either use the Beginning Home Value for the purpose of calculating the Current Property Value and Minimum Owner Equity or may require, at Owner's expense, a new Appraisal of the Property.

(4) Following receipt of (i) a request for an Approved Subsequent Loan, (ii) all documentation required in Section 6.1(i)(ii)(1), and (iii) a new Appraisal (if applicable), Hometap will conduct all such other inquiries and reviews as it deems necessary to make a determination regarding whether to consent to such Approved Subsequent Loan; *provided, however*, that so long as such request meets all such requirements, consent to such Approved Subsequent Loan shall not be unreasonably withheld.

(5) In the event that Hometap consents to an Approved Subsequent Loan, Owner shall provide Hometap with the final executed documentation relating to such Approved Subsequent Loan as soon as reasonably practicable following the closing of such transaction.

(iii) Prohibited Loans and Transactions. Owner will not encumber the Property with, and Hometap will not give consent to, any proposed transaction that could have the effect of impairing Hometap's rights under the Investment Documents, or the Hometap Share, including "reverse" mortgage loans, "shared appreciation" mortgage loans, mortgage loans with negative

amortization features, private or non-institutional loans, investments in the equity or appreciation of the Property, or unrecorded loans secured by the Property.

(iv) Subsequent Loans used for Owner Repurchase. Owner may incur additional indebtedness secured by a lien on the Property at any time during the Effective Period if Owner is incurring such additional indebtedness in order to execute an Owner Repurchase in full compliance with the terms of this Agreement, including but not limited to Section 2.4. In all such instances, Hometap shall receive a direct payment, via wire transfer or similar means, for the entire Hometap Share concurrently with the closing of this subsequent indebtedness; failure to do so will be considered an Event of Default. Notwithstanding the foregoing, Hometap reserves the right to withhold its approval for the additional indebtedness if Hometap believes, in its sole discretion, that such additional indebtedness will not facilitate a full Owner Repurchase.

(j) Obligation to Provide Information to and Cooperate with Hometap. During the Effective Period, you will cooperate with Hometap to schedule any Appraisal, and you will use commercially reasonable efforts to promptly respond to requests for information that Hometap may reasonably ask from time to time regarding the status of the Property, or information, reports, proof of payment of taxes or assessments, insurance policies, proof of insurance coverage, and any other information available to you concerning the Property and any modifications to the Property. You will immediately provide us with notice of any event that has or may be expected to have a material effect upon the Property, the value of the Property, the Option, or Hometap's rights under the Investment Documents, including, without limitation, (i) the death or divorce of any Owner; (ii) the death or removal of any Trustee or Trustor, as well as the appointment of any substitute or additional Trustee or Trustor; (iii) environmental matters affecting the Property; (iv) the commencement of any legal action involving the Property; or (v) the occurrence of an Event of Default.

Section 6.2 Hometap Covenants.

(a) Hometap Interest. Pursuant to this Agreement, during the Effective Period, Hometap shall have an economic interest in the Property, which is protected by this Agreement and the other Investment Documents.

(b) Waiver of Right to Partition. Owner and Hometap each waive and relinquish all rights either of them may now or later have to seek partition of the Property, whether in kind or by sale; *provided, however*, that we will retain the right to seek a partition (i) in the event of, and as part of any action arising out of an Event of Default, which is not timely cured pursuant to Section 7.2, or (ii) in connection with any claim or action by Owner which asserts that any provision of this Agreement is against the law or unenforceable.

(c) Right to Disclose Certain Information. We may share certain personal and financial information relating to you or the Property with our affiliates, subsidiaries, assignees, contractors, agents, representatives, and persons with whom we intend to conduct business, including the address and general location of the Property, appraisal reports and other valuations of the Property, and the financial terms of this Agreement, to the extent not prohibited by law.

(d) Agreement to Subordination. We may agree to subordinate the priority of our rights under any of the Investment Documents to the lien of any lender that refinances any Acknowledged Pre-Existing Lien or proposes to extend to you any other Approved Subsequent Loan secured by a lien on the Property; *provided that* any requested subordination and loan documents contain only reasonable and customary terms common to such agreements, and you pay any amounts we reasonably require.

(e) <u>No Hometap Liability</u>. Hometap shall not be liable for any (i) Acknowledged Pre-Existing Liens, Liens and Encumbrances, Approved Subsequent Loans, or any other loans or obligations to any third parties created, established, or obtained by you whether before or after the consummation of the transactions contemplated hereunder, and whether or not consented to, approved by, or subordinated to by us, or (ii) for homeowner association fees, property taxes, homeowner or property insurance, or other liabilities or obligations that might arise in connection with the Property.

## SECTION 7
## EVENTS OF DEFAULT

Section 7.1 <u>Events of Default</u>. The occurrence of any of the following will constitute an Event of Default ("**Event of Default**"):

(a) you breach or fail to perform any obligation or covenant under the Investment Documents, including any action or failure to act resulting in, or which can reasonably be expected to result in, a violation of Hometap's rights herein or a breach of this Agreement or other Investment Document, which breach or failure is not cured (if capable of being cured) within thirty (30) days of the occurrence thereof;

(b) you take any action that does not honor the Option or you omit to state a material fact relating to your obligations in this Agreement, including any misrepresentation or omission related to the amount or kind of consideration given to you in any Transfer which can reasonably be expected to result in a violation of Hometap's rights under the Investment Documents or a breach of this Agreement or other Investment Document), which breach or failure is not cured (if capable of being cured) within thirty (30) days of the occurrence thereof;

(c) you fail to timely provide us any notice required under this Agreement;

(d) any representation or warranty set forth above in <u>Section 4.1</u>, is or becomes false or misleading, and you fail to correct and provide Hometap written notice of such false or misleading representation or warranty within five (5) Business Days of becoming aware of such occurrence;

(e) (i) the voluntary or involuntary commencement of any case or proceeding against an Owner under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency, or similar law, or the appointment or election of a receiver, conservator, trustee, custodian, or similar official for an Owner or any substantial part of the Property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (ii) the making by an Owner of a general assignment for the benefit of creditors, or (iii) the admission in writing by an Owner of Owner's inability to pay such Owner's debts as they become due or of your or any co-owner's insolvency, and in all cases, where such case, proceeding, assignment, or admission is not dismissed or otherwise reversed within thirty (30) days;

(f) Owner fails to pay in a timely manner any taxes, assessments, liens, amounts due under loans that are secured by liens on the Property, whether recorded or unrecorded, or other obligations relating to or on the Property, which failure is not cured within thirty (30) days of the occurrence thereof;

(g) the Transfer or [illegible] Transfer of the Property, or any interest in the Property, by you, except in accordance with this A[illegible]

(h) a lien attaches to the Property that does not have our prior written approval, or you obtain any loan secured or to be secured by the Property that we have not approved in writing, whether recorded or unrecorded;

(i) you fail to preserve or maintain the Property in good repair and in a condition substantially similar to its condition on the Effective Date, except for normal wear and tear;

(j) insurance on the Property is not maintained as required by this Agreement, including any payment due on the insurance becomes delinquent, which failure, if curable, is not cured within thirty (30) days of the occurrence thereof;

(k) any assignment, attempted assignment, or other transfer of the Option or Investment Documents in violation of this Agreement;

(l) any other action or event occurs within your reasonable control which has, or may reasonably be expected to have, a material adverse effect on the Property, the value of the Property, the Option, or the Hometap Share.

Section 7.2 Remedies Following Event of Default. Following an Event of Default, Hometap will provide you with a Notice of Right to Cure Default, which shall state the specific Event(s) of Default and the time in which it must be cured, which shall be no more than thirty (30) days following delivery of the Notice of Right to Cure Default. If Owner fails to cure the default within the time period set forth in the Notice of Right to Cure Default, Hometap may declare a default and exercise any of the rights and remedies set forth below in this Section 7.2.

(a) Hometap Option Exercise. We will have the right in our sole discretion, by delivering to you a written notice (a "**Default Notice**"), to (i) complete a Hometap Option Exercise in compliance with Section 3.1 or (ii) pay any amounts ("**Hometap Cure Payments**") to any third parties to cure and remedy an actual or impending Event of Default. We may make payments to cover any delinquent payments, insurance premiums, accrued interest, late fees, reinstatement fees, taxes, and other penalties, together with any and all amounts which we deem necessary to cure an Event of Default. Upon delivery of the Default Notice, Hometap shall be permitted to start a Hometap Option Exercise. We may record the Default Notice in the county where the Property is located.

(b) Hometap Cure. To the extent that you fail to take any actions or make any payments that Hometap determines are necessary to avoid or remedy an Event of Default or otherwise protect Hometap's rights under the Investment Documents or the Option, Hometap shall have the right, but not the obligation, to take such actions or complete such payments. Hometap shall provide Owner with five (5) Business Days written notice, or the minimum notice period required by applicable law, prior to taking any corrective action or making any Hometap Cure Payments, which may include, without limitation, payment of taxes, placement of insurance or curing of a default with a lender or other third party with an interest in the Property. Beginning on the day a Hometap Cure Payment is made, interest shall accrue at the lesser of eight percent (8%) per annum or the maximum amount permitted by applicable law. Hometap shall have the right to demand repayment of any Hometap Cure Payments (plus applicable interest) on five (5) Business Days' notice, and failure to pay such amounts shall be deemed an Event of Default. Notwithstanding anything in the foregoing to the contrary, any repayment of Hometap Cure Payments will be deemed reimbursement of expenses and the Hometap Cap shall not apply to such amounts.

(c) Power of Foreclosure Under State Laws. We will be entitled to foreclose on the Property and otherwise exercise our rights under the Mortgage and Security Instrument in accordance with applicable laws and regulations established in the jurisdiction where the Property is located.

(d) Failure to Maintain Adequate Insurance. If you fail to maintain insurance in amounts required by Section 6.1(e), or any insurance claim is denied due to Owner's action or inaction, then the Hometap Share will be increased by the amount of any such denied claim. Any such increase shall be

deemed exempt, on a dollar-for-dollar basis, from the Hometap Cap. If this occurs, we may complete a Hometap Option Exercise if we have not already done so and Transfer the Property in its then-current state according to the procedure set forth in Section 3.1. The proceeds of any Transfer pursuant to this Section 7.2(d), together with any available proceeds from any insurance policies (whether or not the underlying insurance was required by us), will be allocated as in the order provided in Section 6.1(d)(ii).

(e) Owner Repurchase After Event of Default. At any time following our delivery of a Default Notice, you may repurchase the Option by paying us the Hometap Share in an Owner Repurchase pursuant to Section 2.4 above; *provided that* the Repurchase Settlement must (i) occur (A) within twenty (20) days of you providing us written notice of your election to make an Owner Repurchase, and (B) prior to any scheduled closing of a Hometap Option Exercise, and (ii) use an Ending Home Value that is the value of the Property as determined by a Physical Appraisal. If you elect to make an Owner Repurchase, but the Repurchase Settlement is not completed within the prescribed periods in this Section 7.2(e) then (1) your right to make an Owner Repurchase may be terminated, and (2) we may elect to immediately exercise a Hometap Option Exercise without regard to any restrictions in Section 3.1.

(f) Specific Performance, Rescission and Injunctive Relief. You and we agree that if we are not allowed to exercise our rights under any of the Investment Documents, or if you fail to comply with your obligations under any of the Investment Documents, the damages to us would be irreparable and extremely difficult to estimate, making money damages, or any remedy at law inadequate. Thus, in addition to any other rights and remedies available to us in law, equity, or otherwise, we will be entitled to seek specific performance of the covenants, agreements, and rights contained in each of the Investment Documents or, as permitted by applicable law, to seek full rescission of this Agreement. You and we further agree and acknowledge that a violation or threatened violation of this Agreement by you is likely to cause irreparable injury to us and that, in addition to any other remedies that may be available, in law, in equity, or otherwise, we are entitled to obtain immediate and other injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by you, without the posting of a bond or the necessity of proving actual damages.

Section 7.3 Repayment in Bankruptcy. If we are required to and do remit or disgorge any amounts paid by you pursuant to this Agreement as a preference claim in a bankruptcy proceeding involving you, then we will be entitled to assert a claim against yon for the amount remitted or disgorged and any related costs we incur, and such claim by us will begin to accrue on the date such amount is actually remitted or disgorged and will automatically survive the Effective Period.

Section 7.4 Calculation of Liquidated Damages. To the extent that enforcement of the Security Instruments require specification of an amount in default or liquidated bid amount or we elect to foreclose on the Property, Owner and Hometap agree and acknowledge that the damages that would arise from Owner's (or Owner's executor's) defaults may be uncertain, depend on many factors, and may be extremely difficult to ascertain, and that a reasonable calculation of such damages is the calculation of liquidated damages. The amount in default or liquidated bid amount under any remedy may also include: (a) the sum of all monetary obligations owed to us by you under this Agreement; and (b) any amounts required to satisfy your loan, tax, and insurance related obligations on the Property, including late fees, reinstatement fees, and other penalties.

Section 7.5 Remedies Concurrent and Not Exclusive. The remedies set forth in Section 7.2 will be concurrent, cumulative, and not exclusive, to the extent not prohibited by law. Every right, power, and remedy granted to us in the Investment Documents will be in addition to all those rights, powers, and remedies available to us at law, equity, or otherwise, and each such right, power, and remedy may be exercised from time to time and as often and in any order we decide to the extent not prohibited by law,

and the decision not to exercise of any such right, power, or remedy will not be deemed a waiver of the right to exercise any right, power, or remedy.

## SECTION 8
## MISCELLANEOUS

Section 8.1 Indemnification by Owner and Maximum Liability. You agree to defend, indemnify, and hold us harmless from and against any claims, causes of action, proceedings, judgments, damages, losses, liabilities, penalties, fines, reasonable fees (including reasonable attorneys' fees), reasonable costs, reasonable expenses, settlements, and other obligations of every kind arising out of or relating to: (a) a breach of any of your representations, warranties, covenants, or agreement in this Agreement or the other Investment Documents; (b) any act or omission by you or your contractors, agents, or representatives; or (c) any and all damage to any person or property occurring in, on, or about the Property or off the Property arising out of actions on the Property. Notwithstanding your indemnification obligation under this Section 8.1, at our election, we may defend any third-party claim subject to your indemnification obligation with counsel of our own choosing at your reasonable cost and expense and without your participation. You will not, without our prior written consent, which shall not be unreasonably withheld settle or compromise any claim, action or proceeding or consent to the entry of any judgment regarding which indemnification is owed to us. WITHOUT LIMITING YOUR INDEMNIFICATION OBLIGATION, IN NO EVENT WILL OUR AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE PROPERTY EXCEED THE INVESTMENT AMOUNT.

Section 8.2 Asset Administration. From time to time during the Effective Period, Hometap may designate one or more authorized representatives to (a) monitor and effect your compliance with this Agreement and any other Investment Documents, (b) exercise our rights and carry out our obligations under this Agreement or any other Investment Documents, (c) protect and administer the Option, and (d) do anything else we may be permitted to do under this Agreement or any other Investment Documents.

Section 8.3 Covenants to Run with Land. The provisions of this Agreement are covenants running with the land so long as this Agreement remains in effect. We will record the Memorandum of Option reflecting this fact in the public records.

Section 8.4 Relationship. We are not a partner, joint venturer, trustee, lender, or fiduciary with, or of, Owner. You are not permitted to execute any document or enter into any agreement on our behalf. The Option is intended to be and will be treated for all purposes (including tax purposes) as an economic interest and not as a loan or joint venture.

Section 8.5 Ongoing Credit Checks. By entering into this Agreement, you are providing written instructions, consent, and authorization to Hometap under the Fair Credit Reporting Act authorizing Hometap to obtain information from your personal credit report or other information for the duration of the Term from one or more consumer reporting agencies, such as TransUnion, Experian, or Equifax.

Section 8.6 Multiple Owners. If multiple Persons are Owners, then: (a) the Investment Documents must be signed by each Owner; (b) all rights and powers specified for Owner in the Investment Documents must be approved and exercised unanimously by each Owner; (c) each Owner will be jointly and severally liable for all liabilities and obligations specified for an Owner under this Agreement or any other Investment Documents; (d) any notice required to be given by or to an Owner will be deemed adequately given if given by or to any Owner using the Notice Address, as defined below in Section 8.16; and (e) we may treat any notice received from any one Owner as notice from all Owners.

Section 8.7 Revocable Trusts. If Owner is a Revocable Trust: (a) all Trustors must sign the Investment Documents in their capacities as individuals and as Trustors; (b) all Trustees must sign the Investment Documents in their capacities as Trustees; (c) each Trustee and Trustor who signs this Agreement represents and warrants that all Trustees and Trustors have been disclosed to us; (d) all rights and powers specified for, and all actions required of, Owner in the Investment Documents must be approved and exercised by all Trustees unanimously; (e) all Trustors, in their capacities as individuals, will be jointly and severally liable with Owner for all liabilities and obligations specified for Owner under any of the Investment Documents; (f) all representations and warranties by Owner in the Investment Documents are made by all Trustees on behalf of the Revocable Trust and by all Trustors in their capacities as individuals; (g) notice required to be given by or to an Owner will be deemed adequately given if given by or to any of the Trustees using the Notice Address, as defined below in Section 8.16; and (h) we may treat any notice received from any one Trustee as notice from all Trustees and from Owner.

Section 8.8 Delegation of Duties. We may perform any of our duties under this Agreement or any other Investment Document by or through contractors, agents, employees, or attorneys-in-fact and will be entitled to advice of counsel concerning all matters pertaining to such duties and any actions taken on the basis of such advice from counsel will be deemed to have been taken in good faith. We will not be responsible for the negligence or misconduct of any contractor, agent, employee, or attorney-in-fact that we select as long as our selection was made without gross negligence or willful misconduct.

Section 8.9 Successors and Assignees; Owner's Estate. The Investment Documents will be binding on your and our respective heirs, successors, and permitted assignees. If Owner dies, then the Investment Documents will be binding on Owner's Estate. The death of Owner will not terminate any of the Investment Documents.

(a) Assignment by Hometap. We may assign, participate, hypothecate, sell, transfer, or otherwise transact, in whole or in part, our right and title to, and interest in, any of the Investment Documents at any time and to any Person without prior notice to or consent of Owner. In connection with any assignment, participation, hypothecation, sale, transfer, or transaction, we may disclose any documents and information in our possession relating to Owner and the Property. Upon such assignment, sale, or transfer, our assignee, buyer, or transferee will automatically have all the rights and remedies of Hometap under the Investment Documents. You will execute and deliver in recordable form, if requested, at our expense, such other documents we deem appropriate to reflect the assignment, sale, or transfer of the Option and the other Investment Documents. You agree to cooperate with such assignee, buyer, or transferee, including by executing any documents deemed appropriate by assignee, buyer, or transferee to insure or protect such Person's interest in the Investment Documents.

(b) Assignment of Agreement by Owner. Absent our prior written consent, which consent may be withheld, Owner may not assign or otherwise transfer any of the Investment Documents. We may grant consent to an assignment to Owner's spouse who acquires an interest in the Property or a Trustee of a Revocable Trust in which Owner is the sole Trustor; *provided that* in each case the assignee: (i) was alive as of the Effective Date; (ii) executes this Agreement and the Memorandum of Option; (iii) executes a recordable addendum to the Security Instruments in a form provided by us; (iv) executes an assignment with the assignor in a form satisfactory to us; and (v) provides any information or other documents requested by us and satisfactory to us (**"Exempted Owner Assignment"**). In the event of an Exempted Owner Assignment to the Trustee(s) of a Revocable Trust, the original Owner (i.e., the Trustor(s)), jointly and severally, will continue to remain liable under the Investment Documents.

(c) Exempted Owner Property Transfer. If Owner obtains our prior written consent, Owner may Transfer the Property into the name of Owner's spouse or the Trustees of a Revocable Trust in which you are the sole Trustor; *provided that* the requirements for an Exempted Owner Assignment under Section

8.9(b) are met (an "**Exempted Owner Property Transfer**"). An Exempted Owner Property Transfer shall not trigger a Hometap Option Exercise.

Section 8.10 Survival. The following provisions will survive any termination of this Agreement without limitation: (a) Owner's obligations to reimburse any Hometap Cure Payments and Option Fees; (b) Owner's obligation to remove any liens on the Property and pay any Sales Commissions and Closing Costs; (c) Section 7.2; (d) any amounts owed to us under this Agreement; (e) any other provisions which entitle us to remedies, fees, costs, and expenses; (f) Section 4; and (g) Section 8.

Section 8.11 Injunction. If we are stayed or enjoined from undertaking a Hometap Option Exercise, commencing or initiating any notice and procedures relating thereto in this Agreement, or enforcing any of our rights under this Agreement, the Option will not expire until ninety (90) days after such stay or injunction is lifted by a final order of the appropriate court. Any deadline or notice period contained in the Investment Documents which we are prevented or prohibited from observing by operation of law, court order, or otherwise, will automatically be stayed for the duration of such stay, injunction, prevention, or prohibition until such stay, injunction, prevention, or prohibition is no longer applicable or is lifted by final order of the appropriate court.

Section 8.12 Governing Law. The Option, this Agreement, and the other Investment Documents will be determined under, governed by, and construed in accordance with laws of the state in which the Property is located, without regard to its conflict of law principles to the furthest extent possible; *provided, however*, to the extent the mandatory provisions of the laws of another jurisdiction relating to (a) the perfection or the effect of perfection or non-perfection of any lien or other right, title, and/or interest in the Property, or (b) the availability of and procedures relating to any remedy hereunder or related to this Agreement are required to be governed hy such other jurisdiction's laws, such other laws will be deemed to govern and control.

Section 8.13 DISPUTE RESOLUTION BY BINDING ARBITRATION. PLEASE READ THIS SECTION CAREFULLY AS IT AFFECTS YOUR RIGHTS.

(a) Agreement to Arbitrate. This Dispute Resolution by Binding Arbitration Section 8.13 is referred to in this Agreement as the "**Arbitration Agreement.**" You agree that any and all disputes or claims that have arisen or may arise between you and us, whether arising out of or relating to this Agreement or the other Investment Documents, any advertising, or any aspect of the relationship or transactions between us, will be resolved exclusively through final and binding arbitration, rather than a court, in accordance with the terms of this Arbitration Agreement, except that you may assert individual claims in small claims court, if your claims qualify. Further, this Arbitration Agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies, and such agencies can, if the law allows, seek relief against us on your behalf. You agree that, by entering into this Agreement, you and we are each waiving the right to a trial by jury or to participate in a class action. Your rights will be determined by a neutral arbitrator, not a judge or jury. The Federal Arbitration Act governs the interpretation and enforcement of this Arbitration Agreement.

(b) WAIVER OF JURY TRIAL. TO THE FULLEST EXTENT POSSIBLE, HOMETAP AND OWNER VOLUNTARILY, UNCONDITIONALLY, AND IRREVOCABLY WAIVE TRIAL BY JURY UNDER ALL CIRCUMSTANCES WHETHER IN ANY LITIGATION OR PROCEEDING IN A STATE OR FEDERAL COURT RELATED TO, OR ARISING OUT OF, THE INVESTMENT DOCUMENTS OR THE OBLIGATIONS OR TRANSACTIONS CONTEMPLATED BY THE INVESTMENT DOCUMENTS, INCLUDING ALL CLAIMS OR DISPUTES HOWEVER ARISING (INCLUDING TORT CLAIMS AND CLAIMS FOR BREACH OF CONTRACT) BETWEEN HOMETAP AND OWNER.

(c) PROHIBITION OF CLASS AND REPRESENTATIVE ACTIONS AND NON-INDIVIDUALIZED RELIEF. YOU AND WE AGREE THAT EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION OR PROCEEDING. UNLESS BOTH YOU AND WE AGREE OTHERWISE, THE ARBITRATOR MAY NOT CONSOLIDATE OR JOIN MORE THAN ONE PERSON'S OR PARTY'S CLAIMS AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A CONSOLIDATED, REPRESENTATIVE, OR CLASS PROCEEDING. ALSO, THE ARBITRATOR MAY AWARD RELIEF (INCLUDING MONETARY, INJUNCTIVE, AND DECLARATORY RELIEF) ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF NECESSITATED BY THAT PARTY'S INDIVIDUAL CLAIM(S), EXCEPT THAT YOU MAY PURSUE A CLAIM FOR AND THE ARBITRATOR MAY AWARD PUBLIC INJUNCTIVE RELIEF UNDER APPLICABLE LAW TO THE EXTENT REQUIRED FOR THE ENFORCEABILITY OF THIS PROVISION.

(d) Pre-Arbitration Dispute Resolution. We are always interested in resolving disputes amicably and efficiently, and most concerns can be resolved quickly and to your satisfaction by emailing us at legal@hometap.com. If such efforts prove unsuccessful, a party who intends to seek arbitration must first send to the other, by certified mail, a written notice of dispute (a "**Notice of Dispute**"). The party seeking arbitration must send the Notice of Dispute to the other Party at their Notice Address (as defined in Section 8.16 below) by certified mail, with a copy of any Notice of Dispute directed to Hometap to legal@hometap.com. The Notice of Dispute must (i) describe the nature and basis of the claim or dispute, and (ii) set forth the specific relief sought. If we or you do not resolve the claim within sixty (60) days after the Notice of Dispute is received, we or you may commence an arbitration proceeding. During the arbitration, the amount of any settlement offer made by us or you will not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you or we are entitled.

(e) Arbitration Procedures. Arbitration will be conducted by a neutral arbitrator in accordance with the American Arbitration Association's (the "**AAA**") rules and procedures, including the AAA's Consumer Arbitration Rules (collectively, the "**AAA Rules**"), as modified by this Arbitration Agreement. For information on the AAA, please visit its website, http://www.adr.org. Information about the AAA Rules and fees for consumer disputes can be found at the AAA's consumer arbitration page, http://www.adr.org/consumer. If there is any inconsistency between any term of the AAA Rules and any term of this Arbitration Agreement, the terms of this Arbitration Agreement will control unless the arbitrator determines that the application of the inconsistent Arbitration Agreement terms would not result in a fundamentally fair arbitration. The arbitrator must also follow the provisions of this Agreement as a court would. All issues are for the arbitrator to decide, including issues relating to the scope, enforceability, and arbitrability of this Arbitration Agreement. Although arbitration proceedings are usually simpler and more streamlined than trials and other judicial proceedings, the arbitrator can award the same damages and relief on an individual basis that a court can award to an individual under this Agreement and applicable law. Decisions by the arbitrator are enforceable in court and may be overturned by a court only for very limited reasons.

(f) Unless we and you agree otherwise, any arbitration hearings will take place in a reasonably convenient location for both parties with due consideration of their ability to travel and other pertinent circumstances. If the parties are unable to agree on a location, the determination will be made by AAA. If your claim is for $10,000 or less, we agree that you may choose whether the arbitration will be conducted solely on the basis of documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing as established by the AAA Rules. If your claim exceeds $10,000, the right to a hearing will be determined by the AAA Rules. Regardless of the manner in which the arbitration is conducted, the

arbitrator will issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based.

(g) Costs of Arbitration. Payment of all filing, administration, and arbitrator fees (collectively, the "**Arbitration Fees**") will be governed by the AAA Rules, unless otherwise provided in this Arbitration Agreement. If the value of the relief sought is $75,000 or less, at your request, we will pay all Arbitration Fees. If the value of relief sought is more than $75,000 and you are able to demonstrate to the arbitrator that you are economically unable to pay your portion of the Arbitration Fees or if the arbitrator otherwise determines for any reason that you should not be required to pay your portion of the Arbitration Fees, we will pay your portion of such fees. In addition, if you demonstrate to the arbitrator that the costs of arbitration will be prohibitive as compared to the costs of litigation, we will pay as much of the Arbitration Fees as the arbitrator deems necessary to prevent the arbitration from being cost-prohibitive. Any payment of attorneys' fees will be governed by the AAA Rules.

(h) Confidentiality. All aspects of the arbitration proceeding, and any ruling, decision, or award by the arbitrator, will be strictly confidential for the benefit of all parties.

(i) Severability. If a court or the arbitrator decides that any term or provision of this Arbitration Agreement (other than Section 8.13(b)) is invalid or unenforceable, the parties agree to replace such term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Arbitration Agreement will be enforceable as so modified. If a court or the arbitrator decides that any of the provisions of Section 8.13(b) are invalid or unenforceable, then the entirety of this Arbitration Agreement will be null and void, unless such provisions are deemed to be invalid or unenforceable solely with respect to claims for public injunctive relief. The remainder of this Agreement will continue to apply.

(j) Future Changes to Arbitration Agreement. Notwithstanding any provision in this Agreement to the contrary, we agree that if we make any future change to this Arbitration Agreement (other than a change to the Notice Address) during the Effective Period, you may reject any such change by sending us written notice within thirty (30) days of the change to the Notice Address. By rejecting any future change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this Arbitration Agreement as of the date you first accepted this Agreement (or accepted any subsequent changes to this Agreement).

Section 8.14 Further Assurances. Each party agrees, from time to time, as requested by the other party or its successors, assigns, buyers, or transferees, to execute and deliver any instruments and take any action reasonably necessary or desirable in order to implement the provisions and otherwise to effect the intent and purposes of the Investment Documents.

Section 8.15 Severability; Waivers. Each provision of this Agreement and of the other Investment Documents will be severable from every other provision for the purpose of determining the legal enforceability of any provision and will be construed separately and is separately enforceable from every other provision. No waiver by us of any of our rights or remedies in connection with this Agreement or the other Investment Documents will be effective unless the waiver is in writing and signed by both parties, and then any waiver or consent will be effective only in the specific instance and for the specific purpose for which given. No delay, consent, or waiver by us will be construed as continuing, as a bar to, or as a waiver or release of, any subsequent right, remedy, or recourse. To the extent that enforcement of any provision or exercise of any right under this Agreement or the other Investment Documents is held to be invalid or stayed or enjoined by a court of competent jurisdiction, then the provision will be considered separate and apart from the remaining provisions, and any other remaining provisions will continue to be fully enforceable under law.

Section 8.16 Notice. Each party will deliver all notices, requests, consents, claims, demands, waivers, and other communications under this Agreement (each, a "**Notice**") in writing to the address of the other party listed below, unless a party has been notified by the other party in writing of a substitute address ("**Notice Address**"). Each party will deliver all Notices by personal delivery, nationally recognized overnight courier (with all fees prepaid), facsimile or email (with confirmation of transmission), or certified or registered mail (in each case, return receipt requested, postage prepaid). A Notice is effective only upon receipt by the receiving party. If any Notice required by the Security Instruments is also required under applicable law, such requirement of law will satisfy the corresponding requirement under this Agreement.

| **HOMETAP:** | **OWNER:** |
|---|---|
| HOMETAP INVESTMENT PARTNERS II, L.P.<br>800 Boylston Street, 16th Floor<br>Boston, MA 02199<br>Attention: Legal Department<br>Email: homeowners@hometap.com | See signature page. |

Section 8.17 Entire Agreement; Amendment. Schedule A and the exhibits are incorporated into this Agreement by this reference. This Agreement, the Security Instruments, and the other written agreements made by and between the parties as of the Effective Date together constitute the entire agreement between the parties regarding the subject matter contained in them. All prior agreements, understandings, representations, warranties, statements, and negotiations between the parties, if any, whether oral, electronic or written, relating to the Property, the Option, this Agreement, the other Investment Documents, and the related transaction, including any offer letters, terms sheets, and draft and earlier versions of settlement statements and other documents and agreements, are superseded and merged into this Agreement. No supplement, modification, or amendment of this Agreement will be binding unless in writing and executed by the party against whom enforcement is sought.

Section 8.18 No Third-Party Beneficiaries. This Agreement and the other Investment Documents are entered into for the protection and benefit of us and Owner and their respective successors and permitted assigns. No other Person will have any rights, remedies, or recourse under this Agreement or the other Investment Documents.

Section 8.19 Counterparts; Electronic Signatures. This Agreement and the other Investment Documents may be executed in counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement. A signed copy of this Agreement that is transmitted by a party to the other party via facsimile or by electronic means will be binding on the signatory to that copy.

Section 8.20 Registered Domestic Partnerships and Civil Unions. An Owner will have the same rights and obligations with respect to Owner's civil union partner or registered domestic partner as Owner will have with respect to its spouse for all purposes under the Investment Documents, subject to the same conditions and limitations that would apply to a transfer or assignment to Owner's spouse, a payment by Owner's spouse, or the rights of Owner's spouse not on record title.

Section 8.21 Consent of Spouse/Domestic Partner. If you are married or in a civil union or registered domestic partnership on the date of this Agreement and your spouse or domestic partner, as applicable, is not named on the title to the Property, Hometap may require your spouse or domestic partner, as applicable, to execute and deliver to us a Consent of Spouse/Domestic Partner in the form of Exhibit F ("**Consent of Spouse/Domestic Partner**"). If you should marry or remarry or enter into a civil union or registered domestic partnership after the Effective Date, within thirty (30) days after the marriage, civil union, or

domestic partnership, as applicable, you and your spouse or domestic partner, as applicable, must execute and deliver a Consent of Spouse/Domestic Partner to Hometap at the Notice Address.

Section 8.22 RECOMMENDATION TO SEEK LEGAL AND TAX ADVICE. OWNER UNDERSTANDS THAT THE SALE OF THE PROPERTY, OR THE SALE OF AN ECONOMIC INTEREST IN THE PROPERTY, CAN HAVE SIGNIFICANT TAX, FINANCIAL, AND FAMILY CONSEQUENCES. OWNER ACKNOWLEDGES THAT HOMETAP HAS REQUESTED THAT OWNER DISCUSS THIS AGREEMENT WITH TAX, LEGAL, AND FINANCIAL ADVISORS AND WITH FAMILY MEMBERS TO ENSURE AN UNDERSTANDING OF THE RISKS AND BENEFITS OF THIS AGREEMENT, AND OWNER HAS HAD THE OPPORTUNITY TO DO SO.

Section 8.23 NO ADVICE. IN ENTERING INTO THE INVESTMENT DOCUMENTS AND INTO ANY FUTURE PROPERTY SALE, OWNER IS NOT RELYING AND WILL NOT RELY ON ANY INFORMATION OR REPRESENTATION THAT MAY HAVE BEEN PROVIDED BY HOMETAP OR ITS AGENTS OR REPRESENTATIVES, INCLUDING: (a) THE VALUE OF THE PROPERTY OR THAT THE BEGINNING HOME VALUE IS A REPRESENTATION OF THE MARKETABLE, INSURABLE, OR FAIR MARKET VALUE OF THE PROPERTY; (b) THE ADVISABILITY OF ENTERING INTO THE INVESTMENT DOCUMENTS OR A PROPERTY SALE; OR (c) THE TAX IMPLICATIONS AND CONSEQUENCES OF ENTERING INTO THE INVESTMENT DOCUMENTS OR A PROPERTY SALE. OWNER HAS MADE, AND WILL MAKE, HIS, HER OR ITS OWN INVESTIGATION AND JUDGMENTS REGARDING SUCH MATTERS AND HAS BEEN ADVISED BY HOMETAP TO DISCUSS THEM WITH OWNER'S LEGAL, FINANCIAL AND TAX ADVISORS, AS WELL AS WITH FAMILY MEMBERS.

Section 8.24 Subordination of Homestead and Waivers. If you have acquired or acquire in the future an estate of homestead in the Property, you agree, to the greatest extent permitted by applicable law, that such homestead estate is subordinated in all respects to the Mortgage and Security Instrument and any amounts due under this Agreement and to all renewals, extensions, and modifications of the Mortgage and Security Instrument or this Agreement, and that such homestead estate is subject to all of our rights under the Mortgage and Security Instrument and this Agreement and all renewals, extensions and modifications of the Mortgage and Security Instrument and this Agreement, and is subordinate to the lien evidenced by the Mortgage and Security Instrument, and all renewals, extensions and modifications of the Mortgage and Security Instrument. You waive and relinquish all rights of curtesy and dower in the Property.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGES FOLLOW]**

**IN WITNESS WHEREOF**, intending to be legally bound, the Parties have executed this Memorandum as of the Signing Date by their signatures below. This Memorandum may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same Memorandum.

**HOMETAP INVESTMENT PARTNERS II, L.P.**

By: Hometap Holdings II, LLC,
Its General Partner

By: [signature]
Name: Adam Jaskiewicz
Title: VP Authorized Signer
Date: 4/21/21

Acknowledgment Certificate

Commonwealth of Massachusetts

County of Suffolk

On this 21st day of April, 2021, before me, the undersigned notary public, personally appeared Adam Jaskiewicz, proved to me through satisfactory evidence of identification, which was MA ID, to be the person whose name is signed on the preceding or attached document in my presence, and acknowledged to me that he signed it voluntarily for its stated purpose.

[signature]
Notary Public Signature

My commission expires DANIEL MILLER BURNETT Notary Public COMMONWEALTH OF MASSACHUSETTS My Commission Expires On December 04, 2026

**IN WITNESS WHEREOF**, intending to be legally bound, the parties hereto have caused this Agreement to be executed as of the Signing Date. This Agreement may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement.

**OWNER(S)**

By: ______________________

Larry E. Fisher

Date: 4-21-2021

By: ______________________

Date: ______________________

Notice Address:

21597 Juego Circle, Unit 6D, Boca Raton, FL 33433

STATE OF ~~FLORIDA~~

COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this 21st day of APRIL, 2021 by Larry E. Fisher (name of person acknowledging).

MERRY SANON-LITTLE
Notary Public - State of Florida
Commission # HH 017847
My Comm. Expires Sep 19, 2024
Bonded through National Notary Assn.

Notary Public Signature

My commission expires ___________________

Personally known ___________ OR Produced Identification ✓

Type of Identification Produced Drivers License

STATE OF FLORIDA

COUNTY OF ________________

The foregoing instrument was acknowledged before me this _____ day of ___________, 20__, by ________________________ (name of person acknowledging).

____________________________________________
Notary Public Signature

My commission expires _________________________

Personally known ___________ OR Produced Identification ____________

Type of Identification Produced __________________________________

**List of Schedules and Exhibits**

Schedule A – Investment Term Sheet

Exhibit A – Property Description
Exhibit B – Memorandum of Option
Exhibit C – Mortgage and Security Instrument
Exhibit D – UCC-1 Financing Statement
Exhibit E – Notice of Right to Cancel
Exhibit F – Consent of Spouse/Domestic Partner

# EXHIBIT A

## LEGAL DESCRIPTION

Real property described as follows:

All that certain land situate in Palm Beach County, State of Florida, viz:

Unit 6-D, Vistas of Boca Lago, a Condominium, according to the Declaration of Condominium thereof, as recorded in Official Records Book 2495, Page 1, and all amendments thereto, of the Public Records of Palm Beach County, Florida, together with an undivided interest or share in the common elements appurtenant thereto.

Parcel ID / APN: 00-42-47-20-02-000-0604

## Schedule A: Hometap Investment Term Sheet

This document and the Option Purchase Agreement define key terms of the Option and Hometap's investment in the Property ("**Investment Terms**"). Capitalized terms are further defined in the Option Purchase Agreement.

Homeowner(s): Larry E. Fisher
Property Address: 21597 Juego Circle, Unit 6D, Boca Raton, FL 33433
Option ID: FL999199
Effective Date: 04/26/2021

**Section I: Predetermined Investment Terms**
Hometap and Owner agree to the Investment Terms defined below. These terms have the value assigned to them as shown below, and such values shall not change during the Option Period.

| Predetermined Investment Terms | | |
|---|---|---|
| **Term** | **Definition** | **Value** |
| Investment Amount | *Gross amount that Hometap will pay you to acquire an Option in the Property* | $74,287.00 |
| Net Investment Amount | *Net amount that you will receive after Investment Fees and Costs (see Section II below) have been deducted from the Investment Amount* | $70,165.27 |
| Beginning Home Value | *Property's value at the time of Investment Signing, determined by Appraisal* | $250,000.00 |
| Hometap Percentage (if Ending Home Value ≥ Beginning Home Value) | *Percentage of the Property that Hometap will acquire upon exercise of the Option when the Ending Home Value is equal to or greater than the Beginning Home Value; used to determine Option's value* | 49.525% |
| Hometap Percentage (if Ending Home Value < Beginning Home Value) | *Percentage of the Property that Hometap will acquire upon exercise of the Option when the Ending Home Value is less than the Beginning Home Value; used to determine Option's value* | 41.271% |
| Acknowledged Pre-Existing Liens | *Current sum of debt obligations secured by a lien on the Property*<br><br>*First National Bank of America, $101,186.71* | $101,186.71 |

**Section II: Investment Fees and Costs**
Hometap and Owner agree to the Investment Fees and Costs defined below. The Investment Fees and Costs have the value assigned to them as shown below, which shall be deducted from the Investment Amount to determine the Net Investment Amount. The Net Investment Amount shall be paid to the Owner, as further provided in the Option Purchase Agreement.

| Investment Fees and Costs Deducted from Investment Amount | | |
|---|---|---|
| **Term** | **Definition** | **Value** |
| Investment Fee | *3% investment fee charged by Hometap* | $2,228.61 |
| Third-Party Costs | *Costs incurred for third-party processing and services related to finalizing the Investment and signing the Investment Documents*<br>*Appraisal, $599.00*<br>*Title Charges, $700.00* | $1,299.00 |
| Government Taxes and Fees | *Taxes and fees assessed by government entities related to finalizing the Investment and signing the Investment Documents*<br>*Memorandum,$61.60*<br>*UCC,$36.10*<br>*Mortgage/Deed of Trust,$87.10*<br>*State Deed and Mortgage Tax/Stamp and Intangible Tax,$409.32* | $594.12 |
| Payoffs | *Amounts paid at time of Signing to third-party lien holders, on Owner's behalf, to pay down the total amount of debt against the Property* | $0.00 |
| Total Investment Fees and Costs | *Total of amounts listed in this table, to be deducted from the Investment Amount to determine the Net Investment Amount* | $4,121.73 |

**Section III: Investment Terms Valued at Time of Option Exercise or Repurchase**
Hometap and Owner agree to the Investment Terms defined below. The value of the Investment Terms in this Section III cannot be determined until the Owner repurchases or Hometap exercises the Option. Hometap and Owner agree that the value of the Investment Terms in this Section III shall be determined or calculated as stated herein and as further provided in the Option Purchase Agreement. Sample calculations of the Investment Terms in this Section III have been provided to Owner in the Investment Disclosures.

| Investment Terms Valued at Time of Option Exercise or Repurchase | |
|---|---|
| **Term** | **Definition** |
| Ending Home Value | *Property's value at the time of Option exercise or repurchase, determined by Appraisal or Permitted Sale* |
| Hometap Cap | *Maximum 20% annualized rate of return on the Investment Amount, prorated for a partial year, as applied to the Hometap Share* |
| Hometap Share | *Value of Hometap's Option, calculated by multiplying the Ending Home Value by the Hometap Percentage; the maximum value of the Hometap Share is the Hometap Cap* |

I acknowledge and agree that the Investment Terms defined in this Schedule A shall apply to the Option, as further described in the Option Purchase Agreement.

_______________________________ 2/-21-2021

Larry E. Fisher Date

_______________________________ _______________

Date

**EXHIBIT E**

**NOTICE OF RIGHT TO CANCEL**

**HOMEOWNER(S): Larry E. Fisher** **DATE: 04/21/2021**

**ADDRESS: 21597 Juego Circle, Unit 6D, Boca Raton, FL 33433**

**INVESTMENT NO.: FL999199**

**YOUR RIGHT TO CANCEL**

You are entering into a transaction that will result in a security interest in your home. You have a right to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

(1) The date of this transaction, which is **04/21/2021**; or
(2) The date you received your Investment Term Sheet; or
(3) The date you received this notice of your right to cancel.

If you cancel the transaction, the security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the security interest in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing, at

Hometap Investment Partners II, L.P.
800 Boylston Street, 16th Floor
Boston, MA 02199
Fax: 1-617-663-6878 / email: homeowners@hometap.com

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. You may notify us of your intention to cancel by email at homeowners@hometap.com, but we may require you to confirm in writing. Keep one copy of this notice because it contains important information about your rights.

If you cancel by email, you must send the notice no later than 11:59 PM ET of **04/24/2021**. If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

Larry E. Fisher

**By signing this notice, I acknowledge that I have RECEIVED this Notice of Right to Cancel:**

Larry E. Fisher

# COMPLIANCE AGREEMENT

INVESTMENT NO.: FL999199 DATE: 04/21/2021

HOMEOWNER(S): Larry E. Fisher INVESTOR: Hometap Investment Partners II

PROPERTY ADDRESS: 21597 Juego Circle, Unit 6D, Boca Raton, FL 33433

The undersigned Homeowner(s) agree if requested by Investor, or someone acting on behalf of Investor, to fully cooperate and adjust for clerical errors found in/on any documentation prepared and executed in connection with the consummation of your investment if deemed necessary or desirable in the reasonable discretion of the Investor.

The Homeowner(s) agree(s) to comply with any such requests within thirty (30) days from date of such requests. The provisions of this agreement shall survive the execution of the Investment.

Dated effective this 21 day of April 2021

Larry E. Fisher

## SIGNATURE / NAME AFFIDAVIT

INVESTMENT NO.: FL999199

HOMEOWNER(S): Larry E. Fisher

PROPERTY ADDRESS: 21597 Juego Circle, Unit 6D, Boca Raton, FL 33433

I, Larry E. Fisher (Owner), do certify that this is my true and correct signature.

Larry E Fisher

Owner

Sample Signature

**AKA STATEMENT**

I, Larry E. Fisher (Owner), further certify that I am one and the same person as the names listed below.

Name Variation (Print) — Sample Signature (Variation / If Applicable)

Name Variation (Print) — Sample Signature (Variation / If Applicable)

Name Variation (Print) — Sample Signature (Variation / If Applicable)

hometap

# INSURANCE REQUEST & AUTHORIZATION FORM

**DATE: 04/21/2021**

| | |
|---|---|
| **Investment Number:** FL999199 | **Homeowner/Insured:** |
| **Lien Position:** 2 | Larry E. Fisher |
| **Investor:**<br><br>Hometap Investment Partners II, LP | **Property Address:**<br><br>21597 Juego Circle, Unit 6D, Boca Raton, FL 33433 |
| **Investor Contact Information:**<br><br>Hometap Investment Partners II, LP<br>800 Boylston St, 16th Floor<br>Boston, MA 02199 | **Homeowner Insurance Company:**<br><br>Castle Key |

☑ **Update the Mortgagee clause to read:**

Hometap Investment Partners II, LP ISAOA/ATIMA
800 Boylston St, 16th Floor
Boston, MA 02199

☑ **Please provide a copy of the insurance policy including premium and coverage amounts, deductibles, and collateral information.**

**Homeowner Authorization**

By signing below, I/We hereby authorize and direct Castle Key to make the above requested changes to my/our Homeowners Insurance policy and/or to release the requestedinfonnation to the Investor. Please send the requested infonnation, or evidence of updated mortgagee clause to the Investor at: **Hometap Investment Partners, LP, 800 Boylston St, 16th Floor, Boston, MA 02199.**

Homeowner Signature

Homeowner Signature

*After Recording Return To:*
Hometap Equity Partners LLC
800 Boylston Street
16th Floor
Boston, MA 02199

*Recording Requested By:*
*Hometap Investment Partners II, L.P.*
Investment No.: FL999199

[Space Above This Line For Recording Data]

**Investment Amount: $74,287.00**

MORTGAGE AND SECURITY AGREEMENT

This MORTGAGE AND SECURITY AGREEMENT, together with any riders (this "**Security Instrument**"), is made as of 04/21/2021 ("**Signing Date**"), by and between Larry E. Fisher, a single man (the "**Owner/Mortgagor**") and Hometap Investment Partners II, L.P., a Delaware limited partnership, and its successors and assigns ("**Hometap/Mortgagee**"). Capitalized terms used in this Security Instrument have the meanings provided in this Security Instrument, or if not defined in this Security Instrument, in the Option Purchase Agreement by and between Owner and Hometap (the "**Option Agreement**") of even date. The Option Agreement, Memorandum of the Option Purchase Agreement, and this Security Instrument are collectively referred to as the "**Hometap Homeowner Agreement.**"

This Mortgage and Security Agreement was prepared by Noah Spaulding, with an address of: c/o Hometap, 800 Boylston Street, 16th Floor, Boston, MA 02199.

1. Grant.

OWNER HEREBY IRREVOCABLY mortgages and conveys to Hometap, and its successors and assigns, a security interest for the benefit of Hometap, and its successors and assigns, in and to the property located at 21597 Juego Circle, Unit 6D, Boca Raton, FL 33433 and further described on Exhibit A attached hereto (the "**Property**"), together with all improvements, replacements, and additions now or hereafter erected on the Property, all easements, appurtenances, and fixtures now or hereafter a part of the Property, and all rents, issues, profits, and proceeds, including insurance and condemnation proceeds, from the Property.

2. Secured Obligations.

Owner makes the mortgage and conveyance set forth in Section 1 to secure the following:

(a) Owner's performance of each of its obligations in the Hometap Homeowner Agreement;

(b) Hometap's rights under the Hometap Homeowner Agreement;

(c) Homeowner's payment obligations in the Hometap Homeowner Agreement, including:

(i) Payment of the Hometap Share owed to Hometap pursuant to the terms of the Option Agreement;

(ii) Payment of all Option Fees owed to Hometap pursuant to Section 6.1 of the Option Agreement;

(iii) Payment of all insurance proceeds owed to Hometap pursuant to Section 6.1 of the Option Agreement;

(iv) Payment of all condemnation proceeds owed to Hometap pursuant to Section 6.1 of the Option Agreement;

(v) Payment of the liquidated damages pursuant to Section 7.4 of the Option Agreement;

(vi) Reimbursement of any expenditures made by Hometap pursuant to Section 6.1 and Section 7.2 of the Option Agreement; and

(d) Payment of all costs, fees, and expenses (including, as allowed by applicable law, court and other dispute resolution costs, attorneys' and experts' fees and costs, and fees and disbursements of in-house counsel) (collectively, "**Legal Fees**") incurred by Hometap in the enforcement and collection of the obligations listed above and the protection of Hometap's related rights, whether such costs, fees, and expenses are incurred in any state, federal, appellate, or bankruptcy court or otherwise and whether or not litigation or arbitration is commenced. Legal Fees include Legal Fees incurred in any state, federal, appellate, or bankruptcy court and in any bankruptcy case or insolvency proceeding, of any kind in any way related to this Security Instrument, to the interpretation or enforcement of the parties' rights under this Security Instrument, or to the Property.

The foregoing obligations are referred to collectively as the "**Obligations.**"

3. Uniform Commercial Code Security Agreement and Fixture Filing. This Security Instrument also is intended to be and will constitute a security agreement under the Florida Commercial Code for any items of personal property that constitute fixtures or are specified as part of the Property and that under applicable law may be subject to a security interest under the Florida Commercial Code. Owner grants to Hometap a security interest in those items to secure the performance and payment of the Obligations.

(a) Owner agrees that Hometap may file this Security Instrument, or a copy of it, and a UCC-1 Financing Statement in the real estate records or other appropriate index and/or in the Office of

the Secretary of State of Florida, as a financing statement for any of the items specified in the preceding paragraph as part of the Property.

(b) This Security Instrument constitutes a financing statement filed as a fixture filing pursuant to Sections 679.5011(1)(a) and 679.5021(3) of the Florida Commercial Code, and any similar or successor provisions.

(c) Hometap may file such extensions, renewals, amendments, and releases as are appropriate to reflect the status of its security interest.

(d) Owner will pay all costs, fees, and expenses of filing such financing statements and any extensions, renewals, amendments, and releases of such statements, and will pay all costs, fees, and expenses of any record searches for financing statements that Hometap may require.

(e) Upon an Event of Default, Hometap will have the remedies of a secured party under the Florida Commercial Code and may also take the actions provided in Section 7 of the Option Agreement. In exercising any of these remedies and taking any of these actions, Hometap may proceed against the Property's items of real property, fixtures or improvements separately or together and in any order whatsoever without in any way affecting the availability of Hometap's remedies under the Florida Commercial Code or the actions available in Section 7 of the Option Agreement.

4. Absolute Assignment of Leases and Rents. Owner absolutely and unconditionally assigns to Hometap all of Owner's right, title, and interest in and to all current and future leases, subleases, and licenses relating to the use, occupancy, or enjoyment of all or any part of the Property and all rents, income, revenues, profits, proceeds, and earnings now or hereafter payable with respect to the ownership, use, or occupancy of the Property (collectively, "**Rents**"); it being intended by Owner that this assignment constitutes a present, absolute assignment and not an assignment for additional security only.

(a) Owner gives to and confers upon Hometap the right, power, and authority, during the continuance of this Security Instrument, to collect the Rents, reserving the right upon an Event of Default, Owner's failure to perform any Obligation timely, or a breach of any agreement of Owner in this Security Instrument, to collect and retain the Rents, as they become due and payable.

(b) Upon an Event of Default, Owner's failure to perform any Obligation timely, or a breach of any agreement of Owner in this Security Instrument, Hometap may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the Obligations, enter upon and take possession of the Property or any part of it, in its own name sue for or otherwise collect the Rents, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including Legal Fees, to the Obligations, and in such order as Hometap may determine.

(c) The entering upon and taking possession of the Property, the collection of the Rents, issues, and profits and the application of the Rents, issues, and profits pursuant to this Security Instrument, will not cure or waive any breach or notice of default under this Security Instrument or invalidate any act done pursuant to such notice.

(d) Nothing in this Section will permit Owner to lease or rent the Property in contravention of any provision of the Option Agreement; nor will anything in this Section modify any provision in the Option Agreement relating to the use, lease, rent, or occupancy of the Property.

5. Covenants of Owner Regarding the Property. Owner agrees as follows:

(a) To appear in and defend any action, suit, or proceeding purporting to affect the security of this Security Instrument or the rights or powers of Hometap; and to pay all costs, fees, and expenses of Hometap (including cost of evidence of title and Legal Fees) incurred: (i) in any state, federal, appellate, or bankruptcy court, in any action, suit, or proceeding in which Hometap may appear, and in any action, suit, or proceeding brought by Hometap to foreclose this Security Instrument or to collect the Obligations or to protect Hometap's rights under this Security Instrument or the Hometap Homeowner Agreement; and/or (ii) in connection with the enforcement of any provision of this Security Instrument or in connection with foreclosure upon the collateral granted under this Security Instrument, whether or not an action or suit is filed.

(b) To pay at least ten (10) days before delinquency all taxes and assessments affecting the Property and all encumbrances, charges, and liens, with interest, on the Property (or any part of the Property), which are prior or could obtain priority to the lien or to the rights granted under this Security Instrument, and all costs, fees, and expenses of this Security Instrument.

(i) If Owner fails to make any payment or to do any act as provided in this Security Instrument, Hometap may, but will not be obligated to, make the payment or do any such act, and any such payment and related expenses, including Legal Fees, will also be secured by this Security Instrument.

(ii) Such payments made or actions taken by Hometap will not require notice to, or demand on, Owner and will not release Owner from any obligation under this Security Instrument.

(iii) Hometap will have the following related rights and powers: (A) to enter upon the Property for the foregoing purposes, (B) to appear in and defend any action or proceeding purporting to affect the Property or the rights or powers of Hometap under this Security Instrument, (C) to pay, purchase, contest, or compromise any encumbrance, charge, or lien that in the judgment of Hometap appears to be prior or superior to this Security Instrument, and (D) to employ counsel and to pay such counsel necessary expenses and costs, including Legal Fees.

(c) To pay immediately upon demand all sums expended by Hometap related to this Security Instrument and to pay interest on any of such amounts demanded by Hometap at a rate not to exceed the maximum rate allowed by law at the time of such demand.

6. Power of Attorney. Owner irrevocably appoints Hometap as Owner's agent and attorney-in-fact (such agency being coupled with an interest). As agent and attorney-in-fact, Hometap may, in Hometap's name or in the name of Homeowner, prepare, execute, and file or record financing statements, continuation statements, applications for registration, and similar documents to create, perfect, or preserve any of Hometap's security interests and rights in or to any of the Property. Upon an Event of Default, Owner's failure to perform any Obligation timely, or a breach of any agreement of Owner in this Security Instrument, Hometap may take any other action that may be required or desired of Owner, including the ability to advertise and solicit the Property for sale, encumber the Property by obtaining loans secured by liens on the Property to raise funds deemed required or advisable to improve, repair, and prepare the Property for sale, and sell and convey the entire interest in, and title to, the Property; *provided, however*, that Hometap as agent and attorney-in-fact will be accountable only for such funds as are actually received by Hometap.

7. Default and Foreclosure. Upon an Event of Default, Hometap may declare all performance and Obligations secured by this Security Instrument immediately due by delivery to Owner

of a written declaration of default. If any Event of Default has occurred and is continuing, Hometap may take any or all of the following actions, at the same or at different times:

(a) Possession. Hometap may enter upon and take possession of the Property; lease, rent and let the Property; and receive all the Rents, income, issues, and profits and apply the same to satisfy any Obligation. Hometap is granted full power and authority to do any act or thing which Owner or its successors or assignees who may then own the Property might or could do in connection with the ownership, use, and maintenance of the Property. This covenant becomes effective either with or without any action brought to foreclose upon the Property and without applying for a receiver of the Rents, if any. Should the Rents or any part thereof be assigned without the consent of Hometap, then this Security Instrument will, at the option of Hometap, become due and payable immediately, anything herein contained to the contrary notwithstanding.

(b) Appointment of Receiver. Hometap may have a receiver of the Rents (including an Asset Administrator), income, issues, and profits of the Property appointed without the necessity of proving either the depreciation or the inadequacy of the value of the security or the insolvency of Owner or any other person who may be legally or equitably liable for the Obligations, and Owner and each such person waive such proof and consent to the appointment of a receiver.

(c) Fair Rental Payments. If Owner or any subsequent owner is occupying the Property or any part the Property, it is agreed that the occupants will pay Hometap the amount of rent requested by Hometap in advance each monthly, and for the use of personal property covered by this Security Instrument.

(d) Excess Monies. Hometap may apply on account of the unsatisfied Obligations owed to Hometap after a foreclosure sale of the Property, whether or not a deficiency action has or will be instituted, any unexpended monies still retained by Hometap that were paid by Owner to Hometap or from the proceeds of such sale (i) for the payment of, or as security for, the payment of taxes, assessments, municipal or governmental rates, charges, impositions, liens, water or sewer rents, or insurance premiums, if any, or (ii) in order to secure the performance of some act by Owner.

(e) Remedies at Law or Equity. Hometap may take any of the remedies otherwise available to it as a matter of law, equity or otherwise.

(f) Judicial Foreclosure. Hometap may foreclose this Security Instrument by judicial proceeding. In connection with the foreclosure sale, Hometap may declare all performance and Obligations immediately due by delivery to Owner of a written declaration of default. Hometap will give notice of default to Owner prior to acceleration following an Event of Default. The notice will specify: (i) the default; (ii) the action required to cure the Event of Default; (iii) a date by which the Event of Default must be cured; and (iv) that failure to cure the Event of Default on or before the date specified in the notice may result in acceleration of the performance and Obligations secured by this Security Instrument, foreclosure by judicial proceeding, and sale of the Property. The notice will further inform Owner of any right to cure after acceleration and the right to assert in the foreclosure proceeding the nonexistence of an Event of Default or any other defense of Owner to acceleration and sale. If the Event of Default is not cured on or before the date specified in the notice, Hometap at its option may require immediate performance in full of all Obligations without further demand and may foreclose this Security Instrument by judicial proceeding. Hometap will be entitled to collect all costs, fees, and expenses incurred in pursuing the remedies provided in this Security Instrument, including legal fees and costs of title evidence.

(g) Notice. Notice provided to Owner under this Security Instrument will be to the address specified in this Security Instrument unless otherwise required by applicable law.

(h) Applicable Law. Exercise of Hometap's remedies under this Security Instrument will be in compliance with applicable law.

8. Late Performance. By accepting performance of any Obligation after its due date, Hometap does not waive its right either to require prompt performance when due of all other Obligations or to declare a breach or default for such failure to perform.

9. Hometap's Powers. At any time and from time to time, without liability and without notice, upon written request of Owner and presentation of this Security Instrument, and without affecting the personal liability of any person for the performance of the Obligations Hometap may: (a) release any part of the Property; (b) consent to the making of any map or plat of the Property; (c) join in granting any easement on the Property; and (d) join in any extension agreement or any agreement subordinating the lien or charge of this Security Instrument.

10. Subordination. This Security Instrument is subordinate to and junior to the Memorandum of Option Purchase Agreement which affects the Property and is executed by Owner as "Owner" as of the same date as this Security Instrument.

11. Successors. This Security Instrument applies to, inures to the benefit of, and binds all parties to this Security Instrument, their heirs, legatees, devisees, administrators, executors, and permitted successors and assigns. The term "**Hometap**" will include any successor or assign of Hometap's rights in the Option Agreement and in this Security Instrument, whether or not named as Hometap in this Security Instrument. Absent Hometap's prior written consent, which consent may be withheld in Hometap's sole discretion, Owner may not assign or otherwise transfer this Security Instrument.

12. Interpretation. In this Security Instrument, whenever the context so requires, the masculine gender includes the feminine and/or the neuter, and the singular number includes the plural. Also, in this Security Instrument, the term "include" or "including" means without limitation by reason of enumeration.

13. Joint and Several Liability. If more than one person signs this Security Instrument as Owner, the obligations of each signatory will be joint and several.

14. Multiple Owners. If there are multiple Owners of the Property:

(a) this Security Instrument must be signed by each Owner;

(b) all rights and powers specified for Owner in this Security Instrument must be approved and exercised unanimously by each Owner;

(c) each Owner will be jointly and severally liable for all liabilities and Obligations;

(d) notice required to be given by, or to, each Owner will be deemed adequately given if given by or to any Owner using the contact information set forth in this Security Instrument; and

(e) Hometap may treat any notice received from any Owner as notice from all Owners.

15. Incorporation by Reference. Exhibit A to this Security Instrument is incorporated by this reference.

16. Extent of Lien. The lien granted under this Security Instrument will encumber Owner's entire interest in the Property, notwithstanding the fact that the Hometap Homeowner Agreement relates to only a fractional interest in the Property.

17. No Merger. So long as any of the Obligations remain outstanding and undischarged, unless Hometap otherwise consents in writing, the fee estate of Owner in the Property or any part of the Property (including the estate of Hometap after exercising the Option) will not merge, by operation of law or otherwise, with any other estate in the Property or any part of it, but will always remain separate and distinct, notwithstanding the union of the fee estate and such other estate in Hometap or in any other person.

18. Release. Following payment of all amounts secured by this Security Instrument, Hometap will discharge this Security Instrument.

19. Subordination of Homestead and Waivers. If Owner has acquired before the Signing Date or acquires on or after the Signing Date an estate of homestead in the Property, Owner agrees, to the fullest extent permitted by applicable law, that such homestead estate is subordinated in all respects to this Security Instrument and the amount of any Obligation owed and to all renewals, extensions, and modifications of any Hometap Homeowner Agreement, and that such homestead estate is subject to all of the rights of Hometap under the Hometap Homeowner Agreement and all renewals, extensions, and modifications of the Hometap Homeowner Agreement, and is subordinate to the lien evidenced by this Security Instrument and all renewals, extensions, and modifications of this Security Instrument. Owner waives and relinquishes all rights of curtesy and dower in the Property.

20. Notices. All notices or other written communications hereunder shall be delivered in accordance with the applicable terms and conditions of the Option Agreement. Notices shall be sent to the address of the other party listed below as follows, unless a party has been notified by the other party in writing of a substitute address:

**Hometap/Mortgagee:**

Hometap Investment Partners II, L.P.
800 Boylston Street, 16th Floor
Boston, MA 02199
Attention: Legal Department

**Owner/Mortgagor:**

Larry E. Fisher

21597 Juego Circle, Unit 6D, Boca Raton, FL 33433

*[Signature Pages Follow]*

**OWNER DECLARES THAT OWNER HAS READ THIS MORTGAGE AND SECURITY AGREEMENT, UNDERSTANDS IT, HAS RECEIVED A COMPLETELY FILLED-IN COPY OF IT WITHOUT CHARGE THEREFOR, AND HAS SIGNED IT AS OF THE SIGNING DATE.**

IN WITNESS WHEREOF, each undersigned Mortgagor has executed this Mortgage and Security Agreement under seal as of the Signing Date.

**MORTGAGORS:**

By: ______________________
Larry E. Fisher

Date: 4-21-2021

By: ______________________

Date: ______________________

**The undersigned Owner(s) requests that a copy of any Notice of Default or Notice of Sale under this Security Instrument be mailed to the Owner at the Owner's address set forth in Section 20 above.**

**MORTGAGORS:**

By: ______________________
Larry E. Fisher

Date: 4-21-2021

By: ______________________

Date: ______________________

**Acknowledgment Certificate**

STATE OF ~~FLORIDA~~

COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this 21st day of APRIL, 2021 by LARRY E. FISHER (name of person acknowledging).

MERRY SANON-LITTLE
Notary Public - State of Florida
Commission # HH 017847
My Comm. Expires Sep 19, 2024
Bonded through National Notary Assn.

Notary Public Signature

My commission expires ______________

Personally known ____________ OR Produced Identification ✓

Type of Identification Produced DRIVER'S LICENSE

**Acknowledgment Certificate**
STATE OF FLORIDA

COUNTY OF _______________

The foregoing instrument was acknowledged before me this _____ day of ____________, 20__, by _________________________ (name of person acknowledging).

______________________________________
Notary Public Signature

My commission expires ________________________

Personally known ___________ OR Produced Identification ___________

Type of Identification Produced ________________________________

## EXHIBIT A

## LEGAL DESCRIPTION

Real property described as follows:

All that certain land situate in Palm Beach County, State of Florida, viz:

Unit 6-D, Vistas of Boca Lago, a Condominium, according to the Declaration of Condominium thereof, as recorded in Official Records Book 2495, Page 1, and all amendments thereto, of the Public Records of Palm Beach County, Florida, together with an undivided interest or share in the common elements appurtenant thereto.

Parcel ID / APN: 00-42-47-20-02-000-0604

*After Recording Return To:*
Hometap Equity Partners LLC
800 Boylston Street
16th Floor
Boston, MA 02199

*Recording Requested By:*
*Hometap Investment Partners II, L.P.*
Investment No.: FL999199

________________ **[Space Above This Line For Recording Data]** ________________

**Investment Amount: $74,287.00**

## MEMORANDUM OF OPTION PURCHASE AGREEMENT

This Memorandum of Option Purchase Agreement (this "**Memorandum**") is entered into as of 04/21/2021 (the "**Signing Date**"), by and between Larry E. Fisher, a single man (the "**Owner**") and Hometap Investment Partners II, L.P., a Delaware limited partnership, and its successors and assigns ("**Hometap**"). The Owner and Hometap are sometimes referred to together in this Memorandum as the "**Parties**" and individually as a "**Party**". Terms not defined in this Memorandum have the meanings provided in the Hometap Option Purchase Agreement (the "**Option Agreement**").

WHEREAS, on the Signing Date the Owner and Hometap entered into that certain unrecorded Option Agreement, which is incorporated by reference into this Memorandum as if set forth in full;

WHEREAS, pursuant to the Option Agreement, the Owner has granted and conveyed to Hometap an option (the "**Option**") to purchase an undivided percentage interest of fee simple title ownership in and to the residential real property owned by the Owner located at 21597 Juego Circle, Unit 6D, Boca Raton, FL 33433 and further described on Exhibit A attached hereto (the "**Property**");

WHEREAS, in consideration for granting and conveying the Option, Hometap has paid to the Owner the Investment Amount;

WHEREAS, pursuant to the Option Agreement the Owner has made certain representations, warranties, covenants and promises to, and for the benefit of, Hometap regarding the Option and the Property; and

WHEREAS, the Parties have executed and recorded this Memorandum to give notice of the Option Agreement and certain rights of Hometap to the Property and certain responsibilities the Owner owes Hometap, as well as the covenants and promises of the Owner included in the Option Agreement that run with the land and will be binding on any person who acquires the Property or any interest in the Property so long as the Option Agreement has not expired or been terminated.

NOW THEREFORE, in consideration of the foregoing the Parties agree as follows:

1. Irrevocable Nature of Option. The Option is irrevocable by the Owner.

2. Option Period. The Option will commence on Effective Date and will expire on the Expiration Date, unless the Option Period has been extended in accordance with the Option Agreement.

3. Subsequent Owners. Every person who now or later owns or acquires any right, title, or interest in or to the Property is and will be conclusively deemed to have consented and agreed to every restriction, provision, covenant, right, and limitation contained in the Option Agreement and this Memorandum, whether or not such person expressly assumes such restrictions, provisions, covenants, rights, and limitations or whether or not any reference to the Option Agreement or this Memorandum is contained in the instrument conveying such interest in the Property to such person.

4. Option Covenants Run with the Land. The Option Agreement covenants are deemed to be covenants running with the land, so as to give it the broadest possible application, and include, without limitation, the following:

   a. Restrictions on the Owner's right to transfer the Property.

   b. Restrictions on the Owner's ability to borrow against the Property.

   c. Restrictions of the Owner's ability to rent the Property.

   d. Requirement that the Owner pay Hometap the Hometap Share pursuant to the terms and conditions of the Option Agreement.

   e. Requirements that any sale of the Property conform to certain procedures set forth in the Option Agreement.

   f. Requirements that the Owner maintain adequate insurance on the Property against certain hazards.

   g. Requirements that the Owner keep the property free and clear of any liens or encumbrances not authorized by Hometap.

5. Governing Law. This Memorandum will be determined under, governed by, and construed in accordance with the laws of the state in which the Property is located, without regard to its conflict of law principles to the furthest extent possible.

6. Counterparts. This Memorandum may be executed in counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement.

7. Termination. This Memorandum will remain in full force and effect until released by written termination or quitclaim deed executed by Hometap and notarized and recorded in the real property records where the Property is located, or until extinguished by operation of law.

8. Notices. All notices or written communications required in connection with this Memorandum will be delivered in accordance with the Option Agreement and to the following addresses, unless a Party has been notified by the other Party in writing of a substitute address:

   Hometap

   Hometap Investment Partners II, L.P.
   800 Boylston Street
   16th Floor
   Boston, MA 02199
   Attention: Legal Department

   Owner
   Larry E. Fisher

   21597 Juego Circle, Unit 6D, Boca Raton, FL 33433

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, intending to be legally bound, the parties hereto have caused this Agreement to be executed as of the Signing Date. This Agreement may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement.

**HOMETAP INVESTMENT PARTNERS II, L.P.**

By: Hometap Holdings II, LLC,
Its General Partner

By: ______________________

Name: ADAM JASKIEWIC

Title: VP Authorized Signer

Date: 4/21/21

Acknowledgment Certificate

Commonwealth of Massachusetts

County of Suffolk

On this 21st day of April, 20 21, before me, the undersigned notary public, personally appeared Adam Jaskiewic, proved to me through satisfactory evidence of identification, which was MA ID, to be the person whose name is signed on the preceding or attached document in my presence, and acknowledged to me that he signed it voluntarily for its stated purpose.

______________________
Notary Public Signature

My commission expires ______

DANIEL MILLER BURNETT
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires On
December 04, 2026

**IN WITNESS WHEREOF**, intending to be legally bound, the Parties have executed this Memorandum as of the Signing Date by their signatures below. This Memorandum may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same Memorandum.

**OWNER(S):**

By: ______________________________
Larry E. Fisher

Date: 4-21-2021

By: ______________________________

Date: ______________________________

STATE OF FLORIDA

COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this 21st day of April, 2024 by Larry E. Fisher (name of person acknowledging).

MERRY SANON-LITTLE
Notary Public - State of Florida
Commission # HH 017847
My Comm. Expires Sep 19, 2024
Bonded through National Notary Assn.

Notary Public Signature

My commission expires ______________________

Personally known ______________ OR Produced Identification ✓

Type of Identification Produced Driver's License

STATE OF FLORIDA

COUNTY OF ____________________

The foregoing instrument was acknowledged before me this _____ day of ____________, 20__, by ____________________________ (name of person acknowledging).

__________________________________________
Notary Public Signature

My commission expires ____________________________

Personally known ____________ OR Produced Identification ____________

Type of Identification Produced ________________________________________

**Exhibit A**

Property Description

All that certain land situate in Palm Beach County, State of Florida, viz:

Unit 6-D, Vistas of Boca Lago, a Condominium, according to the Declaration of Condominium thereof, as recorded in Official Records Book 2495, Page 1, and all amendments thereto, of the Public Records of Palm Beach County, Florida, together with an undivided interest or share in the common elements appurtenant thereto.

Parcel ID / APN: 00-42-47-20-02-000-0604

[redacted]

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Hometap Investment Partners II, L.P.
800 Boylston Street - 16th Floor
Boston, MA 02199

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| Fisher | Larry | | | |
| **1c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 21597 Juego Circle, Unit 6D | Boca Raton | FL | 33433 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **2c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| | | | | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME

Hometap Investment Partners II, L.P.

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **3c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 800 Boylston St., 16th Floor | Boston | MA | 02199 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All personal property of Debtors now owned or hereafter acquired and used in connection with the Property described below, including but not limited to all items described in the attached Schedule A.

ALL THAT REAL PROPERTY AS DESCRIBED ON SCHEDULE B.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

OR 9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR 10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

| OR 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT:
☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

ALL THAT REAL PROPERTY AS DESCRIBED IN SCHEDULE B.

17. MISCELLANEOUS:

Investment No.: FL999199

**FINANCING STATEMENT**

**SCHEDULE A**

All of Debtor's present and future right, title and interest in and to all of the following:

(a) Improvements and Fixtures. All property owned by Debtor which is attached to the property described in Section 4 of the foregoing UCC Financing Statement ("**Land**") and/or improvements, replacements and additions now or hereafter erected on the Land ("**Improvements**") ("**Property**" means the Land and/or the Improvements) and all easements, appurtenances and fixtures now or hereafter a part of the Property.

(b) Leases and Rents. All leases, subleases, sub subleases, lettings, licenses, concessions or other agreements (weather written or oral) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Property, and every modification, amendment or other agreement relating to such leases, subleases, sub subleases or other agreements entered into in connection with such leases, subleases, sub subleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into, whether before or after the filing by or against Borrower of an petition for relief under any Creditors Rights Laws (collectively, the "**Leases**") and all right, title and interest of Owner, its successors and assigns therein and thereunder including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder all rents, additional rents, rent equivalents, moneys payable as damages in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash issues, profits, charges for services rendered, and other consideration of whatever form of nature received by or paid to or for the account of or benefit of Owner or its agents or employees from any and all sources arising from or attributable to the Property, including, all receivables, customer obligations, installment payment obligations and other obligations now existing of hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Owners and proceeds, if any, from business interruption or other loss of income insurance whether paid or accruing before or after the filing by or against Owner of any petition for relief under any Creditors Rights Laws (collectively, the "**Rents**") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply Rents to the payment of the Hometap Share.

(c) Insurance Proceeds. All insurance proceeds in respect of the Property under any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property (collectively, the "**Insurance Proceeds**").

(d) Condemnation Awards. All condemnation awards, including interest therein, which may heretofore and hereafter be made with respect to the Property by reason of any taking or condemnation whether from the exercise of the right of eminent domain (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property (collectively, the "**Awards**").

(e) All proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds.

## SCHEDULE B

Description of Real Property:

All that certain land situate in Palm Beach County, State of Florida, viz:

Unit 6-D, Vistas of Boca Lago, a Condominium, according to the Declaration of Condominium thereof, as recorded in Official Records Book 2495, Page 1, and all amendments thereto, of the Public Records of Palm Beach County, Florida, together with an undivided interest or share in the common elements appurtenant thereto.

Parcel ID / APN: 00-42-47-20-02-000-0604

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re Larry Edward Fisher, Case No. 26-18759-MAM
Fisher v. Hometap Investment Partners II, L.P., et al.

# EXHIBIT B

Complete preserved June 18-July 1, 2026 correspondence concerning document production, settlement, and transaction explanations.

*Source pages follow in preserved order. Existing source-page exhibit identifiers and legacy packet-reference markings are retained for stable pinpoint citation; they do not alter the source document text.*

From: homeowners@hometap.com
Subject: Re: Settlement - Estimated Settlement Amount
Date: Jul 1, 2026 at 12:21:58 PM
To: larryf2323@yahoo.com

Hi Larry,

Thank you for your response! I completely understand why you want to be certain about how everything aligns, especially since this is a major financial milestone and differs from a traditional loan structure. It is very common to want to cross-reference everything with your original conversations.

To address your point about the paperwork: **the mortgage that was recorded simply serves as a legal claim (or lien) that your property acts as collateral for the debt.** Because this is an equity investment rather than a traditional loan, there is no interest rate or APR causing a balance to grow over time. Instead, the final payoff amount grows or shrinks based entirely on the actual market value of your property at the time of settlement.

To answer your question about our program changes: **No, Hometap has not changed the underlying mechanism or calculation structure for existing agreements since you signed in 2021.** The settlement figures we are looking at today are strictly governed by the original **Option Purchase Agreement** you executed at your closing in 2021. The formula used to calculate your payoff today is identical to the structure established on day one:

- **The Hometap Share:** Your agreed-upon percentage (49.525%) multiplied by the ending home value ($275,000), totaling **$136,193.75**.
- **The Cap:** The protective ceiling capping the maximum annualized return at 20%, which would be **$189,029.58**.

Because the contract specifies you pay the *lesser* of these two amounts, your final settlement is the Hometap Share of **$136,193.75**. The difference between your initial expectations and today's figures comes down to how much your home's value has appreciated since 2021.

Hope this helps!

Best regards,

Mary Henderson
*Investment Support Coordinator*
+16176046985 | hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** [larryf2323@yahoo.com]
**Sent:** 6/30/2026 3:34 PM
**To:** homeowners@hometap.com
**Subject:** Re: Settlement - Estimated Settlement Amount

Hi Mary,

I really appreciate you taking the time to explain all of this. I'm starting to understand it a little better, but I still have a few questions that I just can't seem to pull together.

The reason I've been asking is because the payoff calculation is very different from what I understood when I entered into the agreement.

I remember speaking with Devlin Keogh several times before I signed. This was a big financial decision for me, so I asked him over and over, in several different ways, how HomeTap's share would be calculated because I wanted to make absolutely sure I understood it. He took the time to explain everything, and by the time we were done, I honestly believed I fully understood how it worked. Those conversations are what gave me the confidence to move forward

and sign the agreement.

Looking at the payoff calculation now, it just doesn't seem to line up with what I remember being explained, which is why I'm trying to understand how it all fits together.

What I'm still having trouble understanding is, if this isn't considered a loan, why was a mortgage recorded against my property? I always thought a mortgage was used to secure a loan.

I'm also not seeing things like an APR or other figures that would normally help me understand how the amount grows over time. Maybe I'm just looking at it the wrong way, but could you break that down for me in plain English?

One other thing I was wondering… has HomeTap changed its program or the way these investments are calculated since I signed back in 2021? I'm just wondering if maybe I'm comparing today's program to what I originally signed up for, because what I'm see today seems different from what I remember being told.

Thanks again for all your patience and for taking the time to help me understand it.

**Thank you**
**Larry F**

**On Jun 30, 2026, at 11:01 AM, homeowners@hometap.com wrote:**

**Thanks for reaching out, and please don't apologize at all!**

This is a unique financial product, and it is completely normal to want a clear understanding of how it all works under the hood. I am more than happy to break it down in plain English.

Here is how the recorded mortgage and the lack of an APR tie together:

- **Why a mortgage/lien is recorded:** Even though a Hometap investment is not a loan, we still record a mortgage (or security lien) against the property with your county. This document doesn't mean you have a loan; instead, it acts as a public notice to lenders, title companies, and future buyers that Hometap has a contractual stake in a percentage of the home's future value. It secures our right to receive that shared equity whenever the investment is settled (like when you sell, refinance, or buy us out), protecting our investment much like a traditional mortgage protects a lender's funds.

**How your specific settlement ($136,193.75) was calculated:** As we look at your current settlement figures, the final amount is determined by a simple comparison where you always pay the **lesser** of two numbers:

1. **The Hometap Share:** Based on your ending home value of $275,000, your agreed-upon investment share is

49.525%. Multiplying those gives **$136,193.75**.

2. **The Hometap Cap:** This sets a maximum ceiling to protect you from extreme home appreciation, capping our maximum return at a 20% annualized rate. For your timeline, that cap is **$189,029.58**.

Since the Hometap Share ($136,193.75) is lower than the Cap, that is the exact amount required to clear the lien and settle the investment.

I hope this helps connect the pieces for you and if you have any other questions, just let me know!

Mary Henderson
*Investment Support Coordinator*
+16176046985 I hometap.com
Book a meeting with me!

thread::qesnl2waC_WB5_YvEo_2DxA::

From: homeowners@hometap.com
Subject: Re: Settlement - Estimated Settlement Amount
Date: Jun 30, 2026 at 11:01:35 AM
To: larryf2323@yahoo.com

Hi Larry,

Thanks for reaching out, and please don't apologize at all! This is a unique financial product, and it is completely normal to want a clear understanding of how it all works under the hood. I am more than happy to break it down in plain English.

Here is how the recorded mortgage and the lack of an APR tie together:

- **Why a mortgage/lien is recorded:** Even though a Hometap investment is not a loan, we still record a mortgage (or security lien) against the property with your county. This document doesn't mean you have a loan; instead, it acts as a public notice to lenders, title companies, and future buyers that Hometap has a contractual stake in a percentage of the home's future value. It secures our right to receive that shared equity whenever the investment is settled (like when you sell, refinance, or buy us out), protecting our investment much like a traditional mortgage protects a lender's funds.

**How your specific settlement ($136,193.75) was calculated:** As we look at your current settlement figures, the final amount is determined by a simple comparison where you always pay the **lesser** of two numbers:

1. **The Hometap Share:** Based on your ending home value of $275,000, your agreed-upon investment share is 49.525%. Multiplying those gives **$136,193.75**.

2. **The Hometap Cap:** This sets a maximum ceiling to protect you from extreme home appreciation, capping our maximum return at a 20% annualized rate. For your timeline, that cap is **$189,029.58**.

Since the Hometap Share ($136,193.75) is lower than the Cap, that is the exact amount required to clear the lien and settle the investment.

I hope this helps connect the pieces for you and if you have any other questions, just let me know!

Mary Henderson
*Investment Support Coordinator*
+16176046985 | hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** [larryf2323@yahoo.com]
**Sent:** 6/29/2026 5:27 PM
**To:** homeowners@hometap.com
**Subject:** Re: Settlement - Estimated Settlement Amount

Hi Mary,

Thanks again , I appreciate the explanation. I promise this is my last question.

I guess I'm just trying to wrap my head around it. The payoff was quite a bit higher than I expected, so I've been going back through all my paperwork.

What I'm having trouble understanding is, if this isn't considered a loan, why was a mortgage recorded against my property? I always thought a mortgage was used to secure a loan.

I'm also not seeing things like an APR or other numbers that would normally help me understand how the balance changes over time. Maybe I'm just looking at it the wrong way. If you don't mind, could you break it down for me in plain English? I'm just trying to understand how it all fits together.

Thank you
Larry F

On Jun 29, 2026, at 4:42 PM, homeowners@hometap.com wrote:

Hi Larry,

Thanks for reaching out! To help clear up any confusion, Hometap provides home equity investments rather than traditional mortgages. Because it isn't a loan, mortgage-specific disclosure forms (like a Loan Estimate or Closing Disclosure) are not generated or used in our process.

The paperwork we sent over earlier includes everything that was prepared, executed, and signed at your closing. If you'd like to walk through any of the specific terms or calculations in your Option Purchase Agreement together, I'd be more than happy to help!

Mary Henderson
*Investment Support Coordinator*
+16176046985 | hometap.com

Book a meeting with me!

--------------- Original Message ---------------
**From:** [larryf2323@yahoo.com]
**Sent:** 6/29/2026 1:10 PM
**To:** homeowners@hometap.com
**Subject:** Re: Settlement - Estimated Settlement Amount

Hi Mary,
Thank you for your response.
I'm not referring to the documents that were recorded with the county.
I'm referring to the closing package. As I've been reviewing everything, the estimated settlement amount is significantly higher than I originally expected, so I'm going back through my file to make sure I have a complete copy of all of the closing documents.
I don't see documents such as a Truth in Lending Disclosure, Closing Disclosure, Loan Estimate, APR disclosure, finance charge disclosure, or similar mortgage lending disclosure forms.
If any of those documents were prepared for my closing,

would you please send me copies? If no such documents were prepared or provided, please let me know so I know my file is complete.
Thank you,
Larry

On Jun 29, 2026, at 12:47 PM, homeowners@hometap.com wrote:

Hi Larry,

To confirm, the documents I previously provided include everything that was executed and signed at your closing. Are you looking for copies of the documents that were recorded with the county after closing (such as the mortgage/lien recording)?

Let me know and I will gladly look into that for you!

Mary Henderson
*Investment Support Coordinator*
+16176046985 I hometap.com
Book a meeting with me!

--------------- Original Message ---------------

**From:** [larryf2323@yahoo.com]
**Sent:** 6/27/2026 4:08 PM
**To:** homeowners@hometap.com
**Subject:** Re: Settlement - Estimated Settlement Amount

Good morning Mary, I do have a question for you. I was going through the package and I think you accidentally left some forms out. I'm missing all the forms for the mortgage, I understand errors occur, can you please send me those documents so I have a complete file

Thank you
Larry F

On Jun 25, 2026, at 2:40 PM, homeowners@hometap.com wrote:

Hi Larry,

Please see the attached documents that were signed at closing

Best,

Mary

From: homeowners@hometap.com
Subject: Re: Settlement - Estimated Settlement Amount
Date: Jun 25, 2026 at 2:40:24 PM
To: larryf2323@yahoo.com

---

Hi Larry,

Please see the attached documents that were signed at closing

Best,

Mary

Mary Henderson
*Investment Support Coordinator*
+16176046985 I hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** [larryf2323@yahoo.com]
**Sent:** 6/25/2026 11:37 AM
**To:** homeowners@hometap.com
**Subject:** Re: Settlement - Estimated Settlement Amount

Good morning,

Since I requested my entire closing package, I'm simply trying to confirm that what was provided is complete. Please confirm that the documents previously provided constitute the complete executed closing package for Investment No.

FL999199, including all schedules, exhibits, addenda, and every document executed at closing. Based on my review, it appears that some documents may be missing from the package I received, and I would appreciate your confirming whether the production is complete.

Thank you,

Larry Fisher

**On Jun 19, 2026, at 9:25 AM, homeowners@hometap.com wrote:**

Hello,

I hope this email provides a clear breakdown of how we calculate your settlement. The amount required to settle your investment depends on the value of your property at the time of settlement, and Hometap will use the lesser of the Hometap Percentage or the Hometap Cap.

The Hometap Percentage is calculated based on the ending home value. If the ending home value is greater than or equal to the beginning home value, the Hometap

Percentage will be 49.525%. If the ending home value is less than the beginning home value, the Hometap Percentage will be 41.271%. For your investment, the Hometap Percentage is 49.525% that will be active based on an ending home value of $275,000.

$275,000 X 49.525% = $136,193.75

The Hometap Cap limits the amount that Hometap may receive to a 20% annualized rate of return, prorated for any partial year. The Hometap Cap is calculated as: (Investment Amount)*1.2^(days since Effective Date/365). For your individual investment, it will look like this:

$74,287 X 1.2 ^ (1,880 DIVIDED by 365) = $189,029.58

This cap is not an interest rate, but sets a ceiling on Hometap's recovery in the event that an investment is held for a short period of time or in cases of extreme home price appreciation. Assuming you were to settle 06/19/2026, the Hometap Cap would be $189,029.58.

Therefore, because the Hometap SHARE is less than the Hometap CAP, your settlement amount would be $136,193.75.

Please let me know if I can answer any questions for you.

**Mary Henderson**
*Investment Support Coordinator*
+16176046985 I hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** [larryf2323@yahoo.com]
**Sent:** 6/18/2026 8:03 PM
**To:** homeowners@hometap.com
**Subject:** Re: Settlement - Estimated Settlement Amount

Mary,

Thank you again for providing the contract and the estimated settlement amount.
I am not planning to sell, refinance, or settle at this time. I am simply trying to understand how the estimated settlement amount of $136,193.75 was calculated using a home value of $275,000.
Would you please provide a breakdown showing the calculation used to arrive at that figure, including any percentages, caps, appreciation calculations, adjustments, or other factors that were applied?
I am not disputing the estimate. I would simply like to

understand the math and the specific contract provisions used to arrive at the estimated settlement amount.
Thank you for your assistance.

Larry F

On Jun 18, 2026, at 4:55 PM, larryf2323@yahoo.com wrote:

Good afternoon Mary,

thank you for getting this information. At the present time I'm not thinking of selling my house refinancing or anything at this point. Right now it's for my information to understand.

Can you please forward me the contract? The contract used to be available and then disappeared.
I would appreciate any help you can give me

Thank you
Larry F

On Jun 18, 2026, at 2:57 PM, homeowners@hometap.com

wrote:

thread::qesnl2waC_WB5_YvEo_2DxA::

**FL999199.pdf**
9.5 MB

**Closing Docs.pdf**
2.4 MB

Mary Henderson
*Investment Support Coordinator*
+16176046985 I hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** [larryf2323@yahoo.com]
**Sent:** 6/25/2026 11:37 AM
**To:** homeowners@hometap.com
**Subject:** Re: Settlement - Estimated Settlement Amount

Good morning,

Since I requested my entire closing package, I'm simply trying to confirm that what was provided is complete. Please confirm that the documents previously provided constitute the complete executed closing package for Investment No. FL999199, including all schedules, exhibits, addenda, and every document executed at closing. Based on my review, it appears that some documents may be missing from the package I received, and I would appreciate your confirming whether the production is complete.

Thank you,

Larry Fisher

On Jun 19, 2026, at 9:25 AM, homeowners@hometap.com

**wrote:**

Hello,

I hope this email provides a clear breakdown of how we calculate your settlement. The amount required to settle your investment depends on the value of your property at the time of settlement, and Hometap will use the lesser of the Hometap Percentage or the Hometap Cap.

The Hometap Percentage is calculated based on the ending home value. If the ending home value is greater than or equal to the beginning home value, the Hometap Percentage will be 49.525%. If the ending home value is less than the beginning home value, the Hometap Percentage will be 41.271%. For your investment, the Hometap Percentage is 49.525% that will be active based on an ending home value of $275,000.

$275,000 X 49.525% = $136,193.75

The Hometap Cap limits the amount that Hometap may receive to a 20% annualized rate of return, prorated for any partial year. The Hometap Cap is calculated as: (Investment Amount)*1.2^(days since Effective Date/365). For your individual investment, it will look like this:

$74,287 X 1.2 ^ (1,880 DIVIDED by 365) = $189,029.58

This cap is not an interest rate, but sets a ceiling on Hometap's recovery in the event that an investment is held for a short period of time or in cases of extreme home price appreciation. Assuming you were to settle 06/19/2026, the Hometap Cap would be $189,029.58.

Therefore, because the Hometap SHARE is less than the Hometap CAP, your settlement amount would be $136,193.75.

Please let me know if I can answer any questions for you.

**Mary Henderson**
*Investment Support Coordinator*
+16176046985 I hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** [larryf2323@yahoo.com]
**Sent:** 6/18/2026 8:03 PM
**To:** homeowners@hometap.com
**Subject:** Re: Settlement - Estimated Settlement Amount

Mary,

Thank you again for providing the contract and the estimated settlement amount.
I am not planning to sell, refinance, or settle at this time. I am simply trying to understand how the estimated settlement amount of $136,193.75 was calculated using a home value of

$275,000.
Would you please provide a breakdown showing the calculation used to arrive at that figure, including any percentages, caps, appreciation calculations, adjustments, or other factors that were applied?
I am not disputing the estimate. I would simply like to understand the math and the specific contract provisions used to arrive at the estimated settlement amount.
Thank you for your assistance.

Larry F

On Jun 18, 2026, at 4:55 PM, larryf2323@yahoo.com wrote:

Good afternoon Mary,

thank you for getting this information. At the present time I'm not thinking of selling my house refinancing or anything at this point. Right now it's for my information to understand.

Can you please forward me the contract? The contract used to be available and then disappeared.
I would appreciate any help you can give me

Thank you

Larry F

On Jun 18, 2026, at 2:57 PM, homeowners@hometap.com wrote:

thread::qesnl2waC_WB5_YvEo_2DxA::

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re Larry Edward Fisher, Case No. 26-18759-MAM
Fisher v. Hometap Investment Partners II, L.P., et al.

# EXHIBIT C

March 26 Velocity notice, FedEx material, and judgment pages, followed by the preserved June 18 document-request printout.

*Source pages follow in preserved order. Existing source-page exhibit identifiers and legacy packet-reference markings are retained for stable pinpoint citation; they do not alter the source document text.*

ORIGIN ID:GBRA (617) 399-0624
HOMETAP EQUITY PARTNERS, LLC

361 NEWBURY STREET
5TH FLOOR
BOSTON, MA 02115
UNITED STATES US

SHIP DATE: 26MAR26
ACTWGT: 1.00 LB
CAD: 253261766/INET4535

BILL SENDER

TO **LARRY FISHER**

**21597 JUEGO CIRCLE, 6D**

**BOCA RATON FL 33433**
(508) 545-7971 REF:
INV:
PO: DEPT:

58KJ5/7AE5/484B

FedEx Express

E

J261026012001uv

**FRI - 27 MAR 5:00P**
**STANDARD OVERNIGHT**

TRK# 0201 **8700 1245 7447**

**XA PHKA**

**33433**
FL-US **FLL**

After printing this label:
**CONSIGNEE COPY - PLEASE PLACE IN FRONT OF POUCH**
1. Fold the printed page along the horizontal line.
2. Place label in shipping pouch and affix it to your shipment.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed

hometap

Date: March 26, 2026
FedEx Tracking: 870012457447

Larry Fisher
21597 Juego Circle, 6D
Boca Raton, FL 33433

# NOTICE OF RIGHT TO CURE DEFAULT

**Re: Hometap Investment No.: FL999199**
**Subject Property:** 21597 Juego Circle 6D Boca Raton, FL 33433

Larry Fisher:

This letter is in regards to the Hometap Option Purchase Agreement (the "Option Agreement") entered into by and between you and Hometap Investment Partners II, LP ("Hometap"), dated April 21, 2021, in the amount of $74,287.00.

Hometap received notification that a Judgment was placed on 21597 Juego Circle 6D Boca Raton, FL 33433 on November 3, 2025 in the amount of $11,172.62.

Please be advised that any lien that attaches to the Subject Property without Hometap's prior written approval is an Event of Default pursuant to Section 7.1(f) of the Option Agreement.

Please provide Hometap with evidence that the Judgment, has been paid in full and discharged, or contact homeowners@hometap.com to schedule a settlement of the Owner Repurchase. If you fail to cure this default within thirty (30) days of the date of this letter, Hometap may declare a default of the Option Agreement and exercise any of the rights and remedies as described in Section 7.2 of the Option Agreement.

Hometap Equity Partners, LLC
Attn: Servicing Dept
361 Newbury St, 5th Floor
Boston, MA 02115
homeowners@hometap.com

If you are currently experiencing difficulties in meeting this obligation, or wish to discuss this matter further, you may contact us at homeowners@hometap.com or 508-545-7971.

Sincerely,
Your Investment Support Team

CFN 20250394345
OR BK 36113 PG 1957
RECORDED 11/3/2025 3:38 PM
Palm Beach County, Florida
Michael A. Caruso, Clerk
Pgs: 1957 - 1958; (2pgs)

Filing # 234977104 E-Filed 11/03/2025 11:24:31 AM

CFN 20250437599
OR BK 36187 PG 774
RECORDED 12/11/2025 2:28 PM
Palm Beach County, Florida
Michael A. Caruso, Clerk
Pgs: 774 - 775; (2pgs)

IN THE COUNTY COURT IN AND FOR
PALM BEACH COUNTY, FLORIDA

CASE NO: 50-2025-CC-006746-XXXA-MB

VELOCITY INVESTMENTS LLC
Plaintiff

vs.

LARRY FISHER
Defendant(s)
_______________________________/

**FINAL JUDGMENT IN FAVOR OF PLAINTIFF**

**THIS ACTION** was heard on October 3, 2025 on Plaintiff's Motion for Summary Final Judgment. The Court, having granted Plaintiff's Motion by separate written order, hereby **ORDERS AND ADJUDGES** as follows:

1. Defendant, LARRY FISHER, 21597 JUEGO CIR APT 6D, BOCA RATON FL 33433 is liable to Plaintiff, VELOCITY INVESTMENTS LLC, P.O. Box 788, Wall, New Jersey, 07719 for principal of $11,172.62 and filing fees and costs of $368.00.

2. The total final judgment in favor of Plaintiff against Defendant is therefore $11,540.62, which shall bear interest at the applicable statutory rate as set forth in F.S. 55.03. The interest rate will adjust in accordance with section 55.03, Florida Statutes.

3. It is further ORDERED that the Defendant shall complete a Fact Information Sheet, Florida Rules of Civil Procedure Form 1.977(a) and return it to Plaintiff's attorney within 45 days from the date of this final judgment, unless the final judgment is satisfied or a motion for new trial or notice of appeal is filed.

4. Jurisdiction of this case is retained to enter further orders that are proper to compel the Defendant to complete the Fact Information Sheet and return it to the Plaintiff's attorney.

5. Defendant's Motion for Relief from Order Granting Summary Judgment is hereby **DENIED**.

6. Execution of this final judgment is hereby **STAYED** pending resolution of Defendant's counterclaim, which shall be resolved in the normal course of proceedings. *See Peterson v. Affordable Homes of Palm Beach, Inc.*, 65 So. 3d 112, 113 (Fla. 4th DCA 2011) ("Courts have repeatedly held that, where summary judgment is granted for a plaintiff and a counterclaim remains pending, the trial court should stay the execution of the judgment pending the resolution of the counterclaim." (citation omitted)). Accordingly, Defendant's Motion to Clarify and Rule on Defendant's Counterclaim is **DENIED** without prejudice as premature.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida.



FILED: PALM BEACH COUNTY, FL, MICHAEL A. CARUSO, CLERK, 11/03/2025 11:24:31 AM

Unique Code : BAA-BAA-BCAJJ-CACFADJEDEF-GAAJBI-B Page 1 of 2

I HEREBY CERTIFY THAT THIS DOCUMENT IS A TRUE AND CORRECT COPY OF A DOCUMENT THAT WAS RECORDED AS AN OFFICIAL RECORD WITH THE CLERK OF THE CIRCUIT COURT & COMPTROLLER, PALM BEACH COUNTY.

VISIT [illegible] TO VALIDATE THIS DOCUMENT

Digitally signed by Michael A Caruso
Date: 2025.11.21 09:34:17 -05:00
Clerk of the Circuit Court & Comptroller, Palm Beach County
Location: 205 N. Dixie Highway, West Palm Beach, FL 33401

OR BK 36187 PG 775
Pg: 2 of 2

CFN 20250394345
OR BK 36113 PG 1958
Pg: 2 of 2

Case No. 50-2025-CC-006746-XXXA-MB

50-2025-CC-006746-XXXA-MB 11/03/2025
Sarah L. Shullman Judge

50-2025-CC-006746-XXXA-MB 11/03/2025
Sarah L. Shullman
Judge

HONORABLE JUDGE SARAH SHULLMAN
PALM BEACH COUNTY COURT JUDGE

COPIES TO:

| | | |
|---|---|---|
| JONATHAN R. SINGER | | JSINGER@SINGERWEISSMAN.COM<br>rweissman@singerweissman.com<br>litigation@singerweissman.com<br>cwright@singerweissman.com<br>jsinger@ollawgroup.com |
| LARRY FISHER | | larry2323@gmail.com |
| LARRY FISHER | 21597 JUEGO CIR APT 6D<br>BOCA RATON, FL 33433 | |

SINGER WEISSMAN, 5701 E Hillsborough Ave, #1231, Tampa, Florida 33610, ACCOUNT: 00042569
LARRY FISHER larry2323@gmail.com



Unique Code : BAA-BAA-BCAJJ-CACFADJEDEF-GAAJBI-B Page 2 of 2

From: homeowners@hometap.com
Subject: Re: Settlement - Estimated Settlement Amount
Date: Jun 18, 2026 at 6:02:34 PM
To: larryf2323@yahoo.com

Hi Larry,

Please see the attached Option Purchase Agreement and Schedule A, please don't hesitate to reach out with any questions

Best,

Mary

Mary Henderson
*Investment Support Coordinator*
+16176046985 I hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** [larryf2323@yahoo.com]
**Sent:** 6/18/2026 4:55 PM
**To:** homeowners@hometap.com
**Subject:** Re: Settlement - Estimated Settlement Amount

Good afternoon Mary,

thank you for getting this information. At the present time I'm

not thinking of selling my house refinancing or anything at this point. Right now it's for my information to understand.

Can you please forward me the contract? The contract used to be available and then disappeared.
I would appreciate any help you can give me

Thank you
Larry F

On Jun 18, 2026, at 2:57 PM, homeowners@hometap.com wrote:

Hello!

Below is an estimated settlement amount for 06/18/2026 using the Ending home value of $275,000. Please note that this is just an estimate and the final settlement amount may vary. To ensure that you have the most accurate and up-to-date information, we kindly request that you do not send settlement funds until you have received a formal settlement statement from us.

At this time, we have not verified the exit method (Home Sale, Refinance, or Cash) as well as the settlement date. Once we have confirmed these details, we will provide you with a formal and accurate settlement statement.

For now, the approximate settlement amount would be $136,193.75.

If you are selling your home, the first step when selling your property is to fill out the attached "Notice of Intent to Sell" form. After that is returned, the next step is to alert Hometap when you receive a binding offer on the home. When you accept a binding offer please send the executed version of the purchase and sale agreement and the attached "Notice of Binding Offer" form. From the information in the agreement, Hometap will generate a Settlement Statement that will include settlement amounts good for 30 days, wire instructions, and information around the lien release process. Upon receipt of funds, Hometap releases all associated liens. Feel free to provide this Settlement Statement to the settlement agent of the transaction.

If you have any questions throughout the settlement process please reach out!

Thank you,

Mary Henderson
*Investment Support Coordinator*
+16176046985 | hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** [larryf2323@yahoo.com]
**Sent:** 6/18/2026 4:28 AM
**To:** homeowners@hometap.com
**Subject:** Re: Hometap Response Requested - FL999199

I've been looking for my documents online and they disappeared

I need my original contract and a current approximate payoff amount
Home value is approximately 275k

Can you please assist?

Court case is still moving forward, no change

Thank you
Larry F

On Jun 4, 2026, at 9:26 AM, homeowners@hometap.com wrote:

Hello,

Thank you!

Sincerely,

--

Jazmyn Maxwell
*Default Specialists*
(508) 545-7971 | hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** [larryf2323@yahoo.com]

**Sent:** 6/3/2026 9:12 PM
**To:** homeowners@hometap.com
**Subject:** Re: Hometap Response Requested - FL999199

Same thing, no changes yet
Thank you
Larry F

On Jun 3, 2026, at 11:30?AM, homeowners@hometap.com wrote:

?
Hello,

I hope you are well! I am reaching out for any updates you may have on the judgment with Velocity Investments, LLC.

Thanks!

--

Karen Jones
*Default Specialists*
(508) 545-7971 I hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** Homeowners@hometap
[homeowners@hometap.com]
**Sent:** 4/29/2026 9:39 AM
**To:** larryf2323@yahoo.com
**Subject:** Re: Hometap Response Requested - FL999199

Hello,

Thank you for the update! We will continue to reach out monthly for any updates you may have.

Please let me know if you have any questions.

Sincerely,

--

Jazmyn Maxwell
*Default Specialists*
(508) 545-7971 I hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** [larryf2323@yahoo.com]
**Sent:** 4/28/2026 6:10 PM
**To:** homeowners@hometap.com
**Subject:** Re: Hometap Response Requested - FL999199

Nothing yet,, couple more weeks I think everything will be over with. As I mentioned before, I'll notify you when the results are in. I think they're gonna vacate the judgment. That's my opinion and I'm not a judge.

Thank you
Larry F

On Apr 28, 2026, at 10:52?AM, homeowners@hometap.com wrote:

?
Hello,

I hope you are well! I am reaching out for any updates you may have on the judgment with Velocity Investments, LLC.

Thanks!

--

Jazmyn Maxwell
*Default Specialists*
(508) 545-7971 I hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** Homeowners@hometap
[homeowners@hometap.com]
**Sent:** 3/27/2026 4:49 PM
**To:** larryf2323@yahoo.com
**Subject:** Re: Hometap Response Requested - FL999199

Hello,

Thank you for letting us know, I understand! Any liens or loans placed against the property would need to be reviewed and approved by Hometap prior to doing so and since Velocity Investments, LLC has placed a lien against your home we are looking for any updates you may have on the lien being removed. At this time Hometap will continue to reach out to you monthly for any updates.

Please let me know if you have any questions.

Sincerely,

--

Jazmyn Maxwell
*Default Specialists*
(508) 545-7971 | hometap.com
Book a meeting with me!

--------------- Original Message ---------------
From: [larryf2323@yahoo.com]
Sent: 3/26/2026 1:50 PM

To: homeowners@hometap.com
Subject: Re: Hometap Response Requested - FL999199

Subject: Re: Hometap Investment ID# FL999199 – 21597 Juego Circle, 6D

Hi Preston,

I received your email and your earlier call — I was tied up with work at the time and wasn't able to speak.

For the record, the judgment referenced in your notice is currently subject to a court-ordered stay of enforcement and arises from ongoing litigation in which I am actively involved. As such, there is no present enforcement activity affecting the property.

Under these circumstances, I do not believe that a material default has occurred.

I prefer to keep communication in writing for clarity and

documentation. If you need any additional information, please feel free to reach out by email.

Please confirm receipt of this email.

Best regards,
Larry Fisher

> On Mar 26, 2026, at 11:23?AM, homeowners@hometap.com wrote:
>
> f you are currently experiencing difficulties in meeting this obligation, or wish to discuss this matter further, you may contact us at homeowners@hometap.com or 508-545-

thread::qesnl2waC_WB5_YvEo_2DxA::

Tap to Download
**FL999199 OPA and Schedule A .pdf**
7.9 MB

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re Larry Edward Fisher, Case No. 26-18759-MAM
Fisher v. Hometap Investment Partners II, L.P., et al.

# EXHIBIT D

Complete preserved August-September 2026 correspondence concerning Velocity, bankruptcy default, PACE, and account status.

*Source pages follow in preserved order. Existing source-page exhibit identifiers and legacy packet-reference markings are retained for stable pinpoint citation; they do not alter the source document text.*

From: Larry F larryf2323@yahoo.com
Subject: Re: One Final Clarification Regarding Velocity and the Bankruptcy Default
Date: Sep 15, 2026 at 11:15:31 AM
To: homeowners@hometap.com

Jazmyn, one quick follow-up. I believe I previously updated my contact information with Hometap during my communications with Preston Evans, but to make sure there is no confusion going forward, my current phone number is 754-243-3337

I would still prefer that any substantive information regarding my account, payoff, defaults, or Hometap's position be provided to me in writing by email.

Thank you,
Larry Fisher

> On Sep 15, 2026, at 10:13 AM, Larry F <larryf2323@yahoo.com> wrote:
>
> Jazmyn, I know you had asked to speak by phone. I've held off because I'm frustrated enough with this situation that I don't think a phone conversation would be the best way for me to communicate right now. I try to be respectful, and I'd rather keep things in writing than risk saying something inappropriate out of frustration.
>
> With that said, please provide me with a current payoff/settlement statement for my Hometap transaction. Please include:

- the total amount required to fully satisfy and release Hometap's interest;
- the home value used and the source/date of that valuation;
- the mortgage balance used in the calculation;
- the Hometap Share calculation and any cap calculation;
- all fees, charges, or other amounts included;
- whether any part of the amount is based on an Event of Default, including anything related to Velocity, PACE, or my bankruptcy;
- the contract provisions used to calculate the amount; and
- the date through which the payoff figure is valid.

I'm reviewing my options and need the figures in writing.

Thank you

Larry Fisher

**On Sep 4, 2026, at 3:08 PM, homeowners@hometap.com wrote:**

**Hello,**

**I attempted to give you a call but the number we have on file for you is not in service. I think a phone conversation may be best at this point. Please give us a call when you are able. We are available Monday - Friday 9AM-5PM EST at the number below.**

We will not be available Monday 9/7 due to the holiday.

Thanks!

--

**Jazmyn Maxwell**
*Default Specialists*
(508) 545-7971 | hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** Larry F [larryf2323@yahoo.com]
**Sent:** 9/3/2026 10:12 PM
**To:** homeowners@hometap.com
**Subject:** Re: One Final Clarification Regarding Velocity and the Bankruptcy Default

Hi Jazmyn,

Thank you for responding. I genuinely appreciate your continued help.

Jazmyn, seriously, let's be real here. My frustration is not with you personally, and I don't want you to take it that way. I've been dealing with this back and forth with Hometap for months. Every time I think I'm finally getting somewhere, something else comes up.

I'm tired of this mindfuck. I just want to know exactly where I stand with Hometap and with my home.

First it was my homeowner's insurance. Then it was PACE. Then it was the Velocity judgment. Hometap's default notice and cure demand over Velocity, and my concern about what could happen to my home, were the main reason I ended up filing Chapter 7 trying to resolve the problem.

Then I learned that the bankruptcy itself was another default.

Now I'm being told PACE went back into default.

I thought the PACE issue had been resolved months ago. Hometap asked me for additional documentation, I provided what was requested, and based on the response I received, I believed that issue had been addressed.

Was I wrong in believing that? If I was, please help me understand what happened.

Seriously, what is next?

Hometap keeps telling me this is an investment and not a loan. **What kind of investment acts like this?**

At this point, do I need Hometap's permission to go to the bathroom in my own home too?

I'm making a joke, but the underlying question isn't a joke. How am I supposed to know where I stand when something I believed had already been resolved can suddenly become a default again?

And that brings me back to the Velocity judgment you sent me.

Please help me understand this because I honestly don't see it. **Where on that document does it show that the judgment lien attached to my property? Can you please point me to the exact place on the document that says that?**

I've looked at it several times. I see the judgment against me, and I see where the judge says execution of the judgment is stayed, but I don't see anywhere on that document where it says the judgment attached to my home.

**What am I missing?**

This is another example of what I mean when I say I'm getting information piecemeal. I asked for the judgment and I asked to be shown where Hometap saw that it attached to my property. I received the judgment, but I still didn't get the other part of the answer.

I ask a direct question, get part of an answer, and then have to send another email to get the rest. By the time I get that answer, another question or another default seems to appear.

**Why is it so hard to get a freaking answer to a direct question?**

And I need to ask you something directly because I honestly don't know what else to think.

Are there certain things Hometap prohibits you from telling me or certain

questions you're simply not permitted or authorized to answer? Is there something you're not permitted to tell me?

If there is, please just tell me that. I'm not asking you to violate company policy or tell me something you're not authorized to disclose. If there are questions you can't answer, I can understand that.

But if that's not the problem, please help me get complete answers.

So let me try to put this as simply as I can:

1. Is Hometap currently saying that PACE is an existing default and that I will remain in default until it is paid in full and released — yes or no?
2. Was I wrong in believing the PACE issue had been resolved after I provided the additional documentation Hometap requested? If I was, please explain what happened.
3. Once the Velocity issue is resolved, my Chapter 7 is discharged, and whatever Hometap currently requires concerning PACE is resolved, will Hometap consider me in good standing with no other existing default — yes or no?
4. Once those things are resolved, does Hometap intend to pursue foreclosure or any other remedy against my home based on any of these matters — yes or no?
5. Regarding the Velocity judgment you sent me, where on that document does it show that the judgment lien attached to my property? If Hometap is relying on something other than what is actually contained in that judgment, please tell me what it is.
6. And I have one final practical question because after everything that's happened, I think it's a fair question to ask.

**Based on Hometap's current position, would I be better off selling my**

**home rather than someday finding myself facing foreclosure?**

I'm not asking you for legal or financial advice. I'm asking whether there is something about Hometap's position or the status of my investment that I need to know in making that decision.

If I resolve everything Hometap is currently telling me needs to be resolved, **can I reasonably expect to continue owning and living in my home without Hometap pursuing foreclosure over these matters?**

Please help me.

I'm tired of these emails, and I'm sure Hometap is tired of them too. I've been going back and forth with Hometap for months, and I don't want to keep doing this for another six months or a year.

I don't want another piece of an answer that creates another question and another email. **I just want to know exactly where I stand.**

If you're unable or not permitted to answer some of these questions yourself, please tell me that and help me get them to whoever at Hometap can answer them.

**Please help me bring this to an end.**

Thank you, Jazmyn. I really do appreciate your help.

Larry

**On Sep 3, 2026, at 4:04?PM, homeowners@hometap.com wrote:**

?

Hello,

Your Hometap investment will remain in a default status until

- We receive a copy of the Velocity judgment lien release. I have included a copy of the initial copy here in this email
- We confirm bankruptcy is discharged/dismissed
- Proof that the PACE lien with Renew Financial Group LLC has been paid in full and released.

This document with Velocity creates a legal lien against real property through public recording. If you have any additional questions, please feel free to give us a call with any further questions!

Sincerely,

--

Jazmyn Maxwell
*Default Specialists*
(508) 545-7971 | hometap.com

Book a meeting with me!

--------------- Original Message ---------------
**From:** Larry F [larryf2323@yahoo.com]
**Sent:** 9/1/2026 8:20 AM
**To:** homeowners@hometap.com
**Subject:** Re: One Final Clarification Regarding Velocity and the Bankruptcy Default

Hi Jazmyn,

First, thank you for taking the time to answer my questions. I really do appreciate that you addressed several of my main concerns in your last email instead of just pointing me back to the agreement.

I've been circling back on this for months now, and maybe part of the problem is how I've been framing my questions. I'm not an attorney, and I may simply not be asking the right things. That's on me, and I apologize if that's added to any confusion.

Ever since I received the Notice of Right to Cure, I've been trying to understand exactly what Hometap believed had happened, what I needed to do, and where I stood. For months now, this has weighed on me. I've lost sleep over it because I honestly didn't know if my home was at risk. That's

frightening at my age and not something I could easily recover from.

I'm not trying to be difficult. I'm only trying to understand.

I've read through my paperwork, the agreement, the notices, and our emails over and over, and I still feel like I'm missing something. I really don't want to keep going back and forth. I'd just like to understand what happened, where I stand, and finally put this behind me so I can get a good night's sleep.

To close the loop on my end, I really only have two questions left.

**First**, once I provide the recorded Velocity release and my Chapter 7 case is discharged, will Hometap consider me to be in default for any reason after that?

In other words, is there anything remaining that could result in Hometap pursuing foreclosure or any other remedy against my home?

**Second**, regarding the Velocity default, would you please send me the judgment document that Hometap relied upon when it concluded that I was in default?

If possible, could you also point me to the specific part of that document or record that Hometap relied upon? I've gone through my own paperwork several times, and I still can't see what Hometap saw. If I'm overlooking something, I'd genuinely appreciate your help in understanding it.

I think those two answers will finally give me the complete picture I've been trying to understand for several months and allow me to put this behind me.

If after your response I'm still not fully understanding, would you be open to a brief phone conversation sometime in the near future? Sometimes it's just

easier for me to understand something by talking it through rather than reading it. If not, I completely understand.

Thank you again for your patience, your time, and your help.

Sincerely,

Larry Fisher

**On Aug 31, 2026, at 11:09?AM, homeowners@hometap.com wrote:**

?

Larry,

Thank you for laying out your position so clearly, and I want to make sure I'm responding to the specific questions you've raised rather than pointing you back to the agreement again.

On the Velocity judgment: our position is based on the fact that the judgment was recorded in the county's public record. A recorded judgment attaches as a lien against real property in the county where it's recorded. The homestead protection you're referring to prevents a judgment creditor

from forcing a sale of the property to satisfy the debt - it does not prevent the lien from attaching, and it does not extinguish the underlying debt. Under our contract, a recorded judgment lien against the property is an Event of Default regardless of whether the creditor can currently force a sale. That is the basis Hometap has relied on throughout this process. Once you are able to provide the recorded release from Velocity, this would resolve the default event.

On the bankruptcy default: as I mentioned previously, filing itself is an Event of Default under the agreement, but a homeowner has certain protections under the bankruptcy. Our primary focus during an active bankruptcy is monitoring the proceeding through our attorney to ensure our interest is protected. Once the case is dismissed or discharged, the bankruptcy is no longer considered an open default.

I know this has been a frustrating process, and I appreciate you keeping us updated throughout.

Sincerely,

--

**Jazmyn Maxwell**
*Default Specialists*
(508) 545-7971 | hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** [larryf2323@yahoo.com]
**Sent:** 8/28/2026 8:29 PM
**To:** homeowners@hometap.com
**Subject:** One Final Clarification Regarding Velocity and the Bankruptcy Default

Hi Jazmyn,

I just have one more set of questions, and after this I won't bother you anymore. I'm simply trying to understand this a little further.

I also realize that you may not have been aware of the full history because I had not been dealing directly with you during most of this. So I want to briefly explain how I understood what was happening and ask whether my understanding makes sense to you or whether Hometap sees it differently.

When Hometap placed me in default over the Velocity judgment and gave me 30 days to cure it, enforcement of that judgment was already stayed by the state court. That stay had never been lifted.

Separately, the property is my Florida homestead. My understanding of Article X, Section 4(a) of the Florida Constitution is that, subject to its stated exceptions, an ordinary judgment does not become a lien against protected homestead property. The Constitution itself states that "no judgment, decree or execution shall be a lien thereon."

That is my understanding of how the law applied to my situation. If I am interpreting it incorrectly, I genuinely would like to understand why.

I had discussed these issues with Preston. I suppose it is possible Preston made a mistake somewhere along the way, but that was not my impression from our discussions. I thought he understood that enforcement of the Velocity judgment was stayed and that the property was my Florida homestead. Nevertheless, Hometap continued to maintain that the Velocity judgment had attached to my home and constituted an Event of Default that I had to cure.

If Preston did understand those facts, that is the part I am having difficulty understanding. What specifically did Hometap rely upon in determining that the Velocity judgment actually attached to and was enforceable against my home? Was Hometap relying simply on the fact that the judgment had been recorded, or did Hometap or its Florida counsel identify some specific legal or factual basis for concluding that it attached to my homestead despite the existing stay?

Throughout this entire process, I continued keeping Hometap updated as I had

been asked to do and responded to the requests for information.

I appreciate you sending me the agreement. I have reviewed it. But simply referring me back to the agreement does not really answer the issue I have been trying to understand all along: why Hometap treated the Velocity judgment as an attaching lien against my home while enforcement of that judgment was still stayed and the property was my Florida homestead.

This is important because one of the main reasons I filed Chapter 7 was the default Hometap had placed me in over Velocity and the 30-day demand to cure it. I did not have the money to satisfy the judgment, nor did I have the financial means to defend against a foreclosure if Hometap decided to exercise the remedies referenced in its default notice.

From my perspective, I filed Chapter 7 in substantial part to deal with the very judgment Hometap was requiring me to resolve. I am now being told that filing the Chapter 7 itself constitutes a separate default.

Does my explanation of how I got here make sense to you? If you believe my understanding of what happened, or my interpretation of the Florida homestead protection, is wrong, I would genuinely appreciate knowing where you believe I am mistaken.

I also want to make sure I understand Hometap's present position. You stated that providing the Velocity lien release would resolve the default with respect to Velocity. Once I provide that release and the Velocity issue is cleared as requested, does Hometap consider that matter resolved, or does Hometap still intend to pursue any remedies against my home based upon what it now identifies as the separate bankruptcy default?

I am not asking for another general explanation of the agreement. I am asking

what Hometap intends to do in my specific situation once the Velocity issue is cleared.

I don't think there is any reason for us to keep going back and forth after your response. I have tried to explain my position and how I got here as clearly as I can. I would just like to understand Hometap's position and your thoughts on what I have outlined above.

Thank you,

Larry Fisher

**On Aug 28, 2026, at 2:26?PM, homeowners@hometap.com wrote:**

**?**

**Hello,**

**Kindly refer to the attached Option Purchase Agreement, specifically sections 7.1(d) and 7.1(e), which explain that starting a voluntary bankruptcy process is considered a default event.**

For the Velocity judgment we ask that you please provide a copy of the lien release for our records and that would resolve the default in regards to that.

At this time Hometap is monitoring the bankruptcy and maintaining communication with our attorney to ensure that both the property and our interest in it are safeguarded.

Should anything change you we will keep you updated.

Please let me know if you have any questions.

Sincerely,

--

**Jazmyn Maxwell**
*Default Specialists*
(508) 545-7971 I hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** [larryf2323@yahoo.com]
**Sent:** 8/26/2026 7:16 PM
**To:** homeowners@hometap.com
**Subject:** Re: Hometap Response Requested - FL999199

Thank you for responding. I'm still confused about your answer, and I want to make sure I understand Hometap's position correctly.

I understand what you are saying—that Hometap is not a lender or creditor, that this is not a credit product, and that the agreement does not create debt or accrue interest.

What I still do not understand is what happens because I filed Chapter 7.

Does my Chapter 7 bankruptcy filing put me in default under my Hometap agreement?

If it does, does Hometap claim the right under my agreement to foreclose on or force the sale of my home because of that default?

And in my specific situation, now that the Velocity issue that Hometap asked me to resolve has been resolved, what does Hometap intend to do?

I'm having a hard time understanding why it has been so difficult to get direct answers to these questions. I have been trying to get direct, substantive answers about what this agreement actually is and what rights Hometap claims against my home since I first started raising these issues.

Your response says that any actions under the Option Purchase Agreement are

evaluated on a case-by-case basis. I understand that. But that still doesn't tell me whether my bankruptcy puts me in default, what rights Hometap claims that gives it against my home, or what Hometap intends to do in my particular situation.

I'm not asking what Hometap might do generally or in somebody else's case. I'm asking what Hometap's position is in my case and regarding my home.

I would appreciate a direct answer to those questions so I can understand where I stand.

Thank you,

Larry Fisher

**On Aug 26, 2026, at 4:57?PM, homeowners@hometap.com wrote:**

**?**

**Hello,**

**I understand, if you have a copy of the lien release for the Velocity judgement we ask that you please provide it**

**Please be advised that Hometap's financing solution differs**

from traditional loans, as we operate using an option purchase agreement that enables homeowners to receive a percentage of their property's equity in exchange for the right to acquire a corresponding percentage of the home in the future. Our agreement does not involve the accrual of interest or the creation of debt, as when the homeowner settles the investment or sells the property, the buyout value reflects a set, predetermined percentage of the home's worth. Our financing solution, using the option purchase agreement, is not characterized as a credit product, and Hometap is not a creditor.

Upon receipt of a bankruptcy filing notice, we maintain communication with our attorney to ensure that both the property and our interest in it are safeguarded. Any actions to be taken under the option purchase agreement are evaluated on a case-by-case basis, with the priority being the protection of the property from the bankruptcy. We'll continue to work with you and your client to avoid pursuing Hometap's remedies while the property is protected from bankruptcy.

Please let me know if you have any further questions.

Sincerely,

--

**Jazmyn Maxwell**
*Default Specialists*
(508) 545-7971 I hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** [larryf2323@yahoo.com]
**Sent:** 8/25/2026 5:20 PM
**To:** homeowners@hometap.com
**Subject:** Re: Hometap Response Requested - FL999199

Hello Jazmyn,

I'm trying to understand exactly where I stand with Hometap.

It seems like every time I make a move, I find out that I'm in default of something under the agreement.

I did get rid of the Velocity judgment issue that Hometap asked me to take care of, even though I repeatedly advised Hometap that the judgment did not attach to my homestead.

Now, while reviewing my agreement, I noticed that filing bankruptcy also appears to be an Event of Default.

I filed Chapter 7, so I'm trying to understand where that leaves me now.

Does Hometap consider my Chapter 7 filing a default under my agreement?

If it does, what does that mean for me and my home? Is Hometap intending to take any action against my property because I filed bankruptcy?

I'm simply trying to understand my current status. I took care of the issue Hometap asked me to address, and now I need to understand whether Hometap considers me to be in default for another reason.

Thank you,

Larry F

**On Aug 13, 2026, at 1:34?PM, homeowners@hometap.com wrote:**

**?**

**Hello,**

I understand, a judgment was recorded on your property which we confirmed through a title search, since Velocity Investments, LLC placed a lien on your home it does result in an event of default with Hometap. I have included a copy of the judgment lien here.

Once we receive a copy of the filed/recorded lien release with Velocity Investments, LLC, that would resolve the default with Hometap.

Below is the contact information for the attorney

**Charles Edward Stoecker**
100 South Ashley Dr - Ste 1310
Tampa, FL 33602
813-276-1662
cstoecker@hinshawlaw.com

Hometap is not a lender — we're an investor. In exchange for a lump sum of cash, Hometap receives a percentage of your home's future value when you sell or settle the investment. There's no loan, and no monthly payments.

When you eventually sell your home, Hometap receives its agreed-upon share of the home's value at that time. Lastly, Hometap can never earn more than its agreed upon percentage, as agreed at the commencement of the investment.

I have included a copy of your recorded mortgage and security agreement. Please let me know if you have any questions.

--

Jazmyn Maxwell
*Default Specialists*
(508) 545-7971 I hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** [larryf2323@yahoo.com]
**Sent:** 8/13/2026 5:16 AM
**To:** homeowners@hometap.com

**Subject:** Re: Hometap Response Requested - FL999199

Hi Jazmyn,

Thank you so much for your response I really appreciate it! I want to explain why I keep bringing this up. Back in March, Hometap sent me a Notice of Right to Cure Default over the Velocity judgment, gave me 30 days to cure it, and told me I needed to show it was paid off or work out a settlement. That notice is the reason I ultimately filed Chapter 7. I wouldn't have filed otherwise.

Here's what's confusing me though. In March, Hometap treated this as an already-triggered default. Then in August, Preston told me these debts "only become a concern to Hometap when they attach to the home," which made me a little confused.

What I'm trying to understand is how Hometap determined that the Velocity judgment actually attached to my home. Was it just because the judgment was recorded, or was there

something else that showed Hometap it was actually attached to my property?

One other thing, just so I understand. You said all Hometap is looking for is the satisfaction once the Velocity lien is cleared. So once that is cleared and you get the satisfaction, does that take care of everything with the default, or is there anything else I need to do?

On the bankruptcy side, understood. I'll direct that to the attorney going forward. Could you send me their name and contact information so I know who to reach out to?

Also, just as an FYI, my personal liability on the Velocity judgment is going to be addressed through the Chapter 7 case.

Separate from all that, I've asked a couple times now, if it's not a loan, what is it? I've gotten some information back, but I'll be honest, it's still not clicking for me. I even brought it up with your attorney at the 341 meeting. He asked me if I'd signed a mortgage, and if I'd signed an option agreement. I

told him no to both, because honestly I don't know what to call it. When I turned it around and asked him what it actually was, he wasn't able to tell me either. I'm 70, and the old noggin isn't as sharp as it used to be lol. Us seniors can be a little slow sometimes.

Could you just walk me through it in plain English, like I'm agreeing to it right now instead of five years ago? If it's not a loan, what exactly did I agree to?

Thanks,

Larry

On Aug 12, 2026, at 4:16?PM, homeowners@hometap.com wrote:

?
Hello,

As Velocity Investments, LLC has placed a judgment lien on your home for the unpaid debt Hometap asks that you please take steps in having the lien be removed. Whether that be paying it in full and having it released, completing a payment agreement. We are only looking for the lien to be resolved.

Hometap is not a loan however being Hometap has an interest in your property at 21597 Juego Circle, 6D, Boca Raton, FL 33433 Hometap will show up on title as a lien holder and will hold in interest in your property until the investment is settled in full.

In regards to the bankruptcy communication can be handled directly with the attorney.

Please let me know if you have any questions.

Sincerely,

--

**Jazmyn Maxwell**
*Default Specialists*
(508) 545-7971 I hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** [larryf2323@yahoo.com]
**Sent:** 8/11/2026 9:20 AM
**To:** homeowners@hometap.com
**Subject:** Re: Hometap Response Requested - FL999199

Hi Preston,

Just wanted to keep you updated like you asked. My 341 meeting with the trustee was completed this morning. Hometap also had an attorney at the meeting.

I've been thinking about your last email and what you said about an unrelated debt only becoming a concern to Hometap when it attaches to the home.

As I mentioned to you before, the Notice of Right to Cure Default and my concern about what could happen to my home are what ultimately pushed me into filing Chapter 7. That notice honestly scared the hell out of me. I'm a senior, we scare a little easier these days lol, especially when somebody starts talking about defaults, remedies and your home.

I filed Chapter 7 to get rid of the Velocity judgment because I thought that's what I needed to do. I would not have filed Chapter 7 just to get rid of that judgment otherwise.

That's why I'm still a little confused by what you told me. If it didn't attach, why the push? Is there something in the public records that I need to clear up?

There's one other thing I'm still trying to wrap my head around. I know there's a mortgage recorded on my property, but Hometap says this isn't a loan. I've asked before what exactly this is and I still don't understand it.

Can you explain it to me in normal layman's terms? If it's not a loan, what exactly is it, and why is there a mortgage on my property?

Also, since Hometap had an attorney at the meeting this morning, should I continue keeping you informed directly like you requested, or should I be communicating with the attorney from this point forward?

Thanks for your help.

Larry

**On Aug 6, 2026, at 4:54?PM, homeowners@hometap.com wrote:**

**?**

**Good day,**
**Thank you for reaching back out on this. I do apologize that I caused any fear to you.**

The lien, held by Velocity Investments, LLC, does attach to the property. Once judgment liens attach to the property, they come onto the default teams radar. Based on the Option Purchase Agreement, this is considered a breach of the Hometap contract. This is a breach of that contract due to this lien attaching to your property, without Hometap's prior authorization. Additionally this new lien decreases the Owner's Ending Equity below required threshold. I have included a copy of the contract for your records.

To remain in compliance with the Hometap contract this lien does need to be resolved.

In regards to the Bankruptcy filing, we cannot provide any guidance on that front.

Thank you

--

**Preston Evans**
*Default Specialist*
(508) 545-7971 I hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** [larryf2323@yahoo.com]
**Sent:** 8/5/2026 6:04 AM
**To:** homeowners@hometap.com
**Subject:** Re: Hometap Response Requested - FL999199

Hi Preston,

My main reason for contacting you was to correct an unintentional mistake I made in my earlier email regarding the time of my meeting with the trustee. The meeting is August 11 at 8:30 a.m., not 8:45 a.m. I just wanted to make sure you had the correct information.

Thank you for getting back to me. After reading your response, though, I'm a little confused about something you said.

You mentioned that debts unrelated to the home only become a concern to Hometap when they attach to the home.

That's what has me confused. Hometap sent me a Notice of Right to Cure Default regarding the Velocity judgment, gave me 30 days to cure it, told me I needed to provide proof that the judgment had been paid in full and discharged or discuss settlement of the Owner Repurchase, and continued contacting me about it.

To be candid, that notice scared the hell out of me. I'm a senior, we scare a little easier these days lol, especially when you're reading about defaults, remedies and your home.

That's why I filed Chapter 7 to get rid of the Velocity judgment. Had Hometap not treated the judgment as something I needed to cure, I would not have filed Chapter 7 to get rid of it.

Now, after reading your response, I'm wondering whether continuing with the bankruptcy is even necessary.

If it didn't attach, why the push? Is there something in the public records that I need to clear up?

Thanks for helping me understand this.

Larry

**On Aug 4, 2026, at 5:48?PM, homeowners@hometap.com wrote:**

**?**

**Good day Larry,**
**First off, thank you keeping me informed and providing me with this updated information. We will not be taking any**

actions, at this time, due to the Bankruptcy.

I am sorry you feel that you were not fully advised of the impact regarding debts unrelated to the home. These debts only become a concern to Hometap, when they attach to the home. Here we call those events involuntary liens, liens that attach to the title of the home, and more importantly impact your equity in the home.

We will continue to monitor things from our end.

Please let me know if you have any questions.
Thank you

--

Preston Evans
*Default Specialist*

thread::qesnl2waC_WB5_YvEo_2DxA::

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re Larry Edward Fisher, Case No. 26-18759-MAM
Fisher v. Hometap Investment Partners II, L.P., et al.

# EXHIBIT E

October 22, 2026 Fisher reply and complete supplied settlement/preservation thread, including Fisher's express notice that he would ask the Bankruptcy Court to resolve unanswered questions.

*Source pages follow in preserved order. Existing source-page exhibit identifiers and legacy packet-reference markings are retained for stable pinpoint citation; they do not alter the source document text.*

From: Larry F larryf2323@yahoo.com
Subject: Re: Settlement Statement - FL999199
Date: Oct 22, 2026 at 12:43:39 PM
To: homeowners@hometap.com
Cc: legal@hometap.com, Charles E. Stoecker cstoecker@hinshawlaw.com
Bcc: Larry larryf2323@yahoo.com

Savannah,

Thank you for your October 22 response. I have reviewed it and am responding in writing.

1. The settlement estimate

The figures and calculations you provided are completely different from how this arrangement was explained to me before I signed in 2021.

I do not agree that these figures reflect what I understood I was agreeing to. I reserve all of my rights and do not accept the estimate as an acknowledgment of any amount owed or the legal characterization of this transaction.

2. The defaults Hometap says remain open

Since 2024, Hometap has declared defaults involving my homeowner's insurance, the PACE assessment, the Velocity judgment, and my bankruptcy.

For each default you currently consider open, please identify the specific provision of my signed agreement on which Hometap relies, the facts supporting the alleged default, and what Hometap requires to resolve it.

PACE: I dispute that PACE remains an open default.

After the March 10 notice, I spoke with Hometap by telephone. During that conversation, I was asked whether the work improved the property. I explained that the air conditioning was necessary because, without it, the home could become moldy and unlivable.

I was asked to provide documentation. On March 16, I sent the Palm Beach County permit and HVAC paperwork, and Heather Adkins acknowledged receiving them.

My understanding from those communications was that Hometap would monitor whether the assessment was being paid. The assessment is billed with my property taxes, which are paid by my mortgage company through escrow. My property taxes are current.

I received no further indication that PACE remained an open default until September 3. Based on the March communications, I understood that the matter had been resolved.

Please explain specifically why Hometap considers PACE an existing default despite those communications, the documentation provided, and the current status of my property taxes.

Velocity: On September 1, I asked Hometap to identify where in the Velocity judgment it determined that the judgment attached to my home.

On September 3, Hometap sent me the judgment but did not identify where it established attachment to my property.

The judgment does not describe my home, and execution of the judgment was stayed by the state court. My property is also my Florida homestead.

I have repeatedly questioned Hometap's position that recording this judgment caused it to attach to my protected homestead.

Please identify the specific legal and factual basis for that position, including

any authority Hometap relies upon to conclude that the judgment attached to my property notwithstanding Florida's homestead protections.

Bankruptcy: Your October 22 email states that the bankruptcy default will be resolved once a dismissal or discharge has been formally filed in the bankruptcy court.

Please confirm that understanding in writing.

Please also confirm whether, assuming the other alleged defaults are resolved and my discharge is entered, Hometap will consider my account in good standing with no remaining existing default.

If Hometap maintains that it may still pursue foreclosure or another remedy based on these events, please identify the specific contractual provision and factual basis for that position.

3. Notices of Right to Cure

Please provide complete copies of both Notices of Right to Cure identified in your response:

- March 10, 2026 - PACE
- March 26, 2026 - Velocity

Please include the corresponding FedEx delivery confirmations showing the delivery dates, delivery addresses, and the names or signatures of the individuals who accepted delivery, if available.

4. The 30-day good-through period

On October 1, Jamie Akers offered to process a cash settlement using a 30-day

good-through date.

Your October 22 response states that Hometap cannot provide a 30-day good-through estimate.

Please explain why Hometap's position changed and whether there is any method by which I can obtain a written settlement amount valid for a defined period.

5. Preservation of records

In my October 2 email, I requested confirmation within fourteen days that Hometap had taken steps to preserve the records identified in that request.

Your response states that the request has been noted and that Hometap's legal team is aware of it.

That is not the same as confirming that preservation measures have actually been implemented.

Please confirm in writing whether Hometap has taken steps to preserve the identified records, including relevant records maintained by third parties on Hometap's behalf.

If any requested records are no longer available, please identify them and explain when and how they became unavailable.

As I explained in my October 2 email, I have spent months trying to obtain clear answers about this transaction, the alleged defaults, and Hometap's claimed rights concerning my home.

I have found it unusually difficult to obtain direct answers to specific questions. I would appreciate a complete written response to each numbered item above rather than another general reference to the agreement.

If Hometap does not provide clear and complete written answers, I intend to ask the United States Bankruptcy Court to resolve these questions.

Please respond in writing.

Larry Fisher
Agreement FL999199

On Oct 22, 2026, at 11:05 AM, homeowners@hometap.com wrote:

Hi Larry,

Thank you for your patience. Please see the written answers to your questions below.

Please note that Hometap is not able to provide a 30-day good-through estimate. What follows is a one-date estimate for illustration only. It is not a payoff quote, and it is not guaranteed for any future date.

**Assumptions you asked me to use**

- Hypothetical home value: $275,000 (not an appraised or AVM value)
- Settlement method: Cash, for illustration only
- Calculation date: October 22, 2026

**1. Hometap's estimated share and the applicable cap**

**Hometap Percentage**

Your investment has two set Share percentages, and which one applies depends on how your home's value has changed since your Beginning Home Value of $250,000:

- **49.525%:** This applies if the home has the same value or has appreciated, meaning the home value at settlement is higher than $250,000.
- **41.271%:** This applies if the home has depreciated, meaning the home value at settlement is lower than $250,000.

Because the hypothetical home value of $275,000 is higher than $250,000, the 49.525% applies in this estimate. Assuming you settled today, the Share calculation is:

Share = 49.525% × $275,000 (the hypothetical home value) = **$136,193.75**

**Hometap Cap**

The Cap is a 20% annualized return on your $74,287 investment amount, measured from your April 26, 2021 effective date. Assuming you settled today, the Cap would be $202,240.13, using the formula below:

$74,287.00 × 1.2 ^ (2,005 ÷ 365) = **$202,240.13**

(2,005 is the number of days between April 26, 2021 and October 22, 2026.)

**Hometap Share**

Under your agreement, you pay the lesser of the Share and the Cap. On these assumptions, were you to settle on 10/22/2026 the Hometap Share - the amount Hometap would receive - would be **$136,193.75**.

**2. Additional fees, charges, advances, or adjustments**

Hometap currently shows no other fees, charges, advances, or adjustments, so no other amounts are included in the settlement estimate. If a physical appraisal is needed at the time of settlement, its cost would be your responsibility.

**3. Total estimated amount to settle and release Hometap's recorded interests**

The estimated settlement amount as of October 22, 2026, using an ending home value of $275,000, is **$136,193.75**. Please note that this is only an estimate, and the final settlement amount may vary.

**4. Differences between a home sale, refinance, and cash settlement**

The Share and Cap formulas are the same for all three. The valuation and the paperwork differ:

- **Home sale:** Requires the fully executed purchase and sale agreement. The sale price is generally used as the ending home value, checked against an AVM or physical appraisal to confirm it is within 90% of the Fair Market Value. All Hometap investments on the property must be settled at closing.
- **Refinance:** Requires a settlement date. We also ask for the loan type and lender category.

- **Cash:** Requires a settlement date.
- **Appraisals:** Where a physical appraisal is needed, Hometap initiates it through its third-party management company, as stated in your Option Purchase Agreement.
- **Fees:** We have no separate fee schedule by method.

**5. Defaults Hometap currently considers open**

Hometap has three open defaults:

- **PACE lien** (Florida Green Finance Authority/Renew), recorded September 19, 2025. Requirement: the lien must be paid off and released, or Hometap must otherwise confirm in writing that the default is resolved. The Notice of Right to Cure was sent via FedEx on 3/10/2026 and delivered on 3/13/2026. The Notice of Right to Cure describes the cure terms.
    - Resolution Options: Discharge/Satisfaction of the PACE agreement from the county public records or full settlement of the Hometap Investment.
- **Judgment lien** (Velocity Investments, LLC), recorded November 5, 2025. The Notice of Right to Cure was sent via FedEx on 3/26/2026 and delivered on 3/31/2026.
    - Resolution Options: Satisfaction/release of judgment lien from the county public records or full settlement of the Hometap Investment.
- **Chapter 7 bankruptcy** (Case No. 26-18759-MAM, filed July 2, 2026). This default is tied to the court proceeding. Questions about how it affects your options are handled by Hometap's bankruptcy counsel.
    - Resolution: Once a dismissal or discharge has been formally filed in the bankruptcy

court. Any specific questions regarding the bankruptcy case should be directed to our attorney.

A previous insurance default was resolved on May 30, 2024.

Regarding your records preservation request, I have noted it, and Hometap's Legal team is aware of it since you included them in your email.

Please let me know if you have questions about any of this.

Thank you,

Savannah

--

Savannah Day
*Investment Support Manager*
(617) 604-6985 | hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** Homeowners@hometap [homeowners@hometap.com]

**Sent:** 10/2/2026 2:23 PM
**To:** larryf2323@yahoo.com
**Subject:** RE: Fwd: Settlement Statement - FL999199

Hello,

My name is Savannah Day and I am the manager of the Investment Support department. I will be providing you with the information requested but I will need until Monday end of day to complete your request. Thank you for understanding.

Best,

Savannah
--

Savannah Day
*Investment Support Manager*
(617) 604-6985 | hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** Larry F [larryf2323@yahoo.com]
**Sent:** 10/2/2026 8:35 AM
**To:** homeowners@hometap.com
**Cc:** cstoecker@hinshawlaw.com; legal@hometap.com
**Subject:** Fwd: Settlement Statement - FL999199

Hello Jamie,

When I heard from you , I was hopeful that I would finally receive the information I have been requesting. I provided the information you asked for to prepare an estimate, but as of this email, I still have not received that estimate or answers to my remaining questions.

I have been trying for months to understand this agreement, the defaults Hometap says exist, and what it would take to resolve them. I have asked questions and followed up. Without sufficient answers from Hometap, I cannot evaluate my options or figure out a way forward.

I am exploring what might be possible. I do not know whether I can arrange a settlement, but I would like to understand whether a resolution before discharge is possible.

As requested in my previous email, please use $275,000 as a hypothetical home value, cash for illustration only, and the 30-day good-through period you offered. Please provide:

1. Hometap's estimated share and the applicable cap, showing the formulas and calculation date.
2. Any additional fees, charges, advances, or adjustments, listed separately.
3. The total estimated amount required to settle the agreement and release Hometap's recorded interests.
4. Whether the amount, fees, valuation process, or requirements differ between a home sale, refinance, and cash settlement.

5. Which defaults Hometap currently considers open and what is required to resolve each one.

Please also address the additional questions you said you would answer.

This is a request for information so I can understand my options. I have not decided how or whether I can settle.

While these questions remain unresolved, please preserve all records relating to my transaction, FL999199, from the initial sales discussions through the present, including:

- Sales communications, recorded calls, transcripts, account notes, and the scripts, training materials, and scenario calculations used in presenting the transaction to me.
- Application, underwriting, appraisal, valuation, and closing records.
- All versions of the agreement, Schedule A, mortgage, memorandum, and UCC documents, including delivery, signing, and electronic audit records.
- Customer portal documents and their upload, replacement, removal, and access histories.

- Communications and internal records concerning insurance, PACE, Velocity, bankruptcy, asserted defaults, cure requirements, and owner-equity calculations.
- Title searches, lien-monitoring records, and the report referenced in the August 13, 2026 email.
- Historical payoff estimates, cap calculations, calculation inputs, account ledgers, and records concerning my requests for answers and payoff information.
- Records identifying ownership, assignments, and servicing transfers.

Please keep electronic records in their original formats with associated metadata and prevent routine deletion or overwriting of these materials, including relevant records held on Hometap's behalf.

I am asking that these records be kept intact, not that you send all of them to me now. Please acknowledge receipt and confirm within fourteen days that steps have been taken to preserve them. If relevant records are already unavailable, please identify them and explain when and how they became unavailable.

I remain open to receiving clear answers and finding a workable resolution. The next step depends on Hometap providing the information I have requested.

Please respond in writing.

Larry Fisher
Agreement FL999199

Begin forwarded message:

**From:** Larry F <larryf2323@yahoo.com>
**Date:** October 1, 2026 at 12:21:12 PM EDT
**To:** homeowners@hometap.com
**Subject: Re: Settlement Statement - FL999199**

Hi Jamie,

Thank you for getting back to me. I'm exploring my options, and I'm not sure yet whether I can make any of them work. I need an estimate so I can understand what might be possible.

Could you explain whether the amount, fees, valuation process, or requirements differ between a home sale, refinance, and cash settlement?

Please use $275,000 for the estimate, as that is relatively close to what I believe my home is worth. I understand that it is an estimate, not an appraised value. Please use the 30-day good-through period you mentioned.

If you need to select a method to generate the estimate, please use cash for illustration only. I haven't decided how or whether I can settle.

Please also address the additional questions you said you would answer.

Thank you,
Larry

**On Oct 1, 2026, at 11:17 AM, homeowners@hometap.com wrote:**

Hi Larry,

I was not able to locate an exit method in order to generate the Settlement State.

Could you please provide a good through date and confirm the method of settlement: Home Sale, Refinance, or Cash?

If the method is Home Sale, please provide a copy of the executed Purchase and Sale Agreement.

If you are refinancing and settling your Hometap Investment as part of the transaction, please specify the financing type (HELOC, HELOAN, Cash-out refinance, or other.) and the lender category (Bank, Credit Union, Non-Bank, or other.)

If neither of these options applies, we can process this as a **Cash** settlement with a 30-day good-through date.

Please let me know if you have any questions. We are here to help!

Thank you,
Jamie

Jamie Akers
*Investment Support Coordinator*
(617) 604-6985 I hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** Homeowners@hometap
[homeowners@hometap.com]
**Sent:** 10/1/2026 10:36 AM
**To:** larryf2323@yahoo.com
**Subject:** RE: Fwd: One Final Clarification Regarding Velocity and the Bankruptcy Default

Hello Larry,

I wanted to confirm that we have received your request, and I will be working on your settlement statement. I will also address the additional questions you raised.

Please allow me a little time, and I will send this over to you shortly.

Thank you for being a part of the Hometap family, and please let us know if there is anything else we can assist you with.

Thank you,
Jamie Akers

Jamie Akers

*Investment Support Coordinator*
(617) 604-6985 | hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** Larry F [larryf2323@yahoo.com]
**Sent:** 9/30/2026 2:00 PM
**To:** homeowners@hometap.com
**Subject:** Fwd: One Final Clarification Regarding Velocity and the Bankruptcy Default

Jazmyn

I'm trying hard finding a way to pay off my Hometap investment . Please provide an updated payoff quote for FL999199, including any fees and the date through which it is valid. Could you also briefly explain how you calculated the

amount?

i'm assuming you didn't get my last message, I don't think you'd avoid responding to a direct question like this. I included the last request in this email

Begin forwarded message:

**From:** Larry F <larryf2323@yahoo.com>
**Date:** September 15, 2026 at 11:15:31?AM EDT
**To:** homeowners@hometap.com
**Subject: Re: One Final Clarification Regarding Velocity and the Bankruptcy Default**

?

Jazmyn, one quick follow-up. I believe I previously updated my contact information with Hometap during my communications with Preston Evans, but to make sure there is no confusion going forward, my current phone number is 754-243-3337

I would still prefer that any substantive information regarding my account, payoff, defaults, or Hometap's position be provided to me in writing by email.

Thank you,
Larry Fisher

**On Sep 15, 2026, at 10:13?AM, Larry F <larryf2323@yahoo.com> wrote:**

?

Jazmyn, I know you had asked to speak by phone. I've held off because I'm frustrated enough with this situation that I don't think a phone conversation would be the best way for me to communicate right now. I try to be respectful, and I'd rather keep things in writing than risk saying something inappropriate out of frustration.

With that said, please provide me with a current payoff/settlement statement for my Hometap transaction. Please include:

- the total amount required to fully satisfy and release Hometap's interest;
- the home value used and the source/date of that valuation;

- the mortgage balance used in the calculation;
- the Hometap Share calculation and any cap calculation;
- all fees, charges, or other amounts included;
- whether any part of the amount is based on an Event of Default, including anything related to Velocity, PACE, or my bankruptcy;
- the contract provisions used to calculate the amount; and
- the date through which the payoff figure is valid.

I'm reviewing my options and need the figures in writing.

Thank you

Larry Fisher

On Sep 4, 2026, at 3:08?PM, homeowners@hometap.com wrote:

?

Hello,

I attempted to give you a call but the number we have on file for you is not in service. I think a phone conversation may be best at this point. Please give us a call when you are able. We are available Monday - Friday 9AM-5PM EST at the number

below.

We will not be available Monday 9/7 due to the holiday.

Thanks!

--

**Jazmyn Maxwell**
*Default Specialists*
(508) 545-7971 | hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** Larry F [larryf2323@yahoo.com]
**Sent:** 9/3/2026 10:12 PM
**To:** homeowners@hometap.com
**Subject:** Re: One Final Clarification Regarding Velocity and the Bankruptcy Default

Hi Jazmyn,

Thank you for responding. I genuinely appreciate your continued help.

Jazmyn, seriously, let's be real here. My frustration is not with you personally, and I don't want you to take it that way. I've been dealing with this back and forth with Hometap for months. Every time I think I'm finally getting somewhere, something else comes up.

I'm tired of this mindfuck. I just want to know exactly where I stand with Hometap and with my home.

First it was my homeowner's insurance. Then it was PACE. Then it was the Velocity judgment. Hometap's default notice and cure demand over Velocity, and my concern about what could happen to my home, were the main reason I ended up filing Chapter 7 trying to resolve the problem.

Then I learned that the bankruptcy itself was another default.

Now I'm being told PACE went back into default.

I thought the PACE issue had been resolved months ago. Hometap asked me for additional documentation, I provided what was requested, and based on the response I received, I believed that issue had been addressed.

Was I wrong in believing that? If I was, please help me understand what happened.

Seriously, what is next?

Hometap keeps telling me this is an investment and not a loan. **What kind of investment acts like this?**

At this point, do I need Hometap's permission to go to the bathroom in my own home too?

I'm making a joke, but the underlying question isn't a joke. How am I supposed to know where I stand when something I believed had already been resolved can suddenly become a default again?

And that brings me back to the Velocity judgment you sent me.

Please help me understand this because I honestly don't see it. **Where on that document does it show that the judgment lien attached to my property? Can you please point me to the exact place on the document that says that?**

I've looked at it several times. I see the judgment against me, and I see where the judge says execution of the judgment is stayed, but I don't see anywhere on that document where it says the judgment attached to my home.

**What am I missing?**

This is another example of what I mean when I say I'm getting information piecemeal. I asked for the judgment and I asked to be shown where Hometap saw that it attached to my property. I received the judgment, but I still didn't get the other part of the answer.

I ask a direct question, get part of an answer, and then have to send another email to get the rest. By the time I get that answer, another question or another

default seems to appear.

**Why is it so hard to get a freaking answer to a direct question?**

And I need to ask you something directly because I honestly don't know what else to think.

Are there certain things Hometap prohibits you from telling me or certain questions you're simply not permitted or authorized to answer? Is there something you're not permitted to tell me?

If there is, please just tell me that. I'm not asking you to violate company policy or tell me something you're not authorized to disclose. If there are questions you can't answer, I can understand that.

But if that's not the problem, please help me get complete answers.

So let me try to put this as simply as I can:

1. Is Hometap currently saying that PACE is an existing default and that I will remain in default until it is paid in full and released — yes or no?
2. Was I wrong in believing the PACE issue had been resolved after I provided the additional documentation Hometap requested? If I was, please explain what happened.
3. Once the Velocity issue is resolved, my Chapter 7 is discharged, and whatever Hometap currently requires concerning PACE is resolved, will Hometap consider me in good standing with no other existing default — yes or no?
4. Once those things are resolved, does Hometap intend to pursue

foreclosure or any other remedy against my home based on any of these matters — yes or no?

5. Regarding the Velocity judgment you sent me, where on that document does it show that the judgment lien attached to my property? If Hometap is relying on something other than what is actually contained in that judgment, please tell me what it is.
6. And I have one final practical question because after everything that's happened, I think it's a fair question to ask.

**Based on Hometap's current position, would I be better off selling my home rather than someday finding myself facing foreclosure?**

I'm not asking you for legal or financial advice. I'm asking whether there is something about Hometap's position or the status of my investment that I need to know in making that decision.

If I resolve everything Hometap is currently telling me needs to be resolved, **can I reasonably expect to continue owning and living in my home without Hometap pursuing foreclosure over these matters?**

Please help me.

I'm tired of these emails, and I'm sure Hometap is tired of them too. I've been going back and forth with Hometap for months, and I don't want to keep doing this for another six months or a year.

I don't want another piece of an answer that creates another question and another email. **I just want to know exactly where I stand.**

If you're unable or not permitted to answer some of these questions yourself,

please tell me that and help me get them to whoever at Hometap can answer them.

**Please help me bring this to an end.**

Thank you, Jazmyn. I really do appreciate your help.

Larry

On Sep 3, 2026, at 4:04?PM, homeowners@hometap.com wrote:

?
Hello,

Your Hometap investment will remain in a default status until

- We receive a copy of the Velocity judgment lien release. I have included a copy of the initial copy here in this email
- We confirm bankruptcy is discharged/dismissed
- Proof that the PACE lien with Renew Financial Group LLC has been paid in full and released.

This document with Velocity creates a legal lien against real property through public recording. If you have any additional questions, please feel free to give us a call with any further questions!

Sincerely,

--

**Jazmyn Maxwell**
*Default Specialists*
(508) 545-7971 | hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** Larry F [larryf2323@yahoo.com]
**Sent:** 9/1/2026 8:20 AM
**To:** homeowners@hometap.com
**Subject:** Re: One Final Clarification Regarding Velocity and the Bankruptcy Default

Hi Jazmyn,

First, thank you for taking the time to answer my questions. I really do appreciate that you addressed several of my main concerns in your last email instead of just pointing me back to the agreement.

I've been circling back on this for months now, and maybe part of the problem is how I've been framing my questions. I'm not an attorney, and I may simply not be asking the right things. That's on me, and I apologize if that's added to any confusion.

Ever since I received the Notice of Right to Cure, I've been trying to understand exactly what Hometap believed had happened, what I needed to do, and where I stood. For months now, this has weighed on me. I've lost sleep over it because I honestly didn't know if my home was at risk. That's frightening at my age and not something I could easily recover from.

I'm not trying to be difficult. I'm only trying to understand.

I've read through my paperwork, the agreement, the notices, and our emails over and over, and I still feel like I'm missing something. I really don't want to keep going back and forth. I'd just like to understand what happened, where I stand, and finally put this behind me so I can get a good night's sleep.

To close the loop on my end, I really only have two questions left.

**First**, once I provide the recorded Velocity release and my Chapter 7 case is discharged, will Hometap consider me to be in default for any reason after

that?

In other words, is there anything remaining that could result in Hometap pursuing foreclosure or any other remedy against my home?

**Second**, regarding the Velocity default, would you please send me the judgment document that Hometap relied upon when it concluded that I was in default?

If possible, could you also point me to the specific part of that document or record that Hometap relied upon? I've gone through my own paperwork several times, and I still can't see what Hometap saw. If I'm overlooking something, I'd genuinely appreciate your help in understanding it.

I think those two answers will finally give me the complete picture I've been trying to understand for several months and allow me to put this behind me.

If after your response I'm still not fully understanding, would you be open to a brief phone conversation sometime in the near future? Sometimes it's just easier for me to understand something by talking it through rather than reading it. If not, I completely understand.

Thank you again for your patience, your time, and your help.

Sincerely,

Larry Fisher

On Aug 31, 2026, at 11:09?AM, homeowners@hometap.com wrote:

?

Larry,

Thank you for laying out your position so clearly, and I want to make sure I'm responding to the specific questions you've raised rather than pointing you back to the agreement again.

On the Velocity judgment: our position is based on the fact that the judgment was recorded in the county's public record. A recorded judgment attaches as a lien against real property in the county where it's recorded. The homestead protection you're referring to prevents a judgment creditor from forcing a sale of the property to satisfy the debt - it does not prevent the lien from attaching, and it does not extinguish the underlying debt. Under our contract, a recorded judgment lien against the property is an Event of Default regardless of whether the creditor can currently force a sale.

That is the basis Hometap has relied on throughout this process. Once you are able to provide the recorded release from Velocity, this would resolve the default event.

On the bankruptcy default: as I mentioned previously, filing itself is an Event of Default under the agreement, but a homeowner has certain protections under the bankruptcy. Our primary focus during an active bankruptcy is monitoring the proceeding through our attorney to ensure our interest is protected. Once the case is dismissed or discharged, the bankruptcy is no longer considered an open default.

I know this has been a frustrating process, and I appreciate you keeping us updated throughout.

Sincerely,

--

**Jazmyn Maxwell**
*Default Specialists*
(508) 545-7971 | hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** [larryf2323@yahoo.com]
**Sent:** 8/28/2026 8:29 PM
**To:** homeowners@hometap.com
**Subject:** One Final Clarification Regarding Velocity and the Bankruptcy Default

Hi Jazmyn,

I just have one more set of questions, and after this I won't bother you anymore. I'm simply trying to understand this a little further.

I also realize that you may not have been aware of the full history because I had not been dealing directly with you during most of this. So I want to briefly explain how I understood what was happening and ask whether my understanding makes sense to you or whether Hometap sees it differently.

When Hometap placed me in default over the Velocity judgment and gave me 30 days to cure it, enforcement of that judgment was already stayed by the state court. That stay had never been lifted.

Separately, the property is my Florida homestead. My understanding of Article X, Section 4(a) of the Florida Constitution is that, subject to its stated exceptions, an ordinary judgment does not become a lien against protected homestead property. The Constitution itself states that "no judgment, decree or execution shall be a lien thereon."

That is my understanding of how the law applied to my situation. If I am interpreting it incorrectly, I genuinely would like to understand why.

I had discussed these issues with Preston. I suppose it is possible Preston made a mistake somewhere along the way, but that was not my impression from our discussions. I thought he understood that enforcement of the Velocity judgment was stayed and that the property was my Florida homestead. Nevertheless, Hometap continued to maintain that the Velocity judgment had attached to my home and constituted an Event of Default that I had to cure.

If Preston did understand those facts, that is the part I am having difficulty understanding. What specifically did Hometap rely upon in determining that the Velocity judgment actually attached to and was enforceable against my home? Was Hometap relying simply on the fact that the judgment had been recorded, or did Hometap or its Florida counsel identify some specific legal or factual basis for concluding that it attached to my homestead despite the existing stay?

Throughout this entire process, I continued keeping Hometap updated as I had been asked to do and responded to the requests for information.

I appreciate you sending me the agreement. I have reviewed it. But simply

referring me back to the agreement does not really answer the issue I have been trying to understand all along: why Hometap treated the Velocity judgment as an attaching lien against my home while enforcement of that judgment was still stayed and the property was my Florida homestead.

This is important because one of the main reasons I filed Chapter 7 was the default Hometap had placed me in over Velocity and the 30-day demand to cure it. I did not have the money to satisfy the judgment, nor did I have the financial means to defend against a foreclosure if Hometap decided to exercise the remedies referenced in its default notice.

From my perspective, I filed Chapter 7 in substantial part to deal with the very judgment Hometap was requiring me to resolve. I am now being told that filing the Chapter 7 itself constitutes a separate default.

Does my explanation of how I got here make sense to you? If you believe my understanding of what happened, or my interpretation of the Florida homestead protection, is wrong, I would genuinely appreciate knowing where you believe I am mistaken.

I also want to make sure I understand Hometap's present position. You stated that providing the Velocity lien release would resolve the default with respect to Velocity. Once I provide that release and the Velocity issue is cleared as requested, does Hometap consider that matter resolved, or does Hometap still intend to pursue any remedies against my home based upon what it now identifies as the separate bankruptcy default?

I am not asking for another general explanation of the agreement. I am asking

what Hometap intends to do in my specific situation once the Velocity issue is cleared.

I don't think there is any reason for us to keep going back and forth after your response. I have tried to explain my position and how I got here as clearly as I can. I would just like to understand Hometap's position and your thoughts on what I have outlined above.

Thank you,

Larry Fisher

On Aug 28, 2026, at 2:26?PM, homeowners@hometap.com wrote:

?
Hello,

Kindly refer to the attached Option Purchase Agreement, specifically sections 7.1(d) and 7.1(e), which explain that starting a voluntary bankruptcy process is considered a default event.

For the Velocity judgment we ask that you please provide a copy of the lien release for our records and that would resolve the default in regards to that.

At this time Hometap is monitoring the bankruptcy and maintaining communication with our attorney to ensure that both the property and our interest in it are safeguarded.

Should anything change you we will keep you updated.

Please let me know if you have any questions.

Sincerely,

--

**Jazmyn Maxwell**
*Default Specialists*
(508) 545-7971 I hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** [larryf2323@yahoo.com]
**Sent:** 8/26/2026 7:16 PM
**To:** homeowners@hometap.com
**Subject:** Re: Hometap Response Requested - FL999199

Thank you for responding. I'm still confused about your answer, and I want to make sure I understand Hometap's position correctly.

I understand what you are saying—that Hometap is not a lender or creditor, that this is not a credit product, and that the agreement does not create debt or accrue interest.

What I still do not understand is what happens because I filed Chapter 7.

Does my Chapter 7 bankruptcy filing put me in default under my Hometap agreement?

If it does, does Hometap claim the right under my agreement to foreclose on or force the sale of my home because of that default?

And in my specific situation, now that the Velocity issue that Hometap asked me to resolve has been resolved, what does Hometap intend to do?

I'm having a hard time understanding why it has been so difficult to get direct answers to these questions. I have been trying to get direct, substantive answers about what this agreement actually is and what rights Hometap claims against my home since I first started raising these issues.

Your response says that any actions under the Option Purchase Agreement are evaluated on a case-by-case basis. I understand that. But that still doesn't tell me whether my bankruptcy puts me in default, what rights Hometap claims that gives it against my home, or what Hometap intends to do in my particular situation.

I'm not asking what Hometap might do generally or in somebody else's case. I'm asking what Hometap's position is in my case and regarding my home.

I would appreciate a direct answer to those questions so I can understand where I stand.

Thank you,

Larry Fisher

**On Aug 26, 2026, at 4:57?PM, homeowners@hometap.com wrote:**

**?**

Hello,

I understand, if you have a copy of the lien release for the Velocity judgement we ask that you please provide it

Please be advised that Hometap's financing solution differs from traditional loans, as we operate using an option purchase agreement that enables homeowners to receive a percentage of their property's equity in exchange for the right to acquire a corresponding percentage of the home in the future. Our agreement does not involve the accrual of interest or the creation of debt, as when the homeowner settles the investment or sells the property, the buyout value reflects a set, predetermined percentage of the home's worth. Our financing solution, using the option purchase agreement, is not characterized as a credit product, and Hometap is not a creditor.

Upon receipt of a bankruptcy filing notice, we maintain communication with our attorney to ensure that both the property and our interest in it are safeguarded. Any actions to

be taken under the option purchase agreement are evaluated on a case-by-case basis, with the priority being the protection of the property from the bankruptcy. We'll continue to work with you and your client to avoid pursuing Hometap's remedies while the property is protected from bankruptcy.

Please let me know if you have any further questions.

Sincerely,

--

**Jazmyn Maxwell**
*Default Specialists*
(508) 545-7971 | hometap.com
Book a meeting with me!

---------------- Original Message ----------------
**From:** [larryf2323@yahoo.com]
**Sent:** 8/25/2026 5:20 PM

**To:** homeowners@hometap.com
**Subject:** Re: Hometap Response Requested - FL999199

thread::qesnl2waC_WB5_YvEo_2DxA::

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re Larry Edward Fisher, Case No. 26-18759-MAM
Fisher v. Hometap Investment Partners II, L.P., et al.

# EXHIBIT F

Docket Entry 13 Notice of Appearance filed July 15, 2026.

*Source pages follow in preserved order. Existing source-page exhibit identifiers and legacy packet-reference markings are retained for stable pinpoint citation; they do not alter the source document text.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| **IN RE:** | **CASE NO. 26-18759** |
| | **CHAPTER 7** |
| **LARRY EDWARD FISHER** | **JUDGE MINDY A MORA** |
| **Debtor,** | |

**NOTICE OF APPEARANCE AND REQUEST FOR NOTICE**

The undersigned hereby appears as counsel for Hometap HEI Fund II SPV I, by and through its servicer, Hometap Equity Partners, LLC., ("**Hometap**"). Hometap requests that all notices given or required to be given, and all papers served or required to be served, in this case upon Hometap, be given to and served on:


Charles E. Stoecker
Hinshaw and Culbertson, LLC
100 South Ashley Drive, Suite 1310
Tampa, FL 33602
Tel.: (813) 868-8881
Fax: (813) 436-8738
cstoecker@hinshawlaw.com


This request includes not only the notices and papers referred to in the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), including, without limitation, those Bankruptcy Rules specified above, but also includes, without limitation, any plan and objections thereto, notices of any orders, pleadings, motions, applications, complaints, demands, hearings, answers, responses, memoranda and/or briefs in support of the foregoing, any other documents brought before the Court with respect to those pleadings, whether

formal or informal, whether written or oral, and whether transmitted or conveyed by mail, hand delivery, telephone, telegraph, telex, facsimile, e-mail or otherwise, which (1) affects or seeks to affect in any way any rights or interests of any creditor or party-in-interest in this case, including, without limitation, Hometap, with respect to (a) the debtor, (b) property of the debtor's estate, or proceeds thereof, in which the debtor and/or Hometap may claim an interest; or (2) requires or seeks to require any act, delivery of any property, payment or other conduct of Hometap.

Respectfully submitted, this 15th day of July, 2026.

/s/ Charles E. Stoecker
Charles E. Stoecker FLB # 92560
Hinshaw and Culbertson, LLC
100 South Ashley Drive, Suite 1310
Tampa, FL 33602
Tel.: (813) 868-8881
Fax: (813) 436-8738
cstoecker@hinshawlaw.com

*Counsel for Creditor,* Hometap *HEI Fund II SPV I by and through its servicer, Hometap Equity Partners, LLC.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| **IN RE:** | **CASE NO. 26-18759** |
| **LARRY EDWARD FISHER** | **CHAPTER 7** |
| **Debtor,** | **JUDGE MINDY A. MORA** |

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be electronically sent to the registered participants as identified on the Notice of Electronic Filing on this 15 day of July, 2026.

*/s/ Charles E. Stoecker*
Charles E. Stoecker, FLB # 92560
Hinshaw and Culbertson, LLC
100 South Ashley Drive, Suite 1310
Tampa, FL 33602
Tel.: (813) 868-8881
Fax: (813) 436-8738
cstoecker@hinshawlaw.com

*Counsel for Creditor,* Hometap *HEI Fund II SPV I by and through its servicer, Hometap Equity Partners, LLC.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re Larry Edward Fisher, Case No. 26-18759-MAM
Fisher v. Hometap Investment Partners II, L.P., et al.

# EXHIBIT H

Servicing-transfer email dated July 27, 2026, effective August 3, 2026.

*Source pages follow in preserved order. Existing source-page exhibit identifiers and legacy packet-reference markings are retained for stable pinpoint citation; they do not alter the source document text.*

From: Hometap hello@hometap.com
Subject: Important notice regarding your home equity investment.
Date: Jul 27, 2026 at 10:21:39 AM
To: Larry Fisher larryf2323@yahoo.com

hometap

Hi Larry,

**Effective 8/3/26, the servicing of your home equity investment is being transferred to Hometap Homeownership Solutions, LLC, a subsidiary of Hometap Equity Partners, LLC.**

**What this means for you:**

This change has no impact on the terms of your home equity investment or how you contact and interact with Hometap. Specifically:

- The terms and conditions of your Investment (such as pricing and term length) remain the same
- You will continue to access your account through your Hometap portal at www.hometap.com
- You may still contact Hometap at homeowners@hometap.com with any questions on your investment
- Written communications may come from Hometap Homeownership Solutions, LLC
- Any ongoing communications with Hometap's Investment Support team, such as email or text messages, will not be interrupted or impacted

No action is required on your part, but if you have questions about this notice,

feel free to contact our Investment Support team at homeowners@hometap.com or 855-223-3144.

Thank you for being a Hometap homeowner. We're proud to help you get more out of homeownership.

Until next time,
The Hometap Team

Check out our **7,550** reviews

Trustpilot

hometap

© 2026 Hometap Homeownership Solutions, LLC dba Hometap.
NMLS ID# 2819930 NMLS Consumer Access All Rights Reserved

**361 Newbury St, 5th Floor, Boston, MA 02115**

Contact • Privacy Policy • Unsubscribe

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re Larry Edward Fisher, Case No. 26-18759-MAM
Fisher v. Hometap Investment Partners II, L.P., et al.

# EXHIBIT I

Entered Docket Entries 33 and 34, filed October 19, 2026.

*Source pages follow in preserved order. Existing source-page exhibit identifiers and legacy packet-reference markings are retained for stable pinpoint citation; they do not alter the source document text.*

**ORDERED in the Southern District of Florida on October 19, 2026.**

Mindy A. Mora, Judge
United States Bankruptcy Court

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
**www.flsb.uscourts.gov**

In re: Case No.: 26-18759-MAM

Larry Edward Fisher, Chapter 7

Debtor.
_______________________________________/

**ORDER GRANTING MOTION TO REQUIRE ABANDONMENT OF ESTATE'S INTEREST IN SCHEDULED HOMETAP MONETARY CLAIMS**

The Court heard Debtor's *Motion to Require Abandonment of Estate's Interest in Scheduled Hometap Monetary Claims* (Dkt. No. 24) (the "Motion") on October 15, 2026 at 10:00 a.m. For the reasons stated on the record, the Court ORDERS:

1. The Motion is **GRANTED**.

2. The chapter 7 trustee is directed to abandon the estate's interest in the scheduled prepetition affirmative monetary causes of action against Hometap arising from or relating to transaction FL 999199.

###

Copy to:

All interested parties by the chapter 7 trustee, who is also directed to file a conforming certificate of service.

**ORDERED in the Southern District of Florida on October 19, 2026.**

Mindy A. Mora, Judge
United States Bankruptcy Court

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
**www.flsb.uscourts.gov**

In re: Case No.: 26-18759-MAM

Larry Edward Fisher, Chapter 7

Debtor.
_______________________________________/

**ORDER GRANTING MOTION TO DEFER ENTRY OF A DISCHARGE**

THIS MATTER came before the Court on October 15, 2026 at 10:00 a.m. on Debtor's *Motion to Defer Entry of a Discharge Pursuant to Fed. R. Bankr. Proc. 4004(c)(2)* (Dkt. No. 29) (the "Motion"). For the reasons stated on the record, the Court ORDERS:

1. The Motion is **GRANTED**.

2. The clerk of the Court is directed to defer entry of Debtor's chapter 7 order of discharge until on or after November 19, 2026.

###

Copy to:

All interested parties by the chapter 7 trustee, who is also directed to file a conforming certificate of service.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re Larry Edward Fisher, Case No. 26-18759-MAM
Fisher v. Hometap Investment Partners II, L.P., et al.

# EXHIBIT J

Recorded-image copies of the 2021 Mortgage and Security Agreement, Memorandum of Option Purchase Agreement, and UCC-1.

*Source pages follow in preserved order. Existing source-page exhibit identifiers and legacy packet-reference markings are retained for stable pinpoint citation; they do not alter the source document text.*

CFN 20210300000
OR BK 32643 PG 856
RECORDED 07/01/2021 08:52:03
Palm Beach County, Florida
AMT 74,287.00
MTG DOC 260.05
INTANGIBLE 148.57
Joseph Abruzzo
Clerk
Pgs 0856-0865; (10Pgs)

***After Recording Return To:***
Hometap Equity Partners LLC
800 Boylston Street
16th Floor
Boston, MA 02199

***Recording Requested By:***
***Hometap Investment Partners II, L.P.***
Investment No.: FL999199

Prepared by: Noah Spaulding
Hometap Equity Partners LLC
800 Boylston Street, Suite 2906
Boston, MA 02199

M-FL678502

______________[**Space Above This Line For Recording Data**]______________

**Investment Amount: $74,287.00**

## MORTGAGE AND SECURITY AGREEMENT

This MORTGAGE AND SECURITY AGREEMENT, together with any riders (this "**Security Instrument**"), is made as of 04/21/2021 ("**Signing Date**"), by and between Larry E. Fisher, a single man (the "**Owner/Mortgagor**") and Hometap Investment Partners II, L.P., a Delaware limited partnership, and its successors and assigns ("**Hometap/Mortgagee**"). Capitalized terms used in this Security Instrument have the meanings provided in this Security Instrument, or if not defined in this Security Instrument, in the Option Purchase Agreement by and between Owner and Hometap (the "**Option Agreement**") of even date. The Option Agreement, Memorandum of the Option Purchase Agreement, and this Security Instrument are collectively referred to as the "**Hometap Homeowner Agreement.**"

This Mortgage and Security Agreement was prepared by Noah Spaulding, with an address of: c/o Hometap, 800 Boylston Street, 16th Floor, Boston, MA 02199.

1. Grant.

OWNER HEREBY IRREVOCABLY mortgages and conveys to Hometap, and its successors and assigns, a security interest for the benefit of Hometap, and its successors and assigns, in and to the property located at 21597 Juego Circle, Unit 6D, Boca Raton, FL 33433 and further described on Exhibit A attached hereto (the "**Property**"), together with all improvements, replacements, and additions now or hereafter erected on the Property, all easements, appurtenances, and fixtures now or hereafter a part of the Property, and all rents, issues, profits, and proceeds, including insurance and condemnation proceeds, from the Property.

2. Secured Obligations.

Owner makes the mortgage and conveyance set forth in Section 1 to secure the following:

(a) Owner's performance of each of its obligations in the Hometap Homeowner Agreement;

(b) Hometap's rights under the Hometap Homeowner Agreement;

(c) Homeowner's payment obligations in the Hometap Homeowner Agreement, including:

(i) Payment of the Hometap Share owed to Hometap pursuant to the terms of the Option Agreement;

(ii) Payment of all Option Fees owed to Hometap pursuant to Section 6.1 of the Option Agreement;

(iii) Payment of all insurance proceeds owed to Hometap pursuant to Section 6.1 of the Option Agreement;

(iv) Payment of all condemnation proceeds owed to Hometap pursuant to Section 6.1 of the Option Agreement;

(v) Payment of the liquidated damages pursuant to Section 7.4 of the Option Agreement;

(vi) Reimbursement of any expenditures made by Hometap pursuant to Section 6.1 and Section 7.2 of the Option Agreement; and

(d) Payment of all costs, fees, and expenses (including, as allowed by applicable law, court and other dispute resolution costs, attorneys' and experts' fees and costs, and fees and disbursements of in-house counsel) (collectively, "**Legal Fees**") incurred by Hometap in the enforcement and collection of the obligations listed above and the protection of Hometap's related rights, whether such costs, fees, and expenses are incurred in any state, federal, appellate, or bankruptcy court or otherwise and whether or not litigation or arbitration is commenced. Legal Fees include Legal Fees incurred in any state, federal, appellate, or bankruptcy court and in any bankruptcy case or insolvency proceeding, of any kind in any way related to this Security Instrument, to the interpretation or enforcement of the parties' rights under this Security Instrument, or to the Property.

The foregoing obligations are referred to collectively as the "**Obligations.**"

3. Uniform Commercial Code Security Agreement and Fixture Filing. This Security Instrument also is intended to be and will constitute a security agreement under the Florida Commercial Code for any items of personal property that constitute fixtures or are specified as part of the Property and that under applicable law may be subject to a security interest under the Florida Commercial Code. Owner grants to Hometap a security interest in those items to secure the performance and payment of the Obligations.

(a) Owner agrees that Hometap may file this Security Instrument, or a copy of it, and a UCC-1 Financing Statement in the real estate records or other appropriate index and/or in the Office of

the Secretary of State of Florida, as a financing statement for any of the items specified in the preceding paragraph as part of the Property.

(b) This Security Instrument constitutes a financing statement filed as a fixture filing pursuant to Sections 679.5011(1)(a) and 679.5021(3) of the Florida Commercial Code, and any similar or successor provisions.

(c) Hometap may file such extensions, renewals, amendments, and releases as are appropriate to reflect the status of its security interest.

(d) Owner will pay all costs, fees, and expenses of filing such financing statements and any extensions, renewals, amendments, and releases of such statements, and will pay all costs, fees, and expenses of any record searches for financing statements that Hometap may require.

(e) Upon an Event of Default, Hometap will have the remedies of a secured party under the Florida Commercial Code and may also take the actions provided in Section 7 of the Option Agreement. In exercising any of these remedies and taking any of these actions, Hometap may proceed against the Property's items of real property, fixtures or improvements separately or together and in any order whatsoever without in any way affecting the availability of Hometap's remedies under the Florida Commercial Code or the actions available in Section 7 of the Option Agreement.

4. Absolute Assignment of Leases and Rents. Owner absolutely and unconditionally assigns to Hometap all of Owner's right, title, and interest in and to all current and future leases, subleases, and licenses relating to the use, occupancy, or enjoyment of all or any part of the Property and all rents, income, revenues, profits, proceeds, and earnings now or hereafter payable with respect to the ownership, use, or occupancy of the Property (collectively, "**Rents**"); it being intended by Owner that this assignment constitutes a present, absolute assignment and not an assignment for additional security only.

(a) Owner gives to and confers upon Hometap the right, power, and authority, during the continuance of this Security Instrument, to collect the Rents, reserving the right upon an Event of Default, Owner's failure to perform any Obligation timely, or a breach of any agreement of Owner in this Security Instrument, to collect and retain the Rents, as they become due and payable.

(b) Upon an Event of Default, Owner's failure to perform any Obligation timely, or a breach of any agreement of Owner in this Security Instrument, Hometap may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the Obligations, enter upon and take possession of the Property or any part of it, in its own name sue for or otherwise collect the Rents, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including Legal Fees, to the Obligations, and in such order as Hometap may determine.

(c) The entering upon and taking possession of the Property, the collection of the Rents, issues, and profits and the application of the Rents, issues, and profits pursuant to this Security Instrument, will not cure or waive any breach or notice of default under this Security Instrument or invalidate any act done pursuant to such notice.

(d) Nothing in this Section will permit Owner to lease or rent the Property in contravention of any provision of the Option Agreement; nor will anything in this Section modify any provision in the Option Agreement relating to the use, lease, rent, or occupancy of the Property.

5. Covenants of Owner Regarding the Property. Owner agrees as follows:

(a) To appear in and defend any action, suit, or proceeding purporting to affect the security of this Security Instrument or the rights or powers of Hometap; and to pay all costs, fees, and expenses of Hometap (including cost of evidence of title and Legal Fees) incurred: (i) in any state, federal, appellate, or bankruptcy court, in any action, suit, or proceeding in which Hometap may appear, and in any action, suit, or proceeding brought by Hometap to foreclose this Security Instrument or to collect the Obligations or to protect Hometap's rights under this Security Instrument or the Hometap Homeowner Agreement; and/or (ii) in connection with the enforcement of any provision of this Security Instrument or in connection with foreclosure upon the collateral granted under this Security Instrument, whether or not an action or suit is filed.

(b) To pay at least ten (10) days before delinquency all taxes and assessments affecting the Property and all encumbrances, charges, and liens, with interest, on the Property (or any part of the Property), which are prior or could obtain priority to the lien or to the rights granted under this Security Instrument, and all costs, fees, and expenses of this Security Instrument.

(i) If Owner fails to make any payment or to do any act as provided in this Security Instrument, Hometap may, but will not be obligated to, make the payment or do any such act, and any such payment and related expenses, including Legal Fees, will also be secured by this Security Instrument.

(ii) Such payments made or actions taken by Hometap will not require notice to, or demand on, Owner and will not release Owner from any obligation under this Security Instrument.

(iii) Hometap will have the following related rights and powers: (A) to enter upon the Property for the foregoing purposes, (B) to appear in and defend any action or proceeding purporting to affect the Property or the rights or powers of Hometap under this Security Instrument, (C) to pay, purchase, contest, or compromise any encumbrance, charge, or lien that in the judgment of Hometap appears to be prior or superior to this Security Instrument, and (D) to employ counsel and to pay such counsel necessary expenses and costs, including Legal Fees.

(c) To pay immediately upon demand all sums expended by Hometap related to this Security Instrument and to pay interest on any of such amounts demanded by Hometap at a rate not to exceed the maximum rate allowed by law at the time of such demand.

6. Power of Attorney. Owner irrevocably appoints Hometap as Owner's agent and attorney-in-fact (such agency being coupled with an interest). As agent and attorney-in-fact, Hometap may, in Hometap's name or in the name of Homeowner, prepare, execute, and file or record financing statements, continuation statements, applications for registration, and similar documents to create, perfect, or preserve any of Hometap's security interests and rights in or to any of the Property. Upon an Event of Default, Owner's failure to perform any Obligation timely, or a breach of any agreement of Owner in this Security Instrument, Hometap may take any other action that may be required or desired of Owner, including the ability to advertise and solicit the Property for sale, encumber the Property by obtaining loans secured by liens on the Property to raise funds deemed required or advisable to improve, repair, and prepare the Property for sale, and sell and convey the entire interest in, and title to, the Property; *provided, however*, that Hometap as agent and attorney-in-fact will be accountable only for such funds as are actually received by Hometap.

7. Default and Foreclosure. Upon an Event of Default, Hometap may declare all performance and Obligations secured by this Security Instrument immediately due by delivery to Owner

of a written declaration of default. If any Event of Default has occurred and is continuing, Hometap may take any or all of the following actions, at the same or at different times:

(a) Possession. Hometap may enter upon and take possession of the Property; lease, rent and let the Property; and receive all the Rents, income, issues, and profits and apply the same to satisfy any Obligation. Hometap is granted full power and authority to do any act or thing which Owner or its successors or assignees who may then own the Property might or could do in connection with the ownership, use, and maintenance of the Property. This covenant becomes effective either with or without any action brought to foreclose upon the Property and without applying for a receiver of the Rents, if any. Should the Rents or any part thereof be assigned without the consent of Hometap, then this Security Instrument will, at the option of Hometap, become due and payable immediately, anything herein contained to the contrary notwithstanding.

(b) Appointment of Receiver. Hometap may have a receiver of the Rents (including an Asset Administrator), income, issues, and profits of the Property appointed without the necessity of proving either the depreciation or the inadequacy of the value of the security or the insolvency of Owner or any other person who may be legally or equitably liable for the Obligations, and Owner and each such person waive such proof and consent to the appointment of a receiver.

(c) Fair Rental Payments. If Owner or any subsequent owner is occupying the Property or any part the Property, it is agreed that the occupants will pay Hometap the amount of rent requested by Hometap in advance each monthly, and for the use of personal property covered by this Security Instrument.

(d) Excess Monies. Hometap may apply on account of the unsatisfied Obligations owed to Hometap after a foreclosure sale of the Property, whether or not a deficiency action has or will be instituted, any unexpended monies still retained by Hometap that were paid by Owner to Hometap or from the proceeds of such sale (i) for the payment of, or as security for, the payment of taxes, assessments, municipal or governmental rates, charges, impositions, liens, water or sewer rents, or insurance premiums, if any, or (ii) in order to secure the performance of some act by Owner.

(e) Remedies at Law or Equity. Hometap may take any of the remedies otherwise available to it as a matter of law, equity or otherwise.

(f) Judicial Foreclosure. Hometap may foreclose this Security Instrument by judicial proceeding. In connection with the foreclosure sale, Hometap may declare all performance and Obligations immediately due by delivery to Owner of a written declaration of default. Hometap will give notice of default to Owner prior to acceleration following an Event of Default. The notice will specify: (i) the default; (ii) the action required to cure the Event of Default; (iii) a date by which the Event of Default must be cured; and (iv) that failure to cure the Event of Default on or before the date specified in the notice may result in acceleration of the performance and Obligations secured by this Security Instrument, foreclosure by judicial proceeding, and sale of the Property. The notice will further inform Owner of any right to cure after acceleration and the right to assert in the foreclosure proceeding the nonexistence of an Event of Default or any other defense of Owner to acceleration and sale. If the Event of Default is not cured on or before the date specified in the notice, Hometap at its option may require immediate performance in full of all Obligations without further demand and may foreclose this Security Instrument by judicial proceeding. Hometap will be entitled to collect all costs, fees, and expenses incurred in pursuing the remedies provided in this Security Instrument, including legal fees and costs of title evidence.

(g) Notice. Notice provided to Owner under this Security Instrument will be to the address specified in this Security Instrument unless otherwise required by applicable law.

(h) Applicable Law. Exercise of Hometap's remedies under this Security Instrument will be in compliance with applicable law.

8. Late Performance. By accepting performance of any Obligation after its due date, Hometap does not waive its right either to require prompt performance when due of all other Obligations or to declare a breach or default for such failure to perform.

9. Hometap's Powers. At any time and from time to time, without liability and without notice, upon written request of Owner and presentation of this Security Instrument, and without affecting the personal liability of any person for the performance of the Obligations Hometap may: (a) release any part of the Property; (b) consent to the making of any map or plat of the Property; (c) join in granting any easement on the Property; and (d) join in any extension agreement or any agreement subordinating the lien or charge of this Security Instrument.

10. Subordination. This Security Instrument is subordinate to and junior to the Memorandum of Option Purchase Agreement which affects the Property and is executed by Owner as "Owner" as of the same date as this Security Instrument.

11. Successors. This Security Instrument applies to, inures to the benefit of, and binds all parties to this Security Instrument, their heirs, legatees, devisees, administrators, executors, and permitted successors and assigns. The term "**Hometap**" will include any successor or assign of Hometap's rights in the Option Agreement and in this Security Instrument, whether or not named as Hometap in this Security Instrument. Absent Hometap's prior written consent, which consent may be withheld in Hometap's sole discretion, Owner may not assign or otherwise transfer this Security Instrument.

12. Interpretation. In this Security Instrument, whenever the context so requires, the masculine gender includes the feminine and/or the neuter, and the singular number includes the plural. Also, in this Security Instrument, the term "include" or "including" means without limitation by reason of enumeration.

13. Joint and Several Liability. If more than one person signs this Security Instrument as Owner, the obligations of each signatory will be joint and several.

14. Multiple Owners. If there are multiple Owners of the Property:

(a) this Security Instrument must be signed by each Owner;

(b) all rights and powers specified for Owner in this Security Instrument must be approved and exercised unanimously by each Owner;

(c) each Owner will be jointly and severally liable for all liabilities and Obligations;

(d) notice required to be given by, or to, each Owner will be deemed adequately given if given by or to any Owner using the contact information set forth in this Security Instrument; and

(e) Hometap may treat any notice received from any Owner as notice from all Owners.

15. Incorporation by Reference. Exhibit A to this Security Instrument is incorporated by this reference.

16. Extent of Lien. The lien granted under this Security Instrument will encumber Owner's entire interest in the Property, notwithstanding the fact that the Hometap Homeowner Agreement relates to only a fractional interest in the Property.

17. No Merger. So long as any of the Obligations remain outstanding and undischarged, unless Hometap otherwise consents in writing, the fee estate of Owner in the Property or any part of the Property (including the estate of Hometap after exercising the Option) will not merge, by operation of law or otherwise, with any other estate in the Property or any part of it, but will always remain separate and distinct, notwithstanding the union of the fee estate and such other estate in Hometap or in any other person.

18. Release. Following payment of all amounts secured by this Security Instrument, Hometap will discharge this Security Instrument.

19. Subordination of Homestead and Waivers. If Owner has acquired before the Signing Date or acquires on or after the Signing Date an estate of homestead in the Property, Owner agrees, to the fullest extent permitted by applicable law, that such homestead estate is subordinated in all respects to this Security Instrument and the amount of any Obligation owed and to all renewals, extensions, and modifications of any Hometap Homeowner Agreement, and that such homestead estate is subject to all of the rights of Hometap under the Hometap Homeowner Agreement and all renewals, extensions, and modifications of the Hometap Homeowner Agreement, and is subordinate to the lien evidenced by this Security Instrument and all renewals, extensions, and modifications of this Security Instrument. Owner waives and relinquishes all rights of curtesy and dower in the Property.

20. Notices. All notices or other written communications hereunder shall be delivered in accordance with the applicable terms and conditions of the Option Agreement. Notices shall be sent to the address of the other party listed below as follows, unless a party has been notified by the other party in writing of a substitute address:

**Hometap/Mortgagee:**

Hometap Investment Partners II, L.P.
800 Boylston Street, 16th Floor
Boston, MA 02199
Attention: Legal Department

**Owner/Mortgagor:**

Larry E. Fisher

21597 Juego Circle, Unit 6D, Boca Raton, FL 33433

*[Signature Pages Follow]*

CFN 20210300000
BOOK 32643 PAGE 863
8 OF 10

**OWNER DECLARES THAT OWNER HAS READ THIS MORTGAGE AND SECURITY AGREEMENT, UNDERSTANDS IT, HAS RECEIVED A COMPLETELY FILLED-IN COPY OF IT WITHOUT CHARGE THEREFOR, AND HAS SIGNED IT AS OF THE SIGNING DATE.**

IN WITNESS WHEREOF, each undersigned Mortgagor has executed this Mortgage and Security Agreement under seal as of the Signing Date.

**MORTGAGORS:**

By: [signature]
Larry E. Fisher

Date: 4-21-2021

By: ______________________

Date: ______________________

**The undersigned Owner(s) requests that a copy of any Notice of Default or Notice of Sale under this Security Instrument be mailed to the Owner at the Owner's address set forth in Section 20 above.**

**MORTGAGORS:**

By: [signature]
Larry E. Fisher

Date: 4-21-2021

By: ______________________

Date: ______________________

CFN 20210000000
BOOK 32643 PAGE 864
9 OF 10

**Acknowledgment Certificate**
STATE OF ~~FLORIDA~~
COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this 21st day of APRIL, 2021 by LARRY E. FISHER (name of person acknowledging).

MERRY SANON-LITTLE
Notary Public - State of Florida
Commission # HH 017847
My Comm. Expires Sep 19, 2024
Bonded through National Notary Assn.

Notary Public Signature

My commission expires ____________________

Personally known ____________ OR Produced Identification ✓

Type of Identification Produced DRIVER'S LICENSE

**EXHIBIT A**

**LEGAL DESCRIPTION**

Real property described as follows:

All that certain land situate in Palm Beach County, State of Florida, viz:

Unit 6-D, Vistas of Boca Lago, a Condominium, according to the Declaration of Condominium thereof, as recorded in Official Records Book 2495, Page 1, and all amendments thereto, of the Public Records of Palm Beach County, Florida, together with an undivided interest or share in the common elements appurtenant thereto.

Parcel ID / APN: 00-42-47-20-02-000-0604

CFN 20210300334
OR BK 32643 PG 866
RECORDED 07/01/2021 08:52:03
Palm Beach County, Florida
AMT
Joseph Abruzzo
Clerk
Pgs 0866-0872; (7Pgs)

***After Recording Return To:***
Hometap Equity Partners LLC
800 Boylston Street
16th Floor
Boston, MA 02199

***Recording Requested By:***
*Hometap Investment Partners II, L.P.*
Investment No.: FL999199

Prepared by: Noah Spaulding
Hometap Equity Partners LLC
800 Boylston Street, Suite 2906
Boston, MA 02199

M-FL678502

**[Space Above This Line For Recording Data]**

**Investment Amount: <u>$74,287.00</u>**

**MEMORANDUM OF OPTION PURCHASE AGREEMENT**

This Memorandum of Option Purchase Agreement (this "**Memorandum**") is entered into as of 04/21/2021 (the "**Signing Date**"), by and between Larry E. Fisher, a single man (the "**Owner**") and Hometap Investment Partners II, L.P., a Delaware limited partnership, and its successors and assigns ("**Hometap**"). The Owner and Hometap are sometimes referred to together in this Memorandum as the "**Parties**" and individually as a "**Party**". Terms not defined in this Memorandum have the meanings provided in the Hometap Option Purchase Agreement (the "**Option Agreement**").

WHEREAS, on the Signing Date the Owner and Hometap entered into that certain unrecorded Option Agreement, which is incorporated by reference into this Memorandum as if set forth in full;

WHEREAS, pursuant to the Option Agreement, the Owner has granted and conveyed to Hometap an option (the "**Option**") to purchase an undivided percentage interest of fee simple title ownership in and to the residential real property owned by the Owner located at 21597 Juego Circle, Unit 6D, Boca Raton, FL 33433 and further described on <u>Exhibit A</u> attached hereto (the "**Property**");

WHEREAS, in consideration for granting and conveying the Option, Hometap has paid to the Owner the Investment Amount;

WHEREAS, pursuant to the Option Agreement the Owner has made certain representations, warranties, covenants and promises to, and for the benefit of, Hometap regarding the Option and the Property; and

WHEREAS, the Parties have executed and recorded this Memorandum to give notice of the Option Agreement and certain rights of Hometap to the Property and certain responsibilities the Owner owes Hometap, as well as the covenants and promises of the Owner included in the Option Agreement that run with the land and will be binding on any person who acquires the Property or any interest in the Property so long as the Option Agreement has not expired or been terminated.

NOW THEREFORE, in consideration of the foregoing the Parties agree as follows:

1. Irrevocable Nature of Option. The Option is irrevocable by the Owner.

2. Option Period. The Option will commence on Effective Date and will expire on the Expiration Date, unless the Option Period has been extended in accordance with the Option Agreement.

3. Subsequent Owners. Every person who now or later owns or acquires any right, title, or interest in or to the Property is and will be conclusively deemed to have consented and agreed to every restriction, provision, covenant, right, and limitation contained in the Option Agreement and this Memorandum, whether or not such person expressly assumes such restrictions, provisions, covenants, rights, and limitations or whether or not any reference to the Option Agreement or this Memorandum is contained in the instrument conveying such interest in the Property to such person.

4. Option Covenants Run with the Land. The Option Agreement covenants are deemed to be covenants running with the land, so as to give it the broadest possible application, and include, without limitation, the following:

    a. Restrictions on the Owner's right to transfer the Property.

    b. Restrictions on the Owner's ability to borrow against the Property.

    c. Restrictions of the Owner's ability to rent the Property.

    d. Requirement that the Owner pay Hometap the Hometap Share pursuant to the terms and conditions of the Option Agreement.

    e. Requirements that any sale of the Property conform to certain procedures set forth in the Option Agreement.

    f. Requirements that the Owner maintain adequate insurance on the Property against certain hazards.

    g. Requirements that the Owner keep the property free and clear of any liens or encumbrances not authorized by Hometap.

5. Governing Law. This Memorandum will be determined under, governed by, and construed in accordance with the laws of the state in which the Property is located, without regard to its conflict of law principles to the furthest extent possible.

6. Counterparts. This Memorandum may be executed in counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement.

7. Termination. This Memorandum will remain in full force and effect until released by written termination or quitclaim deed executed by Hometap and notarized and recorded in the real property records where the Property is located, or until extinguished by operation of law.

8. Notices. All notices or written communications required in connection with this Memorandum will be delivered in accordance with the Option Agreement and to the following addresses, unless a Party has been notified by the other Party in writing of a substitute address:

Hometap

Hometap Investment Partners II, L.P.
800 Boylston Street
16th Floor
Boston, MA 02199
Attention: Legal Department

Owner
Larry E. Fisher

21597 Juego Circle, Unit 6D, Boca Raton, FL 33433

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, intending to be legally bound, the Parties have executed this Memorandum as of the Signing Date by their signatures below. This Memorandum may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same Memorandum.

**HOMETAP INVESTMENT PARTNERS II, L.P.**

By: Hometap Holdings II, LLC,
Its General Partner

By: [signature]
Name: Adam Jaskiewicz
Title: VP Authorized Signer
Date: 4/21/21

Acknowledgment Certificate

Commonwealth of Massachusetts

County of Suffolk

On this 21st day of April, 2021, before me, the undersigned notary public, personally appeared Adam Jaskiewicz, proved to me through satisfactory evidence of identification, which was MA ID, to be the person whose name is signed on the preceding or attached document in my presence, and acknowledged to me that he signed it voluntarily for its stated purpose.

[signature]
Notary Public Signature

My commission expires DANIEL MILLER BURNETT Notary Public COMMONWEALTH OF MASSACHUSETTS My Commission Expires On December 04, 2026

**IN WITNESS WHEREOF**, intending to be legally bound, the Parties have executed this Memorandum as of the Signing Date by their signatures below. This Memorandum may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same Memorandum.

**OWNER(S):**

By: ______________________
Larry E. Fisher

Date: 4-21-2021

By: ______________________

Date: ______________________

STATE OF FLORIDA

COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this 21st day of April, 2021 by Jarry E. Fisher (name of person acknowledging).

Notary Public Signature

MERRY SANON-LITTLE
Notary Public - State of Florida
Commission # HH 017847
My Comm. Expires Sep 19, 2024
Bonded through National Notary Assn.

My commission expires ______________________

Personally known ____________ OR Produced Identification ✓

Type of Identification Produced Driver's License

**Exhibit A**

Property Description

All that certain land situate in Palm Beach County, State of Florida, viz:

Unit 6-D, Vistas of Boca Lago, a Condominium, according to the Declaration of Condominium thereof, as recorded in Official Records Book 2495, Page 1, and all amendments thereto, of the Public Records of Palm Beach County, Florida, together with an undivided interest or share in the common elements appurtenant thereto.

Parcel ID / APN: 00-42-47-20-02-000-0604

6:05 100

erec.mypalmbeachclerk.com

AS B LAGO CONDO U6-D

[redacted]

CFN 20210306535
OR BK 32643 PG 873
RECORDED 07/01/2021 08 52 03
Palm Beach County, Florida
AMT
Joseph Abruzzo
Clerk
Pgs 0873-0876, (4Pgs)

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Hometap Investment Partners II, L.P.
800 Boylston Street - 16th Floor
Boston, MA 02199
M-FL678562

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME | | | | |
| OR 1b. INDIVIDUAL'S SURNAME<br>Fisher | FIRST PERSONAL NAME<br>Larry | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS<br>21597 Juego Circle, Unit 6D | CITY<br>Boca Raton | STATE<br>FL | POSTAL CODE<br>33433 | COUNTRY<br>USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY<br>USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME<br>Hometap Investment Partners II, L.P. | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS<br>800 Boylston St., 16th Floor | CITY<br>Boston | STATE<br>MA | POSTAL CODE<br>02199 | COUNTRY<br>USA |

4. COLLATERAL: This financing statement covers the following collateral:

All personal property of Debtors now owned or hereafter acquired and used in connection with the Property described below, including but not limited to all items described in the attached Schedule A.

ALL THAT REAL PROPERTY AS DESCRIBED ON SCHEDULE B.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

TIFIED COPY

6:06 100

erec.mypalmbeachclerk.com

TAS B LAGO CONDO U6-D

CFN 20210306535
BOOK 32643 PAGE 874
2 OF 4

## UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| | |
|---|---|
| 9a. ORGANIZATION'S NAME | |
| OR 9b. INDIVIDUAL'S SURNAME | |
| FIRST PERSONAL NAME | |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| | | | | |
|---|---|---|---|---|
| 10a. ORGANIZATION'S NAME | | | | |
| OR 10b. INDIVIDUAL'S SURNAME | | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | | SUFFIX |
| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| | | | | |
|---|---|---|---|---|
| 11a. ORGANIZATION'S NAME | | | | |
| OR 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

| | |
|---|---|
| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: ☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing |
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: ALL THAT REAL PROPERTY AS DESCRIBED IN SCHEDULE B. |

17. MISCELLANEOUS:



TIFIED COPY

CFN 20210306535
BOOK 32643 PAGE 875
3 OF 4

Investment No.: FL999199

**FINANCING STATEMENT**

**SCHEDULE A**

All of Debtor's present and future right, title and interest in and to all of the following:

(a) Improvements and Fixtures. All property owned by Debtor which is attached to the property described in Section 4 of the foregoing UCC Financing Statement ("**Land**") and/or improvements, replacements and additions now or hereafter erected on the Land ("**Improvements**") ("**Property**" means the Land and/or the Improvements) and all casements, appurtenances and fixtures now or hereafter a part of the Property.

(b) Leases and Rents. All leases, subleases, sub subleases, lettings, licenses, concessions or other agreements (weather written or oral) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Property, and every modification, amendment or other agreement relating to such leases, subleases, sub subleases or other agreements entered into in connection with such leases, subleases, sub subleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into, whether before or after the filing by or against Borrower of an petition for relief under any Creditors Rights Laws (collectively, the "**Leases**") and all right, title and interest of Owner, its successors and assigns therein and thereunder including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder all rents, additional rents, rent equivalents, moneys payable as damages in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash issues, profits, charges for services rendered, and other consideration of whatever form of nature received by or paid to or for the account of or benefit of Owner or its agents or employees from any and all sources arising from or attributable to the Property, including, all receivables, customer obligations, installment payment obligations and other obligations now existing of hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Owners and proceeds, if any, from business interruption or other loss of income insurance whether paid or accruing before or after the filing by or against Owner of any petition for relief under any Creditors Rights Laws (collectively, the "**Rents**") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply Rents to the payment of the Hometap Share.

(c) Insurance Proceeds. All insurance proceeds in respect of the Property under any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property (collectively, the "**Insurance Proceeds**").

(d) Condemnation Awards. All condemnation awards, including interest therein, which may heretofore and hereafter be made with respect to the Property by reason of any taking or condemnation whether from the exercise of the right of eminent domain (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property (collectively, the "**Awards**").

(e) All proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds.

CFN 20210306535
BOOK 32643 PAGE 876
4 OF 4

**SCHEDULE B**

Description of Real Property:

All that certain land situate in Palm Beach County, State of Florida, viz:

Unit 6-D, Vistas of Boca Lago, a Condominium, according to the Declaration of Condominium thereof, as recorded in Official Records Book 2495, Page 1, and all amendments thereto, of the Public Records of Palm Beach County, Florida, together with an undivided interest or share in the common elements appurtenant thereto.

Parcel ID / APN: 00-42-47-20-02-000-0604

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re Larry Edward Fisher, Case No. 26-18759-MAM
Fisher v. Hometap Investment Partners II, L.P., et al.

# EXHIBIT K-1

FL999199 OPA and Schedule A.pdf supplied by Hometap on June 18, 2026.

*Source pages follow in preserved order. Existing source-page exhibit identifiers and legacy packet-reference markings are retained for stable pinpoint citation; they do not alter the source document text.*

Investment No.: FL999199

**THIS IS NOT A LOAN.**

**THIS IS AN AGREEMENT PURSUANT TO WHICH A HOMEOWNER RECEIVES PAYMENT IN EXCHANGE FOR AN OPTION TO PURCHASE A SPECIFIED PERCENTAGE INTEREST IN THE HOMEOWNER'S HOME THAT MAY BE EXERCISED IN THE FUTURE UPON THE OCCURRENCE OF CERTAIN EVENTS SUCH AS A SALE OF THE HOME.**

# OPTION PURCHASE AGREEMENT

This Option Purchase Agreement (this "**Agreement**") is entered into as of the date of last signature (the "**Signing Date**") by and between Hometap Investment Partners II, L.P., a Delaware limited partnership with its principal offices at 800 Boylston Street, 16th Floor, Boston, MA 02199 ("**we**", "**our**", "**us**", and/or "**Hometap**"), and the homeowner(s) set forth on the signature page attached hereto under the heading of "Owner" ("**you**", "**your**", and/or the "**Owner**"). Capitalized terms used in this Agreement but not otherwise defined shall be defined as set forth in the Investment Term Sheet (as defined below).

**WHEREAS,** Hometap wishes to purchase an exclusive and irrevocable option to acquire, in the future, a percentage possessory interest in Owner's home according to the terms and conditions of this Agreement and to provide the Owner with consideration in exchange for granting such an option;

**WHEREAS,** the Owner wishes to grant Hometap the requested option according to the terms and conditions of this Agreement in exchange for the Investment Amount and understands that by doing so, Hometap shall immediately have a contractual and economic interest in the Owner's home that may be exercised in the future, at which time Hometap may have a possessory interest in the Owner's home;

**WHEREAS,** Hometap wishes to protect its economic interest in the Option through the mechanisms identified in this Agreement and the concurrent Mortgage and Security Instrument, and these and other documents shall be recorded in a manner to establish the priority of Hometap's economic interest;

**WHEREAS,** as of the Signing Date, the Owner and Hometap have conducted and completed the execution of this Agreement (the "**Investment Signing**") at which the Owner has reviewed, confirmed, executed, and returned to Hometap a full, complete, and accurate Investment Term Sheet (the "**Investment Term Sheet**"), which together with this Agreement define, among other information, the Beginning Home Value, Investment Amount, Net Investment Amount, Hometap Percentage, Hometap Share, and Investment Fee;

**WHEREAS,** as of the Signing Date, Hometap has deposited the Investment Amount, as set forth in the Investment Term Sheet, in escrow with the Settlement Agent, which shall be disbursed upon the Effective Date in accordance with the terms and conditions of this Agreement;

**WHEREAS,** the Investment Term Sheet sets forth certain fees, costs, and expenses that Hometap shall incur and/or charge to the Owner in connection with its purchase of the Option;

**WHEREAS,** the Investment Term Sheet is attached and made a part of this Agreement as Schedule A; and

**WHEREAS**, in reliance upon the Investment Term Sheet, and the terms and conditions set forth in this Agreement, Hometap wishes to purchase the Option, and the Owner wishes to sell the Option and accept the Investment Amount, as described in this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Owner and Hometap agree as follows:

## SECTION 1
## OPTION PURCHASE

Section 1.1 Option and Hometap Percentage. You agree to sell to Hometap an exclusive and irrevocable option (the "**Option**") to acquire an undivided percentage interest (the "**Hometap Percentage**") of fee simple title ownership in that certain residential real property owned by the Owner as more fully identified and described on Exhibit A (the "**Property**"), which is attached and made a part of this Agreement. The Property will include only the real property described in Exhibit A and fixtures appurtenant thereto, as covered by a UCC-1 Financing Statement, as more fully set forth in Section 1.2(a)(v) below.

Section 1.2 Agreement Execution and Delivery. In connection with the execution and delivery of this Agreement, the Settlement Agent has conducted the Investment Signing, at which you have:

(a) Executed and delivered to the Settlement Agent originals of the following documents (each as well as other documents completed and delivered in connection with the consummation of the transactions contemplated by this Agreement an "**Investment Document**", and together the "**Investment Documents**"):

(i) this Agreement;

(ii) the Investment Term Sheet;

(iii) a notarized Memorandum of Option Purchase Agreement summarizing the provisions of this Agreement, substantially in the form set forth in Exhibit B, which is attached and made a part of this Agreement (the "**Memorandum of Option**");

(iv) a notarized Mortgage and Security Instrument substantially in the form set forth in Exhibit C, which is attached and made a part of this Agreement (the "**Mortgage and Security Instrument**");

(v) a complete and satisfactory UCC-1 Financing Statement substantially in the form set forth in Exhibit D, which is attached and made a part of this Agreement (the "**UCC-1**", and together with the Memorandum of Option and Mortgage and Security Instrument, the "**Security Instruments**");

(vi) a Notice of Right to Cancel, substantially in the form as set forth in Exhibit E, which is attached and made a part of this Agreement; and

(vii) a Consent of Spouse/Domestic Partner, as defined below, if applicable, in form and substance satisfactory to Hometap, and substantially in the form as set forth in Exhibit F, which is attached and made a part of this Agreement.

(b) Provided (i) written evidence that Hometap has been added as a loss payee (or as we otherwise direct) on all of Owner's insurance policies for the Property and the Settlement Agent is satisfied

with the evidence thereof or (ii) written authorization for Hometap to be added as a loss payee (or as we otherwise direct) on all of Owner's insurance policies for the Property;

(c) Received the Signing Instructions prepared and provided by the Settlement Agent based upon the Investment Term Sheet, which shall set forth the use and disbursement of the Investment Amount (the "**Signing Instructions**"); and

(d) Provided the Settlement Agent any other documents and information we reasonably request to have completed the Investment Signing and secure and perfect the Option and related documents as a lien upon the Property.

Section 1.3 Right to Cancel.

(a) You have a right to rescind and cancel this Agreement ("**Right to Cancel**") by delivering written notice to us at any time prior to 11:59 p.m. Eastern Time on the third (3rd) Business Day following the Signing Date (the "**Cancellation Period**") of your exercise of your Right to Cancel.

(b) If you exercise your Right to Cancel during the Cancellation Period, then this Agreement shall become null and void and of no further legal effect or consequence, the Investment Amount shall be returned to Hometap, and you and Hometap shall have no further obligations to one another.

(c) If you do not exercise your Right to Cancel during the Cancellation Period, then upon expiration thereof, this Agreement shall become binding and effective upon the parties at 12:00 a.m. Eastern Time on the first Business Day following the Cancellation Period (the "**Effective Date**").

(d) For purposes of this Agreement, a "**Business Day**" shall be all calendar days except Sundays and any day that is a federal banking holiday in the United States.

Section 1.4 Disbursement of Funds and Recording of Documents. Upon the Effective Date:

(a) Disbursement of Investment Amount and Net Investment Amount. Hometap shall cause the Investment Amount to be disbursed by the Settlement Agent in accordance with the Settlement Instructions, and the Net Investment Amount shall be delivered and paid to the Owner via wire transfer or check, as instructed by the Owner as soon as reasonably practicable on or following the Effective Date.

(b) Recording of Documents. Hometap shall use commercially reasonable efforts, via the Settlement Agent, to record and file the Security Instruments, as well as any other documents evidencing the satisfaction of liens or encumbrances on the Property as a result of the payments made pursuant to the Settlement Instructions with the appropriate county recorder or other applicable governmental, city, county, or municipal office in which the Property is situated. You agree to take any reasonable actions and sign any additional documentation deemed necessary or desirable by Hometap to allow Hometap to record and file the Security Instruments and any related documents.

Section 1.5 Option Period. The term of the Option (the "**Option Period**") shall commence on the Effective Date and shall continue until the earlier of (a) an Owner Repurchase (as defined below), (b) a Hometap Option Exercise (as defined below), or (c) 11:59 p.m. Eastern Time on the tenth (10th) anniversary of the Effective Date (the "**Expiration Date**"); *provided, however*, that Hometap may extend the Option Period one or more times by up to a total of an additional ten (10) years, by providing you with written notice (an "**Extension Notice**") of our intent to extend the Option Period prior to the Expiration Date or the conclusion of any Extension Period (as defined below). Any Extension Notice shall include the period for which Hometap intends to extend the Option Period (such period being the "**Extension Period**", and the

Option Period and any Extension Period collectively being the "**Effective Period**"), and upon any such extension, the Expiration Date shall be accordingly extended to the last day of any Extension Period. The Extension Period shall continue until the earlier of (a) an Owner Repurchase (as defined below), (b) a Hometap Option Exercise (as defined below), or (c) 11:59 p.m. Eastern Time on the last day of the Extension Period.

## SECTION 2
## OPTION CONDITIONS

Section 2.1 Determination of Ending Home Value. The "**Ending Home Value**" shall be (i) determined by the Appraisal Process (as defined below in Section 2.3) or (ii) in the event of a Permitted Sale (as defined below in Section 2.6(a)), the sale price of the Property, provided that such price is at least ninety percent (90%) of the value of the Property determined by the Appraisal Process.

Section 2.2 Calculation of the Hometap Share. The "**Hometap Share**" represents the value of Hometap's interest in the Property by virtue of the Option and shall be determined by multiplying (a) the Hometap Percentage, as set forth in the Investment Term Sheet, by (b) the Ending Home Value; *provided, however*, that the Hometap Share shall not exceed an amount equal to an annualized rate of return of twenty percent (20%) on the Investment Amount ("**Hometap Cap**"), as further described in the Investment Term Sheet.

Section 2.3 Appraisal Process.

(a) Physical Appraisal. For purposes of this Agreement, a "**Physical Appraisal**" shall mean a physical inspection and appraisal of the Property that meets the following criteria:

(i) the appraiser will be selected by us or approved in advance by us;

(ii) the appraiser must be unaffiliated with either you or us or any other individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government, or any agency or political subdivision of any of the foregoing (each a "**Person**") with an interest in the Property, such as a potential third-party buyer;

(iii) the inspection and appraisal of the Property must be done in compliance with the Uniform Standards of Professional Appraisal Practice; and

(iv) the Owner shall be responsible for payment of Appraisal costs.

(b) Second Physical Appraisal. In any circumstance where the Ending Home Value is being determined by an Appraisal under the terms of this Agreement, either the Owner or Hometap shall have the right to order and complete a second Physical Appraisal. If either party desires to have a second Physical Appraisal, then (a) the second Physical Appraisal must be completed (not just requested or ordered) within thirty (30) days after receiving final results of the first Appraisal and at least ten (10) Business Days before any scheduled closing or settlement, and (b) the Ending Home Value will then be the average of the value of the two Appraisals. Notwithstanding anything in this Agreement to the contrary, the party requesting a second Physical Appraisal shall bear the costs associated with such second Physical Appraisal. The process of undertaking and completing one or two Appraisals under this Agreement shall be referred to as the "**Appraisal Process**".

(c) Alternative Appraisal. Notwithstanding the requirements of Section 2.3(a) above, Hometap may elect to utilize an alternative method of appraisal (an "**Alternative Appraisal**") in lieu of a Physical Appraisal and such Alternative Appraisal shall be deemed binding for all purposes under this Agreement as if such Alternative Appraisal was a Physical Appraisal, subject to the rights of the Owner or Hometap to request a second Physical Appraisal pursuant to Section 2.3(b) above.

(d) Appraisal. For purposes of this Agreement, the singular or plural term "**Appraisal**" shall include, in Hometap's sole discretion, either a Physical Appraisal as defined in Section 2.3(a) or an Alternative Appraisal as defined in Section 2.3(c).

(e) Cooperation. Each party agrees to comply with the Appraisal Process and cooperate in good faith with any third-party vendors so that the Physical Appraisal(s) may be completed in a timely and effective manner.

(f) Notice. If applicable, Hometap shall deliver to you written notice of the Ending Home Value and the Hometap Share within ten (10) Business Days after completion of the Appraisal Process.

(g) Cost of Physical Appraisals. You will pay all reasonable costs and expenses associated with any Physical Appraisal ordered, scheduled, or conducted in accordance with the terms of this Agreement.

Section 2.4 Owner Repurchase.

(a) Owner Right to Repurchase. The Owner shall have the right to repurchase the Option (an "**Owner Repurchase**") from Hometap in the amount of the Hometap Share in accordance with the terms and conditions of this Agreement.

(b) Repurchase Notice. You may elect to complete an Owner Repurchase at any time during the Effective Period, regardless of whether a Transfer is contemplated, by delivering to us written notice (a "**Repurchase Notice**"). Within fifteen (15) Business Days of our receipt of a Repurchase Notice, we shall have the right to conduct the Appraisal Process, at your cost, and determine the Ending Home Value for purposes of calculating the Hometap Share. Within ten (10) Business Days after completion of the Appraisal Process, Hometap shall deliver to you written notice of the Ending Home Value and the Hometap Share and schedule a settlement of the Owner Repurchase (the "**Repurchase Settlement**").

(c) Confirmation of Title. Upon receipt of your Repurchase Notice, we may request, as evidenced by a completed title report, at your cost, confirmation of good and marketable title in and to the Property in fee simple and free of any Liens and Encumbrances (as defined below in Section 2.6(a)(iii)), subject only to the Permitted Encumbrances (as defined below in Section 2.6(a)(iii)), to be provided in the form either (i) of a policy of title insurance issued to, or for the benefit of, Hometap and insuring our rights under the Investment Documents; or (ii) of a written title report, abstract of title, or other title search documentation reflecting, to our satisfaction, confirmation of good and marketable title to the Property (either such form of confirmation being "**Confirmation of Title**").

(d) Transfer. In the event of a Transfer (as defined below in Section 2.5(a)), you agree to follow all procedures set forth below in Section 2.6 in addition to those provided herein in Section 2.4. Should any procedures be inconsistent, those procedures in Section 2.6 shall control.

(e) Expiration. In the event of the Expiration Date, you agree to follow all procedures set forth below in Section 2.7 in addition to those provided herein in Section 2.4. Should any procedures be inconsistent, those procedures in Section 2.7 shall control.

(f) Sufficiency of Tender. Hometap retains the right to reject any tender by you of the Hometap Share payment where we believe your tender is not for the full amount of the Hometap Share, is not actually received by us, is not tendered within the time frame agreed to by you and us, or is subject to any legal limitation.

(g) Termination of Option. Upon our receipt of the Hometap Share payment, the Option shall be terminated, and we will have no further right to exercise the Option or have any further interest whatsoever in the Property. After our receipt of the Hometap Share (together with any other amounts owed by Owner to Hometap under the terms of this Agreement), we will terminate and release the Security Instruments and deliver any other documents reasonably required to verify the termination of the Option and release of the Security Instruments. Owner will be responsible for all Closing Costs as defined and set forth in Section 2.6(d)(iv) below.

Section 2.5 Hometap Right to Exercise Option. Unless and until you elect and complete an Owner Repurchase, Hometap shall have the right to exercise the Option (a "**Hometap Option Exercise**"), as provided for below in Section 3.1, upon any of the following events or occurrences during the Effective Period:

(a) any Permitted Sale (as defined below in Section 2.6(a)), or other sale, exchange, transfer, conveyance, or assignment of all or any part of the Property or any legal or beneficial interest in the Property (any such occurrence being a "**Transfer**"), as provided below in Section 2.6; *provided, however*, that any Transfer to a surviving Owner or estate of an Owner in the event of a death of an Owner shall not trigger a Hometap Option Exercise;

(b) on or in anticipation of the Expiration Date, as provided below in Section 2.7;

(c) upon an Event of Default, as provided below in Section 7;

(d) upon destruction of the Property as provided below in Section 6.1(d); or

(e) upon condemnation of the Property, as provided below in Section 6.1(h).

Section 2.6 Event of Transfer.

(a) Permitted Sale. For purposes of this Agreement, a "**Permitted Sale**" shall mean a Transfer of the Property that meets the following conditions as determined in Hometap's sole reasonable discretion:

(i) the Transfer must be a transaction entered into in good faith without fraud or deceit carried out by unrelated or unaffiliated parties, by a willing buyer and a willing seller, each acting in his or her own self-interest, in which the sale price represents fair market value of the Property (an "**Arm's Length Transaction**"); *provided, however*, that an Arm's Length Transaction does not include any of the following: (A) a transaction between family members or business associates at less than fair market value of the Property, (B) a transaction subject to hidden terms or agreements or special understandings between the parties, whether written or oral (for example, the seller to regain ownership of the Property or the buyer to resell the Property and the seller to receive any proceeds from the resell transaction), or (C) a Transfer in which the sale price of the Property is less than ninety percent (90%) of the fair market value as determined by an Appraisal;

(ii) the terms and conditions of an Arm's Length Transaction will be set forth in a commercially reasonable standard form of Agreement for the Purchase and Sale of Real Property (a "**P&S**") prepared and negotiated by legal counsel with experience in such matters; and

(iii) you must convey title free and clear of any and all (A) licenses, easements, equitable servitudes, public bond obligations, and other conditions, covenants, restrictions and rights to which the Property is subject (collectively, "**Liens and Encumbrances**"), except for those: (1) that are stated as exceptions in the Confirmation of Title, or (2) to which we have expressly agreed in writing that the Property will remain subject (such excepted Liens and Encumbrances being "**Permitted Encumbrances**"), and (B) loans or other obligations (such items being "**Senior Liens**"), or any other liens on the Property to secure the payment of any loans or the performance of any obligations owed to any creditor or third-party vendor.

(b) Notices and Documentation upon Proposed Transfer. In connection with any Transfer, the Owner agrees as follows:

(i) Permitted Sale: Owner Notice of Binding Offer. In the event of a Permitted Sale, Owner shall provide Hometap written notice (a "**Binding Offer Notice**") of any binding offers to Transfer the Property to any Person who proposes to purchase the Property (a "**Third-Party Buyer**"). Such Binding Offer Notice must be delivered within three (3) Business Days of receiving such binding offer and, in any event, no less than thirty (30) days prior to the proposed closing date for such Permitted Sale. Any binding offers shall be in form and substance that are typical of real property purchases and sales for the state in which the Property is located and shall be required to include terms and conditions evidencing an Arm's Length Transaction. A Binding Offer Notice shall include a full and complete copy of the binding offer, which must include the name of the Third-Party Buyer, the sale price, the proposed closing date for the Permitted Sale, the proposed inspection date, if any, and any and all other material terms and conditions of the proposed Permitted Sale, including, without limitation, any financing or mortgage contingencies. The Binding Offer Notice must also indicate whether the Owner intends to complete an Owner Repurchase prior to, or simultaneous with, the closing of the Permitted Sale.

(ii) All Other Transfers: Owner Notice of Transfer. In the event of any Transfer other than a Permitted Sale, Owner shall provide Hometap written notice (a "**Transfer Notice**") no less than thirty (30) days prior to the closing date for such Transfer. A Transfer Notice shall include a full and complete copy of the documents governing the Transfer, which must include the name of the transferee, the sale price (if any), the proposed closing date for the Transfer, the proposed inspection date (if any), and any and all other material terms and conditions of the proposed Transfer, including, without limitation, any financing or mortgage contingencies. If the Owner intends for the Transfer to be an Exempted Owner Assignment (as defined below in Section 8.9(b)) or an Exempted Owner Property Transfer (as defined below in Section 8.9(c)), the Owner shall provide any additional necessary documentation in the Transfer Notice. The Transfer Notice must also indicate whether the Owner intends to complete an Owner Repurchase prior to, or simultaneous with, the closing of the Transfer.

(iii) Notice of Hometap Option Exercise upon a Transfer. Following receipt of a Binding Offer Notice or a Transfer Notice in which you do not elect to exercise your right to an Owner Repurchase, and prior to the closing of the proposed Transfer contemplated by such Binding Offer Notice or Transfer Notice, Hometap shall have the right to complete a Hometap Option Exercise, as further described in Section 3.1, by delivering to you a written notice (an "**Exercise Notice**") of our intent to do so. Upon receipt of an Exercise Notice, you (A) shall not consummate any closing of the Transfer unless and until Hometap has completed its Hometap Option Exercise and all actions deemed necessary or advisable by Hometap to document its interest in the Property, and (B) shall promptly, and in no event more than two (2) Business Days from receipt thereof, provide Hometap all documents, binding offers, escrow instructions, preliminary title reports, and any other materials and information relating to the proposed Transfer that become available.

Following receipt of such materials, Hometap shall use commercially reasonable efforts to complete its Hometap Option Exercise and all actions deemed necessary or advisable by Hometap to document its interest in the Property prior to any closing of a Transfer.

(c) Appraisal Process upon Transfer. Within fifteen (15) Business Days of receiving notice of your election to exercise the Owner Repurchase or our delivering you an Exercise Notice, we may undertake the Appraisal Process and conduct an Appraisal.

(d) Transfer Closing. Any Transfer shall be completed through a closing process (the "**Transfer Closing**") that is commercially reasonable and follows standard practices and procedures for the purchase and sale of real property in the state in which the Property is located, including without limitation using the services of a Settlement Agent. The Owner shall provide written notice (the "**Transfer Closing Notice**") to Hometap promptly, and in any event no later than ten (10) Business Days prior to the date of the Transfer Closing. The Transfer Closing Notice shall include the proposed date of the Transfer Closing, and any and all relevant documents related to such Transfer Closing, including written settlement instructions, identification and acknowledgement of an Owner Repurchase or Hometap Option Exercise, and instructions for the payment of the Hometap Share. Hometap shall have the right to (A) review and provide input on any such settlement instructions and (B) have a representative attend the Transfer Closing. The Owner acknowledges and agrees that the completion of an Owner Repurchase or Hometap Option Exercise shall be concurrent with a Transfer Closing.

(i) Transfer Closing Deliverables. On or prior to a Transfer Closing where there will be an Owner Repurchase or a Hometap Option Exercise, you agree to deliver to the Settlement Agent the appropriate deeds, affidavits, certificates, notices, and other documents required by law, the Settlement Agent or us, in form satisfactory to us, to effect the Owner Repurchase or the Hometap Option Exercise.

(ii) Payment Allocations. At any Transfer Closing where there will be an Owner Repurchase, the Owner shall be responsible for paying Hometap the Hometap Share, as well as any Closing Costs (as defined below in Section 2.6(d)(iv)).

(iii) Termination and Release by Hometap at Transfer Closing. Within ten (10) Business Days of any Transfer Closing, and contingent upon our receipt of the Hometap Share funds, we will submit the documents necessary to terminate and release the Security Instruments.

(iv) Closing Costs. Owner shall pay all costs in connection with a Transfer Closing or Repurchase Settlement including, without limitation, recording fees and costs, reconveyance fees, lien release fees, escrow fees, title insurance fees, federal, state, local and documentary transfer taxes ("**Closing Costs**") and all sales commissions ("**Sales Commissions**"). Closing Costs and Sales Commissions shall be paid from the amounts that are owed to Owner and not from any amounts that are owed to Hometap; *provided, however*, that Owner shall pay Hometap directly for any Closing Costs or Sales Commissions incurred by Hometap and as detailed on the settlement instructions provided by Hometap to Owner.

Section 2.7 Event of Expiration Date.

(a) In the event that the Option remains in [illegible] and has not been, nor is the subject of, a Hometap Option Exercise or Owner Repurchase, then (i) the Owner has the right to complete an Owner Repurchase as of the Expiration Date, and (ii) Hometap shall have the right to complete a Hometap Option Exercise as of the Expiration Date (either an Owner Repurchase as of the Expiration Date or a Hometap Option Exercise as of the Expiration Date being an "**Expiration Settlement**"), each implemented by

delivering written notice to the other party (either a Repurchase Notice or Exercise Notice, as appropriate) prior to the Expiration Date.

(b) Any Owner Repurchase or Hometap Option Exercise shall follow the procedures, terms, and conditions of Section 2.4 and Section 3.1, respectively. Should any provisions be inconsistent, those provisions of this Section 2.7 shall control.

(c) If we are not satisfied with the Ending Home Value following the Appraisal Process, or with the Confirmation of Title, we may withdraw or reject the Expiration Settlement without any penalty to us, and extend the Effective Period as provided in this Agreement.

## SECTION 3
## EXERCISE OF OPTION; OTHER TERMINATION OF OPTION

Section 3.1 Exercise of Option. Exercise of the Option shall allow Hometap to acquire a percentage possessory ownership interest in the Property equivalent to the Hometap Percentage at the time of exercise.

(a) Exercise Notice. Upon our election to exercise our right to a Hometap Option Exercise, we shall provide you with an Exercise Notice at least thirty (30) days prior to the anticipated date for closing the Hometap Option Exercise ("**Exercise Closing**"). The Exercise Notice shall specify the Exercise Closing date, the Exercise Payment (as defined below in Section 3.1(e)), written settlement instructions, and instructions for release of the Security Instruments upon completion of the Hometap Option Exercise.

(b) Hometap Ownership. In Hometap's sole discretion, we may implement the Hometap Exercise Option by (i) taking joint ownership of the Property with you and (ii) soliciting a Transfer of the entire Property, including your interest, to one or more Third-Party Buyers, and receiving the Hometap Share and the Exercise Payment in connection with such Transfer. Hometap's ownership of the Property shall be a percentage possessory interest in the Property equivalent to the Hometap Percentage at the time of the Hometap Option Exercise. If Hometap takes joint ownership of the Property, the legal form of such joint ownership will be decided by us, which may include a trust with you and us as beneficiaries.

(c) Owner Repurchase. After receiving the Exercise Notice, you may exercise your right to elect an Owner Repurchase pursuant to Section 2.4 above; *provided that* (i) you deliver a Repurchase Notice to Hometap at least twenty (20) days before the Exercise Closing date; (ii) the Repurchase Settlement must (A) occur (1) within fifteen (15) days of you providing us with a Repurchase Notice, and (2) prior to any scheduled Exercise Closing, and (B) use an Ending Home Value that is the value of the Property as determined by an Appraisal. If you elect to make an Owner Repurchase but the Repurchase Settlement is not completed within the prescribed periods in this Section 3.1(c), then (1) your right to make an Owner Repurchase may be terminated, and (2) we may elect to immediately exercise a Hometap Option Exercise.

(d) Exercise Closing. You agree to take any reasonable actions and sign any documentation deemed necessary or desirable by Hometap to allow Hometap to complete the Hometap Option Exercise, including without limitation participating in an Exercise Closing, and to effect our Hometap Percentage possessory interest in the Property.

(e) Disbursement of Exercise Closing Payment. In consideration of the Hometap Percentage possessory interest in the Property, Hometap shall issue a payment to you in the amount of one percent (1%) of the Investment Amount ("**Exercise Payment**"). Hometap shall cause the Exercise Payment to be disbursed by the Settlement Agent in accordance with the Exercise Notice, and the Exercise Payment shall be delivered and paid to the Owner via wire transfer or check, as instructed by the Owner, as soon as reasonably practicable at or following the Exercise Closing.

(f) Recording of Documents. Hometap shall use commercially reasonable efforts, via the Settlement Agent, to record and file the any documents evidencing the Hometap Option Exercise and the Hometap Percentage possessory interest in the Property with the appropriate county recorder or other applicable governmental, city, county, or municipal office in which the Property is situated. You agree to take any reasonable actions and sign any additional documentation deemed necessary or desirable by Hometap to allow Hometap to record and file such documents.

(g) Transfer Following Hometap Option Exercise.

(i) Occupancy. Prior to a Transfer, you will retain physical possession and the exclusive right to occupy the Property (except if we determine that the Property is at risk of waste or gross neglect, in which case we will have discretionary rights of entry or possession solely in order to preserve and maintain the Property).

(ii) Initiation of Transfer by Owner. If you intend to initiate a Transfer, such Transfer shall meet the conditions of a Permitted Sale as described above in Section 2.6(a). Furthermore, you agree to comply with the requirements of Section 2.6 in completing the Transfer.

(iii) Initiation of Transfer by Hometap. If we choose to initiate a Transfer, we will provide you with written notice at least ten (10) Business Days prior to soliciting buyers and transferring the Property to one or more third parties in a Transfer. You will cooperate by allowing access to the Property and promptly executing all documents presented to you by us to effect a Transfer of your interest in the Property to the Third-Party Buyer.

(iv) Ending Home Value and Payment of the Hometap Share. In any Transfer following a Hometap Option Exercise, the Ending Home Value will be the sale price of the Property. At the Transfer Closing for such Transfer, the sale proceeds will be allocated and paid in the manner described in this Section 3.1 and above in Section 2.6(d)(ii), and we will be paid (A) any Closing Costs that we paid as further detailed in Section 2.6(d)(iv) and (B) any other amounts paid by us related to the preparation, marketing, or sale of the Property.

Section 3.2 Non-Exercise; Other Terminations of Option. Subject to the continuing duties, rights, and obligations of the parties in this Agreement, the Option will terminate under the following conditions if there has not been a prior Owner Repurchase or Hometap Option Exercise:

(a) upon a Permitted Sale for which we received a Binding Offer Notice, as provided above in Section 2.4(b)(1), and we affirmatively elected not to exercise the Option and complete a Hometap Option Exercise;

(b) we elect not to complete a Hometap Option Exercise as of the Expiration Date and allow the Option to lapse as of the Expiration Date;

(c) the Property is destroyed and the insurance proceeds and proceeds of any sale of the Property are paid to us in the full amount specified below in Section 6.1(d);

(d) the Property is condemned, in whole and not in part, and the condemnation proceeds are paid to us in the full amount specified below in Section 6.1(h); or

(e) we voluntarily terminate the Option in a written notice delivered by us to you.

Section 3.3 Effect of Non-Exercise and Termination. If the Option is terminated as provided above in Section 3.2, then:

(a) the Option and our rights to exercise the Option will immediately terminate;

(b) the Investment Amount will be retained by you in consideration for the Option;

(c) subject to any survival provisions, this Agreement and any and all the other Investment Documents will terminate and be of no further legal force or effect; and

(d) we will execute, acknowledge, deliver to you, and record and file with the appropriate county recorder or other applicable governmental, city, county, or municipal office in which the Property is situated a termination and release of the Memorandum of Option, a reconveyance of the Security Instruments (including the filing of a termination statement to terminate the UCC-1), and any other documents reasonably required to verify the termination of the Option and the Investment Documents; *provided, however*, that certain obligations and provisions of this Agreement will survive such termination as provided below in Section 8.10.

## SECTION 4
## OWNER REPRESENTATIONS AND WARRANTIES

Section 4.1 Owner Representations and Warranties. The truth, accuracy, and completeness of the representations and warranties set forth in this Section 4.1 are a condition precedent to any of Hometap's obligations under each of the Investment Documents. The Owner hereby represents and warrants to Hometap as of the Effective Date, and hereby renews and reiterates such representations and warranties upon any consummation of a Hometap Option Exercise or Owner Repurchase as provided for in this Agreement, as follows:

(a) Title to Property. You, as Owner(s) identified in this Agreement, individually and collectively, appear on record title of the Property as holding fee simple title to 100% of the Property. There are no other Persons who have a claim to any title to the Property, and all Owners are identified in this Agreement. Your fee simple title to the Property is marketable and insurable, free of any Liens and Encumbrances, except for any Permitted Encumbrances, and there are no additional existing or pending Liens and Encumbrances, or any other claims, restrictions, or other interests against the title to the Property.

(b) Capacity and Authority. You have the full capacity and the legal power, right, and authority to grant the Option, to enter into this Agreement and the other Investment Documents, and to consummate the transactions contemplated hereby and thereby.

(c) Trust. If you are the Trustee of a Revocable Trust: (a) the trust has been duly formed; (b) the Trustees of the trust have the capacity and authority to enter into this Agreement and the other Investment Documents; and (c) true, accurate, and complete copies of all trust documents (and all amendments and supplements) have been delivered to us. For purposes of this Agreement, a "**Revocable Trust**" shall mean a revocable trust, revocable living trust, inter vivos trust, revocable family trust or similar trust established in accordance with the laws of any state.

(d) No Lawsuits, Claims, Bankruptcy, or Foreclosures. There is no litigation or arbitration pending, or to your knowledge, threatened against you relating to your ownership of the Property or that might adversely affect your title to the Property, the Property itself, the value of the Property, the Hometap Share, Hometap's rights herein, or your ability to perform your obligations under this Agreement. You have not received nor are you aware of any: (a) special assessment or other proceedings affecting the Property;

(b) default or notice of default with respect to any loan or other obligation secured by the Property; (c) notice of sale with respect to any lien or deed of trust or mortgage (as appropriate) on the Property; or (d) information or notice that the Property is to be sold or foreclosed upon by a Person holding a lien on the Property.

(e) No Violations. There are no violations of, or claims of violation of, any laws, regulations, zoning ordinances or other land-use regulations relating to the Property and all operations or activities upon, or use or occupancy of the Property or any portion of the Property, by you or others comply with law, including local laws and zoning ordinances.

(f) Environmental Matters. To your knowledge, there are no violations of, or claims of violation of, any state, federal, or local environmental law or regulation relating to the Property, including those concerning hazardous materials ("**Environmental Laws**"). To your knowledge, no hazardous materials are present on, in, or about the Property or property in the vicinity of the Property. You will not, and will not allow others to, violate any laws, including, without limitation, Environmental Laws, relating to the Property or perform any activities upon, or use or occupy the Property or any portion of the Property, in any manner that violates any laws, including, without limitation, Environmental Laws.

(g) Documentation and Information Supplied by Owner; Financial Condition of Owner. Your application to us and all financial and other documentation and other information supplied or made available by you or your spouse or co-owner, if applicable, as part of applying for, or in connection with entering into, this Agreement, the Option, and the Investment Documents is truthful, complete, not misleading, and fairly and accurately reflects your (and, if applicable, your spouse's or co-owner's) financial condition as of (a) the date supplied and (b) the Effective Date. There has been no material change in your financial condition as of the Effective Date since your application to us. To your knowledge, there has not been any change in the condition or value of the Property since the date of any Appraisal conducted prior to the Effective Date.

(h) New Debt or Obligations. Since the date on which you initiated discussions with Hometap, you have not incurred (or agreed to incur) any additional obligations with respect to the Property such as additional debt or other investments in the equity or appreciation of the Property, nor have any additional liens been placed (or, to your knowledge, will be placed) on the Property, in each case other than where you have provided written notification to Hometap of such debt, obligations, or liens.

(i) Not a Loan. You acknowledge and understand that the payment of the Investment Amount by Hometap is not a loan or any other form of financing transaction, swap, or futures contract. Under no circumstances will the Investment Amount accrue interest, and if the Option expires, then you will not be obligated to return or repay the Investment Amount.

(j) Conflict; Enforceability. The execution, delivery, and performance of the Investment Documents will not conflict with, or result in a breach of, any of the terms, conditions, or provisions of, or constitute a default under, any note or other evidence of indebtedness or any contract, indenture, mortgage, deed of trust, loan, agreement, lease, or other agreement or instrument to which you are a party or by which the Property may be bound. The Investment Documents and all other documents required to be executed by you in connection with those documents are and will be valid, legally binding obligations of, and enforceable against, you and any successors or permitted assignees in accordance with their terms.

## SECTION 5
## HOMETAP REPRESENTATIONS AND WARRANTIES

Section 5.1 Hometap Representations and Warranties. Hometap hereby represents and warrants to the Owner as of the Effective Date, and hereby renews and reiterates such representations and warranties upon any consummation of a Hometap Option Exercise or Owner Repurchase as provided for in this Agreement, as follows:

(a) Authority. Hometap is a duly established and organized Delaware limited partnership, is in good standing in all jurisdictions in which it is qualified to do business, and is duly authorized to execute and deliver this Agreement, to enter into transactions contemplated hereunder, and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery, and performance.

(b) Enforceability. Hometap's obligations under this Agreement and any related agreement to which it is a party constitute its legal, valid, and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium, or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

## SECTION 6
## COVENANTS

Section 6.1 Owner Covenants. During the Effective Period, the Owner hereby agrees to comply with and satisfy and observe the following covenants:

(a) Maintain Mortgage, Liens and Encumbrances and Other Secured Obligations. You shall (i) maintain, pay, keep current, and comply with any and all obligations, maintenance requirements, and covenants under your primary mortgage and any and all other mortgages, loans, and obligations that are senior to the lien established by the Security Instruments, the covenants running with the land under this Agreement, and the Option, of which (A) we have actual written notice under a title report, title search, or title commitment obtained in connection with this Agreement and the transaction related thereto, and (B) that are acknowledged in writing by us before or upon our execution of this Agreement (each an "**Acknowledged Pre-Existing Lien**"), and you shall notify Hometap promptly in writing of any defaults or potential or pending defaults thereunder; and (ii) at all times keep the Property free of any and all Liens and Encumbrances, except for (A) Acknowledged Pre-Existing Liens, (B) Permitted Encumbrances, and (C) Approved Subsequent Loans (as defined below in Section 6.1(i)(ii)).

(b) Owner Occupied; Right of Occupancy. During the Effective Period, the Owner (or at least one Owner if there are multiple Owners) shall occupy the Property as Owner's principal place of residence ("**Owner Occupied**") other than during periods of vacancy no longer than ninety (90) days due to renovation. In the event you desire for the Property to no longer be Owner Occupied, you must request such change in writing from Hometap, which shall be approved or denied in Hometap's sole discretion. You will enjoy continuous right of occupancy of the Property as an owner, and not as a tenant or lessee, whether or not we have completed a Hometap Option Exercise, subject to the rights of you and Hometap to Transfer the Property pursuant to the terms of this Agreement. Your sole right of occupancy will be effective only so long as you do not Transfer or attempt to Transfer the Property except as permitted under this Agreement. Your sole right of occupancy is not transferable by you except as part of a Permitted Sale or Exempted Owner Property Transfer, or as otherwise permitted by us.

(c) Maintain Adequate Insurance Coverage. You will keep the Property and all buildings or other customarily insured improvements upon the Property insured by a nationally recognized insurer acceptable to us against loss by fire, hazards of extended coverage, other hazards common for similar properties in similar locations, and other hazards we may request, in an amount equal or greater than the full insurable value of the Property, but in no event less than the minimum amount necessary to fully compensate for any damage or loss on a replacement cost basis. All such insurance policies will name us and our successors and assigns as a loss payee (or as we otherwise direct). If the Property is or becomes located in an area identified on a flood hazard map or flood insurance rate map issued by the Federal Emergency Management Agency as having special flood hazards, a flood insurance policy meeting the requirements of the guidelines of the Federal Insurance Administration is and will be in effect, which policy is and will be issued by a nationally recognized insurer acceptable to us and provide coverage in an amount equal to not less than the lesser of the full insurable value of the Property or the maximum amount of insurance available under the National Flood Insurance Act of 1968. All such flood insurance policies will name us and our successors and assigns as a loss payee (or as we otherwise direct). You will timely pay all premiums for all such insurance policies and, if you fail to do so, we are authorized to maintain and/or obtain such policies at your cost and expense, and you will immediately reimburse us for such costs and expenses. Hometap is under no obligation to purchase any particular type or amount of coverage. As such, coverage shall cover Hometap but may not protect Owner, Owner's equity in the Property, or the contents of the Property and might provide greater or lesser coverage than was previously in effect. You shall provide written evidence of your compliance with the above at any and all signings, closings, and settlements conducted under this Agreement, or as Hometap may reasonably request from time to time.

(d) Destruction or Loss of Property.

(i) Repair and Restoration. If the Property is destroyed or experiences material damage, you will restore or repair the Property to at least the same condition and characteristics as of the time immediately preceding the destruction or damage, subject to all applicable local ordinances. Except to the extent you are required to take other action in connection with any Senior Lien on the Property, you will apply any insurance proceeds to the restoration or repair. If the insurance proceeds are insufficient to complete the restoration or repair, you will be responsible for any shortfall and we will have no responsibility or obligation to pay any amount whatsoever in connection with the restoration or repair of the Property.

(ii) Allocation Where Repair Not Feasible. If any loss occurs in connection with the Property, and restoration or repair is not economically feasible, you will obtain a Physical Appraisal, *provided that* the appraiser will be instructed to determine the value of the Property as it existed immediately prior to the destruction or damage. Any insurance proceeds, whether or not the underlying insurance was required by us, will be allocated in the following order: (A) to the payment (or reimbursement) of reasonable costs and expenses (including attorneys' fees that have been approved by us) reasonably incurred by you, any lender of a Senior Lien, and/or Hometap in collecting and contesting with the insurers the payments under the insurance policies; (B) to payment of any Senior Lien, *provided that*, if the insurance proceeds equal or exceed the amount owed under any Senior Lien, such payment will result in the discharge of any related Senior Lien; (C) to us, an amount equal to the Hometap Share; and (D) to you, the balance of the proceeds.

(e) Physical Appraisals. In connection with any Physical Appraisal, you will cooperate with the appraiser by granting full access to the Property at reasonable times and by making available any relevant documents in your possession pertaining to conditions that may affect the value of the Property. You will immediately share with us any written Physical Appraisal you receive related to this Agreement.

(f) Renovation.

(i) Owner shall be entitled, in your sole discretion to renovate, modify, or otherwise make physical alterations to the Property (a "**Renovation**"), *provided that* any such Renovation is completed by licensed contractors in accordance with local zoning laws and regulations, properly permitted, and only upon receipt of any approvals from any local, municipal, or state authorities. If the Owner undertakes a single Renovation project with documented aggregate costs in excess of $25,000, then the Owner may provide written notice (a "**Renovation Notice**") to Hometap within ninety (90) days following the completion of such Renovation. The Renovation Notice will include: (A) a summary describing the Renovation, (B) photographs of the Property prior to and following the Renovation, (C) copies of all contracts, invoices, permits, and other documentation associated with such Renovation, (D) all material terms and information describing the Renovation, and (E) any other information relating thereto that Hometap may reasonably request.

(ii) In connection with an Owner Repurchase, the Owner may request and Hometap may, in its sole discretion, accept an adjustment to the Ending Home Value to account for any appreciation in the value of the Property resulting from the Renovation. In connection with such a potential Renovation adjustment at the time of an Owner Repurchase, Hometap shall complete an Appraisal at Owner's expense, and such Appraisal shall include a determination of the increase in the Ending Home Value attributable exclusively to the Renovation (the "**Renovation Value Increase**"). If accepted by Hometap, in its sole discretion, the amount of the Renovation Value Increase shall be deducted from the Ending Home Value for purposes of calculating the Hometap Share; *provided, however*, that the Renovation Value Increase shall not exceed the actual cost of the Renovation as evidenced and documented in the Renovation Notice; *and further provided* that the Renovation Value Increase shall not exceed the difference between the Ending Home Value and the Beginning Home Value.

(g) Option Fees. You will pay any reasonable fees imposed or incurred by us from time to time related to the Option during the Effective Period (such fees being referred to as "**Option Fees**"), which may include, without limitation: (i) fees for processing any requests for subordination; (ii) fees for processing any requests for Property title or ownership changes; (iii) fees for processing any reconveyance or renewal recordings of any Security Instruments or other documentation pertaining to the Option; (iv) fees for processing Hometap Cure Payments (defined below in Section 7.2(a)); (v) fees relating to any Event of Default (defined below in Section 7.1), including any fees, costs, or expenses for our oversight of the default process; (vi) fees incurred in any dispute relating to the Property; and (vii) charges to cover any third-party or other out-of-pocket costs relating to any of the foregoing (including charges imposed by title companies and escrow companies, charges related to recording of documents, and attorneys' fees).

(h) Condemnation. If the Property is condemned in whole or in part during the Effective Period, then all condemnation proceeds net of reasonable costs and expenses (including attorneys' fees that have been approved by us) reasonably incurred by you and/or us in collecting and contesting the condemnation proceeds ("**Net Condemnation Proceeds**") will be allocated as provided above in Section 6.1(d)(ii). If the Property is condemned in part, then the Hometap Share shall be calculated using the Net Condemnation Proceeds as the Ending Home Value, and such proceeds will be allocated in the order provided above in Section 6.1(d)(ii). In the case of a partial condemnation, the Option will be retained with respect to any portion of the Property that has not been condemned.

(i) Allowed Loans and Transactions.

(i) Minimum Owner Equity. Without Hometap's prior written consent, Owner may not at any time increase, or permit the increase of, the total balance of loans or other property

interests secured by liens on the Property (including for such purposes the unused portion of any committed line of credit) if such additional debt or property interest would reduce Owner's remaining Owner Equity (as defined below) below the Minimum Owner Equity (as defined below). For purposes of the foregoing, "**Owner Equity**" shall be defined as the amount calculated by subtracting (1) all Acknowledged Pre-Existing Liens, (2) all Approved Subsequent Loans, (3) the present value of the Hometap Share (assuming Ending Home Value higher than Beginning Home Value); *provided, however*, that for purposes of this calculation the Hometap Cap shall not apply, and (4) any other debt or obligations secured by the Property from the current appraised value of the Property (the "**Current Property Value**"). For purposes of the foregoing, "**Minimum Owner Equity**" shall mean the dollar amount equal to twenty percent (20%) of the Current Property Value.

(ii) Approved Subsequent Loans.

(1) Prior to considering any request by Owner to incur any additional indebtedness secured by a lien on the Property (an "**Approved Subsequent Loan**"), Owner shall provide Hometap with all documentation relating to such proposed Approved Subsequent Loan that Hometap may reasonably request, including, without limitation, any commitment letter, offer letter, term sheet, proposed note, preliminary title report, appraisal, or inspection report, as well as any similar documentation relating to any Acknowledged Pre-Existing Liens.

(2) If the proposed Approved Subsequent Loan would result in a lien (or modification or increase of an Acknowledged Pre-Existing Lien) that is senior to the Option, and/or Hometap is being asked to subordinate its Option, any such subordination agreement or consent shall be in a form reasonably acceptable to Hometap.

(3) In connection with a request for an Approved Subsequent Loan, Hometap, in its sole discretion, will either use the Beginning Home Value for the purpose of calculating the Current Property Value and Minimum Owner Equity or may require, at Owner's expense, a new Appraisal of the Property.

(4) Following receipt of (i) a request for an Approved Subsequent Loan, (ii) all documentation required in Section 6.1(i)(ii)(1), and (iii) a new Appraisal (if applicable), Hometap will conduct all such other inquiries and reviews as it deems necessary to make a determination regarding whether to consent to such Approved Subsequent Loan; *provided, however*, that so long as such request meets all such requirements, consent to such Approved Subsequent Loan shall not be unreasonably withheld.

(5) In the event that Hometap consents to an Approved Subsequent Loan, Owner shall provide Hometap with the final executed documentation relating to such Approved Subsequent Loan as soon as reasonably practicable following the closing of such transaction.

(iii) Prohibited Loans and Transactions. Owner will not encumber the Property with, and Hometap will not give consent to, any proposed transaction that could have the effect of impairing Hometap's rights under the Investment Documents, or the Hometap Share, including "reverse" mortgage loans, "shared appreciation" mortgage loans, mortgage loans with negative

amortization features, private or non-institutional loans, investments in the equity or appreciation of the Property, or unrecorded loans secured by the Property.

(iv) Subsequent Loans used for Owner Repurchase. Owner may incur additional indebtedness secured by a lien on the Property at any time during the Effective Period if Owner is incurring such additional indebtedness in order to execute an Owner Repurchase in full compliance with the terms of this Agreement, including but not limited to Section 2.4. In all such instances, Hometap shall receive a direct payment, via wire transfer or similar means, for the entire Hometap Share concurrently with the closing of this subsequent indebtedness; failure to do so will be considered an Event of Default. Notwithstanding the foregoing, Hometap reserves the right to withhold its approval for the additional indebtedness if Hometap believes, in its sole discretion, that such additional indebtedness will not facilitate a full Owner Repurchase.

(j) Obligation to Provide Information to and Cooperate with Hometap. During the Effective Period, you will cooperate with Hometap to schedule any Appraisal, and you will use commercially reasonable efforts to promptly respond to requests for information that Hometap may reasonably ask from time to time regarding the status of the Property, or information, reports, proof of payment of taxes or assessments, insurance policies, proof of insurance coverage, and any other information available to you concerning the Property and any modifications to the Property. You will immediately provide us with notice of any event that has or may be expected to have a material effect upon the Property, the value of the Property, the Option, or Hometap's rights under the Investment Documents, including, without limitation, (i) the death or divorce of any Owner; (ii) the death or removal of any Trustee or Trustor, as well as the appointment of any substitute or additional Trustee or Trustor; (iii) environmental matters affecting the Property; (iv) the commencement of any legal action involving the Property; or (v) the occurrence of an Event of Default.

Section 6.2 Hometap Covenants.

(a) Hometap Interest. Pursuant to this Agreement, during the Effective Period, Hometap shall have an economic interest in the Property, which is protected by this Agreement and the other Investment Documents.

(b) Waiver of Right to Partition. Owner and Hometap each waive and relinquish all rights either of them may now or later have to seek partition of the Property, whether in kind or by sale; *provided, however*, that we will retain the right to seek a partition (i) in the event of, and as part of any action arising out of an Event of Default, which is not timely cured pursuant to Section 7.2, or (ii) in connection with any claim or action by Owner which asserts that any provision of this Agreement is against the law or unenforceable.

(c) Right to Disclose Certain Information. We may share certain personal and financial information relating to you or the Property with our affiliates, subsidiaries, assignees, contractors, agents, representatives, and persons with whom we intend to conduct business, including the address and general location of the Property, appraisal reports and other valuations of the Property, and the financial terms of this Agreement, to the extent not prohibited by law.

(d) Agreement to Subordination. We may agree to subordinate the priority of our rights under any of the Investment Documents to the lien of any lender that refinances any Acknowledged Pre-Existing Lien or proposes to extend to you any other Approved Subsequent Loan secured by a lien on the Property; *provided that* any requested subordination and loan documents contain only reasonable and customary terms common to such agreements, and you pay any amounts we reasonably require.

(e) No Hometap Liability. Hometap shall not be liable for any (i) Acknowledged Pre-Existing Liens, Liens and Encumbrances, Approved Subsequent Loans, or any other loans or obligations to any third parties created, established, or obtained by you whether before or after the consummation of the transactions contemplated hereunder, and whether or not consented to, approved by, or subordinated to by us, or (ii) for homeowner association fees, property taxes, homeowner or property insurance, or other liabilities or obligations that might arise in connection with the Property.

## SECTION 7
## EVENTS OF DEFAULT

Section 7.1 Events of Default. The occurrence of any of the following will constitute an Event of Default (**"Event of Default"**):

(a) you breach or fail to perform any obligation or covenant under the Investment Documents, including any action or failure to act resulting in, or which can reasonably be expected to result in, a violation of Hometap's rights herein or a breach of this Agreement or other Investment Document, which breach or failure is not cured (if capable of being cured) within thirty (30) days of the occurrence thereof;

(b) you take any action that does not honor the Option or you omit to state a material fact relating to your obligations in this Agreement, including any misrepresentation or omission related to the amount or kind of consideration given to you in any Transfer which can reasonably be expected to result in a violation of Hometap's rights under the Investment Documents or a breach of this Agreement or other Investment Document), which breach or failure is not cured (if capable of being cured) within thirty (30) days of the occurrence thereof;

(c) you fail to timely provide us any notice required under this Agreement;

(d) any representation or warranty set forth above in Section 4.1, is or becomes false or misleading, and you fail to correct and provide Hometap written notice of such false or misleading representation or warranty within five (5) Business Days of becoming aware of such occurrence;

(e) (i) the voluntary or involuntary commencement of any case or proceeding against an Owner under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency, or similar law, or the appointment or election of a receiver, conservator, trustee, custodian, or similar official for an Owner or any substantial part of the Property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (ii) the making by an Owner of a general assignment for the benefit of creditors, or (iii) the admission in writing by an Owner of Owner's inability to pay such Owner's debts as they become due or of your or any co-owner's insolvency, and in all cases, where such case, proceeding, assignment, or admission is not dismissed or otherwise reversed within thirty (30) days;

(f) Owner fails to pay in a timely manner any taxes, assessments, liens, amounts due under loans that are secured by liens on the Property, whether recorded or unrecorded, or other obligations relating to or on the Property, which failure is not cured within thirty (30) days of the occurrence thereof;

(g) the Transfer or attempted Transfer of the Property, or any interest in the Property, by you, except in accordance with this Agreement;

(h) a lien attaches to the Property that does not have our prior written approval, or you obtain any loan secured or to be secured by the Property that we have not approved in writing, whether recorded or unrecorded;

(i) you fail to preserve or maintain the Property in good repair and in a condition substantially similar to its condition on the Effective Date, except for normal wear and tear;

(j) insurance on the Property is not maintained as required by this Agreement, including any payment due on the insurance becomes delinquent, which failure, if curable, is not cured within thirty (30) days of the occurrence thereof;

(k) any assignment, attempted assignment, or other transfer of the Option or Investment Documents in violation of this Agreement;

(l) any other action or event occurs within your reasonable control which has, or may reasonably be expected to have, a material adverse effect on the Property, the value of the Property, the Option, or the Hometap Share.

Section 7.2 Remedies Following Event of Default. Following an Event of Default, Hometap will provide you with a Notice of Right to Cure Default, which shall state the specific Event(s) of Default and the time in which it must be cured, which shall be no more than thirty (30) days following delivery of the Notice of Right to Cure Default. If Owner fails to cure the default within the time period set forth in the Notice of Right to Cure Default, Hometap may declare a default and exercise any of the rights and remedies set forth below in this Section 7.2.

(a) Hometap Option Exercise. We will have the right in our sole discretion, by delivering to you a written notice (a "**Default Notice**"), to (i) complete a Hometap Option Exercise in compliance with Section 3.1 or (ii) pay any amounts ("**Hometap Cure Payments**") to any third parties to cure and remedy an actual or impending Event of Default. We may make payments to cover any delinquent payments, insurance premiums, accrued interest, late fees, reinstatement fees, taxes, and other penalties, together with any and all amounts which we deem necessary to cure an Event of Default. Upon delivery of the Default Notice, Hometap shall be permitted to start a Hometap Option Exercise. We may record the Default Notice in the county where the Property is located.

(b) Hometap Cure. To the extent that you fail to take any actions or make any payments that Hometap determines are necessary to avoid or remedy an Event of Default or otherwise protect Hometap's rights under the Investment Documents or the Option, Hometap shall have the right, but not the obligation, to take such actions or complete such payments. Hometap shall provide Owner with five (5) Business Days written notice, or the minimum notice period required by applicable law, prior to taking any corrective action or making any Hometap Cure Payments, which may include, without limitation, payment of taxes, placement of insurance or curing of a default with a lender or other third party with an interest in the Property. Beginning on the day a Hometap Cure Payment is made, interest shall accrue at the lesser of eight percent (8%) per annum or the maximum amount permitted by applicable law. Hometap shall have the right to demand repayment of any Hometap Cure Payments (plus applicable interest) on five (5) Business Days' notice, and failure to pay such amounts shall be deemed an Event of Default. Notwithstanding anything in the foregoing to the contrary, any repayment of Hometap Cure Payments will be deemed reimbursement of expenses and the Hometap Cap shall not apply to such amounts.

(c) Power of Foreclosure Under State Laws. We will be entitled to foreclose on the Property and otherwise exercise our rights under the Mortgage and Security Instrument in accordance with applicable laws and regulations established in the jurisdiction where the Property is located.

(d) Failure to Maintain Adequate Insurance. If you fail to maintain insurance in amounts required by Section 6.1(c), or any insurance claim is denied due to Owner's action or inaction, then the Hometap Share will be increased by the amount of any such denied claim. Any such increase shall be

deemed exempt, on a dollar-for-dollar basis, from the Hometap Cap. If this occurs, we may complete a Hometap Option Exercise if we have not already done so and Transfer the Property in its then-current state according to the procedure set forth in Section 3.1. The proceeds of any Transfer pursuant to this Section 7.2(d), together with any available proceeds from any insurance policies (whether or not the underlying insurance was required by us), will be allocated as in the order provided in Section 6.1(d)(ii).

(e) Owner Repurchase After Event of Default. At any time following our delivery of a Default Notice, you may repurchase the Option by paying us the Hometap Share in an Owner Repurchase pursuant to Section 2.4 above; *provided that* the Repurchase Settlement must (i) occur (A) within twenty (20) days of you providing us written notice of your election to make an Owner Repurchase, and (B) prior to any scheduled closing of a Hometap Option Exercise, and (ii) use an Ending Home Value that is the value of the Property as determined by a Physical Appraisal. If you elect to make an Owner Repurchase, but the Repurchase Settlement is not completed within the prescribed periods in this Section 7.2(e) then (1) your right to make an Owner Repurchase may be terminated, and (2) we may elect to immediately exercise a Hometap Option Exercise without regard to any restrictions in Section 3.1.

(f) Specific Performance, Rescission and Injunctive Relief. You and we agree that if we are not allowed to exercise our rights under any of the Investment Documents, or if you fail to comply with your obligations under any of the Investment Documents, the damages to us would be irreparable and extremely difficult to estimate, making money damages, or any remedy at law inadequate. Thus, in addition to any other rights and remedies available to us in law, equity, or otherwise, we will be entitled to seek specific performance of the covenants, agreements, and rights contained in each of the Investment Documents or, as permitted by applicable law, to seek full rescission of this Agreement. You and we further agree and acknowledge that a violation or threatened violation of this Agreement by you is likely to cause irreparable injury to us and that, in addition to any other remedies that may be available, in law, in equity, or otherwise, we are entitled to obtain immediate and other injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by you, without the posting of a bond or the necessity of proving actual damages.

Section 7.3 Repayment in Bankruptcy. If we are required to and do remit or disgorge any amounts paid by you pursuant to this Agreement as a preference claim in a bankruptcy proceeding involving you, then we will be entitled to assert a claim against you for the amount remitted or disgorged and any related costs we incur, and such claim by us will begin to accrue on the date such amount is actually remitted or disgorged and will automatically survive the Effective Period.

Section 7.4 Calculation of Liquidated Damages. To the extent that enforcement of the Security Instruments require specification of an amount in default or liquidated bid amount or we elect to foreclose on the Property, Owner and Hometap agree and acknowledge that the damages that would arise from Owner's (or Owner's executor's) defaults may be uncertain, depend on many factors, and may be extremely difficult to ascertain, and that a reasonable calculation of such damages is the calculation of liquidated damages. The amount in default or liquidated bid amount under any remedy may also include: (a) the sum of all monetary obligations owed to us by you under this Agreement; and (b) any amounts required to satisfy your loan, tax, and insurance related obligations on the Property, including late fees, reinstatement fees, and other penalties.

Section 7.5 Remedies Concurrent and Not Exclusive. The remedies set forth in Section 7.2 will be concurrent, cumulative, and not exclusive, to the extent not prohibited by law. Every right, power, and remedy granted to us in the Investment Documents will be in addition to all those rights, powers, and remedies available to us at law, equity, or otherwise, and each such right, power, and remedy may be exercised from time to time and as often and in any order we decide to the extent not prohibited by law,

and the decision not to exercise of any such right, power, or remedy will not be deemed a waiver of the right to exercise any right, power, or remedy.

## <u>SECTION 8</u><br><u>MISCELLANEOUS</u>

Section 8.1 <u>Indemnification by Owner and Maximum Liability</u>. You agree to defend, indemnify, and hold us harmless from and against any claims, causes of action, proceedings, judgments, damages, losses, liabilities, penalties, fines, reasonable fees (including reasonable attorneys' fees), reasonable costs, reasonable expenses, settlements, and other obligations of every kind arising out of or relating to: (a) a breach of any of your representations, warranties, covenants, or agreement in this Agreement or the other Investment Documents; (b) any act or omission by you or your contractors, agents, or representatives; or (c) any and all damage to any person or property occurring in, on, or about the Property or off the Property arising out of actions on the Property. Notwithstanding your indemnification obligation under this <u>Section 8.1</u>, at our election, we may defend any third-party claim subject to your indemnification obligation with counsel of our own choosing at your reasonable cost and expense and without your participation. You will not, without our prior written consent, which shall not be unreasonably withheld settle or compromise any claim, action or proceeding or consent to the entry of any judgment regarding which indemnification is owed to us. WITHOUT LIMITING YOUR INDEMNIFICATION OBLIGATION, IN NO EVENT WILL OUR AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE PROPERTY EXCEED THE INVESTMENT AMOUNT.

Section 8.2 <u>Asset Administration</u>. From time to time during the Effective Period, Hometap may designate one or more authorized representatives to (a) monitor and effect your compliance with this Agreement and any other Investment Documents, (b) exercise our rights and carry out our obligations under this Agreement or any other Investment Documents, (c) protect and administer the Option, and (d) do anything else we may be permitted to do under this Agreement or any other Investment Documents.

Section 8.3 <u>Covenants to Run with Land</u>. The provisions of this Agreement are covenants running with the land so long as this Agreement remains in effect. We will record the Memorandum of Option reflecting this fact in the public records.

Section 8.4 <u>Relationship</u>. We are not a partner, joint venturer, trustee, lender, or fiduciary with, or of, Owner. You are not permitted to execute any document or enter into any agreement on our behalf. The Option is intended to be and will be treated for all purposes (including tax purposes) as an economic interest and not as a loan or joint venture.

Section 8.5 <u>Ongoing Credit Checks</u>. By entering into this Agreement, you are providing written instructions, consent, and authorization to Hometap under the Fair Credit Reporting Act authorizing Hometap to obtain information from your personal credit report or other information for the duration of the Term from one or more consumer reporting agencies, such as TransUnion, Experian, or Equifax.

Section 8.6 <u>Multiple Owners</u>. If multiple Persons are Owners, then: (a) the Investment Documents must be signed by each Owner; (b) all rights and powers specified for Owner in the Investment Documents must be approved and exercised unanimously by each Owner; (c) each Owner will be jointly and severally liable for all liabilities and obligations specified for an Owner under this Agreement or any other Investment Documents; (d) any notice required to be given by or to an Owner will be deemed adequately given if given by or to any Owner using the Notice Address, as defined below in <u>Section 8.16</u>; and (e) we may treat any notice received from any one Owner as notice from all Owners.

Section 8.7 Revocable Trusts. If Owner is a Revocable Trust: (a) all Trustors must sign the Investment Documents in their capacities as individuals and as Trustors; (b) all Trustees must sign the Investment Documents in their capacities as Trustees; (c) each Trustee and Trustor who signs this Agreement represents and warrants that all Trustees and Trustors have been disclosed to us; (d) all rights and powers specified for, and all actions required of, Owner in the Investment Documents must be approved and exercised by all Trustees unanimously; (e) all Trustors, in their capacities as individuals, will be jointly and severally liable with Owner for all liabilities and obligations specified for Owner under any of the Investment Documents; (f) all representations and warranties by Owner in the Investment Documents are made by all Trustees on behalf of the Revocable Trust and by all Trustors in their capacities as individuals; (g) notice required to be given by or to an Owner will be deemed adequately given if given by or to any of the Trustees using the Notice Address, as defined below in Section 8.16; and (h) we may treat any notice received from any one Trustee as notice from all Trustees and from Owner.

Section 8.8 Delegation of Duties. We may perform any of our duties under this Agreement or any other Investment Document by or through contractors, agents, employees, or attorneys-in-fact and will be entitled to advice of counsel concerning all matters pertaining to such duties and any actions taken on the basis of such advice from counsel will be deemed to have been taken in good faith. We will not be responsible for the negligence or misconduct of any contractor, agent, employee, or attorney-in-fact that we select as long as our selection was made without gross negligence or willful misconduct.

Section 8.9 Successors and Assignees; Owner's Estate. The Investment Documents will be binding on your and our respective heirs, successors, and permitted assignees. If Owner dies, then the Investment Documents will be binding on Owner's Estate. The death of Owner will not terminate any of the Investment Documents.

(a) Assignment by Hometap. We may assign, participate, hypothecate, sell, transfer, or otherwise transact, in whole or in part, our right and title to, and interest in, any of the Investment Documents at any time and to any Person without prior notice to or consent of Owner. In connection with any assignment, participation, hypothecation, sale, transfer, or transaction, we may disclose any documents and information in our possession relating to Owner and the Property. Upon such assignment, sale, or transfer, our assignee, buyer, or transferee will automatically have all the rights and remedies of Hometap under the Investment Documents. You will execute and deliver in recordable form, if requested, at our expense, such other documents we deem appropriate to reflect the assignment, sale, or transfer of the Option and the other Investment Documents. You agree to cooperate with such assignee, buyer, or transferee, including by executing any documents deemed appropriate by assignee, buyer, or transferee to insure or protect such Person's interest in the Investment Documents.

(b) Assignment of Agreement by Owner. Absent our prior written consent, which consent may be withheld, Owner may not assign or otherwise transfer any of the Investment Documents. We may grant consent to an assignment to Owner's spouse who acquires an interest in the Property or a Trustee of a Revocable Trust in which Owner is the sole Trustor; *provided that* in each case the assignee: (i) was alive as of the Effective Date; (ii) executes this Agreement and the Memorandum of Option; (iii) executes a recordable addendum to the Security Instruments in a form provided by us; (iv) executes an assignment with the assignor in a form satisfactory to us; and (v) provides any information or other documents requested by us and satisfactory to us ("**Exempted Owner Assignment**"). In the event of an Exempted Owner Assignment to the Trustee(s) of a Revocable Trust, the original Owner (i.e., the Trustor(s)), jointly and severally, will continue to remain liable under the Investment Documents.

(c) Exempted Owner Property Transfer. If Owner obtains our prior written consent, Owner may Transfer the Property into the name of Owner's spouse or the Trustees of a Revocable Trust in which you are the sole Trustor; *provided that* the requirements for an Exempted Owner Assignment under Section

8.9(b) are met (an "**Exempted Owner Property Transfer**"). An Exempted Owner Property Transfer shall not trigger a Hometap Option Exercise.

Section 8.10 Survival. The following provisions will survive any termination of this Agreement without limitation: (a) Owner's obligations to reimburse any Hometap Cure Payments and Option Fees; (b) Owner's obligation to remove any liens on the Property and pay any Sales Commissions and Closing Costs; (c) Section 7.2; (d) any amounts owed to us under this Agreement; (e) any other provisions which entitle us to remedies, fees, costs, and expenses; (f) Section 4; and (g) Section 8.

Section 8.11 Injunction. If we are stayed or enjoined from undertaking a Hometap Option Exercise, commencing or initiating any notice and procedures relating thereto in this Agreement, or enforcing any of our rights under this Agreement, the Option will not expire until ninety (90) days after such stay or injunction is lifted by a final order of the appropriate court. Any deadline or notice period contained in the Investment Documents which we are prevented or prohibited from observing by operation of law, court order, or otherwise, will automatically be stayed for the duration of such stay, injunction, prevention, or prohibition until such stay, injunction, prevention, or prohibition is no longer applicable or is lifted by final order of the appropriate court.

Section 8.12 Governing Law. The Option, this Agreement, and the other Investment Documents will be determined under, governed by, and construed in accordance with laws of the state in which the Property is located, without regard to its conflict of law principles to the furthest extent possible; *provided*, *however*, to the extent the mandatory provisions of the laws of another jurisdiction relating to (a) the perfection or the effect of perfection or non-perfection of any lien or other right, title, and/or interest in the Property, or (b) the availability of and procedures relating to any remedy hereunder or related to this Agreement are required to be governed by such other jurisdiction's laws, such other laws will be deemed to govern and control.

Section 8.13 DISPUTE RESOLUTION BY BINDING ARBITRATION. PLEASE READ THIS SECTION CAREFULLY AS IT AFFECTS YOUR RIGHTS.

(a) Agreement to Arbitrate. This Dispute Resolution by Binding Arbitration Section 8.13 is referred to in this Agreement as the "**Arbitration Agreement**." You agree that any and all disputes or claims that have arisen or may arise between you and us, whether arising out of or relating to this Agreement or the other Investment Documents, any advertising, or any aspect of the relationship or transactions between us, will be resolved exclusively through final and binding arbitration, rather than a court, in accordance with the terms of this Arbitration Agreement, except that you may assert individual claims in small claims court, if your claims qualify. Further, this Arbitration Agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies, and such agencies can, if the law allows, seek relief against us on your behalf. You agree that, by entering into this Agreement, you and we are each waiving the right to a trial by jury or to participate in a class action. Your rights will be determined by a neutral arbitrator, not a judge or jury. The Federal Arbitration Act governs the interpretation and enforcement of this Arbitration Agreement.

(b) WAIVER OF JURY TRIAL. TO THE FULLEST EXTENT POSSIBLE, HOMETAP AND OWNER VOLUNTARILY, UNCONDITIONALLY, AND IRREVOCABLY WAIVE TRIAL BY JURY UNDER ALL CIRCUMSTANCES WHETHER IN ANY LITIGATION OR PROCEEDING IN A STATE OR FEDERAL COURT RELATED TO, OR ARISING OUT OF, THE INVESTMENT DOCUMENTS OR THE OBLIGATIONS OR TRANSACTIONS CONTEMPLATED BY THE INVESTMENT DOCUMENTS, INCLUDING ALL CLAIMS OR DISPUTES HOWEVER ARISING (INCLUDING TORT CLAIMS AND CLAIMS FOR BREACH OF CONTRACT) BETWEEN HOMETAP AND OWNER.

(c) PROHIBITION OF CLASS AND REPRESENTATIVE ACTIONS AND NON-INDIVIDUALIZED RELIEF. YOU AND WE AGREE THAT EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION OR PROCEEDING. UNLESS BOTH YOU AND WE AGREE OTHERWISE, THE ARBITRATOR MAY NOT CONSOLIDATE OR JOIN MORE THAN ONE PERSON'S OR PARTY'S CLAIMS AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A CONSOLIDATED, REPRESENTATIVE, OR CLASS PROCEEDING. ALSO, THE ARBITRATOR MAY AWARD RELIEF (INCLUDING MONETARY, INJUNCTIVE, AND DECLARATORY RELIEF) ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF NECESSITATED BY THAT PARTY'S INDIVIDUAL CLAIM(S), EXCEPT THAT YOU MAY PURSUE A CLAIM FOR AND THE ARBITRATOR MAY AWARD PUBLIC INJUNCTIVE RELIEF UNDER APPLICABLE LAW TO THE EXTENT REQUIRED FOR THE ENFORCEABILITY OF THIS PROVISION.

(d) Pre-Arbitration Dispute Resolution. We are always interested in resolving disputes amicably and efficiently, and most concerns can be resolved quickly and to your satisfaction by emailing us at legal@hometap.com. If such efforts prove unsuccessful, a party who intends to seek arbitration must first send to the other, by certified mail, a written notice of dispute (a "**Notice of Dispute**"). The party seeking arbitration must send the Notice of Dispute to the other Party at their Notice Address (as defined in Section 8.16 below) by certified mail, with a copy of any Notice of Dispute directed to Hometap to legal@hometap.com. The Notice of Dispute must (i) describe the nature and basis of the claim or dispute, and (ii) set forth the specific relief sought. If we or you do not resolve the claim within sixty (60) days after the Notice of Dispute is received, we or you may commence an arbitration proceeding. During the arbitration, the amount of any settlement offer made by us or you will not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you or we are entitled.

(e) Arbitration Procedures. Arbitration will be conducted by a neutral arbitrator in accordance with the American Arbitration Association's (the "**AAA**") rules and procedures, including the AAA's Consumer Arbitration Rules (collectively, the "**AAA Rules**"), as modified by this Arbitration Agreement. For information on the AAA, please visit its website, http://www.adr.org. Information about the AAA Rules and fees for consumer disputes can be found at the AAA's consumer arbitration page, http://www.adr.org/consumer. If there is any inconsistency between any term of the AAA Rules and any term of this Arbitration Agreement, the terms of this Arbitration Agreement will control unless the arbitrator determines that the application of the inconsistent Arbitration Agreement terms would not result in a fundamentally fair arbitration. The arbitrator must also follow the provisions of this Agreement as a court would. All issues are for the arbitrator to decide, including issues relating to the scope, enforceability, and arbitrability of this Arbitration Agreement. Although arbitration proceedings are usually simpler and more streamlined than trials and other judicial proceedings, the arbitrator can award the same damages and relief on an individual basis that a court can award to an individual under this Agreement and applicable law. Decisions by the arbitrator are enforceable in court and may be overturned by a court only for very limited reasons.

(f) Unless we and you agree otherwise, any arbitration hearings will take place in a reasonably convenient location for both parties with due consideration of their ability to travel and other pertinent circumstances. If the parties are unable to agree on a location, the determination will be made by AAA. If your claim is for $10,000 or less, we agree that you may choose whether the arbitration will be conducted solely on the basis of documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing as established by the AAA Rules. If your claim exceeds $10,000, the right to a hearing will be determined by the AAA Rules. Regardless of the manner in which the arbitration is conducted, the

arbitrator will issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based.

(g) Costs of Arbitration. Payment of all filing, administration, and arbitrator fees (collectively, the "**Arbitration Fees**") will be governed by the AAA Rules, unless otherwise provided in this Arbitration Agreement. If the value of the relief sought is $75,000 or less, at your request, we will pay all Arbitration Fees. If the value of relief sought is more than $75,000 and you are able to demonstrate to the arbitrator that you are economically unable to pay your portion of the Arbitration Fees or if the arbitrator otherwise determines for any reason that you should not be required to pay your portion of the Arbitration Fees, we will pay your portion of such fees. In addition, if you demonstrate to the arbitrator that the costs of arbitration will be prohibitive as compared to the costs of litigation, we will pay as much of the Arbitration Fees as the arbitrator deems necessary to prevent the arbitration from being cost-prohibitive. Any payment of attorneys' fees will be governed by the AAA Rules.

(h) Confidentiality. All aspects of the arbitration proceeding, and any ruling, decision, or award by the arbitrator, will be strictly confidential for the benefit of all parties.

(i) Severability. If a court or the arbitrator decides that any term or provision of this Arbitration Agreement (other than Section 8.13(b)) is invalid or unenforceable, the parties agree to replace such term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Arbitration Agreement will be enforceable as so modified. If a court or the arbitrator decides that any of the provisions of Section 8.13(b) are invalid or unenforceable, then the entirety of this Arbitration Agreement will be null and void, unless such provisions are deemed to be invalid or unenforceable solely with respect to claims for public injunctive relief. The remainder of this Agreement will continue to apply.

(j) Future Changes to Arbitration Agreement. Notwithstanding any provision in this Agreement to the contrary, we agree that if we make any future change to this Arbitration Agreement (other than a change to the Notice Address) during the Effective Period, you may reject any such change by sending us written notice within thirty (30) days of the change to the Notice Address. By rejecting any future change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this Arbitration Agreement as of the date you first accepted this Agreement (or accepted any subsequent changes to this Agreement).

Section 8.14 Further Assurances. Each party agrees, from time to time, as requested by the other party or its successors, assigns, buyers, or transferees, to execute and deliver any instruments and take any action reasonably necessary or desirable in order to implement the provisions and otherwise to effect the intent and purposes of the Investment Documents.

Section 8.15 Severability; Waivers. Each provision of this Agreement and of the other Investment Documents will be severable from every other provision for the purpose of determining the legal enforceability of any provision and will be construed separately and is separately enforceable from every other provision. No waiver by us of any of our rights or remedies in connection with this Agreement or the other Investment Documents will be effective unless the waiver is in writing and signed by both parties, and then any waiver or consent will be effective only in the specific instance and for the specific purpose for which given. No delay, consent, or waiver by us will be construed as continuing, as a bar to, or as a waiver or release of, any subsequent right, remedy, or recourse. To the extent that enforcement of any provision or exercise of any right under this Agreement or the other Investment Documents is held to be invalid or stayed or enjoined by a court of competent jurisdiction, then the provision will be considered separate and apart from the remaining provisions, and any other remaining provisions will continue to be fully enforceable under law.

Section 8.16 Notice. Each party will deliver all notices, requests, consents, claims, demands, waivers, and other communications under this Agreement (each, a "**Notice**") in writing to the address of the other party listed below, unless a party has been notified by the other party in writing of a substitute address ("**Notice Address**"). Each party will deliver all Notices by personal delivery, nationally recognized overnight courier (with all fees prepaid), facsimile or email (with confirmation of transmission), or certified or registered mail (in each case, return receipt requested, postage prepaid). A Notice is effective only upon receipt by the receiving party. If any Notice required by the Security Instruments is also required under applicable law, such requirement of law will satisfy the corresponding requirement under this Agreement.

| **HOMETAP:** | **OWNER:** |
| --- | --- |
| HOMETAP INVESTMENT PARTNERS II, L.P.<br>800 Boylston Street, 16th Floor<br>Boston, MA 02199<br>Attention: Legal Department<br>Email: homeowners@hometap.com | See signature page. |

Section 8.17 Entire Agreement; Amendment. Schedule A and the exhibits are incorporated into this Agreement by this reference. This Agreement, the Security Instruments, and the other written agreements made by and between the parties as of the Effective Date together constitute the entire agreement between the parties regarding the subject matter contained in them. All prior agreements, understandings, representations, warranties, statements, and negotiations between the parties, if any, whether oral, electronic or written, relating to the Property, the Option, this Agreement, the other Investment Documents, and the related transaction, including any offer letters, terms sheets, and draft and earlier versions of settlement statements and other documents and agreements, are superseded and merged into this Agreement. No supplement, modification, or amendment of this Agreement will be binding unless in writing and executed by the party against whom enforcement is sought.

Section 8.18 No Third-Party Beneficiaries. This Agreement and the other Investment Documents are entered into for the protection and benefit of us and Owner and their respective successors and permitted assigns. No other Person will have any rights, remedies, or recourse under this Agreement or the other Investment Documents.

Section 8.19 Counterparts; Electronic Signatures. This Agreement and the other Investment Documents may be executed in counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement. A signed copy of this Agreement that is transmitted by a party to the other party via facsimile or by electronic means will be binding on the signatory to that copy.

Section 8.20 Registered Domestic Partnerships and Civil Unions. An Owner will have the same rights and obligations with respect to Owner's civil union partner or registered domestic partner as Owner will have with respect to its spouse for all purposes under the Investment Documents, subject to the same conditions and limitations that would apply to a transfer or assignment to Owner's spouse, a payment by Owner's spouse, or the rights of Owner's spouse not on record title.

Section 8.21 Consent of Spouse/Domestic Partner. If you are married or in a civil union or registered domestic partnership on the date of this Agreement and your spouse or domestic partner, as applicable, is not named on the title to the Property, Hometap may require your spouse or domestic partner, as applicable, to execute and deliver to us a Consent of Spouse/Domestic Partner in the form of Exhibit F ("**Consent of Spouse/Domestic Partner**"). If you should marry or remarry or enter into a civil union or registered domestic partnership after the Effective Date, within thirty (30) days after the marriage, civil union, or

domestic partnership, as applicable, you and your spouse or domestic partner, as applicable, must execute and deliver a Consent of Spouse/Domestic Partner to Hometap at the Notice Address.

Section 8.22 RECOMMENDATION TO SEEK LEGAL AND TAX ADVICE. OWNER UNDERSTANDS THAT THE SALE OF THE PROPERTY, OR THE SALE OF AN ECONOMIC INTEREST IN THE PROPERTY, CAN HAVE SIGNIFICANT TAX, FINANCIAL, AND FAMILY CONSEQUENCES. OWNER ACKNOWLEDGES THAT HOMETAP HAS REQUESTED THAT OWNER DISCUSS THIS AGREEMENT WITH TAX, LEGAL, AND FINANCIAL ADVISORS AND WITH FAMILY MEMBERS TO ENSURE AN UNDERSTANDING OF THE RISKS AND BENEFITS OF THIS AGREEMENT, AND OWNER HAS HAD THE OPPORTUNITY TO DO SO.

Section 8.23 NO ADVICE. IN ENTERING INTO THE INVESTMENT DOCUMENTS AND INTO ANY FUTURE PROPERTY SALE, OWNER IS NOT RELYING AND WILL NOT RELY ON ANY INFORMATION OR REPRESENTATION THAT MAY HAVE BEEN PROVIDED BY HOMETAP OR ITS AGENTS OR REPRESENTATIVES, INCLUDING: (a) THE VALUE OF THE PROPERTY OR THAT THE BEGINNING HOME VALUE IS A REPRESENTATION OF THE MARKETABLE, INSURABLE, OR FAIR MARKET VALUE OF THE PROPERTY; (b) THE ADVISABILITY OF ENTERING INTO THE INVESTMENT DOCUMENTS OR A PROPERTY SALE; OR (c) THE TAX IMPLICATIONS AND CONSEQUENCES OF ENTERING INTO THE INVESTMENT DOCUMENTS OR A PROPERTY SALE. OWNER HAS MADE, AND WILL MAKE, HIS, HER OR ITS OWN INVESTIGATION AND JUDGMENTS REGARDING SUCH MATTERS AND HAS BEEN ADVISED BY HOMETAP TO DISCUSS THEM WITH OWNER'S LEGAL, FINANCIAL AND TAX ADVISORS, AS WELL AS WITH FAMILY MEMBERS.

Section 8.24 Subordination of Homestead and Waivers. If you have acquired or acquire in the future an estate of homestead in the Property, you agree, to the greatest extent permitted by applicable law, that such homestead estate is subordinated in all respects to the Mortgage and Security Instrument and any amounts due under this Agreement and to all renewals, extensions, and modifications of the Mortgage and Security Instrument or this Agreement, and that such homestead estate is subject to all of our rights under the Mortgage and Security Instrument and this Agreement and all renewals, extensions and modifications of the Mortgage and Security Instrument and this Agreement, and is subordinate to the lien evidenced by the Mortgage and Security Instrument, and all renewals, extensions and modifications of the Mortgage and Security Instrument. You waive and relinquish all rights of curtesy and dower in the Property.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGES FOLLOW]**

**IN WITNESS WHEREOF**, intending to be legally bound, the parties hereto have caused this Agreement to be executed as of the Signing Date. This Agreement may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement.

**HOMETAP INVESTMENT PARTNERS II, L.P.**

By: Hometap Holdings II, LLC,
Its General Partner

By: [signature]

Name: Adam Jaskiewic

Title: VP Authorized Signer

Date: 4/21/21

Acknowledgment Certificate

Commonwealth of Massachusetts

County of Suffolk

On this 21st day of April, 20 21, before me, the undersigned notary public, personally appeared Adam Jaskiewic, proved to me through satisfactory evidence of identification, which was MA ID, to be the person whose name is signed on the preceding or attached document in my presence, and acknowledged to me that he signed it voluntarily for its stated purpose.

[signature]

Notary Public Signature

My commission expires

DANIEL MILLER BURNETT
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires On
December 04, 2026

**IN WITNESS WHEREOF**, intending to be legally bound, the Parties have executed this Memorandum as of the Signing Date by their signatures below. This Memorandum may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same Memorandum.

**HOMETAP INVESTMENT PARTNERS II, L.P.**

By: Hometap Holdings II, LLC,
Its General Partner

By: [signature]
Name: Adam Jaskiewicz
Title: VP Authorized Signer
Date: 4/21/21

Acknowledgment Certificate

Commonwealth of Massachusetts

County of Suffolk

On this 21st day of April, 2021, before me, the undersigned notary public, personally appeared Adam Jaskiewicz, proved to me through satisfactory evidence of identification, which was MA ID, to be the person whose name is signed on the preceding or attached document in my presence, and acknowledged to me that he signed it voluntarily for its stated purpose.

[signature]
Notary Public Signature

My commission expires DANIEL MILLER BURNETT Notary Public COMMONWEALTH OF MASSACHUSETTS My Commission Expires On December 04, 2026

**IN WITNESS WHEREOF**, intending to be legally bound, the parties hereto have caused this Agreement to be executed as of the Signing Date. This Agreement may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement.

**OWNER(S)**

By: ______________________________

Larry E. Fisher

Date: 4-21-2021

By: ______________________________

Date: ______________________________

Notice Address:

21597 Juego Circle, Unit 6D, Boca Raton, FL 33433

STATE OF ~~FLORIDA~~

COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this 21st day of APRIL, 2021 by LARRY E. FISHER (name of person acknowledging).

MERRY SANON-LITTLE
Notary Public - State of Florida
Commission # HH 017847
My Comm. Expires Sep 19, 2024
Bonded through National Notary Assn.

Notary Public Signature

My commission expires ______________________

Personally known ____________ OR Produced Identification ✓

Type of Identification Produced DRIVER'S LICENSE

**List of Schedules and Exhibits**

Schedule A – Investment Term Sheet

Exhibit A – Property Description
Exhibit B – Memorandum of Option
Exhibit C – Mortgage and Security Instrument
Exhibit D – UCC-1 Financing Statement
Exhibit E – Notice of Right to Cancel
Exhibit F – Consent of Spouse/Domestic Partner

# EXHIBIT A

## LEGAL DESCRIPTION

Real property described as follows:

All that certain land situate in Palm Beach County, State of Florida, viz:

Unit 6-D, Vistas of Boca Lago, a Condominium, according to the Declaration of Condominium thereof, as recorded in Official Records Book 2495, Page 1, and all amendments thereto, of the Public Records of Palm Beach County, Florida, together with an undivided interest or share in the common elements appurtenant thereto.

Parcel ID / APN: 00-42-47-20-02-000-0604

## Schedule A: Hometap Investment Term Sheet

This document and the Option Purchase Agreement define key terms of the Option and Hometap's investment in the Property ("**Investment Terms**"). Capitalized terms are further defined in the Option Purchase Agreement.

Homeowner(s): Larry E. Fisher
Property Address: 21597 Juego Circle, Unit 6D, Boca Raton, FL 33433
Option ID: FL999199
Effective Date: 04/26/2021

**Section I: Predetermined Investment Terms**
Hometap and Owner agree to the Investment Terms defined below. These terms have the value assigned to them as shown below, and such values shall not change during the Option Period.

| Predetermined Investment Terms | | |
|---|---|---|
| **Term** | **Definition** | **Value** |
| Investment Amount | *Gross amount that Hometap will pay you to acquire an Option in the Property* | $74,287.00 |
| Net Investment Amount | *Net amount that you will receive after Investment Fees and Costs (see Section II below) have been deducted from the Investment Amount* | $70,165.27 |
| Beginning Home Value | *Property's value at the time of Investment Signing, determined by Appraisal* | $250,000.00 |
| Hometap Percentage (if Ending Home Value ≥ Beginning Home Value) | *Percentage of the Property that Hometap will acquire upon exercise of the Option when the Ending Home Value is equal to or greater than the Beginning Home Value; used to determine Option's value* | 49.525% |
| Hometap Percentage (if Ending Home Value < Beginning Home Value) | *Percentage of the Property that Hometap will acquire upon exercise of the Option when the Ending Home Value is less than the Beginning Home Value; used to determine Option's value* | 41.271% |
| Acknowledged Pre-Existing Liens | *Current sum of debt obligations secured by a lien on the Property*<br>*First National Bank of America, $101,186.71* | $101,186.71 |

**Section II: Investment Fees and Costs**
Hometap and Owner agree to the Investment Fees and Costs defined below. The Investment Fees and Costs have the value assigned to them as shown below, which shall be deducted from the Investment Amount to determine the Net Investment Amount. The Net Investment Amount shall be paid to the Owner, as further provided in the Option Purchase Agreement.

| Investment Fees and Costs<br>Deducted from Investment Amount | | |
|---|---|---|
| **Term** | **Definition** | **Value** |
| Investment Fee | *3% investment fee charged by Hometap* | $2,228.61 |
| Third-Party Costs | *Costs incurred for third-party processing and services related to finalizing the Investment and signing the Investment Documents*<br>*Appraisal, $599.00*<br>*Title Charges, $700.00* | $1,299.00 |
| Government Taxes and Fees | *Taxes and fees assessed by government entities related to finalizing the Investment and signing the Investment Documents*<br>*Memorandum,$61.60*<br>*UCC,$36.10*<br>*Mortgage/Deed of Trust,$87.10*<br>*State Deed and Mortgage Tax/Stamp and Intangible Tax,$409.32* | $594.12 |
| Payoffs | *Amounts paid at time of Signing to third-party lien holders, on Owner's behalf, to pay down the total amount of debt against the Property* | $0.00 |
| Total Investment Fees and Costs | *Total of amounts listed in this table, to be deducted from the Investment Amount to determine the Net Investment Amount* | $4,121.73 |

**Section III: Investment Terms Valued at Time of Option Exercise or Repurchase**
Hometap and Owner agree to the Investment Terms defined below. The value of the Investment Terms in this Section III cannot be determined until the Owner repurchases or Hometap exercises the Option. Hometap and Owner agree that the value of the Investment Terms in this Section III shall be determined or calculated as stated herein and as further provided in the Option Purchase Agreement. Sample calculations of the Investment Terms in this Section III have been provided to Owner in the Investment Disclosures.

| Investment Terms Valued at Time of Option Exercise or Repurchase | |
|---|---|
| **Term** | **Definition** |
| Ending Home Value | *Property's value at the time of Option exercise or repurchase, determined by Appraisal or Permitted Sale* |
| Hometap Cap | *Maximum 20% annualized rate of return on the Investment Amount, prorated for a partial year, as applied to the Hometap Share* |
| Hometap Share | *Value of Hometap's Option, calculated by multiplying the Ending Home Value by the Hometap Percentage; the maximum value of the Hometap Share is the Hometap Cap* |

I acknowledge and agree that the Investment Terms defined in this Schedule A shall apply to the Option, as further described in the Option Purchase Agreement.

6/-21-2021

Larry E. Fisher                                        Date

Date

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re Larry Edward Fisher, Case No. 26-18759-MAM
Fisher v. Hometap Investment Partners II, L.P., et al.

# EXHIBIT K-2

Closing Docs.pdf supplied by Hometap on June 25, 2026.

*Source pages follow in preserved order. Existing source-page exhibit identifiers and legacy packet-reference markings are retained for stable pinpoint citation; they do not alter the source document text.*

# Hometap Investment Partners II, L.P.
## *Investment Signing Instructions*

The Investment Signing Instructions set forth below are to be used by the applicable settlement agent (the "**Settlement Agent**") to execute a Hometap Investment Partners II, L.P. ("**Hometap**") equity investment (the "**Investment**") in accordance with all of the instructions contained herein.

If any ambiguities, errors, or questions arrive in connection with the Investment, or any matter contained in the Investment Signing Instructions, the Settlement Agent must contact Hometap prior to the signing appointment to clarify or resolve matters. **If the Settlement Agent determines that an Investment cannot be executed in accordance with the Investment Signing Instructions, the Settlement Agent should not proceed to execution without further instructions from Hometap.**

Hometap shall indemnify, defend and hold harmless the settlement agent, ClearEdge, their affiliates, and their respective directors, officers, employees, contractors and agents, against any third party claim, action or proceeding arising out of an allegation that: (i) the Investment violates applicable law, rule or regulation; or (ii) Hometap has breached the terms of any agreements with the homeowner(s), including any documents contained in the Investment Package, as relating to the Investment. Hometap's indemnification obligations do not cover any third-party claim, action or proceeding arising out of acts or omissions of any indemnified party.

**HOMETAP CONTACT**

| | | | |
|---|---|---|---|
| **Name** | Devlin Keogh | **Phone** | 617-675-9764 |
| **Title** | Investment Manager | **Email** | homeowners@hometap.com |

**SETTLEMENT AGENT CONTACT**

| | | | |
|---|---|---|---|
| **Support Email** | | **Support Phone** | |

**HOMEOWNERS AND PROPERTY**

| | | | |
|---|---|---|---|
| **Investment #** | FL999199 | **Property Address** | 21597 Juego Circle, Unit 6D, Boca Raton, FL 33433 |
| **Investment Amount** | $74,287.00 | **Signing Date** | 04/21/2021 |
| **Title File #** | M-FL678502 | **Disbursement Date** | 04/26/2021 |
| **Homeowner 1 Name, Address & Phone Number** | Larry E. Fisher<br>21597 Juego Circle, Unit 6D, Boca Raton, FL 33433<br>386-871-5115 | **Homeowner 2 Name, Address & Phone Number** | |

**REQUIRED DOCUMENTS, SIGNATURES AND RECORDING**

Settlement Agent will be provided an Investment Package, containing the documents listed in the Investment Package section of these instructions, at least 72 hours in advance of the signing appointment. The Investment Package includes Investment

Documents, which require signatures from the Homeowner(s), and Supporting Documents that are needed for verification purposes, but do not require signatures.

The Investment Documents will be delivered to Settlement Agent already signed by Hometap. Settlement Agent must verify the documents do not have missing Hometap signatures. If the documents are incomplete, Settlement Agent must reach out to Hometap for clarification and to obtain correctly signed documents.

Settlement Agent must not allow Investment Package documents to be signed by the Homeowner(s) earlier than the date agreed upon between Hometap and Settlement Agent. To consummate the Investment, Settlement Agent is responsible to verify that all required Homeowner(s) signature blanks are fulfilled on the Investment Package documents. Homeowner(s) must execute all documents as their name(s) appear in the documents.

All documents that require recording, as determined in the Investment Package section of these instructions, must be submitted for recording by Settlement Agent after the file disburses. Settlement Agent is required to notify Hometap that documents have been recorded after the signing appointment.

INVESTMENT PACKAGE

| *Investment Documents* | *Required Signatures* | *Recorded* |
|---|---|---|
| 1. Investment Term Sheet | Homeowner(s) | No |
| 2. Option Purchase Agreement | Hometap, Homeowner(s) | No |
| 3. Memorandum of Option | Hometap, Homeowner(s) | Yes |
| 4. Mortgage and Security Instrument | Homeowner(s) and spouse | Yes |
| 5. UCC-1 Filing Statement | None | Yes |
| 6. Consent of Spouse | Spouse (ONLY if not on title) | No |
| 7. Notice of Right to Cancel | Homeowner(s) | No |
| 8. Compliance Agreement & Name Affidavit | Homeowner(s) | No |
| 9. Information Sharing Disclosure | None | No |
| 10. Insurance Request & Authorization Form | Homeowner(s) | No |
| *Supporting Documents* | *Required Verifications* | |
| 11. Property Report | Homeowner ID matches | No |

SIGNATURES
Homeowner(s) must sign all documents exactly as his or her name appears on the blank line provided for his or her signature(s). Where a witness is required, you must have the document witnessed. If an acknowledgment is provided, a person authorized to take acknowledgments in the state of signing must execute the acknowledgment. The acknowledgment and/or witness date must be no earlier than the date of the document being acknowledged.

CORRECTIONS
Any correction to Investment Documents must be approved in writing by us in advance.

**RIGHT TO CANCEL**
The Notice of Right to Cancel must be given at the signing appointment. The Notice of Right to Cancel must be accurately completed, including all dates populated. The signed originals acknowledging receipt of the completed Notice of Right to Cancel by each homeowner and/or person given copies of the Notice must be returned with the executed Investment Documents. Should the transaction be rescinded by any of the Homeowner(s), immediately notify our office.

**COMPLIANCE AGREEMENT & NAME AFFIDAVIT**
By signing this document, the Homeowner(s) are (i) agreeing to assist Hometap with correcting any errors to documents in the future, and (ii) are notifying Hometap of any other names associated with them currently or in the past (e.g., maiden name; incorrect middle initials; nicknames used on official documents).

**DISBURSEMENT OF FUNDS AND FEES**
Hometap will wire funds to the Settlement Agent pursuant to wire instructions provided by Settlement Agent. An Investment Term Sheet (the "**Investment Term Sheet**") has been included in the Investment Package for verification of the funds that will be wired to the Settlement Agent for disbursement and the funds will be disbursed as described on the Investment Term Sheet.

The Settlement Agent is authorized to disburse proceeds to the Homeowner(s) on the Disbursement Date contained herein, provided neither Hometap nor the Homeowner(s) have notified Settlement Agent in writing that the Homeowner(s) has elected to cancel the transaction. Settlement Agent will notify Hometap if the Homeowner(s) contacts Settlement Agent to rescind the transaction.

**IN CASE OF INVESTMENT DOCUMENTS NOT SIGNED**
If the Investment Documents are not executed, please contact Hometap at the phone number contained herein to receive further instructions, including any instruction to return funds to Hometap.

**COPIES OF INVESTMENT DOCUMENTS**
The Settlement Agent will provide unsigned copies of all Investment Documents to the Homeowner(s) at the signing appointment. After the file disburses, Settlement Agent will return the fully executed Investment Documents to Hometap and will then submit any recordable documents to the County Recorder's office. Once recorded, the original recorded documents will be returned to Hometap at **800 Boylston Street, 16th Floor, Boston, MA 02199**, or to an alternative location designated by Hometap in advance. Shipping charges incurred are the responsibility of the Settlement Agent. The settlement fees should include this charge.

ClearEdgeTitle

**ClearEdge Title, Inc.**
2605 Enterprise Road E
Suite 270
Clearwater, FL 33759
(877) 536-3390

File Number: **M-FL678502**
Loan Amount: **$74,287.00**
Close Date: **4/21/2021**
Disbursement Date: **4/26/2021**

## BORROWER(S) CLOSING STATEMENT

Type: **Property Report**
Property: **21597 JUEGO CIRCLE, UNIT 6D**
**BOCA RATON, FL 33433 (PALM BEACH)**
**(00-42-47-20-02-000-0604)**

Borrower(s): **LARRY E FISHER**
**21597 Juego Circle**
**Boca Raton, FL 33433**

| Description | Debit | Credit |
|---|---|---|
| **New Loans** | | |
| Loan Amount | | $74,287.00 |
| Appraisal Fee to Hometap Equity Partners, LLC | $599.00 | |
| HomeTap Fee to Hometap Equity Partners, LLC | $2,228.61 | |
| **Title Charges** | | |
| Title - Lender's Title Insurance to ClearEdge Title, Inc. $74,287.00 | | |
| Title - Escrow Fee to ClearEdge Title, Inc. | $700.00 | |
| **Government Recording and Transfer Charges** | | |
| Recording fees: Memo $61.60 | $61.60 | |
| Recording Fees: Mortgage $87.10 | $87.10 | |
| UCC $36.10 | $36.10 | |
| State Deed Tax/Stamps to ClearEdge Title - Filing Fee | $0.70 | |
| State Mortgage Tax/Stamps to ClearEdge Title - Filing Fee | $260.05 | |
| Intangible Tax to ClearEdge Title - Filing Fee $148.57 | $148.57 | |
| **Totals** | $4,121.73 | $74,287.00 |

**Balance Due TO Borrower:** $70,165.27

**APPROVED AND ACCEPTED**

BORROWER(S)

LARRY E FISHER

Meridian National Title, Inc.
25400 US 19 North, Suite 135
Clearwater, FL 33763
Phone (866) 374-0646

******* REFUND CONFIRMATION FORM******

**File Number: M-FL678502**

**Property Address: 21597 Juego Circle, Unit 6D**

**Projected Disbursement Date: April 26, 2021**

**Transaction Type: Home Equity Investment**

**PLEASE SELECT HOW YOU WISH TO RECEIVE THE PROCEEDS FROM YOUR TRANSACTION:**

☐ CHECK

Does the check need to be sent to the property address above? ___ Yes ___ No

If No, please provide the address where you want the check sent:

______________________________________________

☐ WIRE

We, the undersigned, have requested that Meridian National Title, Inc. deliver the following proceeds or disbursement of funds related to the above property [21597 Juego Circle, Unit 6D, Boca Raton, FL 33433] of settlement by wire to the following financial institution:

| | | | |
|---|---|---|---|
| **Receiving Institution Name** | | | |
| **Financial Institution Routing Number** | | | |
| **Financial Institution Checking Account Number** | | | |
| **Name(s) / Payee(s) of Record with Financial Institution** | | **Are you attaching a voided check** | ☐ Yes ☐ No |

We as the Payee(s) hereby authorize Meridian National Title, Inc. to wire the amount listed on the Option Closing Disclosure to the above financial institutions account notwithstanding the differences in the payee names and the names on the receiving account. By acknowledging the below through signature, the payee(s) also hereby hold Meridian National Title, Inc Title, Inc. harmless and indemnify them against any and all claims and disputes arising from said delivery of funds to the extent of, but not limited to, actual damages, attorney's fees, penalties and other fees associated with this request.

[signature] 4-21-2021

Signature Date Signature Date

**Subscribed and sworn to before me this** 21st **day of** APRIL, **20**21

[signature]

(seal)

MERRY SANON-LITTLE
Notary Public - State of Florida
Commission # HH 017847
My Comm. Expires Sep 19, 2024
Bonded through National Notary Assn.

**Notary Public**

M E R I D I A N

Attention Signing agent, including this page the total page count for this attachment you are printing is 81 pages.

If you have received or are printing less than that amount please contact our office immediately at:

Toll Free: 877-536-3390
Email: MNTeam@MeridianNatl.com

M E R I D I A N

Borrower Name(s): Larry E Fisher
Property Address: 21597 Juego Circle, Unit 6D, Boca Raton, FL 33433
Loan #:

Thank you for handling this signing for Meridian National Title and Hometap Equity Partners, LLC

During business hours of 9AM eastern – 8PM eastern Monday through Friday please contact our office at 877-536-3390 with regards to any issues at the closing. Additionally, should an issue arise outside of normal business hours or you are unable to make contact during normal business hours please reach out to the emergency contact number at 727-612-5242. PLEASE LEAVE A VOICEMAIL IF THAT NUMBER IS NOT PICKED UP.

If funds are due at the closing and a check is not available and the customer has not already made arrangements for a wire transfer please also contact us using the above methods.

Thank you.

Meridian National Title

25400 US 19 North, Suite 110

Clearwater, FL 33763

**(877)-536-3390 Team Line**

mnteam@meridiannatl.com

# COMPLIANCE AGREEMENT

Re: Order Number: M-FL678502

In consideration of Meridian National Title, Inc. (hereinafter "title company") closing the transaction under the above order number, the undersigned agree, upon request of the company, to fully cooperate with the company to correct any inaccurate term or provision or mistake in, or omission from any document associated with the closing. He/she/they further agree that, subsequent to closing, he/she/they will execute such documents, or take such action as the company may reasonably deem necessary to properly document the transaction.

The undersigned further agree(s) that in the event an error in charges, costs, or payoff amounts is made, he/she/they will, upon request, immediately remit such sums for which he/she/they had initial responsibility for payment as may be necessary to correct such errors. Nothing herein contained shall be construed to impose liability on the parties for charges incurred as a result of the failure of the company to timely remit payment or take actions which the company has agreed in writing to perform.

The undersigned further authorize the company to correct any clerical errors on his/her/their behalf in order to properly complete the title conveyance and/or provide the lender with insurable documentation.

The undersigned further agree to comply with any such requests outlined above and agree that, in the event he/she/they fail to comply with the request, he/she/they will pay, in addition to any amounts owed above, reasonable costs of the company in enforcing this agreement, including but not limited to, reasonable attorney's fees and costs of litigation.

[signature] 4-21-2021

DATE

Sworn to and subscribed before me, this 21st day of APRIL 2021

[signature]

Notary Public

MERRY SANON-LITTLE
Notary Public - State of Florida
Commission # HH 017847
My Comm. Expires Sep 19, 2024
Bonded through National Notary Assn.

**PLEASE TAKE NOTE OF THE FORM IMMEDIATELY FOLLOWING THIS COVER LETTER**

**PLEASE COMPLETE AND EXECUTE THIS FORM IF YOU WISH TO HAVE YOUR PROCEEDS WIRE DIRECTLY INTO A CHECKING OR SAVINGS ACCOUNT**

# PAYOFF AFFIDAVIT

File No: M-FL678502

Property: 21597 Juego Circle, Unit 6D, Boca Raton, FL 33433

WE, the undersigned, do hereby hold Meridian National Title, Inc and Stewart Title Guaranty Company harmless for any addition monies due from any shortages in the payoff amounts of any and all liens on the aforementioned property described above and listed in the title commitment on file number M-FL678502. We also understand that if for any reason the payoff is incorrect, we are fully responsible for making up the difference and will take care of the said shortages within five (5) days from notification by Meridian National Title, Inc Title whether by telephone or by mail. Should there be a remaining escrow balance we hereby authorize any shortages to be covered thru the escrow balance.

That this affidavit is being made to include Hometap Equity Partners, LLC to grant financing to the borrower(s) of the above described property, and the said parties rely on the statement(s) made by the affiant(s) herein are aware that Meridian National Title, Inc Title is insuring the title to the property herein and that affiant(s) warrant the above statements to be accurate. In the event of the necessity to enforce the terms of this affidavit, affiant(s) shall be responsible personally and/or as a corporation for any losses, including but not limited to, attorney's fees and court costs.

**Revolving Line of Credit Instructions**

**If this is a revolving credit/equity line of credit account, I/we, the undersigned borrower (s), hereby authorize you to close this account. We hereby acknowledge that there are no outstanding draws or checks against this line of credit and understand that we will be held responsible for any draws or checks still outstanding as of the date of payoff.**

AFFIANT(S) FURTHER SAYETH NAUGHT.

______________________________

Larry E Fisher

| |
|---|
| A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document |

STATE OF FL

COUNTY OF Palm Beach

Subscribed and sworn to (or affirmed) before me on by, Larry E Fisher who proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

______________________________

(Notary Signature)

MERRY SANON-LITTLE
Notary Public - State of Florida
Commission # HH 017847
My Comm. Expires Sep 19, 2024
Bonded through National Notary Assn.

(SEAL)

# Marital Affidavit

File No: M-FL678502

Date: April 20, 2021

The undersigned being first duly sworn, on oath, deposes and say that (they/he/she) are the owners of the real estate situated in the County of Palm Beach, State of FL, commonly known as 21597 Juego Circle, Unit 6D, Boca Raton, FL 33433 and more particularly described in that certain mortgage dated in favor of Hometap Equity Partners, LLC, the lender, under transaction number .

Affiant makes the following representations in conjunction with the consummation of the pending mortgage of the real estate referenced above (premises).

On April 20, 2021 before me a Notary Public, personally appeared the undersigned

affiant(s), who being duly sworn according to law and intending to be legally bound, depose(s) and say(s):

1. (Y – N ) _______ That I am married to _________ and have been continuously married since _______________
2. (Y – N ) _______ That I am a single person and have never been married
3. (Y – N ) _______ That I am married however currently pending divorce proceedings
4. (Y – N ) _______ That I took title as married and have since been divorced and not remarried
5. (Y – N ) _______ That I took title as married and have since been divorced and remarried, my new spouses name is ___________

FURTHER AFFIANTS SAYETH NAUGHT.

_______________________________________

Larry E Fisher

STATE OF FL

COUNTY OF Palm Beach

The foregoing instrument was acknowledged before me April 20, 2021 by: Larry E Fisher who is/are personally known to me or who has/have produced a drivers license(s) as identification and who did not take an oath.

_______________________________________

(Notary Signature)

(SEAL)

MERRY SANON-LITTLE
Notary Public - State of Florida
Commission # HH 017847
My Comm. Expires Sep 19, 2024
Bonded through National Notary Assn.

hometap

Date Prepared: 04/20/2021

Welcome to Hometap! This document has useful information you need to know before signing your Investment Documents.

Please carefully review all five sections of this document. If you have any questions about the information in these Investment Disclosures before the signing appointment, please contact your Investment Manager. If you have questions about your Investment after the signing appointment, please contact homeowners@hometap.com.

## Section I: Investment Signing

The information on this page contains what you need to know for signing day. Notify your Investment Manager immediately if you have questions so that they can be resolved before your appointment.

A. Signing Information

| | |
|---|---|
| Signing Appointment Date: | 04/21/2021 |
| Cancellation Date: | 04/24/2021 |
| Investment Effective Date: | 04/26/2021 |
| Settlement Agent: | ClearEdge |
| Title File No.: | M-FL678502 |
| Signing Appointment Address: | 21597 Juego Circle, 6D Boca Raton, FL 33433 |

B. Transaction Information

| | |
|---|---|
| Homeowner(s): | Larry E. Fisher |
| Property Address: | 21597 Juego Circle, Unit 6D, Boca Raton, FL 33433 |
| Investor: | Hometap Investment Partners II, LP |

C. Investment Information

| | |
|---|---|
| Occupancy Type: | Primary residence |
| Option Period: | 10 years |
| Option ID: | FL999199 |

## Section II: Cash Flow at Signing

This section explains the fees and costs that are deducted from your Investment Amount at the signing appointment and how your Net Investment Amount is calculated. The fees and costs below are estimates of the amounts assessed at signing and are for informational purposes only. Final numbers will be included in your Option Purchase Agreement. More information about the terms is included in the FAQ section below and in your Option Purchase Agreement. Please review this information carefully and contact your Investment Manager immediately if you have questions.

| | | |
|---|---|---|
| **Investment Amount** | *The amount Hometap will pay you to acquire the Option* | $74,287.00 |

| Investment Fees and Costs | | Amount |
|---|---|---|
| **A. Investment Fee** | *3% of Investment Amount, charged by Hometap* | **$2,228.61** |
| $2,228.61 | to Hometap Investment Partners II, LP | |

| | | |
|---|---|---|
| **B. Third-Party Costs** | *Costs for third-party processing services to finalize Investment* | **$1,299.00** |
| $599.00 | Appraisal | |
| $700.00 | Title Charges | |

| | | |
|---|---|---|
| **C. Taxes and Other Government Fees** | | **$594.12** |
| $61.60 | Memorandum | |
| $36.10 | UCC | |
| $87.10 | Mortgage/Deed of Trust | |
| $409.32 | State Deed and Mortgage Tax/Stamp and Intangible Tax | |

| | | |
|---|---|---|
| **D. Payoffs** | *Amounts paid to third-party lien holders on your behalf* | **$0.00** |

| Total Investment Fees and Costs | |
|---|---|
| E. Total Investment Fees and Costs (A + B + C + D) | **$4,121.73** |

## Calculating Signing Cash Flow

| | |
|---|---|
| Investment Amount | $74,287.00 |
| Total Investment Fees and Costs (E) | $4,121.73 |
| | |
| CASH DUE TO OWNER (NET INVESTMENT AMOUNT) | $70,165.27 |

## Section III: Important Information about Your Investment

**THE SALE OF THE OPTION TO HOMETAP CAN HAVE SIGNIFICANT FINANCIAL AND TAX CONSEQUENCES. BY ACCEPTING AN INVESTMENT, YOU ACKNOWLEDGE THAT HOMETAP HAS URGED YOU TO SEEK TAX, LEGAL, AND FINANCIAL ADVICE TO ENSURE AN UNDERSTANDING OF THE RISKS AND BENEFITS OF ENTERING INTO THE OPTION PURCHASE AGREEMENT AND THAT YOU HAVE HAD AN OPPORTUNITY TO DO SO.**

You are granting Hometap a security interest in the Property. You may lose this Property if you do not satisfy the obligations of the Option Purchase Agreement.

You are required to maintain homeowner's insurance on the Property in accordance with Section 6.1 of the Option Purchase Agreement, including flood insurance if applicable. Your insurance policy must name Hometap Investment Partners II, L.P. as a loss payee / mortgagee.

You are responsible for paying all applicable secured loan payments, property taxes, homeowners association (HOA) fees, maintenance fees, mortgage insurance, and any other payments required in connection with the ownership and maintenance of your Property.

Please refer to your Option Purchase Agreement and Security Agreement for more information about:

- What happens if you fail to repurchase the Option before the end of the Option Period;
- What is an Event of Default under the Option Purchase Agreement;
- Situations in which Hometap can force a sale of your home; and
- Your other obligations under the Option Purchase Agreement.

## Section IV: Sample Settlement Scenarios

This section contains sample scenarios to help you understand how much it will cost to settle your Investment by repurchasing the Option. The exact amount required to settle your Investment will depend on the value of your Property at the time you settle. Because we can't predict what that will be, these scenarios are only examples to explain how settlement works.

The values in this table will not change during the Option Period; they are specific to your Investment.

| | | | |
|---|---|---|---|
| Beginning Home Value: | $250,000.00 | Hometap Percentage, if Ending Home Value ≥ Beginning Home Value: | 49.525% |
| Investment Amount: | $74,287.00 | Hometap Percentage, if Ending Home Value < Beginning Home Value: | 41.271% |

At any time during or at the end of the Option Period, you can settle the Investment by repurchasing the Option. If you do not settle the Investment when selling the Property or the Option Period ends, whichever comes first, Hometap has the right to exercise the Option and force the sale of the Property. The amount required to settle the Investment is the Hometap Share.

The following scenarios show examples of how much you may owe Hometap to settle your Investment, based on assumed potential conditions at the time the Option is repurchased or exercised. ***These values are examples only and are not intended to be promises or guarantees of actual conditions at the time the Option is repurchased or exercised.***

**Settlement Scenario 1: Appreciation** Hometap Percentage: 49.525%

This scenario shows examples of calculating the amount for settlement at different times when the Property has appreciated and the Ending Home Value is ***higher*** than the Beginning Home Value. This example assumes an annual appreciation rate of 3% for your Property.

The Hometap Share is the amount of money you must pay to Hometap to settle your Investment. It is the ***lesser*** of (1) the amount calculated using the Hometap Percentage or (2) the Hometap Cap.

The Hometap Cap is the 20% annualized rate of return on the Investment Amount. In the example below, if the Hometap Cap is shown, then the Hometap Cap is the amount you would pay to settle your Investment because it is less than the Hometap Share using the Hometap Percentage.

| Years to Settlement | Ending Home Value | Hometap Share, using Hometap Percentage | Hometap Cap, if applicable |
|---|---|---|---|
| 0.5 | $250,000 | $123,813 | **$81,695** |
| 1 | $257,500 | $127,527 | **$89,144** |
| 5 | $289,819 | $143,533 | |
| 10 | $335,979 | $166,394 | |

**Settlement Scenario 2: Depreciation** Hometap Percentage: 41.271%

This scenario shows examples of calculating the amount for settlement at different times when the Property has depreciated and the Ending Home Value is ***lower*** than the Beginning Home Value. This example assumes a total depreciation rate of 10% for your Property over the 10-year Option Period.

The Hometap Share is the amount of money you must pay to Hometap to settle your Investment. It is the ***lesser*** of (1) the amount calculated using the Hometap Percentage or (2) the Hometap Cap.

The Hometap Cap is the 20% annualized rate of return on the Investment Amount. In the example below, if the Hometap Cap is shown, then the Hometap Cap is the amount you would pay to settle your Investment because it is less than the Hometap Share using the Hometap Percentage.

| Years to Settlement | Ending Home Value | Hometap Share, using Hometap Percentage | Hometap Cap, if applicable |
|---|---|---|---|
| 0.5 | $249,975 | $103,167 | **$81,695** |
| 1 | $248,750 | $102,662 | **$89,144** |
| 5 | $237,500 | $98,019 | |
| 10 | $225,000 | $92,860 | |

## Section V: Frequently Asked Questions

This section answers questions you may have during the Option Period. If you have any questions about the information in these Investment Disclosures before the signing appointment, please contact your Investment Manager. If you have questions about your Investment after the signing appointment, please contact homeowners@hometap.com.

**I'm ready to sell my property. What should I do?**
When you're ready to sell your property, let us know at homeowners@hometap.com. We'll work with you to settle your Investment as part of the sale. After you accept a binding offer from a potential buyer, you'll need to let us know within 3 business days and at least 30 days before closing on the sale. All of the information you need to provide is in Section 2.6(b) of the Option Purchase Agreement.

**I got married! Does that affect my Investment?**
Congratulations! Because Hometap has an interest in the property, we want to make sure your new spouse or partner understands how that may affect any interest they may have in the property. Within 30 days, please have your new spouse or partner complete Exhibit F to the Option Purchase Agreement and send it to homeowners@hometap.com. More information can be found in Section 8.21 of the Option Purchase Agreement.

**How do I settle the Investment?**
You can settle the Investment by paying Hometap in the amount of the Hometap Share. The Hometap Share is based on the value of your property at the time of settlement, so we can't give you an exact number today. The sample scenarios in Section IV show potential scenarios as examples of how settlement may work for you. When you're ready to settle or get an updated estimate of the Hometap Share for your property, contact homeowners@hometap.com or login to your Hometap account.

**Are there penalties or extra fees for settling my Investment before the end of the Option Period?**
No, there are no penalties or fees for settling your Investment at any time. While the amount required to settle the Investment (the Hometap Share) will change over time based on the value of your property, any costs associated with settling (like getting your property appraised or getting a title report) apply whether you settle in the first or the last year of the Option Period.

**When I settle, do I need to get a new appraisal? Are there signing costs?**
As with the Investment signing, you'll have to pay for third-party costs and fees in order to settle your Investment. These may include a new appraisal, an updated title report, recording fees, and similar fees. Hometap will not charge you any fees to settle the Investment.

**Why is there a Hometap Cap? What is it?**
The Hometap Cap protects you from extreme increases in the Hometap Share because of unusually high appreciation or early settlement of your Investment. The math is a little complicated, but we limit the Hometap Share to an annualized 20% rate of return that's prorated for periods of less than a full year.

**Where does the Option Purchase Agreement talk about the prorated annual rate if I settle within the first year?**
Section 2.2 of the Option Purchase Agreement talks about the prorated annual rate, which we call the Hometap Cap, as part of calculating the Hometap Share. Schedule A to the Agreement also describes the Hometap Cap.

**How will renovating my property affect my Investment?**
Section 6.1(f) of the Option Purchase Agreement explains the process for adjusting the Ending Home Value of your property to take into account the value of your renovation. Be sure to let us know within 90 days of the renovation if you want to document your project for an adjustment to the Ending Home Value. You can always reach out to homeowners@hometap.com for more information.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re Larry Edward Fisher, Case No. 26-18759-MAM
Fisher v. Hometap Investment Partners II, L.P., et al.

# EXHIBIT K-3

Selected photographs of Fisher's retained physical paperwork, including the signed Compliance Agreement.

*Source pages follow in preserved order. Existing source-page exhibit identifiers and legacy packet-reference markings are retained for stable pinpoint citation; they do not alter the source document text.*

COMPLIANCE ...

**RIGHT TO CANCEL**

The Notice of Right to Cancel must be given at the signing appointment. The Notice of Right to Cancel must be accurately completed, including all dates populated. The signed originals acknowledging receipt of the completed Notice of Right to Cancel by each homeowner and/or person given copies of the Notice must be returned with the executed Investment Documents. Should the transaction be rescinded by any of the Homeowner(s), immediately notify our office.

**COMPLIANCE AGREEMENT & NAME AFFIDAVIT**

By signing this document, the Homeowner(s) are (i) agreeing to assist Hometap with correcting any errors in documents in the future, and (ii) are notifying Hometap of any other names associated with them currently or in the past (e.g., maiden name; incorrect middle initials; nicknames used on official documents).

**DISBURSEMENT OF FUNDS AND FEES**

Hometap will wire funds to the Settlement Agent pursuant to wire instructions provided by Settlement Agent. An Investment Term Sheet (the "**Investment Term Sheet**") has been included in the Investment Package for verification of the funds that will be wired to the Settlement Agent for disbursement and the funds will be disbursed as described on the Investment Term Sheet.

The Settlement Agent is authorized to disburse proceeds to the Homeowner(s) on the Disbursement Date contained herein, provided neither Hometap nor the Homeowner(s) have notified Settlement Agent in writing that the Homeowner(s) has elected to cancel the transaction. Settlement Agent will notify Hometap if the Homeowner(s) contacts Settlement Agent to rescind the transaction.

**IN CASE OF INVESTMENT DOCUMENTS NOT SIGNED**

If the Investment Documents are not executed, please contact Hometap at the phone number contained herein to receive further instructions, including any instruction to return funds to Hometap.

**COPIES OF INVESTMENT DOCUMENTS**

The Settlement Agent will provide unsigned copies of all Investment Documents to the Homeowner(s) at the signing appointment. After the file disburses, Settlement Agent will return the fully executed Investment Documents to Hometap and will then submit any recordable documents to the County Recorder's office. Once recorded, the original recorded documents will be returned to Hometap at **800 Boylston Street, 16th Floor, Boston, MA 02199**, or to an alternative location designated by Hometap in advance. Shipping charges incurred are the responsibility of the Settlement Agent. The settlement fees should include this charge.

**IN WITNESS WHEREOF,** intending to be legally bound, the parties hereto have caused this Agreement to be executed as of the Signing Date. This Agreement may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement.

**HOMETAP INVESTMENT PARTNERS II, L.P.**

By: Hometap Holdings II, LLC,
Its General Partner

By: ______________________________

Name: ______________________________

Title: ______________________________

Date: ______________________________

Acknowledgment Certificate

Commonwealth of Massachusetts

County of Suffolk

On this ________ day of ______________________, 20____, before me, the undersigned notary public, personally appeared ______________________, proved to me through satisfactory evidence of identification, which was ______________________, to be the person whose name is signed on the preceding or attached document in my presence, and acknowledged to me that he signed it voluntarily for its stated purpose.

______________________________
Notary Public Signature

My commission expires ______________________

**IN WITNESS WHEREOF**, intending to be legally bound, the parties hereto have caused this Agreement to be executed as of the Signing Date. This Agreement may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement.

**OWNER(S)**

By: ______________________________
Larry E. Fisher

Date: ______________________________

By: ______________________________

Date: ______________________________

Notice Address:

21597 Juego Circle, Unit 6D, Boca Raton, FL 33433

**IN WITNESS WHEREOF**, intending to be legally bound, the Parties have executed this Memorandum as of the Signing Date by their signatures below. This Memorandum may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same Memorandum.

**HOMETAP INVESTMENT PARTNERS II, L.P.**

By: Hometap Holdings II, LLC,
Its General Partner

By: ______________________________

Name: ____________________________

Title: ____________________________

Date: ____________________________

Acknowledgment Certificate

Commonwealth of Massachusetts

County of Suffolk

On this ________ day of ______________________, 20_____, before me, the undersigned notary public, personally appeared ______________________, proved to me through satisfactory evidence of identification, which was __________________, to be the person whose name is signed on the preceding or attached document in my presence, and acknowledged to me that he signed it voluntarily for its stated purpose.

______________________________
Notary Public Signature

My commission expires ________________________

**IN WITNESS WHEREOF**, intending to be legally bound, the Parties have executed this Memorandum as of the Signing Date by their signatures below. This Memorandum may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same Memorandum.

**OWNER(S):**

By: ________________________________________
Larry E. Fisher

Date: ________________________________________

By: ________________________________________

Date: ________________________________________

# Exhibit A

Property Description

All that certain land situate in Palm Beach County, State of Florida, viz:

Unit 6-D, Vistas of Boca Lago, a Condominium, according to the Declaration of Condominium thereof, as recorded in Official Records Book 2495, Page 1, and all amendments thereto, of the Public Records of Palm Beach County, Florida, together with an undivided interest or share in the common elements appurtenant thereto.

Parcel ID / APN: 00-42-47-20-02-000-0604

**OWNER DECLARES THAT OWNER HAS READ THIS MORTGAGE AND SECURITY AGREEMENT, UNDERSTANDS IT, HAS RECEIVED A COMPLETELY FILLED-IN COPY OF IT WITHOUT CHARGE THEREFOR, AND HAS SIGNED IT AS OF THE SIGNING DATE.**

IN WITNESS WHEREOF, each undersigned Mortgagor has executed this Mortgage and Security Agreement under seal as of the Signing Date.

**MORTGAGORS:**

By: ________________________________________

Larry E. Fisher

Date: ________________________________________

By: ________________________________________

Date: ________________________________________

**The undersigned Owner(s) requests that a copy of any Notice of Default or Notice of Sale under this Security Instrument be mailed to the Owner at the Owner's address set forth in Section 20 above.**

**MORTGAGORS:**

By: ________________________________________

Larry E. Fisher

Date: ________________________________________

By: ________________________________________

Date: ________________________________________

# COMPLIANCE AGREEMENT

INVESTMENT NO.: FL999199

HOMEOWNER(S): Larry E. Fisher

DATE: 04/21/2021

INVESTOR: Hometap Investment Partners II

PROPERTY ADDRESS: 21597 Juego Circle, Unit 6D, Boca Raton, FL 33433

The undersigned Homeowner(s) agree if requested by Investor, or someone acting on behalf of Investor, to fully cooperate and adjust for clerical errors found in/on any documentation prepared and executed in connection with the consummation of your investment if deemed necessary or desirable in the reasonable discretion of the Investor.

The Homeowner(s) agree(s) to comply with any such requests within thirty (30) days from date of such requests. The provisions of this agreement shall survive the execution of the Investment.

Dated effective this 2021 day of April.

Larry E. Fisher

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re Larry Edward Fisher, Case No. 26-18759-MAM
Fisher v. Hometap Investment Partners II, L.P., et al.

# EXHIBIT L

All preserved OPA photographs from Fisher's retained paper set, including duplicates, plus the signed Compliance Agreement.

*Source pages follow in preserved order. Existing source-page exhibit identifiers and legacy packet-reference markings are retained for stable pinpoint citation; they do not alter the source document text.*

Investment No.: FL999199

**THIS IS NOT A LOAN.**

**THIS IS AN AGREEMENT PURSUANT TO WHICH A HOMEOWNER RECEIVES PAYMENT IN EXCHANGE FOR AN OPTION TO PURCHASE A SPECIFIED PERCENTAGE INTEREST IN THE HOMEOWNER'S HOME THAT MAY BE EXERCISED IN THE FUTURE UPON THE OCCURRENCE OF CERTAIN EVENTS SUCH AS A SALE OF THE HOME.**

# OPTION PURCHASE AGREEMENT

This Option Purchase Agreement (this "**Agreement**") is entered into as of the date of last signature (the "**Signing Date**") by and between Hometap Investment Partners II, L.P., a Delaware limited partnership with its principal offices at 800 Boylston Street, 16th Floor, Boston, MA 02199 ("**we**", "**our**", "**us**", and/or "**Hometap**"), and the homeowner(s) set forth on the signature page attached hereto under the heading of "Owner" ("**you**", "**your**", and/or the "**Owner**"). Capitalized terms used in this Agreement but not otherwise defined shall be defined as set forth in the Investment Term Sheet (as defined below).

**WHEREAS,** Hometap wishes to purchase an exclusive and irrevocable option to acquire, in the future, a percentage possessory interest in Owner's home according to the terms and conditions of this Agreement and to provide the Owner with consideration in exchange for granting such an option;

**WHEREAS,** the Owner wishes to grant Hometap the requested option according to the terms and conditions of this Agreement in exchange for the Investment Amount and understands that by doing so, Hometap shall immediately have a contractual and economic interest in the Owner's home that may be exercised in the future, at which time Hometap may have a possessory interest in the Owner's home;

**WHEREAS,** Hometap wishes to protect its economic interest in the Option through the mechanisms identified in this Agreement and the concurrent Mortgage and Security Instrument, and these and other documents shall be recorded in a manner to establish the priority of Hometap's economic interest;

**WHEREAS,** as of the Signing Date, the Owner and Hometap have conducted and completed the execution of this Agreement (the "**Investment Signing**") at which the Owner has reviewed, confirmed, executed, and returned to Hometap a full, complete, and accurate Investment Term Sheet (the "**Investment Term Sheet**"), which together with this Agreement define, among other information, the Beginning Home Value, Investment Amount, Net Investment Amount, Hometap Percentage, Hometap Share, and Investment Fee;

**WHEREAS,** as of the Signing Date, Hometap has deposited the Investment Amount, as set forth in the Investment Term Sheet, in escrow with the Settlement Agent, which shall be disbursed upon the Effective Date in accordance with the terms and conditions of this Agreement;

**WHEREAS,** the Investment Term Sheet sets forth certain fees, costs, and expenses that Hometap shall incur and/or charge to the Owner in connection with its purchase of the Option;

**WHEREAS,** the Investment Term Sheet is attached and made a part of this Agreement as Schedule A; and

**WHEREAS**, in reliance upon the Investment Term Sheet, and the terms and conditions set forth in this Agreement, Hometap wishes to purchase the Option, and the Owner wishes to sell the Option and accept the Investment Amount, as described in this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Owner and Hometap agree as follows:

**SECTION 1**
**OPTION PURCHASE**

Section 1.1 Option and Hometap Percentage. You agree to sell to Hometap an exclusive and irrevocable option (the "**Option**") to acquire an undivided percentage interest (the "**Hometap Percentage**") of fee simple title ownership in that certain residential real property owned by the Owner as more fully identified and described on Exhibit A (the "**Property**"), which is attached and made a part of this Agreement. The Property will include only the real property described in Exhibit A and fixtures appurtenant thereto, as covered by a UCC-1 Financing Statement, as more fully set forth in Section 1.2(a)(v) below.

Section 1.2 Agreement Execution and Delivery. In connection with the execution and delivery of this Agreement, the Settlement Agent has conducted the Investment Signing, at which you have:

(a) Executed and delivered to the Settlement Agent originals of the following documents (each as well as other documents completed and delivered in connection with the consummation of the transactions contemplated by this Agreement an "**Investment Document**", and together the "**Investment Documents**"):

(i) this Agreement;

(ii) the Investment Term Sheet;

(iii) a notarized Memorandum of Option Purchase Agreement summarizing the provisions of this Agreement, substantially in the form set forth in Exhibit B, which is attached and made a part of this Agreement (the "**Memorandum of Option**");

(iv) a notarized Mortgage and Security Instrument substantially in the form set forth in Exhibit C, which is attached and made a part of this Agreement (the "**Mortgage and Security Instrument**");

(v) a complete and satisfactory UCC-1 Financing Statement substantially in the form set forth in Exhibit D, which is attached and made a part of this Agreement (the "**UCC-1**", and together with the Memorandum of Option and Mortgage and Security Instrument, the "**Security Instruments**");

(vi) a Notice of Right to Cancel, substantially in the form as set forth in Exhibit E, which is attached and made a part of this Agreement; and

(vii) a Consent of Spouse/Domestic Partner, as defined below, if applicable, in form and substance satisfactory to Hometap, and substantially in the form as set forth in Exhibit F, which is attached and made a part of this Agreement

(b) Provided (i) written evid[illegible] been added as a loss payee (or as we otherwise direct) on all of Owner's insu[illegible]y and the Settlement Agent is satisfied

with the evidence thereof or (ii) written authorization for Hometap to be added as a loss payee (or as we otherwise direct) on all of Owner's insurance policies for the Property;

(c) Received the Signing Instructions prepared and provided by the Settlement Agent based upon the Investment Term Sheet, which shall set forth the use and disbursement of the Investment Amount (the "**Signing Instructions**"); and

(d) Provided the Settlement Agent any other documents and information we reasonably request to have completed the Investment Signing and secure and perfect the Option and related documents as a lien upon the Property.

Section 1.3 Right to Cancel.

(a) You have a right to rescind and cancel this Agreement ("**Right to Cancel**") by delivering written notice to us at any time prior to 11:59 p.m. Eastern Time on the third (3rd) Business Day following the Signing Date (the "**Cancellation Period**") of your exercise of your Right to Cancel.

(b) If you exercise your Right to Cancel during the Cancellation Period, then this Agreement shall become null and void and of no further legal effect or consequence, the Investment Amount shall be returned to Hometap, and you and Hometap shall have no further obligations to one another.

(c) If you do not exercise your Right to Cancel during the Cancellation Period, then upon expiration thereof, this Agreement shall become binding and effective upon the parties at 12:00 a.m. Eastern Time on the first Business Day following the Cancellation Period (the "**Effective Date**").

(d) For purposes of this Agreement, a "**Business Day**" shall be all calendar days except Sundays and any day that is a federal banking holiday in the United States.

Section 1.4 Disbursement of Funds and Recording of Documents. Upon the Effective Date:

(a) Disbursement of Investment Amount and Net Investment Amount. Hometap shall cause the Investment Amount to be disbursed by the Settlement Agent in accordance with the Settlement Instructions, and the Net Investment Amount shall be delivered and paid to the Owner via wire transfer or check, as instructed by the Owner as soon as reasonably practicable on or following the Effective Date.

(b) Recording of Documents. Hometap shall use commercially reasonable efforts, via the Settlement Agent, to record and file the Security Instruments, as well as any other documents evidencing the satisfaction of liens or encumbrances on the Property as a result of the payments made pursuant to the Settlement Instructions with the appropriate county recorder or other applicable governmental, city, county, or municipal office in which the Property is situated. You agree to take any reasonable actions and sign any additional documentation deemed necessary or desirable by Hometap to allow Hometap to record and file the Security Instruments and any related documents.

Section 1.5 Option Period. The term of the Option (the "**Option Period**") shall commence on the Effective Date and shall continue until the earlier of (a) an Owner Repurchase (as defined below), (b) a Hometap Option Exercise (as defined below), or (c) 11:59 p.m. Eastern Time on the tenth (10th) anniversary of the Effective Date (the "**Expiration Date**"); *provided, however*, that Hometap may extend the Option Period one or more times by up to a total of an additional ten (10) years, by providing you with written notice (an "**Extension Notice**") of our intent to extend the Option Period prior to the Expiration Date or the conclusion of any Extension Period (as defined below). Any Extension Notice shall include the period for which Hometap intends to extend the Option Period (such period being the "**Extension Period**", and the

Option Period and any Extension Period collectively being the "**Effective Period**"), and upon any such extension, the Expiration Date shall be accordingly extended to the last day of any Extension Period. The Extension Period shall continue until the earlier of (a) an Owner Repurchase (as defined below), (b) a Hometap Option Exercise (as defined below), or (c) 11:59 p.m. Eastern Time on the last day of the Extension Period.

## SECTION 2
## OPTION CONDITIONS

Section 2.1 Determination of Ending Home Value. The "**Ending Home Value**" shall be (i) determined by the Appraisal Process (as defined below in Section 2.3) or (ii) in the event of a Permitted Sale (as defined below in Section 2.6(a)), the sale price of the Property, provided that such price is at least ninety percent (90%) of the value of the Property determined by the Appraisal Process.

Section 2.2 Calculation of the Hometap Share. The "**Hometap Share**" represents the value of Hometap's interest in the Property by virtue of the Option and shall be determined by multiplying (a) the Hometap Percentage, as set forth in the Investment Term Sheet, by (b) the Ending Home Value; *provided, however*, that the Hometap Share shall not exceed an amount equal to an annualized rate of return of twenty percent (20%) on the Investment Amount ("**Hometap Cap**"), as further described in the Investment Term Sheet.

Section 2.3 Appraisal Process.

(a) Physical Appraisal. For purposes of this Agreement, a "**Physical Appraisal**" shall mean a physical inspection and appraisal of the Property that meets the following criteria:

(i) the appraiser will be selected by us or approved in advance by us;

(ii) the appraiser must be unaffiliated with either you or us or any other individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government, or any agency or political subdivision of any of the foregoing (each a "**Person**") with an interest in the Property, such as a potential third-party buyer;

(iii) the inspection and appraisal of the Property must be done in compliance with the Uniform Standards of Professional Appraisal Practice; and

(iv) the Owner shall be responsible for payment of Appraisal costs.

(b) Second Physical Appraisal. In any circumstance where the Ending Home Value is being determined by an Appraisal under the terms of this Agreement, either the Owner or Hometap shall have the right to order and complete a second Physical Appraisal. If either party desires to have a second Physical Appraisal, then (a) the second Physical Appraisal must be completed (not just requested or ordered) within thirty (30) days after receiving final results of the first Appraisal and at least ten (10) Business Days before any scheduled closing or settlement, and (b) the Ending Home Value will then be the average of the value of the two Appraisals. Notwithstanding anything in this Agreement to the contrary, the party requesting a second Physical Appraisal shall bear the costs associated with such second Physical Appraisal. The process of undertaking and completing one or two Appraisals under this Agreement shall be referred to as the "**Appraisal Process**".

(c) Alternative Appraisal. Notwithstanding the requirements of Section 2.3(a) above, Hometap may elect to utilize an alternative method of appraisal (an "**Alternative Appraisal**") in lieu of a Physical Appraisal and such Alternative Appraisal shall be deemed binding for all purposes under this Agreement as if such Alternative Appraisal was a Physical Appraisal, subject to the rights of the Owner or Hometap to request a second Physical Appraisal pursuant to Section 2.3(b) above.

(d) Appraisal. For purposes of this Agreement, the singular or plural term "**Appraisal**" shall include, in Hometap's sole discretion, either a Physical Appraisal as defined in Section 2.3(a) or an Alternative Appraisal as defined in Section 2.3(c).

(e) Cooperation. Each party agrees to comply with the Appraisal Process and cooperate in good faith with any third-party vendors so that the Physical Appraisal(s) may be completed in a timely and effective manner.

(f) Notice. If applicable, Hometap shall deliver to you written notice of the Ending Home Value and the Hometap Share within ten (10) Business Days after completion of the Appraisal Process.

(g) Cost of Physical Appraisals. You will pay all reasonable costs and expenses associated with any Physical Appraisal ordered, scheduled, or conducted in accordance with the terms of this Agreement.

Section 2.4 Owner Repurchase.

(a) Owner Right to Repurchase. The Owner shall have the right to repurchase the Option (an "**Owner Repurchase**") from Hometap in the amount of the Hometap Share in accordance with the terms and conditions of this Agreement.

(b) Repurchase Notice. You may elect to complete an Owner Repurchase at any time during the Effective Period, regardless of whether a Transfer is contemplated, by delivering to us written notice (a "**Repurchase Notice**"). Within fifteen (15) Business Days of our receipt of a Repurchase Notice, we shall have the right to conduct the Appraisal Process, at your cost, and determine the Ending Home Value for purposes of calculating the Hometap Share. Within ten (10) Business Days after completion of the Appraisal Process, Hometap shall deliver to you written notice of the Ending Home Value and the Hometap Share and schedule a settlement of the Owner Repurchase (the "**Repurchase Settlement**").

(c) Confirmation of Title. Upon receipt of your Repurchase Notice, we may request, as evidenced by a completed title report, at your cost, confirmation of good and marketable title in and to the Property in fee simple and free of any Liens and Encumbrances (as defined below in Section 2.6(a)(iii)), subject only to the Permitted Encumbrances (as defined below in Section 2.6(a)(iii)), to be provided in the form either (i) of a policy of title insurance issued to, or for the benefit of, Hometap and insuring our rights under the Investment Documents; or (ii) of a written title report, abstract of title, or other title search documentation reflecting, to our satisfaction, confirmation of good and marketable title to the Property (either such form of confirmation being "**Confirmation of Title**").

(d) Transfer. In the event of a Transfer (as defined below in Section 2.5(a)), you agree to follow all procedures set forth below in Section 2.6 in addition to those provided herein in Section 2.4. Should any procedures be inconsistent, those procedures in Section 2.6 shall control.

(e) Expiration. In the event of the Expiration Date, you agree to follow all procedures set forth below in Section 2.7 in addition to those provided herein in Section 2.4. Should any procedures be inconsistent, those procedures in Section 2.7 shall control.

(f) Sufficiency of Tender. Hometap retains the right to reject any tender by you of the Hometap Share payment where we believe your tender is not for the full amount of the Hometap Share, is not actually received by us, is not tendered within the time frame agreed to by you and us, or is subject to any legal limitation.

(g) Termination of Option. Upon our receipt of the Hometap Share payment, the Option shall be terminated, and we will have no further right to exercise the Option or have any further interest whatsoever in the Property. After our receipt of the Hometap Share (together with any other amounts owed by Owner to Hometap under the terms of this Agreement), we will terminate and release the Security Instruments and deliver any other documents reasonably required to verify the termination of the Option and release of the Security Instruments. Owner will be responsible for all Closing Costs as defined and set forth in Section 2.6(d)(iv) below.

Section 2.5 Hometap Right to Exercise Option. Unless and until you elect and complete an Owner Repurchase, Hometap shall have the right to exercise the Option (a "**Hometap Option Exercise**"), as provided for below in Section 3.1, upon any of the following events or occurrences during the Effective Period:

(a) any Permitted Sale (as defined below in Section 2.6(a)), or other sale, exchange, transfer, conveyance, or assignment of all or any part of the Property or any legal or beneficial interest in the Property (any such occurrence being a "**Transfer**"), as provided below in Section 2.6; *provided, however*, that any Transfer to a surviving Owner or estate of an Owner in the event of a death of an Owner shall not trigger a Hometap Option Exercise;

(b) on or in anticipation of the Expiration Date, as provided below in Section 2.7;

(c) upon an Event of Default, as provided below in Section 7;

(d) upon destruction of the Property as provided below in Section 6.1(d); or

(e) upon condemnation of the Property, as provided below in Section 6.1(h).

Section 2.6 Event of Transfer.

(a) Permitted Sale. For purposes of this Agreement, a "**Permitted Sale**" shall mean a Transfer of the Property that meets the following conditions as determined in Hometap's sole reasonable discretion:

(i) the Transfer must be a transaction entered into in good faith without fraud or deceit carried out by unrelated or unaffiliated parties, by a willing buyer and a willing seller, each acting in his or her own self-interest, in which the sale price represents fair market value of the Property (an "**Arm's Length Transaction**"); *provided, however*, that an Arm's Length Transaction does not include any of the following: (A) a transaction between family members or business associates at less than fair market value of the Property, (B) a transaction subject to hidden terms or agreements or special understandings between the parties, whether written or oral (for example, the seller to regain ownership of the Property or the buyer to resell the Property and the seller to receive any proceeds from the resell transaction), or (C) a Transfer in which the sale price of the Property is less than ninety percent (90%) of the fair market value as determined by an Appraisal;

(ii) the terms and conditions of an Arm's Length Transaction will be set forth in a commercially reasonable standard form of Agreement for the Purchase and Sale of Real Property (a "**P&S**") prepared and negotiated by legal counsel with experience in such matters; and

(iii) you must convey title free and clear of any and all (A) licenses, easements, equitable servitudes, public bond obligations, and other conditions, covenants, restrictions and rights to which the Property is subject (collectively, "**Liens and Encumbrances**"), except for those: (1) that are stated as exceptions in the Confirmation of Title, or (2) to which we have expressly agreed in writing that the Property will remain subject (such excepted Liens and Encumbrances being "**Permitted Encumbrances**"), and (B) loans or other obligations (such items being "**Senior Liens**"), or any other liens on the Property to secure the payment of any loans or the performance of any obligations owed to any creditor or third-party vendor.

(b) Notices and Documentation upon Proposed Transfer. In connection with any Transfer, the Owner agrees as follows:

(i) Permitted Sale: Owner Notice of Binding Offer. In the event of a Permitted Sale, Owner shall provide Hometap written notice (a "**Binding Offer Notice**") of any binding offers to Transfer the Property to any Person who proposes to purchase the Property (a "**Third-Party Buyer**"). Such Binding Offer Notice must be delivered within three (3) Business Days of receiving such binding offer and, in any event, no less than thirty (30) days prior to the proposed closing date for such Permitted Sale. Any binding offers shall be in form and substance that are typical of real property purchases and sales for the state in which the Property is located and shall be required to include terms and conditions evidencing an Arm's Length Transaction. A Binding Offer Notice shall include a full and complete copy of the binding offer, which must include the name of the Third-Party Buyer, the sale price, the proposed closing date for the Permitted Sale, the proposed inspection date, if any, and any and all other material terms and conditions of the proposed Permitted Sale, including, without limitation, any financing or mortgage contingencies. The Binding Offer Notice must also indicate whether the Owner intends to complete an Owner Repurchase prior to, or simultaneous with, the closing of the Permitted Sale.

(ii) All Other Transfers: Owner Notice of Transfer. In the event of any Transfer other than a Permitted Sale, Owner shall provide Hometap written notice (a "**Transfer Notice**") no less than thirty (30) days prior to the closing date for such Transfer. A Transfer Notice shall include a full and complete copy of the documents governing the Transfer, which must include the name of the transferee, the sale price (if any), the proposed closing date for the Transfer, the proposed inspection date (if any), and any and all other material terms and conditions of the proposed Transfer, including, without limitation, any financing or mortgage contingencies. If the Owner intends for the Transfer to be an Exempted Owner Assignment (as defined below in Section 8.9(b)) or an Exempted Owner Property Transfer (as defined below in Section 8.9(c)), the Owner shall provide any additional necessary documentation in the Transfer Notice. The Transfer Notice must also indicate whether the Owner intends to complete an Owner Repurchase prior to, or simultaneous with, the closing of the Transfer.

(iii) Notice of Hometap Option Exercise upon a Transfer. Following receipt of a Binding Offer Notice or a Transfer Notice in which you do not elect to exercise your right to an Owner Repurchase, and prior to the closing of the proposed Transfer contemplated by such Binding Offer Notice or Transfer Notice, Hometap shall have the right to complete a Hometap Option Exercise, as further described in Section 3.1, by delivering to you a written notice (an "**Exercise Notice**") of our intent to do so. Upon receipt of an Exercise Notice, you (A) shall not consummate any closing of the Transfer unless and until Hometap has completed its Hometap Option Exercise and all actions deemed necessary or advisable by Hometap to document its interest in the Property, and (B) shall promptly, and in no event more than two (2) Business Days from receipt thereof, provide Hometap all documents, binding offers, escrow instructions, preliminary title reports, and any other materials and information relating to the proposed Transfer that become available.

Following receipt of such materials, Hometap shall use commercially reasonable efforts to complete its Hometap Option Exercise and all actions deemed necessary or advisable by Hometap to document its interest in the Property prior to any closing of a Transfer.

(c) Appraisal Process upon Transfer. Within fifteen (15) Business Days of receiving notice of your election to exercise the Owner Repurchase or our delivering you an Exercise Notice, we may undertake the Appraisal Process and conduct an Appraisal.

(d) Transfer Closing. Any Transfer shall be completed through a closing process (the "**Transfer Closing**") that is commercially reasonable and follows standard practices and procedures for the purchase and sale of real property in the state in which the Property is located, including without limitation using the services of a Settlement Agent. The Owner shall provide written notice (the "**Transfer Closing Notice**") to Hometap promptly, and in any event no later than ten (10) Business Days prior to the date of the Transfer Closing. The Transfer Closing Notice shall include the proposed date of the Transfer Closing, and any and all relevant documents related to such Transfer Closing, including written settlement instructions, identification and acknowledgement of an Owner Repurchase or Hometap Option Exercise, and instructions for the payment of the Hometap Share. Hometap shall have the right to (A) review and provide input on any such settlement instructions and (B) have a representative attend the Transfer Closing. The Owner acknowledges and agrees that the completion of an Owner Repurchase or Hometap Option Exercise shall be concurrent with a Transfer Closing.

(i) Transfer Closing Deliverables. On or prior to a Transfer Closing where there will be an Owner Repurchase or a Hometap Option Exercise, you agree to deliver to the Settlement Agent the appropriate deeds, affidavits, certificates, notices, and other documents required by law, the Settlement Agent or us, in form satisfactory to us, to effect the Owner Repurchase or the Hometap Option Exercise.

(ii) Payment Allocations. At any Transfer Closing where there will be an Owner Repurchase, the Owner shall be responsible for paying Hometap the Hometap Share, as well as any Closing Costs (as defined below in Section 2.6(d)(iv)).

(iii) Termination and Release by Hometap at Transfer Closing. Within ten (10) Business Days of any Transfer Closing, and contingent upon our receipt of the Hometap Share funds, we will submit the documents necessary to terminate and release the Security Instruments.

(iv) Closing Costs. Owner shall pay all costs in connection with a Transfer Closing or Repurchase Settlement including, without limitation, recording fees and costs, reconveyance fees, lien release fees, escrow fees, title insurance fees, federal, state, local and documentary transfer taxes ("**Closing Costs**") and all sales commissions ("**Sales Commissions**"). Closing Costs and Sales Commissions shall be paid from the amounts that are owed to Owner and not from any amounts that are owed to Hometap; *provided, however*, that Owner shall pay Hometap directly for any Closing Costs or Sales Commissions incurred by Hometap and as detailed on the settlement instructions provided by Hometap to Owner.

Section 2.7 Event of Expiration Date.

(a) In the event that the Option remains in effect and has not been, nor is the subject of, a Hometap Option Exercise or Owner Repurchase, then (i) the Owner has the right to complete an Owner Repurchase as of the Expiration Date, and (ii) Hometap shall have the right to complete a Hometap Option Exercise as of the Expiration Date (either an Owner Repurchase as of the Expiration Date or a Hometap Option Exercise as of the Expiration Date being an "**Expiration Settlement**"), each implemented by

delivering written notice to the other party (either a Repurchase Notice or Exercise Notice, as appropriate) prior to the Expiration Date.

(b) Any Owner Repurchase or Hometap Option Exercise shall follow the procedures, terms, and conditions of Section 2.4 and Section 3.1, respectively. Should any provisions be inconsistent, those provisions of this Section 2.7 shall control.

(c) If we are not satisfied with the Ending Home Value following the Appraisal Process, or with the Confirmation of Title, we may withdraw or reject the Expiration Settlement without any penalty to us, and extend the Effective Period as provided in this Agreement.

## SECTION 3
## EXERCISE OF OPTION; OTHER TERMINATION OF OPTION

Section 3.1 Exercise of Option. Exercise of the Option shall allow Hometap to acquire a percentage possessory ownership interest in the Property equivalent to the Hometap Percentage at the time of exercise.

(a) Exercise Notice. Upon our election to exercise our right to a Hometap Option Exercise, we shall provide you with an Exercise Notice at least thirty (30) days prior to the anticipated date for closing the Hometap Option Exercise (**"Exercise Closing"**). The Exercise Notice shall specify the Exercise Closing date, the Exercise Payment (as defined below in Section 3.1(e)), written settlement instructions, and instructions for release of the Security Instruments upon completion of the Hometap Option Exercise.

(b) Hometap Ownership. In Hometap's sole discretion, we may implement the Hometap Exercise Option by (i) taking joint ownership of the Property with you and (ii) soliciting a Transfer of the entire Property, including your interest, to one or more Third-Party Buyers, and receiving the Hometap Share and the Exercise Payment in connection with such Transfer. Hometap's ownership of the Property shall be a percentage possessory interest in the Property equivalent to the Hometap Percentage at the time of the Hometap Option Exercise. If Hometap takes joint ownership of the Property, the legal form of such joint ownership will be decided by us, which may include a trust with you and us as beneficiaries.

(c) Owner Repurchase. After receiving the Exercise Notice, you may exercise your right to elect an Owner Repurchase pursuant to Section 2.4 above; *provided that* (i) you deliver a Repurchase Notice to Hometap at least twenty (20) days before the Exercise Closing date; (ii) the Repurchase Settlement must (A) occur (1) within fifteen (15) days of you providing us with a Repurchase Notice, and (2) prior to any scheduled Exercise Closing, and (B) use an Ending Home Value that is the value of the Property as determined by an Appraisal. If you elect to make an Owner Repurchase but the Repurchase Settlement is not completed within the prescribed periods in this Section 3.1(c), then (1) your right to make an Owner Repurchase may be terminated, and (2) we may elect to immediately exercise a Hometap Option Exercise.

(d) Exercise Closing. You agree to take any reasonable actions and sign any documentation deemed necessary or desirable by Hometap to allow Hometap to complete the Hometap Option Exercise, including without limitation participating in an Exercise Closing, and to effect our Hometap Percentage possessory interest in the Property.

(e) Disbursement of Exercise Closing Payment. In consideration for the Hometap Percentage possessory interest in the Property, Hometap shall issue a payment to you in the amount of one percent (1%) of the Investment Amount (**"Exercise Payment"**). Hometap shall cause the Exercise Payment to be disbursed by the Settlement Agent in accordance with the Exercise Notice, and the Exercise Payment shall be delivered and paid to the Owner via wire transfer or check, as instructed by the Owner, as soon as reasonably practicable at or following the Exercise Closing.

(f) Recording of Documents. Hometap shall use commercially reasonable efforts, via the Settlement Agent, to record and file the any documents evidencing the Hometap Option Exercise and the Hometap Percentage possessory interest in the Property with the appropriate county recorder or other applicable governmental, city, county, or municipal office in which the Property is situated. You agree to take any reasonable actions and sign any additional documentation deemed necessary or desirable by Hometap to allow Hometap to record and file such documents.

(g) Transfer Following Hometap Option Exercise.

(i) Occupancy. Prior to a Transfer, you will retain physical possession and the exclusive right to occupy the Property (except if we determine that the Property is at risk of waste or gross neglect, in which case we will have discretionary rights of entry or possession solely in order to preserve and maintain the Property).

(ii) Initiation of Transfer by Owner. If you intend to initiate a Transfer, such Transfer shall meet the conditions of a Permitted Sale as described above in Section 2.6(a). Furthermore, you agree to comply with the requirements of Section 2.6 in completing the Transfer.

(iii) Initiation of Transfer by Hometap. If we choose to initiate a Transfer, we will provide you with written notice at least ten (10) Business Days prior to soliciting buyers and transferring the Property to one or more third parties in a Transfer. You will cooperate by allowing access to the Property and promptly executing all documents presented to you by us to effect a Transfer of your interest in the Property to the Third-Party Buyer.

(iv) Ending Home Value and Payment of the Hometap Share. In any Transfer following a Hometap Option Exercise, the Ending Home Value will be the sale price of the Property. At the Transfer Closing for such Transfer, the sale proceeds will be allocated and paid in the manner described in this Section 3.1 and above in Section 2.6(d)(ii), and we will be paid (A) any Closing Costs that we paid as further detailed in Section 2.6(d)(iv) and (B) any other amounts paid by us related to the preparation, marketing, or sale of the Property.

Section 3.2 Non-Exercise; Other Terminations of Option. Subject to the continuing duties, rights, and obligations of the parties in this Agreement, the Option will terminate under the following conditions if there has not been a prior Owner Repurchase or Hometap Option Exercise:

(a) upon a Permitted Sale for which we received a Binding Offer Notice, as provided above in Section 2.4(b)(1), and we affirmatively elected not to exercise the Option and complete a Hometap Option Exercise;

(b) we elect not to complete a Hometap Option Exercise as of the Expiration Date and allow the Option to lapse as of the Expiration Date;

(c) the Property is destroyed and the insurance proceeds and proceeds of any sale of the Property are paid to us in the full amount specified below in Section 6.1(d);

(d) the Property is condemned, in whol[illegible] in part, and the condemnation proceeds are paid to us in the full amount specified below in Secti[illegible].1(h); or

(e) we voluntarily terminate the Option in a written notice delivered by us to you.

Section 3.3 Effect of Non-Exercise and Termination. If the Option is terminated as provided above in Section 3.2, then:

(a) the Option and our rights to exercise the Option will immediately terminate;

(b) the Investment Amount will be retained by you in consideration for the Option;

(c) subject to any survival provisions, this Agreement and any and all the other Investment Documents will terminate and be of no further legal force or effect; and

(d) we will execute, acknowledge, deliver to you, and record and file with the appropriate county recorder or other applicable governmental, city, county, or municipal office in which the Property is situated a termination and release of the Memorandum of Option, a reconveyance of the Security Instruments (including the filing of a termination statement to terminate the UCC-1), and any other documents reasonably required to verify the termination of the Option and the Investment Documents; *provided, however*, that certain obligations and provisions of this Agreement will survive such termination as provided below in Section 8.10.

## SECTION 4
## OWNER REPRESENTATIONS AND WARRANTIES

Section 4.1 Owner Representations and Warranties. The truth, accuracy, and completeness of the representations and warranties set forth in this Section 4.1 are a condition precedent to any of Hometap's obligations under each of the Investment Documents. The Owner hereby represents and warrants to Hometap as of the Effective Date, and hereby renews and reiterates such representations and warranties upon any consummation of a Hometap Option Exercise or Owner Repurchase as provided for in this Agreement, as follows:

(a) Title to Property. You, as Owner(s) identified in this Agreement, individually and collectively, appear on record title of the Property as holding fee simple title to 100% of the Property. There are no other Persons who have a claim to any title to the Property, and all Owners are identified in this Agreement. Your fee simple title to the Property is marketable and insurable, free of any Liens and Encumbrances, except for any Permitted Encumbrances, and there are no additional existing or pending Liens and Encumbrances, or any other claims, restrictions, or other interests against the title to the Property.

(b) Capacity and Authority. You have the full capacity and the legal power, right, and authority to grant the Option, to enter into this Agreement and the other Investment Documents, and to consummate the transactions contemplated hereby and thereby.

(c) Trust. If you are the Trustee of a Revocable Trust: (a) the trust has been duly formed; (b) the Trustees of the trust have the capacity and authority to enter into this Agreement and the other Investment Documents; and (c) true, accurate, and complete copies of all trust documents (and all amendments and supplements) have been delivered to us. For purposes of this Agreement, a "**Revocable Trust**" shall mean a revocable trust, revocable living trust, inter vivos trust, revocable family trust or similar trust established in accordance with the laws of any state.

(d) No Lawsuits, Claims, Bankruptcy, or Foreclosures. There is no litigation or arbitration pending, or to your knowledge, threatened against you relating to your ownership of the Property or that might adversely affect your title to the Property, the Property itself, the value of the Property, the Hometap Share, Hometap's rights herein, or your ability to perform your obligations under this Agreement. You have not received nor are you aware of any: (a) special assessment or other proceedings affecting the Property;

(b) default or notice of default with respect to any loan or other obligation secured by the Property; (c) notice of sale with respect to any lien or deed of trust or mortgage (as appropriate) on the Property; or (d) information or notice that the Property is to be sold or foreclosed upon by a Person holding a lien on the Property.

(e) <u>No Violations</u>. There are no violations of, or claims of violation of, any laws, regulations, zoning ordinances or other land-use regulations relating to the Property and all operations or activities upon, or use or occupancy of the Property or any portion of the Property, by you or others comply with law, including local laws and zoning ordinances.

(f) <u>Environmental Matters</u>. To your knowledge, there are no violations of, or claims of violation of, any state, federal, or local environmental law or regulation relating to the Property, including those concerning hazardous materials (**"Environmental Laws"**). To your knowledge, no hazardous materials are present on, in, or about the Property or property in the vicinity of the Property. You will not, and will not allow others to, violate any laws, including, without limitation, Environmental Laws, relating to the Property or perform any activities upon, or use or occupy the Property or any portion of the Property, in any manner that violates any laws, including, without limitation, Environmental Laws.

(g) <u>Documentation and Information Supplied by Owner; Financial Condition of Owner</u>. Your application to us and all financial and other documentation and other information supplied or made available by you or your spouse or co-owner, if applicable, as part of applying for, or in connection with entering into, this Agreement, the Option, and the Investment Documents is truthful, complete, not misleading, and fairly and accurately reflects your (and, if applicable, your spouse's or co-owner's) financial condition as of (a) the date supplied and (b) the Effective Date. There has been no material change in your financial condition as of the Effective Date since your application to us. To your knowledge, there has not been any change in the condition or value of the Property since the date of any Appraisal conducted prior to the Effective Date.

(h) <u>New Debt or Obligations</u>. Since the date on which you initiated discussions with Hometap, you have not incurred (or agreed to incur) any additional obligations with respect to the Property such as additional debt or other investments in the equity or appreciation of the Property, nor have any additional liens been placed (or, to your knowledge, will be placed) on the Property, in each case other than where you have provided written notification to Hometap of such debt, obligations, or liens.

(i) <u>Not a Loan</u>. You acknowledge and understand that the payment of the Investment Amount by Hometap is not a loan or any other form of financing transaction, swap, or futures contract. Under no circumstances will the Investment Amount accrue interest, and if the Option expires, then you will not be obligated to return or repay the Investment Amount.

(j) <u>Conflict; Enforceability</u>. The execution, delivery, and performance of the Investment Documents will not conflict with, or result in a breach of, any of the terms, conditions, or provisions of, or constitute a default under, any note or other evidence of indebtedness or any contract, indenture, mortgage, deed of trust, loan, agreement, lease, or other agreement or instrument to which you are a party or by which the Property may be bound. The Investment Documents and all other documents required to be executed by you in connection with those documents are and will be valid, legally binding obligations of, and enforceable against, you and any successors or permitted assignees in accordance with their terms.

## SECTION 5
## HOMETAP REPRESENTATIONS AND WARRANTIES

Section 5.1 Hometap Representations and Warranties. Hometap hereby represents and warrants to the Owner as of the Effective Date, and hereby renews and reiterates such representations and warranties upon any consummation of a Hometap Option Exercise or Owner Repurchase as provided for in this Agreement, as follows:

(a) Authority. Hometap is a duly established and organized Delaware limited partnership, is in good standing in all jurisdictions in which it is qualified to do business, and is duly authorized to execute and deliver this Agreement, to enter into transactions contemplated hereunder, and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery, and performance.

(b) Enforceability. Hometap's obligations under this Agreement and any related agreement to which it is a party constitute its legal, valid, and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium, or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

## SECTION 6
## COVENANTS

Section 6.1 Owner Covenants. During the Effective Period, the Owner hereby agrees to comply with and satisfy and observe the following covenants:

(a) Maintain Mortgage, Liens and Encumbrances and Other Secured Obligations. You shall (i) maintain, pay, keep current, and comply with any and all obligations, maintenance requirements, and covenants under your primary mortgage and any and all other mortgages, loans, and obligations that are senior to the lien established by the Security Instruments, the covenants running with the land under this Agreement, and the Option, of which (A) we have actual written notice under a title report, title search, or title commitment obtained in connection with this Agreement and the transaction related thereto, and (B) that are acknowledged in writing by us before or upon our execution of this Agreement (each an "**Acknowledged Pre-Existing Lien**"), and you shall notify Hometap promptly in writing of any defaults or potential or pending defaults thereunder; and (ii) at all times keep the Property free of any and all Liens and Encumbrances, except for (A) Acknowledged Pre-Existing Liens, (B) Permitted Encumbrances, and (C) Approved Subsequent Loans (as defined below in Section 6.1(i)(ii)).

(b) Owner Occupied; Right of Occupancy. During the Effective Period, the Owner (or at least one Owner if there are multiple Owners) shall occupy the Property as Owner's principal place of residence ("**Owner Occupied**") other than during periods of vacancy no longer than ninety (90) days due to renovation. In the event you desire for the Property to no longer be Owner Occupied, you must request such change in writing from Hometap, which shall be approved or denied in Hometap's sole discretion. You will enjoy continuous right of occupancy of the Property as an owner, and not as a tenant or lessee, whether or not we have completed a Hometap Option Exercise, subject to the rights of you and Hometap to Transfer the Property pursuant to the terms of this Agreement. Your sole right of occupancy will be effective only so long as you do not Transfer or attempt to Transfer the Property except as permitted under this Agreement. Your sole right of occupancy is not transferable by you except as part of a Permitted Sale or Exempted Owner Property Transfer, or as otherwise permitted by us.

(c) Maintain Adequate Insurance Coverage. You will keep the Property and all buildings or other customarily insured improvements upon the Property insured by a nationally recognized insurer acceptable to us against loss by fire, hazards of extended coverage, other hazards common for similar properties in similar locations, and other hazards we may request, in an amount equal or greater than the full insurable value of the Property, but in no event less than the minimum amount necessary to fully compensate for any damage or loss on a replacement cost basis. All such insurance policies will name us and our successors and assigns as a loss payee (or as we otherwise direct). If the Property is or becomes located in an area identified on a flood hazard map or flood insurance rate map issued by the Federal Emergency Management Agency as having special flood hazards, a flood insurance policy meeting the requirements of the guidelines of the Federal Insurance Administration is and will be in effect, which policy is and will be issued by a nationally recognized insurer acceptable to us and provide coverage in an amount equal to not less than the lesser of the full insurable value of the Property or the maximum amount of insurance available under the National Flood Insurance Act of 1968. All such flood insurance policies will name us and our successors and assigns as a loss payee (or as we otherwise direct). You will timely pay all premiums for all such insurance policies and, if you fail to do so, we are authorized to maintain and/or obtain such policies at your cost and expense, and you will immediately reimburse us for such costs and expenses. Hometap is under no obligation to purchase any particular type or amount of coverage. As such, coverage shall cover Hometap but may not protect Owner, Owner's equity in the Property, or the contents of the Property and might provide greater or lesser coverage than was previously in effect. You shall provide written evidence of your compliance with the above at any and all signings, closings, and settlements conducted under this Agreement, or as Hometap may reasonably request from time to time.

(d) Destruction or Loss of Property.

(i) Repair and Restoration. If the Property is destroyed or experiences material damage, you will restore or repair the Property to at least the same condition and characteristics as of the time immediately preceding the destruction or damage, subject to all applicable local ordinances. Except to the extent you are required to take other action in connection with any Senior Lien on the Property, you will apply any insurance proceeds to the restoration or repair. If the insurance proceeds are insufficient to complete the restoration or repair, you will be responsible for any shortfall and we will have no responsibility or obligation to pay any amount whatsoever in connection with the restoration or repair of the Property.

(ii) Allocation Where Repair Not Feasible. If any loss occurs in connection with the Property, and restoration or repair is not economically feasible, you will obtain a Physical Appraisal, *provided that* the appraiser will be instructed to determine the value of the Property as it existed immediately prior to the destruction or damage. Any insurance proceeds, whether or not the underlying insurance was required by us, will be allocated in the following order: (A) to the payment (or reimbursement) of reasonable costs and expenses (including attorneys' fees that have been approved by us) reasonably incurred by you, any lender of a Senior Lien, and/or Hometap in collecting and contesting with the insurers the payments under the insurance policies; (B) to payment of any Senior Lien, *provided that*, if the insurance proceeds equal or exceed the amount owed under any Senior Lien, such payment will result in the discharge of any related Senior Lien; (C) to us, an amount equal to the Hometap Share; and (D) to you, the balance of the proceeds.

(e) Physical Appraisals. In connection with any Physical Appraisal, you will cooperate with the appraiser by granting full access to the Property at reasonable times and by making available any relevant documents in your possession pertaining to conditions that may affect the value of the Property. You will immediately share with us any written Physical Appraisal you receive related to this Agreement.

(f) Renovation.

(i) Owner shall be entitled, in your sole discretion to renovate, modify, or otherwise make physical alterations to the Property (a "**Renovation**"), *provided that* any such Renovation is completed by licensed contractors in accordance with local zoning laws and regulations, properly permitted, and only upon receipt of any approvals from any local, municipal, or state authorities. If the Owner undertakes a single Renovation project with documented aggregate costs in excess of $25,000, then the Owner may provide written notice (a "**Renovation Notice**") to Hometap within ninety (90) days following the completion of such Renovation. The Renovation Notice will include: (A) a summary describing the Renovation, (B) photographs of the Property prior to and following the Renovation, (C) copies of all contracts, invoices, permits, and other documentation associated with such Renovation, (D) all material terms and information describing the Renovation, and (E) any other information relating thereto that Hometap may reasonably request.

(ii) In connection with an Owner Repurchase, the Owner may request and Hometap may, in its sole discretion, accept an adjustment to the Ending Home Value to account for any appreciation in the value of the Property resulting from the Renovation. In connection with such a potential Renovation adjustment at the time of an Owner Repurchase, Hometap shall complete an Appraisal at Owner's expense, and such Appraisal shall include a determination of the increase in the Ending Home Value attributable exclusively to the Renovation (the "**Renovation Value Increase**"). If accepted by Hometap, in its sole discretion, the amount of the Renovation Value Increase shall be deducted from the Ending Home Value for purposes of calculating the Hometap Share; *provided, however*, that the Renovation Value Increase shall not exceed the actual cost of the Renovation as evidenced and documented in the Renovation Notice; *and further provided* that the Renovation Value Increase shall not exceed the difference between the Ending Home Value and the Beginning Home Value.

(g) Option Fees. You will pay any reasonable fees imposed or incurred by us from time to time related to the Option during the Effective Period (such fees being referred to as "**Option Fees**"), which may include, without limitation: (i) fees for processing any requests for subordination; (ii) fees for processing any requests for Property title or ownership changes; (iii) fees for processing any reconveyance or renewal recordings of any Security Instruments or other documentation pertaining to the Option; (iv) fees for processing Hometap Cure Payments (defined below in Section 7.2(a)); (v) fees relating to any Event of Default (defined below in Section 7.1), including any fees, costs, or expenses for our oversight of the default process; (vi) fees incurred in any dispute relating to the Property; and (vii) charges to cover any third-party or other out-of-pocket costs relating to any of the foregoing (including charges imposed by title companies and escrow companies, charges related to recording of documents, and attorneys' fees).

(h) Condemnation. If the Property is condemned in whole or in part during the Effective Period, then all condemnation proceeds net of reasonable costs and expenses (including attorneys' fees that have been approved by us) reasonably incurred by you and/or us in collecting and contesting the condemnation proceeds ("**Net Condemnation Proceeds**") will be allocated as provided above in Section 6.1(d)(ii). If the Property is condemned in part, then the Hometap Share shall be calculated using the Net Condemnation Proceeds as the Ending Home Value, and such proceeds will be allocated in the order provided above in Section 6.1(d)(ii). In the case of a partial condemnation, the Option will be retained with respect to any portion of the Property that has not been condemned.

(i) Allowed Loans and Transactions.

(i) Minimum Owner Equity. Without Hometap's prior written consent, Owner may not at any time increase, or permit the increase of, the total balance of loans or other property

interests secured by liens on the Property (including for such purposes the unused portion of any committed line of credit) if such additional debt or property interest would reduce Owner's remaining Owner Equity (as defined below) below the Minimum Owner Equity (as defined below). For purposes of the foregoing, **"Owner Equity"** shall be defined as the amount calculated by subtracting (1) all Acknowledged Pre-Existing Liens, (2) all Approved Subsequent Loans, (3) the present value of the Hometap Share (assuming Ending Home Value higher than Beginning Home Value); *provided, however*, that for purposes of this calculation the Hometap Cap shall not apply, and (4) any other debt or obligations secured by the Property from the current appraised value of the Property (the **"Current Property Value"**). For purposes of the foregoing, **"Minimum Owner Equity"** shall mean the dollar amount equal to twenty percent (20%) of the Current Property Value.

(ii) Approved Subsequent Loans.

(1) Prior to considering any request by Owner to incur any additional indebtedness secured by a lien on the Property (an **"Approved Subsequent Loan"**), Owner shall provide Hometap with all documentation relating to such proposed Approved Subsequent Loan that Hometap may reasonably request, including, without limitation, any commitment letter, offer letter, term sheet, proposed note, preliminary title report, appraisal, or inspection report, as well as any similar documentation relating to any Acknowledged Pre-Existing Liens.

(2) If the proposed Approved Subsequent Loan would result in a lien (or modification or increase of an Acknowledged Pre-Existing Lien) that is senior to the Option, and/or Hometap is being asked to subordinate its Option, any such subordination agreement or consent shall be in a form reasonably acceptable to Hometap.

(3) In connection with a request for an Approved Subsequent Loan, Hometap, in its sole discretion, will either use the Beginning Home Value for the purpose of calculating the Current Property Value and Minimum Owner Equity or may require, at Owner's expense, a new Appraisal of the Property.

(4) Following receipt of (i) a request for an Approved Subsequent Loan, (ii) all documentation required in Section 6.1(i)(ii)(1), and (iii) a new Appraisal (if applicable), Hometap will conduct all such other inquiries and reviews as it deems necessary to make a determination regarding whether to consent to such Approved Subsequent Loan; *provided, however*, that so long as such request meets all such requirements, consent to such Approved Subsequent Loan shall not be unreasonably withheld.

(5) In the event that Hometap consents to an Approved Subsequent Loan, Owner shall provide Hometap with the final executed documentation relating to such Approved Subsequent Loan as soon as reasonably practicable following the closing of such transaction.

(iii) Prohibited Loans and Transactions. Owner will not encumber the Property with, and Hometap will not give consent to, any proposed transaction that could have the effect of impairing Hometap's rights under the Investment Documents, or the Hometap Share, including "reverse" mortgage loans, "shared appreciation" mortgage loans, mortgage loans with negative

interests secured by liens on the Property (including for such purposes the unused portion of any committed line of credit) if such additional debt or property interest would reduce Owner's remaining Owner Equity (as defined below) below the Minimum Owner Equity (as defined below). For purposes of the foregoing, "**Owner Equity**" shall be defined as the amount calculated by subtracting (1) all Acknowledged Pre-Existing Liens, (2) all Approved Subsequent Loans, (3) the present value of the Hometap Share (assuming Ending Home Value higher than Beginning Home Value); *provided, however*, that for purposes of this calculation the Hometap Cap shall not apply, and (4) any other debt or obligations secured by the Property from the current appraised value of the Property (the "**Current Property Value**"). For purposes of the foregoing, "**Minimum Owner Equity**" shall mean the dollar amount equal to twenty percent (20%) of the Current Property Value.

(ii) Approved Subsequent Loans.

(1) Prior to considering any request by Owner to incur any additional indebtedness secured by a lien on the Property (an "**Approved Subsequent Loan**"), Owner shall provide Hometap with all documentation relating to such proposed Approved Subsequent Loan that Hometap may reasonably request, including, without limitation, any commitment letter, offer letter, term sheet, proposed note, preliminary title report, appraisal, or inspection report, as well as any similar documentation relating to any Acknowledged Pre-Existing Liens.

(2) If the proposed Approved Subsequent Loan would result in a lien (or modification or increase of an Acknowledged Pre-Existing Lien) that is senior to the Option, and/or Hometap is being asked to subordinate its Option, any such subordination agreement or consent shall be in a form reasonably acceptable to Hometap.

(3) In connection with a request for an Approved Subsequent Loan, Hometap, in its sole discretion, will either use the Beginning Home Value for the purpose of calculating the Current Property Value and Minimum Owner Equity or may require, at Owner's expense, a new Appraisal of the Property.

(4) Following receipt of (i) a request for an Approved Subsequent Loan, (ii) all documentation required in Section 6.1(i)(ii)(1), and (iii) a new Appraisal (if applicable), Hometap will conduct all such other inquiries and reviews as it deems necessary to make a determination regarding whether to consent to such Approved Subsequent Loan; *provided, however*, that so long as such request meets all such requirements, consent to such Approved Subsequent Loan shall not be unreasonably withheld.

(5) In the event that Hometap consents to an Approved Subsequent Loan, Owner shall provide Hometap with the final executed documentation relating to such Approved Subsequent Loan as soon as reasonably practicable following the closing of such transaction.

(iii) Prohibited Loans and Transactions. Owner will not encumber the Property with, and Hometap will not give consent to, any proposed transaction that could have the effect of impairing Hometap's rights under the Investment Documents, or the Hometap Share, including "reverse" mortgage loans, "shared appreciation" mortgage loans, mortgage loans with negative

amortization features, private or non-institutional loans, investments in the equity or appreciation of the Property, or unrecorded loans secured by the Property.

(iv) Subsequent Loans used for Owner Repurchase. Owner may incur additional indebtedness secured by a lien on the Property at any time during the Effective Period if Owner is incurring such additional indebtedness in order to execute an Owner Repurchase in full compliance with the terms of this Agreement, including but not limited to Section 2.4. In all such instances, Hometap shall receive a direct payment, via wire transfer or similar means, for the entire Hometap Share concurrently with the closing of this subsequent indebtedness; failure to do so will be considered an Event of Default. Notwithstanding the foregoing, Hometap reserves the right to withhold its approval for the additional indebtedness if Hometap believes, in its sole discretion, that such additional indebtedness will not facilitate a full Owner Repurchase.

(j) Obligation to Provide Information to and Cooperate with Hometap. During the Effective Period, you will cooperate with Hometap to schedule any Appraisal, and you will use commercially reasonable efforts to promptly respond to requests for information that Hometap may reasonably ask from time to time regarding the status of the Property, or information, reports, proof of payment of taxes or assessments, insurance policies, proof of insurance coverage, and any other information available to you concerning the Property and any modifications to the Property. You will immediately provide us with notice of any event that has or may be expected to have a material effect upon the Property, the value of the Property, the Option, or Hometap's rights under the Investment Documents, including, without limitation, (i) the death or divorce of any Owner; (ii) the death or removal of any Trustee or Trustor, as well as the appointment of any substitute or additional Trustee or Trustor; (iii) environmental matters affecting the Property; (iv) the commencement of any legal action involving the Property; or (v) the occurrence of an Event of Default.

Section 6.2 Hometap Covenants.

(a) Hometap Interest. Pursuant to this Agreement, during the Effective Period, Hometap shall have an economic interest in the Property, which is protected by this Agreement and the other Investment Documents.

(b) Waiver of Right to Partition. Owner and Hometap each waive and relinquish all rights either of them may now or later have to seek partition of the Property, whether in kind or by sale; *provided, however*, that we will retain the right to seek a partition (i) in the event of, and as part of any action arising out of an Event of Default, which is not timely cured pursuant to Section 7.2, or (ii) in connection with any claim or action by Owner which asserts that any provision of this Agreement is against the law or unenforceable.

(c) Right to Disclose Certain Information. We may share certain personal and financial information relating to you or the Property with our affiliates, subsidiaries, assignees, contractors, agents, representatives, and persons with whom we intend to conduct business, including the address and general location of the Property, appraisal reports and other valuations of the Property, and the financial terms of this Agreement, to the extent not prohibited by law.

(d) Agreement to Subordination. We may agree to subordinate the priority of our rights under any of the Investment Documents to the lien of any lender that refinances any Acknowledged Pre-Existing Lien or proposes to extend to you any other Approved Subsequent Loan secured by a lien on the Property; *provided that* any requested subordination and loan documents contain only reasonable and customary terms common to such agreements, and you pay any amounts we reasonably require.

amortization features, private or non-institutional loans, investments in the equity or appreciation of the Property, or unrecorded loans secured by the Property.

(iv) Subsequent Loans used for Owner Repurchase. Owner may incur additional indebtedness secured by a lien on the Property at any time during the Effective Period if Owner is incurring such additional indebtedness in order to execute an Owner Repurchase in full compliance with the terms of this Agreement, including but not limited to Section 2.4. In all such instances, Hometap shall receive a direct payment, via wire transfer or similar means, for the entire Hometap Share concurrently with the closing of this subsequent indebtedness; failure to do so will be considered an Event of Default. Notwithstanding the foregoing, Hometap reserves the right to withhold its approval for the additional indebtedness if Hometap believes, in its sole discretion, that such additional indebtedness will not facilitate a full Owner Repurchase.

(j) Obligation to Provide Information to and Cooperate with Hometap. During the Effective Period, you will cooperate with Hometap to schedule any Appraisal, and you will use commercially reasonable efforts to promptly respond to requests for information that Hometap may reasonably ask from time to time regarding the status of the Property, or information, reports, proof of payment of taxes or assessments, insurance policies, proof of insurance coverage, and any other information available to you concerning the Property and any modifications to the Property. You will immediately provide us with notice of any event that has or may be expected to have a material effect upon the Property, the value of the Property, the Option, or Hometap's rights under the Investment Documents, including, without limitation, (i) the death or divorce of any Owner; (ii) the death or removal of any Trustee or Trustor, as well as the appointment of any substitute or additional Trustee or Trustor; (iii) environmental matters affecting the Property; (iv) the commencement of any legal action involving the Property; or (v) the occurrence of an Event of Default.

Section 6.2 Hometap Covenants.

(a) Hometap Interest. Pursuant to this Agreement, during the Effective Period, Hometap shall have an economic interest in the Property, which is protected by this Agreement and the other Investment Documents.

(b) Waiver of Right to Partition. Owner and Hometap each waive and relinquish all rights either of them may now or later have to seek partition of the Property, whether in kind or by sale; *provided, however*, that we will retain the right to seek a partition (i) in the event of, and as part of any action arising out of an Event of Default, which is not timely cured pursuant to Section 7.2, or (ii) in connection with any claim or action by Owner which asserts that any provision of this Agreement is against the law or unenforceable.

(c) Right to Disclose Certain Information. We may share certain personal and financial information relating to you or the Property with our affiliates, subsidiaries, assignees, contractors, agents, representatives, and persons with whom we intend to conduct business, including the address and general location of the Property, appraisal reports and other valuations of the Property, and the financial terms of this Agreement, to the extent not prohibited by law.

(d) Agreement to Subordination. We may agree to subordinate the priority of our rights under any of the Investment Documents to the lien of any lender that refinances any Acknowledged Pre-Existing Lien or proposes to extend to you any other Approved Subsequent Loan secured by a lien on the Property; *provided that* any requested subordination and loan documents contain only reasonable and customary terms common to such agreements, and you pay any amounts we reasonably require.

(e) No Hometap Liability. Hometap shall not be liable for any (i) Acknowledged Pre-Existing Liens, Liens and Encumbrances, Approved Subsequent Loans, or any other loans or obligations to any third parties created, established, or obtained by you whether before or after the consummation of the transactions contemplated hereunder, and whether or not consented to, approved by, or subordinated to by us, or (ii) for homeowner association fees, property taxes, homeowner or property insurance or other liabilities or obligations that might arise in connection with the Property.

## SECTION 7
## EVENTS OF DEFAULT

Section 7.1 Events of Default. The occurrence of any of the following will constitute an Event of Default ("**Event of Default**"):

(a) you breach or fail to perform any obligation or covenant under the Investment Documents, including any action or failure to act resulting in, or which can reasonably be expected to result in, a violation of Hometap's rights herein or a breach of this Agreement or other Investment Document, which breach or failure is not cured (if capable of being cured) within thirty (30) days of the occurrence thereof;

(b) you take any action that does not honor the Option or you omit to state a material fact relating to your obligations in this Agreement, including any misrepresentation or omission related to the amount or kind of consideration given to you in any Transfer which can reasonably be expected to result in a violation of Hometap's rights under the Investment Documents or a breach of this Agreement or other Investment Document), which breach or failure is not cured (if capable of being cured) within thirty (30) days of the occurrence thereof;

(c) you fail to timely provide us any notice required under this Agreement;

(d) any representation or warranty set forth above in Section 4.1, is or becomes false or misleading, and you fail to correct and provide Hometap written notice of such false or misleading representation or warranty within five (5) Business Days of becoming aware of such occurrence;

(e) (i) the voluntary or involuntary commencement of any case or proceeding against an Owner under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency or similar law, or the appointment or election of a receiver, conservator, trustee, custodian, or similar official for an Owner or any substantial part of the Property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (ii) the making by an Owner of a general assignment for the benefit of creditors, or (iii) the admission in writing by an Owner of Owner's inability to pay such Owner's debts as they become due or of your or any co-owner's insolvency, and in all cases, where such case, proceeding, assignment, or admission is not dismissed or otherwise reversed within thirty (30) days;

(f) Owner fails to pay in a timely manner any taxes, assessments, liens, amounts due under loans that are secured by liens on the Property, whether recorded or unrecorded, or other obligations relating to or on the Property, which failure is not cured within thirty (30) days of the occurrence thereof;

(g) the Transfer or attempted Transfer of the Property, or any interest in the Property, by you, except in accordance with this Agreement;

(h) a lien attaches to the Property that does not have our prior written approval, or you obtain any loan secured or to be secured by the Property that we have not approved in writing, whether recorded or unrecorded;

(e) No Hometap Liability. Hometap shall not be liable for any (i) Acknowledged Pre-Existing Liens, Liens and Encumbrances, Approved Subsequent Loans, or any other loans or obligations to any third parties created, established, or obtained by you whether before or after the consummation of the transactions contemplated hereunder, and whether or not consented to, approved by, or subordinated to by us, or (ii) for homeowner association fees, property taxes, homeowner or property insurance, or other liabilities or obligations that might arise in connection with the Property.

## SECTION 7
## EVENTS OF DEFAULT

Section 7.1 Events of Default. The occurrence of any of the following will constitute an Event of Default ("**Event of Default**"):

(a) you breach or fail to perform any obligation or covenant under the Investment Documents, including any action or failure to act resulting in, or which can reasonably be expected to result in, a violation of Hometap's rights herein or a breach of this Agreement or other Investment Document, which breach or failure is not cured (if capable of being cured) within thirty (30) days of the occurrence thereof;

(b) you take any action that does not honor the Option or you omit to state a material fact relating to your obligations in this Agreement, including any misrepresentation or omission related to the amount or kind of consideration given to you in any Transfer which can reasonably be expected to result in a violation of Hometap's rights under the Investment Documents or a breach of this Agreement or other Investment Document), which breach or failure is not cured (if capable of being cured) within thirty (30) days of the occurrence thereof;

(c) you fail to timely provide us any notice required under this Agreement;

(d) any representation or warranty set forth above in Section 4.1, is or becomes false or misleading, and you fail to correct and provide Hometap written notice of such false or misleading representation or warranty within five (5) Business Days of becoming aware of such occurrence;

(e) (i) the voluntary or involuntary commencement of any case or proceeding against an Owner under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency, or similar law, or the appointment or election of a receiver, conservator, trustee, custodian, or similar official for an Owner or any substantial part of the Property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (ii) the making by an Owner of a general assignment for the benefit of creditors, or (iii) the admission in writing by an Owner of Owner's inability to pay such Owner's debts as they become due or of your or any co-owner's insolvency, and in all cases, where such case, proceeding, assignment, or admission is not dismissed or otherwise reversed within thirty (30) days;

(f) Owner fails to pay in a timely manner any taxes, assessments, liens, amounts due under loans that are secured by liens on the Property, whether recorded or unrecorded, or other obligations relating to or on the Property, which failure is not cured within thirty (30) days of the occurrence thereof;

(g) the Transfer or attempted Transfer of the Property, or any interest in the Property, by you, except in accordance with this Agreement;

(h) a lien attaches to the Property that does not have our prior written approval, or you obtain any loan secured or to be secured by the Property that we have not approved in writing, whether recorded or unrecorded;

(i) you fail to preserve or maintain the Property in good repair and in a condition substantially similar to its condition on the Effective Date, except for normal wear and tear;

(j) insurance on the Property is not maintained as required by this Agreement, including any payment due on the insurance becomes delinquent, which failure, if curable, is not cured within thirty (30) days of the occurrence thereof;

(k) any assignment, attempted assignment, or other transfer of the Option or Investment Documents in violation of this Agreement;

(l) any other action or event occurs within your reasonable control which has, or may reasonably be expected to have, a material adverse effect on the Property, the value of the Property, the Option, or the Hometap Share.

Section 7.2 <u>Remedies Following Event of Default</u>. Following an Event of Default, Hometap will provide you with a Notice of Right to Cure Default, which shall state the specific Event(s) of Default and the time in which it must be cured, which shall be no more than thirty (30) days following delivery of the Notice of Right to Cure Default. If Owner fails to cure the default within the time period set forth in the Notice of Right to Cure Default, Hometap may declare a default and exercise any of the rights and remedies set forth below in this <u>Section 7.2</u>.

(a) <u>Hometap Option Exercise</u>. We will have the right in our sole discretion, by delivering to you a written notice (a "**Default Notice**"), to (i) complete a Hometap Option Exercise in compliance with <u>Section 3.1</u> or (ii) pay any amounts ("**Hometap Cure Payments**") to any third parties to cure and remedy an actual or impending Event of Default. We may make payments to cover any delinquent payments, insurance premiums, accrued interest, late fees, reinstatement fees, taxes, and other penalties, together with any and all amounts which we deem necessary to cure an Event of Default. Upon delivery of the Default Notice, Hometap shall be permitted to start a Hometap Option Exercise. We may record the Default Notice in the county where the Property is located.

(b) <u>Hometap Cure</u>. To the extent that you fail to take any actions or make any payments that Hometap determines are necessary to avoid or remedy an Event of Default or otherwise protect Hometap's rights under the Investment Documents or the Option, Hometap shall have the right, but not the obligation, to take such actions or complete such payments. Hometap shall provide Owner with five (5) Business Days written notice, or the minimum notice period required by applicable law, prior to taking any corrective action or making any Hometap Cure Payments, which may include, without limitation, payment of taxes, placement of insurance or curing of a default with a lender or other third party with an interest in the Property. Beginning on the day a Hometap Cure Payment is made, interest shall accrue at the lesser of eight percent (8%) per annum or the maximum amount permitted by applicable law. Hometap shall have the right to demand repayment of any Hometap Cure Payments (plus applicable interest) on five (5) Business Days' notice, and failure to pay such amounts shall be deemed an Event of Default. Notwithstanding anything in the foregoing to the contrary, any repayment of Hometap Cure Payments will be deemed reimbursement of expenses and the Hometap Cap shall not apply to such amounts.

(c) <u>Power of Foreclosure Under State Laws</u>. We will be entitled to foreclose on the Property and otherwise exercise our rights under the Mortgage and Security Instrument in accordance with applicable laws and regulations established in the jurisdiction where the Property is located.

(d) <u>Failure to Maintain Adequate Insurance</u>. If you fail to maintain insurance in amounts required by <u>Section 6.1(c)</u>, or any insurance claim is denied due to Owner's action or inaction, then the Hometap Share will be increased by the amount of any such denied claim. Any such increase shall be

Section 8.7 Revocable Trusts. If Owner is a Revocable Trust: (a) all Trustors must sign the Investment Documents in their capacities as individuals and as Trustors; (b) all Trustees must sign the Investment Documents in their capacities as Trustees; (c) each Trustee and Trustor who signs this Agreement represents and warrants that all Trustees and Trustors have been disclosed to us; (d) all rights and powers specified for, and all actions required of, Owner in the Investment Documents must be approved and exercised by all Trustees unanimously; (e) all Trustors, in their capacities as individuals, will be jointly and severally liable with Owner for all liabilities and obligations specified for Owner under any of the Investment Documents; (f) all representations and warranties by Owner in the Investment Documents are made by all Trustees on behalf of the Revocable Trust and by all Trustors in their capacities as individuals; (g) notice required to be given by or to an Owner will be deemed adequately given if given by or to any of the Trustees using the Notice Address, as defined below in Section 8.16; and (h) we may treat any notice received from any one Trustee as notice from all Trustees and from Owner.

Section 8.8 Delegation of Duties. We may perform any of our duties under this Agreement or any other Investment Document by or through contractors, agents, employees, or attorneys-in-fact and will be entitled to advice of counsel concerning all matters pertaining to such duties and any actions taken on the basis of such advice from counsel will be deemed to have been taken in good faith. We will not be responsible for the negligence or misconduct of any contractor, agent, employee, or attorney-in-fact that we select as long as our selection was made without gross negligence or willful misconduct.

Section 8.9 Successors and Assignees; Owner's Estate. The Investment Documents will be binding on your and our respective heirs, successors, and permitted assignees. If Owner dies, then the Investment Documents will be binding on Owner's Estate. The death of Owner will not terminate any of the Investment Documents.

(a) Assignment by Hometap. We may assign, participate, hypothecate, sell, transfer, or otherwise transact, in whole or in part, our right and title to, and interest in, any of the Investment Documents at any time and to any Person without prior notice to or consent of Owner. In connection with any assignment, participation, hypothecation, sale, transfer, or transaction, we may disclose any documents and information in our possession relating to Owner and the Property. Upon such assignment, sale, or transfer, our assignee, buyer, or transferee will automatically have all the rights and remedies of Hometap under the Investment Documents. You will execute and deliver in recordable form, if requested, at our expense, such other documents we deem appropriate to reflect the assignment, sale, or transfer of the Option and the other Investment Documents. You agree to cooperate with such assignee, buyer, or transferee, including by executing any documents deemed appropriate by assignee, buyer, or transferee to insure or protect such Person's interest in the Investment Documents.

(b) Assignment of Agreement by Owner. Absent our prior written consent, which consent may be withheld, Owner may not assign or otherwise transfer any of the Investment Documents. We may grant consent to an assignment to Owner's spouse who acquires an interest in the Property or a Trustee of a Revocable Trust in which Owner is the sole Trustor; *provided that* in each case the assignee: (i) was alive as of the Effective Date; (ii) executes this Agreement and the Memorandum of Option; (iii) executes a recordable addendum to the Security Instruments in a form provided by us; (iv) executes an assignment with the assignor in a form satisfactory to us; and (v) provides any information or other documents requested by us and satisfactory to us (**"Exempted Owner Assignment"**). In the event of an Exempted Owner Assignment to the Trustee(s) of a Revocable Trust, the original Owner (i.e., the Trustor(s)), jointly and severally, will continue to remain liable under the Investment Documents.

(c) Exempted Owner Property Transfer. If Owner obtains our prior written consent, Owner may Transfer the Property into the name of Owner's spouse or the Trustees of a Revocable Trust in which you are the sole Trustor; *provided that* the requirements for an Exempted Owner Assignment under Section

8.9(b) are met (an "**Exempted Owner Property Transfer**"). An Exempted Owner Property Transfer shall not trigger a Hometap Option Exercise.

Section 8.10 Survival. The following provisions will survive any termination of this Agreement without limitation: (a) Owner's obligations to reimburse any Hometap Cure Payments and Option Fees; (b) Owner's obligation to remove any liens on the Property and pay any Sales Commissions and Closing Costs; (c) Section 7.2; (d) any amounts owed to us under this Agreement; (e) any other provisions which entitle us to remedies, fees, costs, and expenses; (f) Section 4; and (g) Section 8.

Section 8.11 Injunction. If we are stayed or enjoined from undertaking a Hometap Option Exercise, commencing or initiating any notice and procedures relating thereto in this Agreement, or enforcing any of our rights under this Agreement, the Option will not expire until ninety (90) days after such stay or injunction is lifted by a final order of the appropriate court. Any deadline or notice period contained in the Investment Documents which we are prevented or prohibited from observing by operation of law, court order, or otherwise, will automatically be stayed for the duration of such stay, injunction, prevention, or prohibition until such stay, injunction, prevention, or prohibition is no longer applicable or is lifted by final order of the appropriate court.

Section 8.12 Governing Law. The Option, this Agreement, and the other Investment Documents will be determined under, governed by, and construed in accordance with laws of the state in which the Property is located, without regard to its conflict of law principles to the furthest extent possible; *provided, however*, to the extent the mandatory provisions of the laws of another jurisdiction relating to (a) the perfection or the effect of perfection or non-perfection of any lien or other right, title, and/or interest in the Property, or (b) the availability of and procedures relating to any remedy hereunder or related to this Agreement are required to be governed by such other jurisdiction's laws, such other laws will be deemed to govern and control.

Section 8.13 DISPUTE RESOLUTION BY BINDING ARBITRATION. PLEASE READ THIS SECTION CAREFULLY AS IT AFFECTS YOUR RIGHTS.

(a) Agreement to Arbitrate. This Dispute Resolution by Binding Arbitration Section 8.13 is referred to in this Agreement as the "**Arbitration Agreement.**" You agree that any and all disputes or claims that have arisen or may arise between you and us, whether arising out of or relating to this Agreement or the other Investment Documents, any advertising, or any aspect of the relationship or transactions between us, will be resolved exclusively through final and binding arbitration, rather than a court, in accordance with the terms of this Arbitration Agreement, except that you may assert individual claims in small claims court, if your claims qualify. Further, this Arbitration Agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies, and such agencies can, if the law allows, seek relief against us on your behalf. You agree that, by entering into this Agreement, you and we are each waiving the right to a trial by jury or to participate in a class action. Your rights will be determined by a neutral arbitrator, not a judge or jury. The Federal Arbitration Act governs the interpretation and enforcement of this Arbitration Agreement.

(b) WAIVER OF JURY TRIAL. TO THE FULLEST EXTENT POSSIBLE, HOMETAP AND OWNER VOLUNTARILY, UNCONDITIONALLY, AND IRREVOCABLY WAIVE TRIAL BY JURY UNDER ALL CIRCUMSTANCES WHETHER IN ANY LITIGATION OR PROCEEDING IN A STATE OR FEDERAL COURT RELATED TO, OR ARISING OUT OF, THE INVESTMENT DOCUMENTS OR THE OBLIGATIONS OR TRANSACTIONS CONTEMPLATED BY THE INVESTMENT DOCUMENTS, INCLUDING ALL CLAIMS OR DISPUTES HOWEVER ARISING (INCLUDING TORT CLAIMS AND CLAIMS FOR BREACH OF CONTRACT) BETWEEN HOMETAP AND OWNER.

(c) <u>PROHIBITION OF CLASS AND REPRESENTATIVE ACTIONS AND NON-INDIVIDUALIZED RELIEF</u>. YOU AND WE AGREE THAT EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION OR PROCEEDING. UNLESS BOTH YOU AND WE AGREE OTHERWISE, THE ARBITRATOR MAY NOT CONSOLIDATE OR JOIN MORE THAN ONE PERSON'S OR PARTY'S CLAIMS AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A CONSOLIDATED, REPRESENTATIVE, OR CLASS PROCEEDING. ALSO, THE ARBITRATOR MAY AWARD RELIEF (INCLUDING MONETARY, INJUNCTIVE, AND DECLARATORY RELIEF) ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF NECESSITATED BY THAT PARTY'S INDIVIDUAL CLAIM(S), EXCEPT THAT YOU MAY PURSUE A CLAIM FOR AND THE ARBITRATOR MAY AWARD PUBLIC INJUNCTIVE RELIEF UNDER APPLICABLE LAW TO THE EXTENT REQUIRED FOR THE ENFORCEABILITY OF THIS PROVISION.

(d) <u>Pre-Arbitration Dispute Resolution</u>. We are always interested in resolving disputes amicably and efficiently, and most concerns can be resolved quickly and to your satisfaction by emailing us at legal@hometap.com. If such efforts prove unsuccessful, a party who intends to seek arbitration must first send to the other, by certified mail, a written notice of dispute (a "**Notice of Dispute**"). The party seeking arbitration must send the Notice of Dispute to the other Party at their Notice Address (as defined in <u>Section 8.16</u> below) by certified mail, with a copy of any Notice of Dispute directed to Hometap to legal@hometap.com. The Notice of Dispute must (i) describe the nature and basis of the claim or dispute, and (ii) set forth the specific relief sought. If we or you do not resolve the claim within sixty (60) days after the Notice of Dispute is received, we or you may commence an arbitration proceeding. During the arbitration, the amount of any settlement offer made by us or you will not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you or we are entitled.

(e) <u>Arbitration Procedures</u>. Arbitration will be conducted by a neutral arbitrator in accordance with the American Arbitration Association's (the "**AAA**") rules and procedures, including the AAA's Consumer Arbitration Rules (collectively, the "**AAA Rules**"), as modified by this Arbitration Agreement. For information on the AAA, please visit its website, http://www.adr.org. Information about the AAA Rules and fees for consumer disputes can be found at the AAA's consumer arbitration page, http://www.adr.org/consumer. If there is any inconsistency between any term of the AAA Rules and any term of this Arbitration Agreement, the terms of this Arbitration Agreement will control unless the arbitrator determines that the application of the inconsistent Arbitration Agreement terms would not result in a fundamentally fair arbitration. The arbitrator must also follow the provisions of this Agreement as a court would. All issues are for the arbitrator to decide, including issues relating to the scope, enforceability, and arbitrability of this Arbitration Agreement. Although arbitration proceedings are usually simpler and more streamlined than trials and other judicial proceedings, the arbitrator can award the same damages and relief on an individual basis that a court can award to an individual under this Agreement and applicable law. Decisions by the arbitrator are enforceable in court and may be overturned by a court only for very limited reasons.

(f) Unless we and you agree otherwise, any arbitration hearings will take place in a reasonably convenient location for both parties with due consideration of their ability to travel and other p[illegible] circumstances. If the parties are unable to agree on a location, the determination will be made by A[illegible]. If your claim is for $10,000 or less, we agree that you may choose whether the arbitration will be co[illegible]d solely on the basis of documents submitted to the arbitrator, through a telephonic hearing, or by [illegible] in-person hearing as established by the AAA Rules. If your claim exceeds $10,000, the right to a hearing will be determined by the AAA Rules. Regardless of the manner in which the arbitration is conducted, the

...will issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based.

(g) Costs of Arbitration. Payment of all filing, administration, and arbitrator fees (collectively, the "**Arbitration Fees**") will be governed by the AAA Rules, unless otherwise provided in this Arbitration Agreement. If the value of the relief sought is $75,000 or less, at your request, we will pay all Arbitration Fees. If the value of relief sought is more than $75,000 and you are able to demonstrate to the arbitrator that you are economically unable to pay your portion of the Arbitration Fees or if the arbitrator otherwise determines for any reason that you should not be required to pay your portion of the Arbitration Fees, we will pay your portion of such fees. In addition, if you demonstrate to the arbitrator that the costs of arbitration will be prohibitive as compared to the costs of litigation, we will pay as much of the Arbitration Fees as the arbitrator deems necessary to prevent the arbitration from being cost-prohibitive. Any payment of attorneys' fees will be governed by the AAA Rules.

(h) Confidentiality. All aspects of the arbitration proceeding, and any ruling, decision, or award by the arbitrator, will be strictly confidential for the benefit of all parties.

(i) Severability. If a court or the arbitrator decides that any term or provision of this Arbitration Agreement (other than Section 8.13(b)) is invalid or unenforceable, the parties agree to replace such term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Arbitration Agreement will be enforceable as so modified. If a court or the arbitrator decides that any of the provisions of Section 8.13(b) are invalid or unenforceable, then the entirety of this Arbitration Agreement will be null and void, unless such provisions are deemed to be invalid or unenforceable solely with respect to claims for public injunctive relief. The remainder of this Agreement will continue to apply.

(j) Future Changes to Arbitration Agreement. Notwithstanding any provision in this Agreement to the contrary, we agree that if we make any future change to this Arbitration Agreement (other than a change to the Notice Address) during the Effective Period, you may reject any such change by sending us written notice within thirty (30) days of the change to the Notice Address. By rejecting any future change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this Arbitration Agreement as of the date you first accepted this Agreement (or accepted any subsequent changes to this Agreement).

Section 8.14 Further Assurances. Each party agrees, from time to time, as requested by the other party or its successors, assigns, buyers, or transferees, to execute and deliver any instruments and take any action reasonably necessary or desirable in order to implement the provisions and otherwise to effect the intent and purposes of the Investment Documents.

Section 8.15 Severability; Waivers. Each provision of this Agreement and of the other Investment Documents will be severable from every other provision for the purpose of determining the legal enforceability of any provision and will be construed separately and is separately enforceable from every other provision. No waiver by us of any of our rights or remedies in connection with this Agreement or the other Investment Documents will be effective unless the waiver is in writing and signed by both parties, and then any waiver or consent will be effective only in the specific instance and for the specific purpose for which given. No delay, consent, or waiver by us will be construed as continuing, as a bar to, or as a waiver or release of, any subsequent right, remedy, or recourse. To the extent that enforcement of any provision or exercise of any right under this Agreement or the other Investment Documents is held to be invalid or stayed or enjoined by a court of competent jurisdiction, then the provision will be considered separate and apart from the remaining provisions, and any other remaining provisions will continue to be fully enforceable under law.

Section 8.16 Notice. Each party will deliver all notices, requests, consents, claims, demands, waivers, and other communications under this Agreement (each, a "**Notice**") in writing to the address of the other party listed below, unless a party has been notified by the other party in writing of a substitute address ("**Notice Address**"). Each party will deliver all Notices by personal delivery, nationally recognized overnight courier (with all fees prepaid), facsimile or email (with confirmation of transmission), or certified or registered mail (in each case, return receipt requested, postage prepaid). A Notice is effective only upon receipt by the receiving party. If any Notice required by the Security Instruments is also required under applicable law, such requirement of law will satisfy the corresponding requirement under this Agreement.

| HOMETAP: | OWNER: |
|---|---|
| HOMETAP INVESTMENT PARTNERS II, L.P.<br>800 Boylston Street, 16th Floor<br>Boston, MA 02199<br>Attention: Legal Department<br>Email: homeowners@hometap.com | See signature page. |

Section 8.17 Entire Agreement; Amendment. Schedule A and the exhibits are incorporated into this Agreement by this reference. This Agreement, the Security Instruments, and the other written agreements made by and between the parties as of the Effective Date together constitute the entire agreement between the parties regarding the subject matter contained in them. All prior agreements, understandings, representations, warranties, statements, and negotiations between the parties, if any, whether oral, electronic or written, relating to the Property, the Option, this Agreement, the other Investment Documents, and the related transaction, including any offer letters, terms sheets, and draft and earlier versions of settlement statements and other documents and agreements, are superseded and merged into this Agreement. No supplement, modification, or amendment of this Agreement will be binding unless in writing and executed by the party against whom enforcement is sought.

Section 8.18 No Third-Party Beneficiaries. This Agreement and the other Investment Documents are entered into for the protection and benefit of us and Owner and their respective successors and permitted assigns. No other Person will have any rights, remedies, or recourse under this Agreement or the other Investment Documents.

Section 8.19 Counterparts; Electronic Signatures. This Agreement and the other Investment Documents may be executed in counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement. A signed copy of this Agreement that is transmitted by a party to the other party via facsimile or by electronic means will be binding on the signatory to that copy.

Section 8.20 Registered Domestic Partnerships and Civil Unions. An Owner will have the same rights and obligations with respect to Owner's civil union partner or registered domestic partner as Owner will have with respect to its spouse for all purposes under the Investment Documents, subject to the same conditions and limitations that would apply to a transfer or assignment to Owner's spouse, a payment by Owner's spouse, or the rights of Owner's spouse not on record title.

Section 8.21 Consent of Spouse/Domestic Partner. If you are married or in a civil union or registered domestic partnership on the date of this Agreement and your spouse or domestic partner, as applicable, is not named on the title to the Property, Hometap may require your spouse or domestic partner, as applicable, to execute and deliver to us a Consent of Spouse/Domestic Partner in the form of Exhibit F ("**Consent of Spouse/Domestic Partner**"). If you should marry or remarry or enter into a civil union or registered domestic partnership after the Effective Date, within thirty (30) days after the marriage, civil union, or

domestic partnership, as applicable, you and your spouse or domestic partner, as applicable, must execute and deliver a Consent of Spouse/Domestic Partner to Hometap at the Notice Address.

Section 8.22 RECOMMENDATION TO SEEK LEGAL AND TAX ADVICE. OWNER UNDERSTANDS THAT THE SALE OF THE PROPERTY, OR THE SALE OF AN ECONOMIC INTEREST IN THE PROPERTY, CAN HAVE SIGNIFICANT TAX, FINANCIAL, AND FAMILY CONSEQUENCES. OWNER ACKNOWLEDGES THAT HOMETAP HAS REQUESTED THAT OWNER DISCUSS THIS AGREEMENT WITH TAX, LEGAL, AND FINANCIAL ADVISORS AND WITH FAMILY MEMBERS TO ENSURE AN UNDERSTANDING OF THE RISKS AND BENEFITS OF THIS AGREEMENT, AND OWNER HAS HAD THE OPPORTUNITY TO DO SO.

Section 8.23 NO ADVICE. IN ENTERING INTO THE INVESTMENT DOCUMENTS AND INTO ANY FUTURE PROPERTY SALE, OWNER IS NOT RELYING AND WILL NOT RELY ON ANY INFORMATION OR REPRESENTATION THAT MAY HAVE BEEN PROVIDED BY HOMETAP OR ITS AGENTS OR REPRESENTATIVES, INCLUDING: (a) THE VALUE OF THE PROPERTY OR THAT THE BEGINNING HOME VALUE IS A REPRESENTATION OF THE MARKETABLE, INSURABLE, OR FAIR MARKET VALUE OF THE PROPERTY; (b) THE ADVISABILITY OF ENTERING INTO THE INVESTMENT DOCUMENTS OR A PROPERTY SALE; OR (c) THE TAX IMPLICATIONS AND CONSEQUENCES OF ENTERING INTO THE INVESTMENT DOCUMENTS OR A PROPERTY SALE. OWNER HAS MADE, AND WILL MAKE, HIS, HER OR ITS OWN INVESTIGATION AND JUDGMENTS REGARDING SUCH MATTERS AND HAS BEEN ADVISED BY HOMETAP TO DISCUSS THEM WITH OWNER'S LEGAL, FINANCIAL AND TAX ADVISORS, AS WELL AS WITH FAMILY MEMBERS.

Section 8.24 Subordination of Homestead and Waivers. If you have acquired or acquire in the future an estate of homestead in the Property, you agree, to the greatest extent permitted by applicable law, that such homestead estate is subordinated in all respects to the Mortgage and Security Instrument and any amounts due under this Agreement and to all renewals, extensions, and modifications of the Mortgage and Security Instrument or this Agreement, and that such homestead estate is subject to all of our rights under the Mortgage and Security Instrument and this Agreement and all renewals, extensions and modifications of the Mortgage and Security Instrument and this Agreement, and is subordinate to the lien evidenced by the Mortgage and Security Instrument, and all renewals, extensions and modifications of the Mortgage and Security Instrument. You waive and relinquish all rights of curtesy and dower in the Property.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGES FOLLOW]**

**IN WITNESS WHEREOF,** intending to be legally bound, the parties hereto have caused this Agreement to be executed as of the Signing Date. This Agreement may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement.

**HOMETAP INVESTMENT PARTNERS II, L.P.**

By: Hometap Holdings II, LLC,
Its General Partner

By: ______________________________

Name: ____________________________

Title: _____________________________

Date: _____________________________

Acknowledgment Certificate

Commonwealth of Massachusetts

County of Suffolk

On this ________ day of ______________________, 20_____, before me, the undersigned notary public, personally appeared ______________________, proved to me through satisfactory evidence of identification, which was ______________________, to be the person whose name is signed on the preceding or attached document in my presence, and acknowledged to me that he signed it voluntarily for its stated purpose.

______________________________________
Notary Public Signature

My commission expires ________________________

**IN WITNESS WHEREOF**, intending to be legally bound, the parties hereto have caused this Agreement to be executed as of the Signing Date. This Agreement may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement.

OWNER(S)

By: ______________________________
Larry E. Fisher

Date: ______________________________

By: ______________________________

Date: ______________________________

Notice Address:

21597 Juego Circle, Unit 6D, Boca Raton, FL 33433

STATE OF FLORIDA

COUNTY OF ____________________

The foregoing instrument was acknowledged before me this _____ day of ____________, 20__, by

______________________________ (name of person acknowledging).

______________________________________________
Notary Public Signature

My commission expires ____________________________

Personally known _____________ OR Produced Identification ______________

Type of Identification Produced ________________________________________

STATE OF FLORIDA

COUNTY OF ____________________

The foregoing instrument was acknowledged before me this _____ day of ____________, 20__, by ____________________________ (name of person acknowledging).

____________________________________________
Notary Public Signature

My commission expires ______________________________

Personally known _____________ OR Produced Identification ______________

Type of Identification Produced ________________________________________

**List of Schedules and Exhibits**

Schedule A – Investment Term Sheet

Exhibit A – Property Description
Exhibit B – Memorandum of Option
Exhibit C – Mortgage and Security Instrument
Exhibit D – UCC-1 Financing Statement
Exhibit E – Notice of Right to Cancel
Exhibit F – Consent of Spouse/Domestic Partner

**EXHIBIT A**

**LEGAL DESCRIPTION**

Real property described as follows:

All that certain land situate in Palm Beach County, State of Florida, viz:

Unit 6-D, Vistas of Boca Lago, a Condominium, according to the Declaration of Condominium thereof, as recorded in Official Records Book 2495, Page 1, and all amendments thereto, of the Public Records of Palm Beach County, Florida, together with an undivided interest or share in the common elements appurtenant thereto.

Parcel ID / APN: 00-42-47-20-02-000-0604

# COMPLIANCE AGREEMENT

INVESTMENT NO.: FL999199
HOMEOWNER(S): Larry E. Fisher

DATE: 04/21/2021
INVESTOR: Hometap Investment Partners II

PROPERTY ADDRESS: 21597 Juego Circle, Unit 6D, Boca Raton, FL 33433

The undersigned Homeowner(s) agree if requested by Investor, or someone acting on behalf of Investor, to fully cooperate and adjust for clerical errors found in/on any documentation prepared and executed in connection with the consummation of your investment if deemed necessary or desirable in the reasonable discretion of the Investor.

The Homeowner(s) agree(s) to comply with any such requests within thirty (30) days from date of such requests. The provisions of this agreement shall survive the execution of the Investment.

Dated effective this 2021 day of April.

Larry E. Fisher

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re Larry Edward Fisher, Case No. 26-18759-MAM
Fisher v. Hometap Investment Partners II, L.P., et al.

# EXHIBIT N

March 10, 2026 PACE Notice of Right to Cure, FedEx material, and recorded PACE pages.

*Source pages follow in preserved order. Existing source-page exhibit identifiers and legacy packet-reference markings are retained for stable pinpoint citation; they do not alter the source document text.*

hometap

Date: March 10, 2026
FedEx Tracking: 889473027168

Larry Fisher
21597 Juego Circle, 6D
Boca Raton, FL 33433

# NOTICE OF RIGHT TO CURE DEFAULT

**Re: Hometap Investment No.: FL999199**
**Subject Property:** 21597 Juego Circle, 6D, Boca Raton, FL 33433

Larry Fisher:

This letter is in regards to the Hometap Option Purchase Agreement (the "Option Agreement") entered into by and between you and Hometap Investment Partners II, L.P. ("Hometap"), dated April 21, 2021, in the amount of $74,287.00.

Hometap received notification that you obtained a Memorandum of PACE Financing Agreement from Renew Financial Group LLC on September 18, 2025, in the amount of $10,117.12.

Please be advised that in Section 6.1(i)(ii) of the Option Agreement, you agreed not to obtain any investments in the Subject Property's equity during the Effective Period. The failure to comply with this requirement is considered an Event of Default pursuant to Sections 7.1(a), 7.1(b), and 7.1(h) of the Option Agreement.

Please provide Hometap with evidence that the Memorandum of PACE Financing Agreement from Renew Financial Group LLC has been paid in full and discharged, or contact homeowners@hometap.com to schedule a settlement of the Owner Repurchase. If you fail to cure this default within thirty (30) days of the date of this letter, Hometap may declare a default of the Option Agreement and exercise any of the rights and remedies as described in Section 7.2 of the Option Agreement.

Hometap Equity Partners, LLC
Attn: Servicing Dept
361 Newbury St, 5th Floor
Boston, MA 02115
homeowners@hometap.com

If you are currently experiencing difficulties in meeting this obligation, or wish to discuss this matter further, you may contact us at homeowners@hometap.com or 508-545-7971.

Sincerely,
Your Investment Support Team

ORIGIN ID:GBRA (617) 399-0624
HOMETAP EQUITY PARTNERS, LLC
361 NEWBURY STREET
5TH FLOOR
BOSTON, MA 02115
UNITED STATES US

SHIP DATE: 10MAR26
ACTWGT: 1.00 LB
CAD: 253261766/INET4535

BILL SENDER

TO **LARRY FISHER**
**21597 JUEGO CIRCLE, 6D,**

**BOCA RATON FL 33433**
(508) 545-7971 REF:
INV:
PO: DEPT:

58KJ3/7351/484B

FedEx Express

J261026012001uv

TRK# 0201 **8894 7302 7168**

**WED - 11 MAR 8:00P**
**STANDARD OVERNIGHT**
**RES**

**XA PHKA**

**33433**
**FL-US FLL**

---

After printing this label:
**CONSIGNEE COPY - PLEASE PLACE IN FRONT OF POUCH**
1. Fold the printed page along the horizontal line.
2. Place label in shipping pouch and affix it to your shipment.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

**CFN 20250335638**
**OR BK 36015 PG 901**
RECORDED 9/19/2025 12:35 PM
Palm Beach County, Florida
Pgs: 901 - 903; (3pgs)

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO

Renew Financial Group LLC
3000 Lava Ridge, Suite 210
Roseville, CA 95661

(Space above reserved for recorder)

NOT A CERTIFIED COPY

## MEMORANDUM OF PACE FINANCING AGREEMENT

Parcel Number: 00-42-47-20-02-000-0604

**NOTICE IS HEREBY GIVEN** that:
Pursuant to the requirements of Section 163.08 Florida Statutes, the Florida Green Finance Authority hereby gives notice that a non ad-valorem assessment has been levied against the Property described below pursuant to a Financing Agreement (the "Financing Agreement") entered into by Property Owner(s) Larry Fisher, Renew Financial Group LLC ("Renew Financial"); and the Florida Green Finance Authority on 08/11/2025.

The Financing Agreement facilitates the financing of renewable energy system(s), energy efficiency improvements, wind resistance improvements, and/or other improvements specifically permitted by Florida law, and the collection of the repayment obligation through a non-ad valorem assessment on the Property Owner's property tax bill. This recorded memorandum of Property Assessed Clean Energy ("PACE") Financing Agreement shall provide constructive notice that the assessment to be levied on the Property constitutes a lien of equal dignity to county taxes and assessments from the date of recordation.

QUALIFYING IMPROVEMENTS FOR ENERGY EFFICIENCY, RENEWABLE ENERGY, OR WIND RESISTANCE.—The property is located within the jurisdiction of a PACE local government that has placed an assessment on the property pursuant to Section 163.08, Florida Statutes. The assessment is for a qualifying improvement to the property relating to energy efficiency, renewable energy, or wind resistance.

The Financing Agreement is exempt from Florida's excise tax on documents under Section 201.24, Florida Statutes, and Florida Administrative Code Rule 12B-4.002(3)(a).

The Property along with the Improvements and the financing that is the subject of the Financing Agreement are described in Exhibit A attached hereto.

AUTHORITY: Florida Green Finance Authority
By: Renew Financial Group LLC, as Program Administrator

Name: Jose Avalos-Roman
Title: Authorized Signatory
Date: 08/11/2025

## EXHIBIT A
## DESCRIPTION OF PROPERTY, IMPROVEMENTS AND FINANCING

### Description of Property

| | |
|---|---|
| Application ID: | **460864** |
| Property Owner 1 Name: | Larry Fisher |
| Property Address: | 21597 JUEGO CIR # D<br>BOCA RATON, Florida 33433 |
| County: | Palm Beach |
| Municipality: | BOCA RATON |
| Parcel Number: | 00-42-47-20-02-000-0604 |
| Property Legal Description: | VISTAS OF BOCA LAGO COND UNIT 6-D |

NOT A CERTIFIED COPY

### Description of Improvements

Central Air Conditioner

### Description of Financing:

| | |
|---|---|
| Financed Amount: | $10,117.12 |
| Term of Financed Amount: | 15 Years |
| For questions contact: | Renew Financial<br>info@renewfinancial.com / 844-RENEWFI (844-736-3934)<br>3000 Lava Ridge, Suite 210<br>Roseville, CA 95661 |

CFN 20250335638
OR BK 36015 PG 903
Pg: 3 of 3



## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Placer )

NOT A CERTIFIED COPY

On 9/18/2025 before me, Eloina Perez Notary Public
(insert name and title of the officer)

personally appeared Jose Avalos Roman,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

ELOINA PEREZ
Notary Public - California
Placer County
Commission # 2398391
My Comm. Expires Apr 20, 2026

Signature ______________________ (Seal)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re Larry Edward Fisher, Case No. 26-18759-MAM
Fisher v. Hometap Investment Partners II, L.P., et al.

# EXHIBIT O

Recorded Assignment of Mortgage, CFN 20240314209, OR Book 35262, Pages 236-239, assigning the identified Mortgage to Hometap HEI Fund II SPV I, a Delaware statutory trust, c/o Wilmington Savings Fund Society, FSB, Trustee.

*Source pages follow in preserved order. Existing source-page exhibit identifiers and legacy packet-reference markings are retained for stable pinpoint citation; they do not alter the source document text.*

TI Height | Width | Zoom | In | Out | 90 | -90

CFN 20240314209
OR BK 35262 PG 236
RECORDED 9/11/2024 10:08 AM
Palm Beach County, Florida
Joseph Abruzzo, Clerk
Pgs: 236 - 239; (4pgs)

***After Recording Return To,***
***Recording Requested and Prepared By:***
Adam Jaskievic
Hometap Equity Partners, LLC
75 Arlington Street
Suite 500
Boston, MA 02116

Investment No.: FL999199

_______________ **[Space Above This Line For Recording Data]** _______________

**Investment Amount: $74,287.00**

CERTIFIED NOT A COPY

**ASSIGNMENT OF MORTGAGE**

In consideration of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Hometap Investment Partners II, L.P., a Delaware limited partnership, having an address of 75 Arlington Street, Suite 500, Boston, Massachusetts 02116, as secured party ("Assignor"), does hereby assign, without recourse, unto Hometap HEI Fund II SPV I, a Delaware Statutory Trust, whose has an address of c/o Wilmington Savings Fund Society, FSB, as Trustee, 500 Delaware Avenue, 11th Floor, Wilmington, Delaware 19801("Assignee"), all of the right, title and interest of Assignor in and to:

1. Mortgage and Security Agreement, dated April 21, 2021, made by Larry E. Fisher, a single man, securing an Option Purchase Agreement with an Investment Amount of $74,287.00 and recorded on July 1, 2021 as Instrument No. 20210306533 in the Public Records of Palm Beach County, State of Florida. * BK 32443 pg 856

The Mortgage and Security Agreement covers the premises located at 21597 Juego Circle, Unit 6d, Boca Raton, Fl 33433 and described in Exhibit A attached hereto and made a part hereof.

TOGETHER with the obligations described in the Mortgage and Security Agreement and the monies due and to become due thereon;

TO HAVE AND TO HOLD the same unto the Assignee and to the successors and assigns of the Assignee forever.

Item 44 of 49 | file 90a6973d-image.jpg | uploaded Sat Oct 17, 2026 06:16:31 PM ET

**Assignment of Mortgage 20240314209, page 2 of 4 (Page 237)**



**IN WITNESS WHEREOF**, intending to be legally bound, the Assignor has executed this Assignment of Mortgage as of the date below.

*[Signature Page Follows]*

NOT A CERTIFIED COPY

CFN 20240314209
OR BK 35262 PG 238
Pg: 3 of 4

**HOMETAP INVESTMENT PARTNERS II, L.P.**

By: ______________________

Name: Adam Jaskievic

Title: Authorized Signatory

Date: 7/17/2024

Acknowledgment Certificate

Commonwealth of Massachusetts

County of Suffolk

On this 17th day of July, 2024, before me, the undersigned notary public, personally appeared Adam Jaskievic, Authorized Signatory, proved to me through satisfactory evidence of identification, which was a drivers license, to be the person whose name is signed on the preceding or attached document in my presence, and acknowledged to me that he signed it voluntarily for its stated purpose, as an authorized signatory for Hometap Investment Partners II, L.P., a limited partnership.

______________________
Notary Public Signature

My commission expires

MYLINH PHAN
Notary Public, Commonwealth of Massachusetts
My Commission Expires August 28, 2026

NOT A CERTIFIED COPY

Item 46 of 49 | file 1905b191-image.jpg | uploaded Sat Oct 17, 2026 06:16:32 PM ET

**Assignment of Mortgage 20240314209, page 4 of 4 (Page 239), Exhibit A**

CFN 20240314209
OR BK 35262 PG 239
Pg: 4 of 4

## Exhibit A

Property Description

All that certain land situate in Palm Beach County, State of Florida, viz:

Unit 6-D, Vistas of Boca Lago, a Condominium, according to the Declaration of Condominium thereof, as recorded in Official Records Book 2495, Page 1, and all amendments thereto, of the Public Records of Palm Beach County, Florida, together with an undivided interest or share in the common elements appurtenant thereto.

Parcel ID / APN: 00-42-47-20-02-000-0604

NOT A CERTIFIED COPY

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF FLORIDA
# WEST PALM BEACH DIVISION

In re Larry Edward Fisher, Case No. 26-18759-MAM

Fisher v. Hometap Investment Partners II, L.P., et al.

# EXHIBIT P

Excerpts from RenewPACE Financing Documents for Application 460864, limited to the pages stating the annual assessment schedule and the estimated first payment due in November 2026.

*Noncontinuous excerpts only. The complete source packet is preserved separately. Source pages are reproduced without rewriting.*

RENEW FINANCIAL

| | | |
|---|---|---|
| Estimated Annual Non-Ad Valorem Assessment | I understand that my estimated annual non-ad valorem payment amount is: $1,334.64 | L.F. |
| Term & Schedules | I understand that the term of this financing agreement is 15 years. The payment schedule for the non-ad valorem assessment is annual. | L.F. |
| Interest & APR | I acknowledge that the interest charged is $1,116.59, and the estimated annual percentage rate is: 9.24%. | L.F. |
| Qualifying Improvements | A description of the qualifying Improvements financed:<br>HVAC, Central Air Conditioner | L.F. |
| Annual Costs | The total estimated annual costs that will be required to be paid under the assessment contract, including program fees is: $1,334.64 | L.F. |
| Monthly Costs | The total estimated average monthly equivalent amount of funds that would need to be saved in order to pay the annual costs of the non-ad valorem assessment, including program fees is: $111.22 | L.F. |

RENEW FINANCIAL

| | | |
|---|---|---|
| First Payment Due Date | The estimated due date of the first payment that includes the non-ad valorem assessment is: November **2026** | L.F. |
| Right to Cancel | I acknowledge that the financing agreement may be canceled within 3 business days after signing the financing agreement without any financial penalty for doing so. | L.F. |
| No Prepayment Penalty | I understand that I may repay any remaining amount owed, at any time, without penalty or imposition of additional prepayment fees or fines other than nominal administrative costs. | L.F. |
| Refinancing or Selling the Property | I understand that if I sell or refinance the residential property, I may be required by the mortgage lender to pay off the full amount owed under this financing agreement. | L.F. |
| Recording | I understand that the assessment will be collected along with my property taxes, and will result in a lien on the property from the date the financing agreement is recorded | L.F. |
| Savings Not Guaranteed | I understand and acknowledge that any potential utility or insurance savings are not guaranteed, and will not reduce the assessment amount under this financing agreement. | L.F. |

RENEW FINANCIAL

**Estimated Financed Amount Terms:**

The estimated schedule of the Estimated Annual Payments is based on the following assumptions:

| | |
|---|---|
| Total Products Cost | **$8,500.00** |
| Financing Costs | **$310.12** |
| Other Costs | **$190.41** |
| Capitalized interest (Prepaid Interest) | **$1,116.59** |
| Estimated First Payment Due Date | **November 2026** |
| Interest rate used to calculate the interest component of the Estimate Annual Payments | **9.24%** |
| Annual Percentage Rate ^ | **12.80%** |
| Term of Financed Amount | **15 years** |

^ The Annual Percentage Rate is interest plus certain other costs and fees over the term of the Financing expressed as a rate. This is not your interest rate.

# EXHIBIT Q

## November 10 Savannah Day email and November 11, 2026 Larry Fisher response

Supplied email-thread printout, reproduced in its entirety and original supplied order.

From: Larry F larryf2323@yahoo.com
Subject: Re: Settlement Statement - FL999199
Date: Nov 11, 2026 at 11:38:10 AM
To: homeowners@hometap.com
Cc: legal@hometap.com, Charles E. Stoecker cstoecker@hinshawlaw.com

---

Savannah,

I received your November 10 email.

In your October 22 email, you told me to direct questions about how my bankruptcy affects my options to Hometap's bankruptcy attorney. I have copied Mr. Stoecker. Please make sure the detailed response you promised is sent to both of us in writing.

Your October 22 response answered some of my questions, but it left others only partly answered or unanswered. I sent follow-up questions and asked you to respond in writing. Those questions were still outstanding when you wrote on November 10.

After months of trying to get clear answers about this agreement, the defaults Hometap says exist, and what they mean for my home, it is hard for me to rely on another promise that answers are coming. I have tried to understand Hometap's position, resolve the alleged defaults, and find a reasonable way forward.

I hereby renew and reaffirm my October 2, 2026 preservation notice in its entirety. Please preserve every document and communication from the very beginning of this transaction through the date of this email concerning me, my home, and FL999199. That includes emails, texts, letters, calls and recordings, agreements, account records, calculations, and communications or records held by Hometap's affiliated companies or outside service providers. This especially includes any recordings, notes, and records of my original sales conversations before I signed on April 21, 2021. If any of these records no longer exist, please tell me what they were and when they stopped being available.

Please make sure none of these records are deleted, changed, overwritten, or destroyed. Please confirm in writing that they are being preserved.

If Hometap had provided complete answers when I first asked, including the basis for its position that the Velocity judgment attached to my homestead, I might not have needed to bring this dispute to the Bankruptcy Court. Instead, I am spending more of my own money and using the Court's time to resolve an issue I tried to resolve directly with Hometap. This could have been avoided with timely, complete answers.

I intend to ask the United States Bankruptcy Court to determine the disputed rights under FL999199, where Hometap will have the opportunity to explain its positions and the defaults it says exist.

I am still willing to communicate with Mr. Stoecker and work toward a reasonable resolution.

Larry Fisher
FL999199

On Nov 10, 2026, at 6:33 PM, homeowners@hometap.com wrote:

Hello,

We will have a detailed response for you by the end of this week answering the questions you have. Thank you for your patience.

Best,
Savannah
--

**Savannah Day**
*Investment Support Manager*
(617) 604-6985 I hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** Larry F [larryf2323@yahoo.com]
**Sent:** 10/22/2026 12:43 PM
**To:** homeowners@hometap.com
**Cc:** cstoecker@hinshawlaw.com; legal@hometap.com
**Subject:** Re: Settlement Statement - FL999199

Savannah,

Thank you for your October 22 response. I have reviewed it and am responding in writing.

1. The settlement estimate

The figures and calculations you provided are completely different from how this arrangement was explained to me before I signed in 2021.

I do not agree that these figures reflect what I understood I was agreeing to. I reserve all of my rights and do not accept the estimate as an acknowledgment of any amount owed or the legal characterization of this transaction.

2. The defaults Hometap says remain open

Since 2024, Hometap has declared defaults involving my homeowner's insurance, the PACE assessment, the Velocity judgment, and my bankruptcy.

For each default you currently consider open, please identify the specific provision of my signed agreement on which Hometap relies, the facts supporting the alleged default, and what Hometap requires to resolve it.

PACE: I dispute that PACE remains an open default.

After the March 10 notice, I spoke with Hometap by telephone. During that conversation, I was asked whether the work improved the property. I explained that the air conditioning was necessary because, without it, the home could become moldy and unlivable.

I was asked to provide documentation. On March 16, I sent the Palm Beach County permit and HVAC paperwork, and Heather Adkins acknowledged receiving them.

My understanding from those communications was that Hometap would monitor whether the assessment was being paid. The assessment is billed with my property taxes, which are paid by my mortgage company through escrow. My property taxes are current.

I received no further indication that PACE remained an open default until September 3. Based on the March communications, I understood that the matter had been resolved.

Please explain specifically why Hometap considers PACE an existing default despite those communications, the documentation provided, and the current status of my property taxes.

Velocity: On September 1, I asked Hometap to identify where in the Velocity judgment it determined that the judgment attached to my home.

On September 3, Hometap sent me the judgment but did not identify where it established attachment to my property.

The judgment does not describe my home, and execution of the judgment was stayed by the state court. My property is also my Florida homestead.

I have repeatedly questioned Hometap's position that recording this judgment caused it to attach to my protected homestead.

Please identify the specific legal and factual basis for that position, including any authority Hometap relies upon to conclude that the judgment attached to

my property notwithstanding Florida's homestead protections.

Bankruptcy: Your October 22 email states that the bankruptcy default will be resolved once a dismissal or discharge has been formally filed in the bankruptcy court.

Please confirm that understanding in writing.

Please also confirm whether, assuming the other alleged defaults are resolved and my discharge is entered, Hometap will consider my account in good standing with no remaining existing default.

If Hometap maintains that it may still pursue foreclosure or another remedy based on these events, please identify the specific contractual provision and factual basis for that position.

3. Notices of Right to Cure

Please provide complete copies of both Notices of Right to Cure identified in your response:

- March 10, 2026 - PACE
- March 26, 2026 - Velocity

Please include the corresponding FedEx delivery confirmations showing the delivery dates, delivery addresses, and the names or signatures of the individuals who accepted delivery, if available.

4. The 30-day good-through period

On October 1, Jamie Akers offered to process a cash settlement using a 30-day good-through date.

Your October 22 response states that Hometap cannot provide a 30-day good-

through estimate.

Please explain why Hometap's position changed and whether there is any method by which I can obtain a written settlement amount valid for a defined period.

5. Preservation of records

In my October 2 email, I requested confirmation within fourteen days that Hometap had taken steps to preserve the records identified in that request.

Your response states that the request has been noted and that Hometap's legal team is aware of it.

That is not the same as confirming that preservation measures have actually been implemented.

Please confirm in writing whether Hometap has taken steps to preserve the identified records, including relevant records maintained by third parties on Hometap's behalf.

If any requested records are no longer available, please identify them and explain when and how they became unavailable.

As I explained in my October 2 email, I have spent months trying to obtain clear answers about this transaction, the alleged defaults, and Hometap's claimed rights concerning my home.

I have found it unusually difficult to obtain direct answers to specific questions. I would appreciate a complete written response to each numbered item above rather than another general reference to the agreement.

If Hometap does not provide clear and complete written answers, I intend to ask the United States Bankruptcy Court to resolve these questions.

Please respond in writing.

Larry Fisher
Agreement FL999199

**On Oct 22, 2026, at 11:05 AM, homeowners@hometap.com wrote:**

Hi Larry,

Thank you for your patience. Please see the written answers to your questions below.

Please note that Hometap is not able to provide a 30-day good-through estimate. What follows is a one-date estimate for illustration only. It is not a payoff quote, and it is not guaranteed for any future date.

**Assumptions you asked me to use**

- Hypothetical home value: $275,000 (not an appraised or AVM value)
- Settlement method: Cash, for illustration only
- Calculation date: October 22, 2026

**1. Hometap's estimated share and the applicable cap**

**Hometap Percentage**

Your investment has two set Share percentages, and which one applies depends on how your home's value has changed since your Beginning Home Value of $250,000:

- **49.525%:** This applies if the home has the same value or has appreciated, meaning the home value at settlement is higher than $250,000.
- **41.271%:** This applies if the home has depreciated, meaning the home value at settlement is lower than $250,000.

Because the hypothetical home value of $275,000 is higher than $250,000, the 49.525% applies in this estimate. Assuming you settled today, the Share calculation is:

Share = 49.525% × $275,000 (the hypothetical home value) = **$136,193.75**

**Hometap Cap**

The Cap is a 20% annualized return on your $74,287 investment amount, measured from your April 26, 2021 effective date. Assuming you settled today, the Cap would be $202,240.13, using the formula below:

$74,287.00 × 1.2 ^ (2,005 ÷ 365) = **$202,240.13**

(2,005 is the number of days between April 26, 2021 and October 22, 2026.)

**Hometap Share**

Under your agreement, you pay the lesser of the Share and the Cap. On these assumptions, were you to settle on 10/22/2026 the Hometap Share - the amount Hometap would receive - would be

**$136,193.75**.

**2. Additional fees, charges, advances, or adjustments**

Hometap currently shows no other fees, charges, advances, or adjustments, so no other amounts are included in the settlement estimate. If a physical appraisal is needed at the time of settlement, its cost would be your responsibility.

**3. Total estimated amount to settle and release Hometap's recorded interests**

The estimated settlement amount as of October 22, 2026, using an ending home value of $275,000, is **$136,193.75**. Please note that this is only an estimate, and the final settlement amount may vary.

**4. Differences between a home sale, refinance, and cash settlement**

The Share and Cap formulas are the same for all three. The valuation and the paperwork differ:

- **Home sale:** Requires the fully executed purchase and sale agreement. The sale price is generally used as the ending home value, checked against an AVM or physical appraisal to confirm it is within 90% of the Fair Market Value. All Hometap investments on the property must be settled at closing.
- **Refinance:** Requires a settlement date. We also ask for the loan type and lender category.
- **Cash:** Requires a settlement date.
- **Appraisals:** Where a physical appraisal is needed, Hometap initiates it through its third-party management company, as stated in your Option Purchase Agreement.
- **Fees:** We have no separate fee schedule by method.

**5. Defaults Hometap currently considers open**

Hometap has three open defaults:

- **PACE lien** (Florida Green Finance Authority/Renew), recorded September 19, 2025. Requirement: the lien must be paid off and released, or Hometap must otherwise confirm in writing that the default is resolved. The Notice of Right to Cure was sent via FedEx on 3/10/2026 and delivered on 3/13/2026. The Notice of Right to Cure describes the cure terms.
    - Resolution Options: Discharge/Satisfaction of the PACE agreement from the county public records or full settlement of the Hometap Investment.
- **Judgment lien** (Velocity Investments, LLC), recorded November 5, 2025. The Notice of Right to Cure was sent via FedEx on 3/26/2026 and delivered on 3/31/2026.
    - Resolution Options: Satisfaction/release of judgment lien from the county public records or full settlement of the Hometap Investment.
- **Chapter 7 bankruptcy** (Case No. 26-18759-MAM, filed July 2, 2026). This default is tied to the court proceeding. Questions about how it affects your options are handled by Hometap's bankruptcy counsel.
    - Resolution: Once a dismissal or discharge has been formally filed in the bankruptcy court. Any specific questions regarding the bankruptcy case should be directed to our attorney.

A previous insurance default was resolved on May 30, 2024.

Regarding your records preservation request, I have noted it, and Hometap's Legal team is aware of it since you included them in your email.

Please let me know if you have questions about any of this.

Thank you,

Savannah

--

Savannah Day
*Investment Support Manager*
(617) 604-6985 I hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** Homeowners@hometap [homeowners@hometap.com]
**Sent:** 10/2/2026 2:23 PM
**To:** larryf2323@yahoo.com
**Subject:** RE: Fwd: Settlement Statement - FL999199

Hello,

My name is Savannah Day and I am the manager of the Investment Support department. I will be providing you

with the information requested but I will need until Monday end of day to complete your request. Thank you for understanding.

Best,

Savannah

--

**Savannah Day**
*Investment Support Manager*
(617) 604-6985 | hometap.com
Book a meeting with me!

--------------- Original Message ---------------

**From:** Larry F [larryf2323@yahoo.com]
**Sent:** 10/2/2026 8:35 AM
**To:** homeowners@hometap.com
**Cc:** cstoecker@hinshawlaw.com; legal@hometap.com
**Subject:** Fwd: Settlement Statement - FL999199

Hello Jamie,

When I heard from you , I was hopeful that I would finally receive the information I have been requesting. I provided the information you asked for to prepare an estimate, but as of this email, I still have not received that estimate or answers to my remaining questions.

I have been trying for months to understand this agreement, the defaults Hometap says exist, and what it would take to resolve them. I have asked questions and followed up.

Without sufficient answers from Hometap, I cannot evaluate my options or figure out a way forward.

I am exploring what might be possible. I do not know whether I can arrange a settlement, but I would like to understand whether a resolution before discharge is possible.

As requested in my previous email, please use $275,000 as a hypothetical home value, cash for illustration only, and the

30-day good-through period you offered. Please provide:

1. Hometap's estimated share and the applicable cap, showing the formulas and calculation date.
2. Any additional fees, charges, advances, or adjustments, listed separately.
3. The total estimated amount required to settle the agreement and release Hometap's recorded interests.
4. Whether the amount, fees, valuation process, or requirements differ between a home sale, refinance, and cash settlement.
5. Which defaults Hometap currently considers open and what is required to resolve each one.

Please also address the additional questions you said you would answer.

This is a request for information so I can understand my options. I have not decided how or whether I can settle.

While these questions remain unresolved, please preserve all records relating to my transaction, FL999199, from the initial sales discussions through the present, including:

- Sales communications, recorded calls, transcripts, account notes, and the scripts, training materials, and

scenario calculations used in presenting the transaction to me.

- Application, underwriting, appraisal, valuation, and closing records.
- All versions of the agreement, Schedule A, mortgage, memorandum, and UCC documents, including delivery, signing, and electronic audit records.
- Customer portal documents and their upload, replacement, removal, and access histories.
- Communications and internal records concerning insurance, PACE, Velocity, bankruptcy, asserted defaults, cure requirements, and owner-equity calculations.
- Title searches, lien-monitoring records, and the report referenced in the August 13, 2026 email.
- Historical payoff estimates, cap calculations, calculation inputs, account ledgers, and records concerning my requests for answers and payoff information.
- Records identifying ownership, assignments, and servicing transfers.

Please keep electronic records in their original formats with associated metadata and prevent routine deletion or

overwriting of these materials, including relevant records held on Hometap's behalf.
I am asking that these records be kept intact, not that you send all of them to me now. Please acknowledge receipt and confirm within fourteen days that steps have been taken to preserve them. If relevant records are already unavailable, please identify them and explain when and how they became unavailable.
I remain open to receiving clear answers and finding a workable resolution. The next step depends on Hometap providing the information I have requested.

Please respond in writing.

Larry Fisher
Agreement FL999199

Begin forwarded message:

**From:** Larry F <larryf2323@yahoo.com>
**Date:** October 1, 2026 at 12:21:12 PM EDT

**To:** homeowners@hometap.com
**Subject: Re: Settlement Statement - FL999199**

Hi Jamie,

Thank you for getting back to me. I'm exploring my options, and I'm not sure yet whether I can make any of them work. I need an estimate so I can understand what might be possible.

Could you explain whether the amount, fees, valuation process, or requirements differ between a home sale, refinance, and cash settlement?

Please use $275,000 for the estimate, as that is relatively close to what I believe my home is worth. I understand that it is an estimate, not an appraised value. Please use the 30-day good-through period you mentioned.

If you need to select a method to generate the estimate, please use cash for illustration only. I haven't decided how or whether I can settle.

Please also address the additional questions you said you would answer.

Thank you,
Larry

On Oct 1, 2026, at 11:17 AM, homeowners@hometap.com wrote:

Hi Larry,

I was not able to locate an exit method in order to generate the Settlement State.

Could you please provide a good through date and confirm the method of settlement: Home Sale, Refinance, or Cash?

If the method is Home Sale, please provide a copy of the executed Purchase and Sale Agreement.

If you are refinancing and settling your Hometap Investment as part of the transaction, please specify the financing type (HELOC, HELOAN, Cash-out refinance, or other.) and the lender category (Bank, Credit Union, Non-Bank, or other.)

If neither of these options applies, we can process this as a **Cash** settlement with a 30-day good-through date.

Please let me know if you have any questions. We are here to help!

Thank you,
Jamie

Jamie Akers
*Investment Support Coordinator*
(617) 604-6985 I hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** Homeowners@hometap [homeowners@hometap.com]
**Sent:** 10/1/2026 10:36 AM
**To:** larryf2323@yahoo.com
**Subject:** RE: Fwd: One Final Clarification Regarding Velocity and the Bankruptcy Default

Hello Larry,

I wanted to confirm that we have received your request, and I will be working on your settlement statement. I will also address the additional questions you raised.

Please allow me a little time, and I will send this over to you shortly.

Thank you for being a part of the Hometap family, and please let us know if there is

anything else we can assist you with.

Thank you,
Jamie Akers

Jamie Akers
*Investment Support Coordinator*
(617) 604-6985 | hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** Larry F [larryf2323@yahoo.com]
**Sent:** 9/30/2026 2:00 PM
**To:** homeowners@hometap.com
**Subject:** Fwd: One Final Clarification Regarding Velocity and the Bankruptcy Default

Jazmyn

I'm trying hard finding a way to pay off my Hometap

investment . Please provide an updated payoff quote for FL999199, including any fees and the date through which it is valid. Could you also briefly explain how you calculated the amount?

i'm assuming you didn't get my last message, I don't think you'd avoid responding to a direct question like this. I included the last request in this email

Begin forwarded message:

**From:** Larry F <larryf2323@yahoo.com>
**Date:** September 15, 2026 at 11:15:31?AM EDT
**To:** homeowners@hometap.com
**Subject: Re: One Final Clarification Regarding Velocity and the Bankruptcy Default**

?

Jazmyn, one quick follow-up. I believe I previously updated my contact information with Hometap during my communications with Preston Evans, but to make sure there is no confusion going forward, my current phone number is

754-243-3337

I would still prefer that any substantive information regarding my account, payoff, defaults, or Hometap's position be provided to me in writing by email.

Thank you,
Larry Fisher

**On Sep 15, 2026, at 10:13?AM, Larry F <larryf2323@yahoo.com> wrote:**

**?**

Jazmyn, I know you had asked to speak by phone. I've held off because I'm frustrated enough with this situation that I don't think a phone conversation would be the best way for me to communicate right now. I try to be respectful, and I'd rather keep things in writing than risk saying something inappropriate out of frustration.

With that said, please provide me with a current payoff/settlement statement for my Hometap transaction. Please include:

- the total amount required to fully satisfy and release Hometap's interest;
- the home value used and the source/date of that valuation;
- the mortgage balance used in the calculation;
- the Hometap Share calculation and any cap calculation;
- all fees, charges, or other amounts included;
- whether any part of the amount is based on an Event of Default, including anything related to Velocity, PACE, or my bankruptcy;
- the contract provisions used to calculate the amount; and
- the date through which the payoff figure is valid.

I'm reviewing my options and need the figures in writing.

Thank you

Larry Fisher

On Sep 4, 2026, at 3:08?PM, homeowners@hometap.com wrote:

?

Hello,

I attempted to give you a call but the number we have on file for you is not in service. I think a phone conversation may be best at this point. Please give us a call when you are able. We

are available Monday - Friday 9AM-5PM EST at the number below.

We will not be available Monday 9/7 due to the holiday.

Thanks!

--

**Jazmyn Maxwell**
*Default Specialists*
(508) 545-7971 | hometap.com
Book a meeting with me!

--------------- Original Message ---------------
**From:** Larry F [larryf2323@yahoo.com]
**Sent:** 9/3/2026 10:12 PM
**To:** homeowners@hometap.com
**Subject:** Re: One Final Clarification Regarding Velocity and the Bankruptcy Default

Hi Jazmyn,

Thank you for responding. I genuinely appreciate your continued help.

Jazmyn, seriously, let's be real here. My frustration is not with you personally, and I don't want you to take it that way. I've been dealing with this back and forth with Hometap for months. Every time I think I'm finally getting somewhere, something else comes up.

I'm tired of this mindfuck. I just want to know exactly where I stand with Hometap and with my home.

First it was my homeowner's insurance. Then it was PACE. Then it was the Velocity judgment. Hometap's default notice and cure demand over Velocity, and my concern about what could happen to my home, were the main reason I ended up filing Chapter 7 trying to resolve the problem.

Then I learned that the bankruptcy itself was another default.

Now I'm being told PACE went back into default.

I thought the PACE issue had been resolved months ago. Hometap asked me for additional documentation, I provided what was requested, and based on the response I received, I believed that issue had been addressed.

Was I wrong in believing that? If I was, please help me understand what happened.

Seriously, what is next?

Hometap keeps telling me this is an investment and not a loan. **What kind of investment acts like this?**

At this point, do I need Hometap's permission to go to the bathroom in my own home too?

I'm making a joke, but the underlying question isn't a joke. How am I supposed to know where I stand when something I believed had already been resolved can suddenly become a default again?

And that brings me back to the Velocity judgment you sent me.

Please help me understand this because I honestly don't see it. **Where on that document does it show that the judgment lien attached to my property? Can you please point me to the exact place on the document that says that?**

I've looked at it several times. I see the judgment against me, and I see where the judge says execution of the judgment is stayed, but I don't see anywhere on that document where it says the judgment attached to my home.

**What am I missing?**

This is another example of what I mean when I say I'm getting information piecemeal. I asked for the judgment and I asked to be shown where Hometap saw that it attached to my property. I received the judgment, but I still didn't get the other part of the answer.

I ask a direct question, get part of an answer, and then have to send another email to get the rest. By the time I get that answer, another question or another default seems to appear.

**Why is it so hard to get a freaking answer to a direct question?**

And I need to ask you something directly because I honestly don't know what else to think.

Are there certain things Hometap prohibits you from telling me or certain questions you're simply not permitted or authorized to answer? Is there something you're not permitted to tell me?

If there is, please just tell me that. I'm not asking you to violate company policy or tell me something you're not authorized to disclose. If there are questions you can't answer, I can understand that.

But if that's not the problem, please help me get complete answers.

So let me try to put this as simply as I can:

1. Is Hometap currently saying that PACE is an existing default and that I will remain in default until it is paid in full and released — yes or no?
2. Was I wrong in believing the PACE issue had been resolved after I provided the additional documentation Hometap requested? If I was, please explain what happened.
3. Once the Velocity issue is resolved, my Chapter 7 is discharged, and whatever Hometap currently requires concerning PACE is resolved, will Hometap consider me in good standing with no other existing default — yes or no?
4. Once those things are resolved, does Hometap intend to pursue foreclosure or any other remedy against my home based on any of these matters — yes or no?

thread::qesnl2waC_WB5_YvEo_2DxA::